Document Accession #: 20030915-3004   Filed Date: 09/15/2003

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION
104 FERC ¶ 61,295

Before Commissioners:  Pat Wood, III, Chairman;
William L. Massey, and Nora Mead Brownell.

Wisconsin Public Service Corporation     Project Nos. 2525-044, 2525-046, and 2525-051; Project Nos. 2546-063, 2546-064, and 2546-068; Project Nos. 2560-040, 2560-042, and 2560-047; Project Nos. 2522-066, 2522- 068, and 2522-074; and Project Nos. 2595-058, 2595-060, and 2595-065

ORDER GRANTING MOTIONS TO INTERVENE, REINSTATING
REQUEST FOR REHEARING, GRANTING REHEARING IN PART,
AND GRANTING WITH CONDITIONS APPLICATION  TO AMEND
PROJECT BOUNDARIES

(Issued September 15, 2003)

1.      This order deals with an application  by Wisconsin Public Service Corporation (Public Service) to amend the project boundaries of five of its projects to remove 9,738 acres of land, of which the licensee is conveying to the State of Wisconsin 174 acres for inclusion in a state park and 9,175 acres for inclusion in a state forest.  The remaining 389 acres are earmarked for private development.  The order grants the application,  with certain conditions.

**BACKGROUND**

2.      Public Service is the licensee for six hydroelectric  projects located along a sixty-mile reach of the Peshtigo River in Marinette and Oconto Counties, Wisconsin, all of which were relicensed in 1997.  This proceeding deals with the 6.4-megawatt (MW) Caldron Falls Project No. 2525, the 3.8-MW Sandstone Rapids Project No. 2546, the 1.4-MW Potato Rapids Project No. 2560, the 3.5-MW Johnson Falls Project No. 2522, and the 7.0-MW High Falls Project No. 2595 (collectively,  the Peshtigo River Projects).[1]

3.      The Peshtigo River projects include a total of 13,417 acres within their project boundaries.  Under the terms of the current licenses, Public Service is required to

---

[1]     See 79 FERC ¶ 62,218 (Potato Rapids); 79 FERC ¶ 62,219 (Caldron Falls); 79 FERC ¶ 62,220 (Peshtigo); 79 FERC ¶ 62,221 (Sandstone Rapids); 79 FERC ¶ 62,222 (Johnson Falls); 79 FERC ¶ 62,223 (High Falls).  The sixth project is the 0.6-MW Peshtigo Project No. 2581.

Exhibit 2
Page 1 of 107

Document Accession #: 20030910-3004    Filed Date: 09/19/2003

Project  No. 2525-044, et al.                                                                          - 2 -

maintain a 200-foot buffer zone around project reservoirs and shoreline recreation areas in order to protect natural resources in these areas.

4.      By order issued December 20, 2001, the Director of the Division of Hydropower Administration  and Compliance of the Commission's Office of Energy Projects (OEP) granted Public Service's request for authorization  to transfer fee title to 5,740 acres in the Peshtigo River Projects to the Wisconsin Department of Natural Resources (Wisconsin DNR), but directed the company to file a separate amendment application  with respect to its request to delete the lands from the project boundaries. [2]  The Director stated that until the Commission approved the revised project boundaries,  the land to be sold would remain within the boundaries,  and Public Service would retain all necessary rights to operate the projects as required by the project licenses and the Commission's regulations.

This directive was consistent with Public Service's understanding: [3]

> The proposed conveyances  will not change [Public Service's] responsibility  to assure that the conveyed property is used and managed in accordance with the hydropower licenses and the approved land, resource and recreation plans. . . .  Thus, the 2001 conveyances  will change only the titleholder  of the property.  The land itself will continue to be used and

---

[2]      Wisconsin Public Service Co., 97 FERC ¶ 62,257 (2001).  The Director's order was in response to Public Service's filing of November 6 and filings of November 14, 2001 (one dated November 13, the other dated November 14).  The filings (1) applied to amend the project boundary to remove lands to be conveyed; (2) asserted the company's authority, under the standard land use article of its licenses, to convey the lands without prior Commission approval, and asked for Commission confirmation  of this authority; and (3) stated that, pursuant to the proposed conveyance instruments,  Wisconsin DNR would manage the conveyed land according to the Commission- approved project management plans for recreation,  land and wildlife, and historic resources until the Commission amended the licenses to remove the lands from the project boundary.

The Director's order did not address the question of whether Public Service had the authority to convey the lands without prior Commission approval.  The company does not have such authority.  The standard land use article authorizes licensees to convey, for certain specified purposes, no more than five acres of project lands in one transaction, and no more than a total of 50 acres each year.  See Article 413 of the Potato Rapids and High Falls Projects, Article 414 of the Johnson Falls Project, Article 415 of the Sandstone Rapids Project, and Article 416 of the Caldron Falls Project.

[3]      Public Service filing of December 14, 2001, at 2.  This filing followed a meeting, referenced in the December 14 filing, between the company and Commission staff.

Exhibit 2
Page 2 of 107

Document Accession #: 20030910-3904

Project No. 2525-044, et al.                                                      - 3 -

managed in the same manner that it has been in the past, unless and until the Commission orders the licenses amended to remove property that is not necessary for project purposes from the project boundaries.

5.      River Alliance[4] filed a motion to intervene and request for rehearing of the Director's December 20, 2001 order.[5]  Public Service filed an answer opposing the motion to intervene, arguing that River Alliance lacks a direct interest in the proceeding because the conveyed lands will continue to be managed in the same manner as before the conveyance.[6]  On February 22, 2002, the Commission Secretary rejected River Alliance's request for rehearing as untimely.[7]  On March 4, 2002, River Alliance filed a request for rehearing of the February 22 rejection notice.

6.      On June 17, 2002, Public Service filed an application to amend the Peshtigo River Project licenses to remove from the project (1) 5,321 acres[8] whose conveyance the Director's December 20, 2001 order approved, (2) the 389 acres Public Service intends to use for development purposes, and (3) 4,028 additional acres that it intends to convey to Wisconsin DNR in the future; and to revise the project boundaries accordingly.  This would remove a total of 9,738 acres from the project, leaving 3,269 acres within the boundaries, of which about 410 acres are "upland," i.e., not inundated.  Public Service proposes to retain a 100-foot buffer zone around the project reservoirs, as opposed to the 200-foot buffer required by the current licenses.  Public Service asks for approval of phased deletions of project lands, to coincide with its phased conveyance schedule.

7.      Public notice of the company's June 17, 2002 application was issued on June 26, 2002, with an intervention/comment deadline of July 31, 2002.  Timely motions to intervene were filed by River Alliance (July 16, 2002), the Department of the Interior (July 29, 2002), and Wisconsin DNR (July 30, 2002).  Interior also filed comments on

---

4       River Alliance is a coalition of groups and individuals whose interest is the protection and enhancement of Wisconsin rivers.

5       Where, as here, there is no public notice of an application, a person who is aggrieved may file a motion to intervene, which will be timely if it is filed no later than the deadline for requests for rehearing of an order issued in the proceeding.  See Great Northern Paper, Inc., 88 FERC ¶ 61,042 at 61,108 (1999).

6       Public Service filing of January 23, 2002.

7       98 FERC ¶ 61,185 (2002).

8       After the Director approved the conveyance of 5,740 acres, the parties made revisions to their agreement, with the result that 5,321 acres were sold to Wisconsin DNR in what the parties call the phase one conveyances.

Exhibit 2
Page 3 of 107

Project  No. 2525-044, <u>et</u> <u>al.</u>                                                                              - 4 -

July 25, 2002, stating that its Fish and Wildlife Service (FWS) is supportive of the proposed amendments,  but that both FWS and Interior's National Park Service recommend a 200-foot buffer strip between the water's edge and any proposed development.   The Park Service also supports local efforts to purchase for protection the 389 acres Public Service proposes to be developed.  On August 1, 2002, Public Service filed an answer opposing River Alliance's motion to intervene, again arguing that the

Alliance has not established  its interest in the proceeding. [9]

8.        Commission staff has prepared an environmental  assessment (EA) of the impacts of Public Service's proposed amendment.  The EA is attached to this order.

---

[9]       Public Service also asserts that Rivers Alliance has not given the legal or factual basis for some of its positions, as required by the Commission's intervention  regulations, 18 C.F.R. § 385.214(b) (2003).  However, the rule requires a statement of the basis in fact and law for the movant's position only "to the extent known."

Exhibit 2
Page 4 of 107

Document Accession #: 20030910-3004

Project  No. 2525-044, et al.                                    - 5 -

## DISCUSSION

### A.  The Director's Order Authorizing  Conveyance of Interests in Project Lands

#### 1.  River Alliance's Motion to Intervene

9.     We grant River Alliance's January 22, 2002 motion to intervene in the proceedings involving Public Service's application  for permission to convey interests in project lands. River Alliance states that its members fish, boat, camp, and otherwise recreate on the Peshtigo River, and may be affected by changes in the licenses for the affected projects. This is a sufficient interest to justify intervention.

#### 2.  River Alliance's March 4 Request for Rehearing of the Rejection of its Rehearing Request

10.     The Secretary notice rejecting River Alliance's request for rehearing of the Director's December 21, 2001 order stated that, pursuant to Section 313(a) of the Federal Power Act (FPA), 16 U.S.C. § 825l(a), requests for rehearing must be filed within 30 days of issuance of a Commission order.  Thus, requests for rehearing of the Director's order were due by January 22, 2002.[10]  The notice stated that River Alliance's request for rehearing was filed on January 23, 2002,[11] and therefore rejected the filing as late.

11.     In its March 4 request for rehearing of the Secretary's rejection notice, River Alliance explains that it first sent its request for rehearing on January 11, 2002, by priority U.S. Mail.  When it learned that the filing had not yet arrived at the Commission, River Alliance resent the pleading via Federal Express.  Attached to its March 4 request for rehearing is confirmation  from Federal Express that the package was received by the Commission on January 22.

12.     River Alliance has demonstrated  that it timely filed its request for rehearing of the Director's order.  We therefore reinstate its January 22 request for rehearing.

#### 3.  River Alliance's January 22, 2002 Request for Rehearing of the Director's December 21, 2001

---

10     Monday, January 21, was a federal holiday (Martin Luther King, Jr.'s birthday); therefore, the deadline was the next business day, Tuesday, January 22.  See 18 C.F.R. § 385.2007(a)(2) (2003).

11     The Secretary's file stamp indicated that the pleading was received on      January 23, 2002.

Exhibit 2
Page 5 of 107

Project No. 2525-044, et al.                                                                    - 6 -

## Order

13.     River Alliance seeks reversal of the Director's order authorizing Public Service to convey fee title to 9,738 acres at the Peshtigo River Projects. Alliance argues that these lands are needed for project purposes, and that Public Service should continue to administer them pursuant to the licenses' management plans, rather than transferring them to Wisconsin, which may change how they are managed.[12] River Alliance also asserts that Public Service's proposal to convey these lands should have been subject to public notice and a hearing.

14.     It is useful to review the meaning, in this context, of the terms "project lands" and "project boundaries." Part I of the FPA directs the Commission, when issuing a license for a hydroelectric project, to require the licensee to undertake appropriate measures on behalf of both developmental and non-developmental public interest uses of the waterway, including fish, wildlife, and recreation.[13] These requirements, as set forth in a

---

[12]     The Alliance also argues that Public Service lacks authority under the standard land use article of its licenses to convey the interests in project property without prior Commission approval. We addressed this point above, in n. 2.

[13]     FPA Section 10(a)(1), 16 U.S.C. § 803(a)(1), states:

> That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the improvement and utilization of waterpower development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public purposes, including irrigation, flood control, water supply, and recreational and other purposes referred to in Section 4(e); and if necessary in order to secure such plan the Commission shall have the authority to require the modification of any project and of the plans and specifications of the project works before approval.

Section 4(e) of the FPA, 16 U.S.C. § 797(e), states in part:

> In deciding whether to issue any license under this Part for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental

Exhibit 2
Page 6 of 107

Project  No. 2525-044, et al.                                                                        - 7 -

license, constitute the "project purposes."

15.    Standard license Article 5 requires the licensee to acquire and retain all interests in non-federal lands and other property necessary or appropriate to carry out project purposes.[14]  The license may obtain these property interests by contract or, if necessary, by means of federal eminent domain pursuant to FPA Section 21.[15]  A licensee's property

_____

quality.

14    Standard Article 5 appears in what are called "L-Forms," which are published at 54 FPC 1792-1928 (1975) and are incorporated into project licenses by an ordering paragraph.  See 18 C.F.R. §  2.9 (2003).  Article 5 states in pertinent part:

> The Licensee, within five years from the date of issuance of the license, shall acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction, maintenance, and operation of the project.  The Licensee or its successors and assigns shall, during the period of the license, retain the possession of all project property covered by the license as issued or as later amended, including the project area, the project works, and all franchises, easements, water rights, and rights of occupancy and use; and none of such properties shall be voluntarily sold, leased, transferred, abandoned, or otherwise disposed of without the prior written approval of the Commission, except that the Licensee may lease or otherwise dispose of interests in project lands or property without specific written approval of the Commission pursuant to the then current regulations of the Commission.  . . .

The Commission has regulatory authority only over the licensee, and thus can administer and enforce the terms of the license only through the licensee and the licensee's property rights.

15    16 U.S.C. § 814.  Section 21 states in part:

> That when any licensee can not acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the Commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain . . . .

Courts have held that Section 21 is available to obtain not only lands necessary for the dam, reservoir, and other project works, but also lands for other project purposes,

Exhibit 2
Page 7 of 107

Document Accession #: 20030916-3004     Filed Date: 09/15/2003

Project  No. 2525-044, et al.                                                                 - 8 -

interests can range from fee simple to perpetual or renewable leases, easements, and

rights-of-way.[16]  If the licensee wishes to convey any of its interests in project property, Article 5 requires it to obtain the Commission' s approval.

16.     Project boundaries are used to designate the geographic extent of the lands, waters, works, and facilities that the license identifies as comprising the licensed project and for

which the licensee must hold the rights necessary to carry out the project purposes.[17]  A

---

including recreation.  See, e.g., Louisiana v. Sabine River Authority, 524 F.2d 934 (5th Cir. 1975); Alabama Power Co. v. Curry, Ala., 420 So.2d 48 (1982).

[16]     Thus, title to lands within the boundary can be owned by someone other than the licensee, so long as the licensee holds the necessary property interests (e.g., flowage easements) and permits (e.g., a Forest Service special use permit) to carry out licensed project purposes.  The license covers only those property interests held by the licensee; each license with a project boundary states (in an ordering paragraph) that "[t]he project consists [inter alia] of (1) All lands, to the extent of the licensee's interests in those lands, enclosed by the project boundary shown by [a designated exhibit] . . . ."  Thus, neither the Commission nor the licensee can interfere with the property interests of the non- licensee.

If the Commission requires additional control in order to accomplish a project purpose, or amends the license to expand or add a project purpose, it can direct its licensee to obtain any necessary additional property rights, whether inside or outside the existing project boundary, and amend the boundary as appropriate.  See, e.g., FPL Energy Maine Hydro LLC, 88 FERC ¶ 61,116 at 61,274 (1999); PacifiCorp,  80 FERC ¶ 61,330 at 62,113-14 (1997); Great Northern Paper, Inc., 77 FERC ¶ 61,066 at 61,247-48 (1996); Niagara Mohawk Power Corp., 77 FERC ¶ 61,306 at 62,391 (1996); Georgia Power Co., 32 FERC ¶ 61,237 (1985).  If the Commission determines that less land is needed to meet project purposes, or if it redefines project purposes, it can remove land from the boundary.

[17]     Until 1986, the FPA did not mention project boundaries,  although they were implicitly needed for purposes of FPA Section 24, 16 U.S.C. § 818 (power site withdrawals),  and FPA Section 10(e), 16 U.S.C. § 803(e) (annual charges for use of federal lands), and useful for purposes of FPA Section 4(f), 16 U.S.C. § 797(e) (public notice in local newspapers).  Section 14 of the Electric Consumers Protection Act of 1986 (ECPA) amended FPA Section 9 to require an applicant for an original license to make a good-faith effort to notify owners of lands "within the bounds" of the proposed project.  Section 4 of ECPA amended FPA Section 15 to require an incumbent relicense applicant to identify federal and Indian lands located within the project boundary, and the fees paid under the FPA for project occupancy of such lands.

Exhibit 2
Page 8 of 107

Project No. 2525-044, et al. - 9 -

project boundary does not change property rights, nor does the conveyance of a property right change a project boundary.[18] If a licensee wishes to remove lands from a project – i.e., from the Commission's regulatory control as defined in the project license – it files an application to delete the lands from the license and from the project boundary.[19]

17.    Any transfer by a licensee of an interest in land that is and will remain in the project is authorized or will be approved only if the non-project use for which the interest is being conveyed will not interfere with project purposes, including the protection and enhancement of environmental values. Conditions to this end are required covenants to conveyances authorized by the standard land use article, and are imposed in Commission approvals as appropriate, so that the Commission, through its licensee, can enforce the conditions and protect the project.[20]

_____

The Commission's regulations have required project boundaries for licensed projects since early in its history. See, e.g., the 1938 regulations of the predecessor Federal Power Commission (Commission), which required (at Section 4.41, Exhibit K) a detail map showing "the project area and the project boundary." This regulation also stipulated that the project boundary was to be no more than 200 feet (horizontal measurement) from the exterior (high-water level) margin of reservoirs. The current regulations require boundaries for projects over 1.5 MW (major projects) (18 C.F.R. §§ 4.41(h)(2) and § 4.51(h)(2)), but do not require boundaries for projects under 1.5 MW (minor projects) (18 C.F.R. § 4.61(f)), unless they contain federal land. The current regulations continue to stipulate a project boundary no more than 200 feet from the exterior margin of reservoirs, but make an exception where additional lands are "necessary for project purposes, such as recreation, shoreline control, or protection of environmental resources."

18    See, e.g., Niagara Mohawk Power Corp., 77 FERC ¶ 61,306 (1996). Property rights are governed by state law, whereas project boundaries are determined by the Commission.

19    These are applications to amend the license by revising the license's description of project lands and the exhibits showing the project works and (if applicable; see n. 17, supra) boundaries (both referenced in a license's ordering paragraphs). See 18 C.F.R. §§ 4.200 - 4.202 (2003).

20    The standard land use article (referenced in n. 2, supra), which delegates to licensees the authority to convey property interests for certain minor non-project uses of project lands and waters, tracks these principles. See, e.g., Article 416 of the license for the Caldron Falls Project No. 2525, 79 FERC ¶ 62,219 at 64,686-87. Paragraph (a) provides that:

Exhibit 2
Page 9 of 107

Project No. 2525-044, et al. - 10 -

18.    Any application to remove lands from a project boundary will be approved only if the Commission determines that the land is no longer necessary or appropriate for project purposes; that is, that all project purposes will continue to be satisfied in the absence of the lands at issue. If the Commission deletes a parcel of land from the project and its boundary, the Commission is placing that land outside of its jurisdiction and regulatory reach. As a consequence, it can neither impose nor enforce any conditions on that removal, including any covenants running with the land.

19.    It follows that if the land in question has already been the subject of the licensee's transfer of property rights, with attendant covenants, then once the land is removed from the project the Commission cannot, either directly or through its licensee, enforce such covenants.[21] This means that if the ineffectiveness of the covenants to limit activities on

_____

the Licensee shall have the authority to convey certain interests in project lands
and waters for certain . . . types of use and occupancy, without prior Commission approval. The Licensee may exercise the authority only if the proposed use and occupancy is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project. [The developmental project purposes are already protected by the very limited nature of the authority delegated to the licensee.] For these purposes, the Licensee shall also have continuing responsibility to . . . monitor the use of, and ensure compliance with the covenants [in Paragraph (e)(3)] of the instrument of conveyance for, any interests that it has conveyed under this article. . . . [I]f a covenant of a conveyance made under the authority of this article is violated, the Licensee shall take any lawful action necessary to correct the violation. . . .

Paragraph (e)(2) requires the licensee to determine that the proposed use of the lands to be conveyed (pursuant to Paragraph (d)) is not inconsistent with any approved Exhibit R (recreation plan) or that the lands to be conveyed do not have recreational value.

Paragraph (d)(3) requires that the instrument of conveyance contain three covenants: (I) that the use of the lands shall not endanger health, create a nuisance, or otherwise be incompatible with overall project recreational use; (ii) that the grantee's activities will not harm the scenic, recreational, and environmental values of the project; and (iii) that the grantee shall not unduly restrict public access to project waters.

21    The standard land article addresses the distinction. Paragraph (f) states:

The conveyance of an interest in project lands under this article does not in itself change the project boundaries. The project boundaries may be changed to exclude land conveyed under this article only upon approval of revised Exhibit G

Exhibit 2
Page 10 of 107

Project No. 2525-044, et al. - 11 -

the removed land could lead to adverse effects on project purposes, then either the license should be amended to require appropriate mitigation for such potential adverse effects,[22] or the Commission should deny in part or in whole the application to remove the land in question.[23]

20.    When a licensee wishes to remove a parcel of land from the project and sell it, the licensee should file an application to amend the project license to delete the land from the project boundary. If the Commission finds that the licensee has demonstrated that the land is not (or no longer) needed for project purposes, the land will be deleted from the project license and boundary, after which the licensee is free to sell or otherwise dispose of the land without any involvement by the Commission.

21.    For its phase one conveyances, Public Service applied both to remove certain

---

or K drawings (project boundary maps) reflecting exclusion of that land. Lands conveyed under this article will be excluded from the project only upon a determination that the lands are not necessary for project purposes, such as operation and maintenance, flowage, recreation, public access, protection of environmental resources, and shoreline control, including shoreline aesthetic values. . . .

The article does not address the fate of covenants placed on the conveyance of the interest in project lands. However, it appears that the Commission did not intend that land removed from the project would be subject to such covenants. In the early 1970s the Commission issued two notices of a proposed rulemaking to codify standards for the approval of conveyances of interests in project lands. The second notice proposed a regulation establishing covenants in such conveyances, "[u]nless the land to be conveyed is shown to be no longer necessary for project purposes . . . ." See Disposal of Interests in Project Lands, and Applications for Certain Uses of Project Property Requiring Commission Approval (Docket No. R-417), 38 F.R. 21652 (Aug. 10, 1973) (proposed Section 2.15(a)). The rulemaking docket was subsequently terminated as unnecessary, in light of the Commission's development of the first version of the standard land use article, which the Commission staff sent to all licensees on November 7, 1974. See Termination of Various Proposed Rulemaking Proceedings, 8 FERC ¶ 61,025 at 61,068-69 (1979).

22    See New York State Electric & Gas Corp., 102 FERC ¶ 61,086 at 61,234 (2003), requiring licensee to undertake certain measures at the project to mitigate for new use on land deleted from project boundary.

23    See, e.g., Marquette Board of Light and Power, 101 FERC ¶ 62,014 (2002).

Exhibit 2
Page 11 of 107

Document Access Case 3:22-cv-00533-SI Document 69-2 Filed 09/13/24 Page 12 of 107
Document Accession #: 20090916-3004 Filed Date: 09/15/2003

Project No. 2525-044, et al. - 12 -

lands from the projects' boundaries and to obtain Commission approval of the conveyance to Wisconsin of fee title to the lands.[24] Thus, Public Service was simultaneously proceeding down two different tracks. The Director's order, instead of addressing the threshold issue of whether the lands could appropriately be deleted from the project,[25] approved the conveyances with the interim requirement that the lands may only be occupied and used in the manner prescribed by the project licenses.[26] The order thus deferred to a later proceeding the real issues, which are whether the acres there at issue must be retained in the project in order to meet licensed project purposes, and, if this question is answered in the affirmative, whether the project purposes may be revised to accommodate the land removal.

22. We turn now to Public Service's June 14, 2002 application to amend the Peshtigo River Projects to remove the lands at issue from the licenses and, therefore, from the project boundaries.

---

24 See n. 2, supra. In connection with its proposed phase two and phase three conveyances, Public Service correctly applied only to delete the affected lands from the project boundary.

25 Public Service's application had stated, without elaboration, that the lands "are not needed for project purposes." November 14, 2001 filing (dated November 14) at 2. The Director's order stated that the proposed conveyances were in the public interest, but contained no discussion or findings as to whether the lands to be conveyed were needed for project purposes. Both Public Service and the Director asserted instead the public benefit of placing land in a state park and forest.

26 The Director's order did not articulate the standard for granting a proposed conveyance of an interest in lands that are in and will remain in the project: that the proposed use of the lands to be conveyed is not inconsistent with any licensed project purpose, including recreation.

Exhibit 2
Page 12 of 107

Project  No. 2525-044, et al.                                                                          - 13 -

### B.        Application to Revise Project Boundaries

#### 1.        River Alliance's Motion to Intervene

23.      For the reasons already stated with respect to River Alliance's other motion to intervene, we grant River Alliance's July 16, 2002 motion to intervene in the proceeding involving Public Service's request to convey interests in project lands.

#### 2.        The Application

24.      Public Service asks the Commission to approve the removal of the 9,738 acres from the Peshtigo River Projects in three phases:  Phase I, involving 5,321 acres to be sold to Wisconsin DNR and the 389 acres to be reserved for development;  Phase II, involving 541 acres to be sold to Wisconsin DNR; and Phase III, involving 3,487 acres to be sold to Wisconsin DNR.  See EA at Table 1.  Public Service asks that the Commission authorize it to complete Phase I now, and to approve Phases II and III, contingent upon the closing of future sales of the acreage involved.

25.      Public Service's application  states that the land it proposes to remove is not needed for current or future hydroelectric  generating purposes.[27]  However, it does not discuss why such land is not needed for any project purposes, including recreation.  Located on lands proposed to be removed are a number of licensed recreation facilities,  including boat launches, snowmobile trails, fishing areas, hiking trails, and campsites.[28]

26.      In its motion to intervene, River Alliance opposes Public Service's application, asserting that the licensee should not be relieved of its land management responsibilities for nearly three-quarters of Peshtigo River Project lands, and that to remove the lands from the projects would be to "disrupt" the balance between the developmental  and non-developmental  project purposes that was arrived at when the projects were relicensed only a few years ago.[29]

---

27      June 14, 2002 application  at 4.  Public Service also states that it will retain flowage rights on some of the transferred  lands.  Lands for which the licensee retains flowage rights must remain in the license.

28      See EA, Tables 4-8, showing which project recreation facilities Public Service proposes to transfer and which it proposes to retain.

29      July 16, 2002 filing at 2.  River Alliance asserts that the land transfers will result in the people of the State of Wisconsin, rather than Public Service, having to bear the cost of maintaining  the lands.  While the amount of cost-shifting, if any, is not clear, since Public Service's ratepayers presumably would receive some benefit from any savings realized by

Exhibit 2
Page 13 of 107

Project No. 2525-044, et al.                                                                     - 14 -

27.    As we discuss below, the licensee is not being relieved of its responsibilities to protect the reservoir shorelines, and is being required to keep in the project boundary the boat landings, town park, campsites, and portage that are located on Public Service-owned lands it seeks to remove. However, River Alliance's filing raises the question of how the Commission can find, as it must, that a project it licenses is "best adapted to a comprehensive plan" for improving or developing a waterway for developmental and environmental public interest uses,[30] and then, a few years later, amend the license to remove most of the project lands, yet still find, as it must,[31] that the project is still best adapted to a comprehensive plan for beneficial public uses.

28.    As noted above, in order to approve an application, such as the one at hand, to remove lands from project boundaries, we must determine that the land is no longer necessary or appropriate for project purposes. In this case, our analysis is somewhat constrained by the fact that Public Service provided no detail in its 1991 relicense applications, in its 1998 recreation plan, or in its applications in the current proceedings as to the reasons for the lands at issue being either included in or withdrawn from the project boundaries. Likewise, neither the 1998 relicense orders, nor the August 13, 1998 order approving the projects' recreation enhancement plans,[32] nor the December 20, 2001 order provides guidance on this matter. We expect licensees seeking to remove lands from project boundaries to provide substantial evidence demonstrating why the public interest no longer requires that those lands remain within the boundary. Likewise, license applicants are to demonstrate why lands proposed for inclusion within project boundaries are necessary or appropriate for project purposes.

29.    As discussed below, however, the environmental analysis performed by Commission staff demonstrates that removing the lands in question from the project boundaries will not significantly affect the ability of the projects to meet their purposes, including power production, recreation, protection of historic properties, and management of the environment.[33] We therefore conclude that the lands are not

---

the company, Wisconsin has voluntarily chosen to acquire and maintain the lands at issue. Any issue River Alliance has with the cost of these transactions is with the state.

30    See n. 12, supra.

31    The Commission's obligation under FPA Section 10(a)(1) is a continuing one throughout the term of the license. See, e.g., Pacific Gas & Electric Co., 46 FERC ¶ 61,249 at 61,732 (1989).

32    84 FERC ¶ 61,133 (1998).

33    No party has asserted that removal of the lands will have an adverse impact on any

Exhibit 2
Page 14 of 107

Project No. 2525-044, et al.                                                      - 15 -

necessary for project purposes, and that their removal will not alter the public interest balancing underlying the 1998 relicensing orders.  We next turn to the EA's analysis of Public Service's proposal.

### 3.    Buffer Zone

30.     Public Service proposes to leave in the project boundaries a 100-foot shoreline buffer strip.  Interior and River Alliance assert that the existing 200-foot buffer zones along the projects' shorelines should be retained.  The EA concluded that the 200-foot buffer zone along the projects' reservoirs and adjacent to the shoreline recreation access areas should remain in the project boundaries,  for the adequate protection of soils, water quality, fishery and terrestrial  resources, and public recreation access to the project reservoirs.  We agree, and will require retention within the project boundaries the 200-foot buffer zone as described in the EA.[34]

### 4.    Recreation

31.     As depicted in Tables 4-8 of the EA, Public Service proposes to remove a number of project recreation facilities from the project boundaries,  including 16 boat landings, a town park at the High Falls Project, primitive campsites accessible only by canoe at the Johnson Falls and Sandstone Rapids Projects, a canoe portage at the Sandstone Rapids Project, five snowmobile trails, a cross-country skiing trail, and a mountain biking trail. The EA recommends that the boat landings, town park, primitive campsites and canoe portage be retained within the project boundary in order to ensure  recreational  access to project lands and waters.[35]  Retention of the 200-foot buffer zone would also protect access to recreational  sites.

32.     The EA does not recommend retention within the project boundaries of the snowmobile,  cross-county skiing, and mountain biking trails (other than the portions of these facilities within the 200-foot buffer zone), because these facilities are not directly associated with public recreational  access to project waters or facilities, and  because

---

specific project purpose.

[34]     Retention of the 200-foot buffer zone will keep some 575 additional acres within the project boundaries,  although it will not be possible to determine these figures exactly until Public Service files revised exhibits showing the project acreage following the transfers.  Public Service may, by delegated authority or Commission approval, convey property rights in the project buffer zone, subject to the licensee's retention of rights adequate to fulfill the license requirements.

[35]     The facilities that staff recommends remain within the project boundaries are set forth in Tables 10-14 of the EA.

Exhibit 2
Page 15 of 107

Project No. 2525-044, et al.                                                        - 16 -

there are other comparable, publically accessible opportunities for such activities in the region.[36]

33.    We agree with the EA's recommendations. The retention within the project boundaries of the boating, camping, and fishing areas will ensure public access to recreation related to the projects' reservoirs. The snowmobile, skiing, and biking trails that the EA recommends for deletion have less of a nexus to reservoir-based recreation and are found elsewhere in the area.[37] We conclude that, in light of Wisconsin DNR's assumption of management of most of the lands at issue for public park and forest uses, the public recreational developments at the projects comply with the Commission' s recreation policy and the meet the public interest standard of FPA Section 10(a)(1).

### 5.    Cultural Resources

34.    Public Service manages the historic resources associated with the Peshtigo River Projects according to Commission- approved historic management plans. These plans were developed in consultation with the Wisconsin State Historic Preservation Officer (Wisconsin SHPO) and follow the requirements of a statewide programmatic agreement applicable to hydroelectric projects in Wisconsin.

35.    The EA states that, within the lands to be conveyed to Wisconsin DNR, there are 29 known archeological or historic properties.[38] Licensee surveys of the lands proposed for development revealed artifacts at four sites, two of which were identified as isolated finds that do not constitute archeological sites, and two of which were identified as dumps relating to Euro-American or later activity, which were not recommended for further investigation because there were no structural remains within the vicinity of the dumps, and because there are many such sites in the region.[39]

36.    On June 26, 2003, Public Service filed with the Commission an executed memorandum of understanding (MOU) among itself, the Wisconsin SHPO, and Wisconsin DNR. The MOU provides that the Wisconsin SHPO and Wisconsin DNR will develop a cultural resources management plan for the lands transferred to the state. On

---

36    The facilities that staff recommends be authorized to be removed from the project boundaries are set forth in Table 15 of the EA.

37    The EA states, at 36-37, that these trails are part of a larger network of trails within the surrounding area, which includes some 244 miles of snowmobile trails within Oconto County, and 406 miles of snowmobile trails within Marinette County.

38    EA at 24.

39    Id.

Exhibit 2
Page 16 of 107

Project No. 2525-044, <u>et</u> <u>al.</u>                                      - 17 -

June 30, 2003, the Wisconsin SHPO and the Commission executed a programmatic
agreement stating that the Commission has taken into account the effects of the removal
of lands from the project boundaries on historic properties and has afforded the Advisory

Council on Historic Preservation an opportunity to comment.[40]

37.      The EA concludes that granting Public Service's application will have no adverse
impacts to cultural resources, based on the MOU among Wisconsin DNR, the Wisconsin
SHPO, and Public Service with respect to the lands to be transferred to the State; the fact
that no archeological or historic sites warranting further investigation were found on the

lands that will be developed; and the continued existence of a 200-foot buffer zone.[41]  In
light of the foregoing, the Commission has adequately analyzed the proposal to removal
the lands in question from the project boundaries and has fulfilled the consultation
requirements of the National Historic Preservation Act.

---

40      As discussed earlier, the Commission will have no jurisdiction over the lands at
issue once they been removed from the project boundaries, and therefore will have no
role in enforcement of the terms of the MOU among Wisconsin DNR, the Wisconsin
SHPO, and Public Service (which is essentially an agreement between the two state
agencies as to how to handle issues regarding historic properties).

41      EA at 38-39.

Exhibit 2
Page 17 of 107

### 6. Endangered Species

38.     Lands within the current project boundaries provide suitable nesting or foraging habitat for the endangered bald eagle (Haliaeetus leucocephalus ).  With respect to the lands to be transferred to the state, Wisconsin DNR has stated that it will follow FWS' Bald Eagle Management Guidelines and will conduct an ecological assessment and ecological context overview for the lands acquired as part of the state forest.  In its comments, FWS states that implementation of the management practices proposed by Wisconsin DNR would, with the maintenance of a 200-foot buffer zone, afford a high level of resource protection and management.  The lands proposed for development have not been designated as an endangered resource zone, and currently there are no bald eagle nests located on these lands.  Under the alternative recommended by the EA, maintenance in the project boundaries of a 200-foot buffer along the project shorelines would help ensure that potential nesting and roosting trees within the vegetative buffer would remain.  Therefore, as the EA concludes, approval of the alternative

recommended by staff will have no effects on the threatened bald eagle.[42]

**CONCLUSION**

For the reasons discussed above, we find that Public Service's application to remove project lands from the licenses and project boundaries, as conditioned herein, meets the FPA Section 10(a)(1) standard and is approved.

The Commission orders:

(A)  The motions to intervene filed by River Alliance on January 22, 2002, and July 16, 2002, are granted.

(B)  The request for rehearing filed by River Alliance on January 22, 2002, is reinstated, is granted to the extent discussed above, and is otherwise denied.

(C)  The application to amend the project boundaries of Project Nos. 2525, 2595, 2522, 2560, and 2546, filed by Wisconsin Public Service Corporation on June 17, 2002, is granted, subject to the requirement that the licensee shall retain within the project boundaries (1) a 200-foot buffer zone along the projects' reservoirs, in the area proposed for development, and along all of the shoreline recreation access areas that will remain in the project boundaries; (2) the recreation facilities listed in Tables 10-14 of the environmental assessment attached to this order; and (3) all lands for which the licensee holds flowage rights.

(D) Wisconsin Public Service Corporation shall, within six months of the date of

---

[42]     EA at 31.

Exhibit 2
Page 18 of 107

Project No. 2525-044, <u>et</u> <u>al.</u>                                                    - 19 -

issuance of this order, file for Commission approval revised Exhibit G maps for Project Nos. 2525, 2595, 2522, 2560, and 2546, reflecting revised project boundaries and detailing the acreage remaining within those boundaries.

By the Commission.

( S E A L )


                                    Magalie R. Salas,
                                    Secretary.


ENVIRONMENTAL  ASSESSMENT
FOR APPLICATION  TO AMEND LICENSES
TO CHANGE PROJECT BOUNDARIES

Exhibit 2
Page 19 of 107

Project  No. 2525-044, et al.                                                                    - 20 -

CALDRON FALLS PROJECT NO. 2525-051

HIGH FALLS PROJECT NO. 2595-065

JOHNSON FALLS PROJECT NO. 2522-074

SANDSTONE RAPIDS PROJECT NO. 2546-068

POTATO RAPIDS PROJECT NO. 2560-047


WISCONSIN




Federal Energy Regulatory Commission
Office of Energy Projects
Division of Hydropower Administration  and Compliance
888 First Street, NE
Washington,  DC 20426




September 2003

Exhibit 2
Page 20 of 107

## I. APPLICATION

A. Application: License amendment application to amend the existing licenses to remove project lands and revise the existing project boundaries for the Caldron Falls (FERC Project No. 2525- 051), High Falls (FERC Project No. 2595-065), Johnson Falls (FERC Project No. 2522-074), Sandstone Rapids (FERC Project No. 2546), and Potato Rapids (FERC Project No. 2560-047) Hydroelectric Projects

B. Date Filed: June 17, 2002

C. Applicant: Wisconsin Public Service Corporation

D. Water Body: Peshtigo River

E. County and State: Marinette and Oconto, Wisconsin

## II. PURPOSE AND NEED FOR ACTION

Wisconsin Public Service Corporation (WPSC) filed an application with the Federal Energy Regulatory Commission (FERC or Commission) on June 17, 2002, to amend the existing licenses to remove project lands and revise the existing project boundaries for the Caldron Falls, High Falls, Johnson Falls, Sandstone Rapids, and Potato Rapids projects (Peshtigo River projects). The Peshtigo River projects are located on the Peshtigo River in the counties of Marinette and Oconto, Wisconsin (see figure 1). The U.S. Bureau of Land Management (BLM) owns and manages approximately 10 acres of federal lands (consisting of islands in the Peshtigo River) within the boundaries of the High Falls, Sandstone Rapids, and Potato Rapids projects.

WPSC proposes to remove approximately 9,738 acres of land from the project boundary of the Peshtigo River projects, of which it proposes to use 389 acres for development and to convey approximately 9,349 acres to the Wisconsin Department of Natural Resources (WDNR). WPSC proposes to accomplish the proposed action in three phases over the next 3 years. WPSC requests approval for the proposed boundary change for phase I and, contingent upon the closing of each planned future conveyance to WDNR, approval of the proposed boundary changes for phases II and III.

This environmental assessment (EA) was prepared to satisfy responsibilities under the National Environmental Policy Act. This EA examines the environmental effects associated with the licensee's proposal (Proposed Action), any identified Action Alternatives, and the No-Action Alternative.

Exhibit 2
Page 21 of 107

Project No. 2525-044, <u>et</u> <u>al.</u> - 22 -



## III. PROPOSED ACTION AND ALTERNATIVES

## A. Location and Description of Projects

Exhibit 2
Page 22 of 107

Project No. 2525-044, et al.                                                                 - 23 -

     The Peshtigo River basin is located in northeastern Wisconsin and drains an area of about 1,080 square miles. The Peshtigo River flows southeasterly about 107 miles, descending in elevation about 800 feet, and empties directly into Green Bay of northwestern Lake Michigan. The Peshtigo River projects (Caldron Falls, High Falls, Johnson Falls, Sandstone Rapids, and Potato Rapids) and the Peshtigo Project (FERC No. 2581) (not part of this proposal)[43] occupy about a 68-mile stretch of the Peshtigo River and are the only dams on the Peshtigo River. The Peshtigo River is free flowing above the Caldron Falls Project, the most upstream project on the river. There are also stretches of free-flowing reaches on the Peshtigo River between the projects, which include about 1 RM below the Caldron Falls Project, about 6 RM below the Johnson Falls Project, and about 30 RM below the Sandstone Rapids Project. We summarize the key characteristics for the Peshtigo River projects in the following section.

### Caldron Falls Project (FERC Project No. 2525)

     The Commission issued a 40-year license to WPSC for the Caldron Falls Project on June 26, 1997. The Caldron Falls Project is located at RM 70 and consists of a dam, reservoir, powerhouse, substation, and appurtenant facilities. At the normal pool elevation of 982.0 feet National Geodetic Vertical Datum (NGVD), the reservoir surface area encompasses 1,180 acres, extends about 7 miles, and has a storage volume of about 11,570 acre-feet. The total installed capacity of the project is 6.4 megawatts (MW). There are about 4,268 acres, including upland and submerged lands, within the Caldron Falls Project boundary.

### High Falls Project (FERC Project No. 2595)

     The Commission issued a 40-year license to WPSC for the High Falls Project on June 26, 1997. The High Falls Project is located at RM 62 and consists of a dam, reservoir, powerhouse, substation, and appurtenant facilities. At the normal pool elevation of 897.0 feet NGVD, the reservoir surface area encompasses 1,670 acres, extends about 7 miles, and has a storage volume of about 15,810 acre-feet. The total installed capacity of the project is 7.0 MW. There are about 4,623 acres, including upland and submerged lands, within the High Falls Project boundary.

### Johnson Falls Project (FERC Project No. 2522)

---

43     The Peshtigo Project, consisting of a dam, a reservoir, a powerhouse, and appurtenant facilities, is the last dam on the river at river mile (RM) 12, before the Peshtigo River empties into Green Bay. No project boundary modifications are proposed for the Peshtigo Project.

Exhibit 2
Page 23 of 107

Project No. 2525-044, <u>et al.</u>                                                                    - 24 -

The Commission issued a 40-year license to WPSC for the Johnson Falls Project on June 26, 1997. The Johnson Falls Project is located at RM 60 and consists of a dam, reservoir, powerhouse, and appurtenant facilities. At the normal pool elevation of 814.1 feet NGVD, the reservoir surface area encompasses 130 acres, extends about 2 miles, and has a storage volume of about 2,200 acre-feet. The total installed capacity of the project is 3.5 MW. There are about 1,078 acres, including upland and submerged lands, within the Johnson Falls Project boundary.

### Sandstone Rapids Project (FERC Project No. 2546)

The Commission issued a 40-year license to WPSC for the Sandstone Rapids Project on June 26, 1997. The Sandstone Rapids Project is located at RM 50 and consists of a dam, reservoir, powerhouse, substation, and appurtenant facilities. At the normal pool elevation of 724.1 feet NGVD, the reservoir surface area encompasses 150 acres, extends about 3.7 miles, and has a storage volume of about 1,640 acre-feet. The total installed capacity of the project is 3.8 MW. There are about 2,310 acres, including upland and submerged lands, within the Sandstone Rapids Project boundary.

### Potato Rapids Project (FERC Project No. 2560)

The Commission issued a 40-year license to WPSC for the Potato Rapids Project on June 26, 1997. The Potato Rapids Project is located at RM 15 and consists of a dam and spillway, reservoir, powerhouse, substation, and appurtenant facilities. At the normal pool elevation of 621.5 feet NGVD, the reservoir surface area encompasses 350 acres, extends about 4 miles, and has a storage volume of about 2,800 acre-feet. The total installed capacity of the project is 1.4 MW. There are about 1,138 acres, including upland and submerged lands, within the Potato Rapids Project boundary.

**B.      Proposed Action**

WPSC proposes to remove approximately 9,738 acres of land from the project boundary of the Peshtigo River projects. These lands include about 389 acres of land WPSC proposes to develop, and about 9,349 acres already conveyed or proposed to be

Exhibit 2
Page 24 of 107

Project No. 2525-044, et al.                                                                                      - 21 -

Table 1.        Summary of Lands Proposed for Removal from Project Boundary for Each Phase
                (Source: WPSC, 2002)

| Project | Existing Acreage within the Project Boundary[a] | Phase I | | Phase II | Phase III | Total Amount Proposed for Removal | Acreage to Remain within Project Boundary if Removal is Approved | |
|---|---|---|---|---|---|---|---|---|
| | | Lands Conveyed to WDNR | Lands for Development | Lands to be Conveyed to WDNR | Lands to be Conveyed to WDNR | | Upland Acreage | Flowage Rights |
| Caldron Falls | 4,268 acres | 1,569 acres | | 541 acres | 906 acres | 3,016 acres | 139 acres | 1,113 acres |
| High Falls | 4,623 acres | 704 acres | 130 acres | | 2,097 acres | 2,931 acres | 108 acres | 1,584 acres |
| Johnson Falls | 1,078 acres | 533 acres | 73 acres | | 314 acres | 920 acres | 25 acres | 133 acres |
| Sandstone Rapids | 2, 310 acres | 1,915 acres | 186 acres | | | 2,101 acres | 49 acres | 160 acres |
| Potato Rapids | 1,138 acres | 600 acres | | | 170 acres | 770 acres | 89 acres | 279 acres |
| Total | 13, 417 acres | 5,321 acres | 389 acres | 541 acres | 3,487 acres | 9,738 acres | 410 acres | 3,269 acres |

[a] Includes both upland and submerged land acreage.

Case 3:22-cv-00533-SI     Document 69-2     Filed 09/13/24     Page 25 of 107

Exhibit 2
Page 25 of 107

Project  No. 2525-044, et al.                                                                      - 22 -

conveyed to WDNR (lands conveyed to WDNR).  WPSC proposes to accomplish the Proposed Action in three phases over the next 3 years.  Table 1 summarizes the proposed acreage of the lands to be removed for each project under each phase and the amount of lands proposed to be retained within the project boundaries for each project, if the Commission approves the project boundary modification.

Phase I would include the removal of approximately  5,321 acres of project lands from the Caldron Falls, High Falls, Johnson Falls, Sandstone Rapids, and Potato Rapids projects that were conveyed to WDNR.[44]  WDNR would use about 178 acres from the Caldron Falls Project for development  of a state park and the remaining 5,143 acres for creation of a new state forest.  Also under Phase I, WPSC proposes to remove about 389 acres for development  purposes.

Phase II would include the removal of approximately  541 acres from the Caldron Falls Project to be conveyed to WDNR in the future, contingent upon the actual transfer of land.  The targeted date for the conveyance is between January 1 and June 30, 2003, with the closing for this conveyance to occur no later than December 31, 2003, unless otherwise delayed by mutual agreement.

Phase III would include removal of about 3,487 acres from the Caldron Falls, High Falls, Johnson Falls, and Potato Rapids projects, as a combination  of purchase by WDNR and donation by WPSC, if WDNR exercises its option to carry out this phase.

WPSC proposes no changes to existing project operations and proposes to retain flowage rights on all lands proposed for ownership transfer.  WPSC would obtain easements for access and ancillary project facilities necessary for operation (e.g., sirens) from WDNR.  WPSC proposes that the upland areas transferred  to WDNR be removed from the project boundaries,  and that the islands located within the project reservoirs that are transferred  from BLM to WDNR remain within the respective project boundaries.[45]

---

[44]     On November 6, and 14, 2001, WPSC filed applications  with the Commission proposing to convey certain lands to the WDNR.  On December 20, 2001, the Commission issued an order approving the conveyance of fee title interest to the WDNR of 174 acres within the Caldron Falls Project and 5,740 acres within the Caldron Falls, High Falls, Johnson Falls, Sandstone Rapids, and Potato Rapids projects with the condition that, until the Commission approves removal of the lands from the project boundaries,  the properties would remain within the project boundaries and would be managed according to the licensee's Commission- approved Comprehensive  Land and Wildlife Management Plan (CLWMP) (June 19, 1998), Recreation Plan (June 23, 1998), and Historic Resource Management Plans (HRMPs) (June 1998) for the Peshtigo River projects.

Exhibit 2
Page 26 of 107

Project  No. 2525-044, et al.                                                                                   - 23 -

For the lands conveyed to WDNR, WDNR proposes to use the CLWMP as the basis for the master planning process for the development of a master plan for the future management of the conveyed lands.  WDNR would manage the property in a similar manner to the current management techniques, including riparian buffers and aesthetic zones in which no timber would be harvested (letter from Terrence Gardon, WDNR, March 22, 2022, to Greg Egtvedt, WPSC).

For the lands proposed for development, WPSC proposes to maintain an undeveloped buffer 100 feet from the normal high water mark of the reservoirs.  This area of about 48 acres would remain within the respective project boundaries under WPSC ownership with a scenic easement to WDNR.  The terms of this scenic easement would include:  no structures or buildings other than authorized piers and docks; no excavation, drainage, filling, or dumping; no dumping of ashes, trash, sawdust, or any unsightly material; no signs or billboards other than signs smaller than 4 feet square advertising the sale or lease of the property; and no vegetation removed without the authorization of WDNR, other than land and forest management activities conducted by WPSC in accordance with the Commission- approved management plans.

WPSC proposes that, within the 100-foot buffer, the public would be permitted to engage in the following activities:  hiking; jogging; walking; beach combing; bird watching; natural observation or photography; bank fishing except within 100 feet of any dock, pier, or area identified by signage or buoys as a swimming beach; and foot travel associated with lawful hunting activities.  WPSC proposes that all other uses by the general public would be prohibited.  On the remainder of the lands to be developed, WPSC proposes that no commercial, industrial, or mining activities would be allowed, and a minimum lot size would be established.  Development would be restricted to single- family residences with limits on color selections of buildings and a 35-foot height restriction.

If the project boundary changes are approved, and upon completion of the proposed three phases of land transfer, WPSC would retain about 410 acres of upland lands and about 3,269 acres with flowage rights (see table 1).  These lands would primarily be areas surrounding the project reservoirs and facilities that are necessary for operation of the hydroelectric projects.

## C.    Action Alternative

---

45      BLM owns, but does not actively manage, numerous small islands within the project areas.  Legislation has been drafted, but not yet submitted to Congress for action, that would transfer those lands from BLM to WDNR (letter from the U.S. Department of Interior, dated July 24, 2002).

Exhibit 2
Page 27 of 107

Project  No. 2525-044, et al.                                                                    - 24 -

The U.S. Department of Interior (Interior), the U.S. Fish and Wildlife Service (FWS), the National Park Service (NPS), and the River Alliance of Wisconsin (RAW) provided comments on the proposed application (see section IV, consultation) recommending  that 200-foot no timber harvest buffer zones be maintained along the projects' shorelines for all the lands proposed for removal from the project boundaries. This EA includes, as an alternative to the Proposed Action, assessment of removal of land from the project boundary of the Peshtigo River projects as proposed by WPSC, with the exception of lands within a 200-foot no timber harvest buffer from the normal high water mark of project reservoirs and the lands associated with the existing shoreline recreation access areas.  Under this Action Alternative, the lands within the 200-foot buffer and shoreline recreation access areas would remain within the respective project boundaries.  The remainder of the 9,738 acres would be removed from the project boundaries to be conveyed to WDNR or maintained by WPSC for development  purposes as proposed by WPSC.

**D.     No-Action Alternative**

The No-Action Alternative  would deny the licensee's proposal.  Under the No-Action alternative,  there would be no change to the existing environment.  No project lands would be removed, and there would be no changes to the existing project boundaries.

**IV.    CONSULTATION**

Commission staff issued a public notice of WPSC's proposed application  on June 26, 2002, with a comment closing date of July 31, 2002.  The following entities commented on the proposed application:

| Entity | Date of Filing |
|---|---|
| RAW | July 12, 2002 |
| Interior | July 24, 2002 |
| Interior | July 29, 2002 |
| WDNR | July 29, 2002 |

The Commission staff issued a Scoping Document on July 25, 2002, soliciting comments and suggestions  on the preliminary  list of issues and alternatives  to be addressed in this EA, with a comment closing date of August 23, 2002.  The following entities provided comments:

| Entity | Date of Filing |
|---|---|

Exhibit 2
Page 28 of 107

Project No. 2525-044, et al.                                              - 25 -

         RAW                                    August 8, 2002
         WDNR                                   August 9, 2002

       On September 10, 2002, FERC issued an additional information request (AIR) to
WPSC for the clarification of the specific acreages of lands proposed by WPSC to be
removed from the project boundary for each project and for each phase. On
September 19, 2002, WPSC provided the response to the AIR, clarifying the proposed
acreages for removal from the Peshtigo River projects (see table 1 for summary).

       **Comments from Interior**

       In the July 24, 2002, filing, Interior commented that, on the properties proposed to
be removed from the project boundaries, forest harvest practices and recreational use
should be compatible with wildlife management, including protection of the bald eagle
and its habitat, that the public should be allowed continued access to the land for
recreational use, and that the proposed development of the 389 acres of project land
should be undertaken so that minimal disturbance occurs to the Peshtigo River and river
shoreline. Interior recommended the establishment of a 200-foot no timber harvest
buffer on the parcel proposed for development, and that the buffer be incorporated into
WDNR's management plan for the properties conveyed to WDNR.

       In the July 29, 2002, filing, Interior filed a motion to intervene on behalf of FWS,
NPS, and BLM to become a party to the proceeding.

       **Comments from FWS**

       In a letter dated May 7, 2002, to WPSC, FWS provided comments on WPSC's
draft application to amend the Peshtigo River project licenses. FWS identified the bald
eagle as the only federally-listed threatened or endangered species within the lands to be
conveyed to WDNR. FWS recommended that the lands conveyed to WDNR be
managed consistent with several of WDNR's existing land management plans and that
implementation of these management principles would provide a high level of resource
protection and management. FWS recommended that, in the event of the land transfer,
WDNR maintain a 200-foot no timber harvest buffer zone along the shoreline of all land
conveyed. FWS stated that the bald eagle currently does not nest on the project lands
proposed for sale by WPSC for development. FWS recommended that a 200-foot no
development and no timber harvest zone be maintained on the 389 acres proposed for
sale by WPSC for development. In addition, FWS recommended that WPSC stipulate a
protective covenant condition on sale of Parcel No. 13 of the lands proposed for sale by
WPSC for development in order to protect an emergent wetland of about one acre in size
so that the wetland is not disturbed by development.

Exhibit 2
Page 29 of 107

Project No. 2525-044, et al.                                                - 26 -

### Comments from NPS

In a letter dated May 8, 2002, to WPSC regarding the draft application, NPS stated a preference for protection of the 389-acre parcel proposed for development and support of the local initiative to raise funds to preserve the parcel for protection. NPS stated that protection of the parcel would be in keeping with the agreements reached by the stakeholders during the relicensing proceeding. NPS also stated that, if WPSC sells the lands for development, the shoreline buffer should be expanded from the proposed 100-foot to a 200-foot buffer to protect visual and ecological resources along the shoreline. NPS also recommended that a 200-foot no timber harvest buffer be maintained on the lands conveyed to WDNR.

### Comments from WDNR

In its July 29, 2002, filing, WDNR filed a motion to intervene to become a party to the proceeding.

In its August 9, 2002, filing, WDNR commented that FERC should consider the existing CLWMP and Recreation Plan for the projects in the development of the EA. WDNR also recommended that the EA include an evaluation of the potential effects of the project boundary changes on water quality and on fishery resources.

### Comments from RAW

In its July 12, 2002, filing, RAW filed a motion to intervene in protest of WPSC's license amendment application. RAW stated strong opposition to the removal of the 389 acres for residential development, stating that the development of these lands would change the wilderness character of the projects' shoreline areas. In addition, RAW commented that the proposed 100-foot buffer zone is in conflict with the approved CLWMP. RAW stated that the CLWMP designates that portions of the lands proposed for development by WPSC require a 200- to 400-foot preservation zone along the riparian corridor rather than the 100-foot riparian buffer zone proposed by WPSC. RAW also protests the conveyance and sale of lands to WDNR, stating that WPSC, as a condition of operating hydroelectric facilities on waters of the State of Wisconsin, should incur the costs of property taxes and operation and maintenance of the recreational facilities on these lands, not the people of the State of Wisconsin. RAW also states that the terms and conditions contained in the licenses were considered by the Commission and the negotiating parties in the balance between developmental and non-developmental resources and that this balance would be disrupted if the license amendment were granted.

Exhibit 2
Page 30 of 107

Project No. 2525-044, et al.                                                    - 27 -

In its August 8, 2002, filing responding to the scoping document, RAW commented that the EA should consider the costs incurred to the citizens of the State of Wisconsin for the purchase; property taxes; and funds for operation, development, and maintenance of the recreational facilities for the lands proposed by WPSC to be conveyed to WDNR and removed from the project boundaries. RAW also stated that the EA should assess extending the shoreline buffer to 200 or 400 feet and assess the socioeconomic effects of the removal of the project lands.

This EA considers the effects of the extended buffer along the project shorelines associated with the properties proposed for removal from the project boundaries. Socioeconomic effects of land purchases by the State of Wisconsin are outside of the Commission's purview and jurisdiction, however, and therefore, we do not assess these effects in the EA. This EA includes an assessment of the proposed action on water quality and fishery resources and considers the existing CLWMP and Recreation Plan.

### Consultation with the Wisconsin State Historical Society (SHPO)

The Commission consulted with the SHPO (letter to Alicia L. Goehring, SHPO Wisconsin State Historical Society dated February 10, 2003) stating the Commission's determination of effect and requesting that the SHPO provide its determination regarding the effects of the proposed action on historic properties. In a letter dated March 12, 2003, the SHPO concurred with the Commmission's determination that the proposed development of the 389 acres would result in no historic properties affected pursuant to 36 CFS 800.4 (d) (1). However, the SHPO also responded that 36 CFR 800 requires the Commission to be a signatory on the proposed Memorandum of Agreement (MOA) filed by the licensee on September 11, 2002 which would be executed between WPSC, WDNR and the SHPO for the parcels to conveyed to the WDNR. A conference call with interested parties was conducted on April 11, 2003, to discuss this matter. The Advisory Council on Historic Preservation (ACHP) stated that it would review WPSC's proposed MOA. On April 30, 2003, the Commission sent a draft Programmatic Agreement (PA) to the SHPO and the ACHP for comment that would fulfill the Commission's responsibilities under Section 106 of the National Historic Preservation Act. Both the ACHP and the SHPO requested changes to the licensee's proposed MOA and the Commission's draft PA, by electronic mail dated May 15, 2003, and May 23, 2003, respectively. By letter dated June 25, 2003, the WPSC filed with the Commission an executed Memorandum of Understanding (MOU), (which replaced the proposed MOA) between the SHPO, WDNR, and WPSC. The executed MOU would ensure the long-term protection of historic properties within the lands to be conveyed to the WDNR. On June 25, 2003, Commission staff electronically mailed to the SHPO, WDNR, and WPSC a final PA for signature. The PA was executed on July 1, 2003. The PA would provide

Exhibit 2
Page 31 of 107

Project  No. 2525-044, <u>et al.</u>                                                                 - 28 -

the means for the protection of historic properties on the project lands to be removed up until the time that the Commission approves their removal and the MOU would provide long-term protection of historic properties on these lands after the lands have been removed from the project boundary.  The execution of the PA and the implementation  of its terms evidence that the Commission has taken into account the effects of this undertaking  on historic properties and afforded the ACHP an opportunity  to comment.

## V.      AFFECTED ENVIRONMENT

### MM. Water, Fishery, and Soils Resources

The Peshtigo River exhibits good overall water quality, largely because of the rural, undeveloped nature of the watershed.  The presence of humic and fulvic acids in organic matter such as leaves and wood gives the river a brownish color and decreased clarity.  The color is not an indicator of a water quality problem, and total nutrient concentrations are in a range indicating good water quality.  Principal water uses of the Peshtigo River within the project area are fishing, recreation, and hydroelectric power generation.  There are no known or proposed consumptive uses of the water of the Peshtigo River within the project areas (FERC, 1997).

As the river enters the Sandstone Rapids Reservoir, the topography becomes more gently rolling to flat.  Sand becomes a more dominant component of the soils, and soils become more poorly drained and acidic, with organic deposits of more than 40 inches occurring in many areas. Reservoir and river shorelines throughout the basin are mostly gently sloping and well vegetated, with little evidence of excessive erosion.

The Peshtigo River within the project area supports a diverse assemblage of fishes that include about 70 species in 18 families.  The principal sport fish are walleye, muskellunge, northern pike, smallmouth bass, and largemouth bass.  The main panfish species include bluegill, pumpkinseed, rock bass, black crappie, and yellow perch.  Brown trout, rainbow trout, and brook trout are present in and downstream of Johnson Falls Reservoir, and in several larger tributaries of the Peshtigo River (FERC, 1997).

### NN.    Terrestrial Resources

Wetlands are abundant throughout the projects and encompass an estimated 325 acres of project lands and waters (FERC, 1997).  Wetlands in Marinette County occupy up to 25 percent of the land cover and comprise a variety of wetland types, including northern wet/mesic forests, shrub wetlands, bog wetlands, marshes, and open water habitats.  The northern wet/mesic forests (palustrine) wetlands are vegetated primarily by black spruce, balsam fir, and tamarack.  Shrub wetlands include shrub-carrs dominated by willows and dogwood, and alder thickets dominated by speckled alder, high bush cranberry, and sweet gale.  Bog wetlands are characterized by acid peat soils and a vegetative mixture of sedges, sphagnum moss, and sparse cover of black spruce and tamarack trees.  Deep and shallow marsh habitats also occur in the project area.  Shallow

Exhibit 2
Page 32 of 107

Project No. 2525-044, et al. - 29 -

systems are dominated by emergent species, such as bulrushes, sedges, cattails, and grasses. Deep marshes are composed of some species of attached and floating aquatic plants, including water lily, water shield, pondweed, and coontail.

The CLWMP indicates that there are about 100 acres of wetlands within the Caldron Falls Project, 150 acres within the High Falls Project, no identified wetlands within the Johnson Falls Project, 3 acres of wetlands within the Sandstone Rapids Project, and 72 acres of wetlands within the Potato Rapids Project. The FWS in their review of the parcels proposed by WPSC for development, identified an emergent wetland of about one acre in size in Parcel 13, near the public access site about 150 feet landward of the water's edge.

In addition to wetland habitats, vegetation communities within the project boundaries are dominated by second-growth, northern mesic forests that comprise a mixture of hardwoods and conifers. Forests in this region are similar to forests across the northern portions of the eastern United States. Historically, major fires and commercial logging have modified original vegetative community structure, resulting in a second- growth system that is dominated by aspen rather than white pine.

Wildlife in the area of the Peshtigo River projects consists mainly of species associated with early successional and second-growth hardwood and coniferous forests, and species associated with a variety of wetland types. The undeveloped shorelines and adjoining forests and wetlands of the reservoirs and the Peshtigo River provide high quality habitat for many of the wildlife species indigenous to this area of northern Wisconsin. At various times of year, this includes about 55 species of mammals, 245 species of birds, and 32 species of amphibians and reptiles (FERC, 1997).

### Threatened and Endangered Species

The bald eagle (*Haliaeetus leucocephalus*) is a federally listed and state listed threatened species and is the only identified federally-listed threatened or endangered species within the lands proposed for removal from the project boundary. Bald eagles typically nest in supercanopy trees near lakes or large rivers and require nearby open water for feeding on fish, waterfowl, and small mammals. WPSC developed a Bald Eagle Management Plan in association with project relicensing, and components of the plan are incorporated in the CLWMP. The CLWMP includes a land management category of "endangered resource zone," which includes areas where endangered plant communities or animal species exist (see section V.C, land use and aesthetic resources). Specialized management practices are required in these designated areas to ensure continued maintenance and protection of the threatened or endangered resources. Bald eagle management areas fall under the endangered resource zone land management category.

### C.     Land Use and Aesthetic Resources

Land use within the region surrounding the Peshtigo River projects consists of primarily

Exhibit 2
Page 33 of 107

Project No. 2525-044, et al.                                                                                    - 30 -

timber production, outdoor recreation, rural residential development, and widely dispersed municipal and industrial uses. Urban communities within or adjacent to the projects include Marinette, Peshtigo, and Crivitz, Wisconsin. The majority of the reservoir shorelines are undeveloped and, with the exception of the areas occupied by project facilities, all project lands are open for public use.

There are a total of 13,417 upland and submerged acres located within the Peshtigo River projects boundaries. Of this, 4,268 acres are within the Caldron Falls Project; 4,623 acres are within the High Falls Project; 1,078 acres are within the Johnson Falls Project; 2,310 acres are within the Sandstone Rapids Project; and 1,138 acres are within the Potato Rapids Project. Within the Caldron Falls Project, about 640 acres lies within the Nicolet National Forest; however, WPSC owns and manages these lands. BLM owns and manages a total of about 10 acres of federal lands, consisting of islands in the Peshtigo River, within the boundaries of the High Falls, Sandstone Rapids, and Potato Rapids projects. Legislation has been drafted, but not yet submitted to Congress for action, that would transfer those lands from BLM to WDNR.

The project lands are managed according to a Commission-approved CLWMP, which was developed in consultation with FWS, NPS, and WDNR. The project lands are managed under a "wild shores" philosophy that promotes the balance of the human needs and the protection of the wilderness atmosphere of the area. There are eight land management classifications for the project lands, described as follows:

*Wild Reservoir* - Project reservoir with exceptional visual qualities characterized by a shoreline with minimal development. The wild reservoir zone includes a 400- foot preservation zone in which no vegetation or wildlife management beyond aesthetic management is permitted. Hunting, fishing, and trapping and designated public access areas are permitted.

*Wild River* - Section of free-flowing, unpolluted river with adjacent lands located in sparsely populated, natural environment. In the wild river zone designated areas no vegetation management occurs on lands between the river and tops of adjacent slopes other than for aesthetic management purposes. Existing and future recreational areas are permitted as long as the scenic values of the area are maintained. Hunting, fishing, and trapping are permitted.

*Forest Management* - Land areas managed for saw timber, pulpwood, fuel wood, and other forest products using acceptable forest management practices in an integrated resource management program.

*Scenic Areas* - Land areas with unique aesthetic qualities or distinctive landscapes, but not considered to be a type of wild resource area. Scenic areas are buffer zones for intensive public use areas; reservoir, river, and stream shorelines; and scenic highways or roads. Aesthetic management techniques are applied to the extent possible within those areas designated as scenic areas. Aesthetic management techniques are modifications of

Exhibit 2
Page 34 of 107

Project No. 2525-044, et al. - 31 -

normal timber management techniques that are designed to minimize the negative effects on aesthetics and recreational values. Shoreline buffers are designated scenic areas, 200-feet wide, and any active vegetative management in these areas must be approved first by the licensee, FWS, NPS, and WDNR.

*Recreational Development* - Includes lands where recreational use occurs, such as boat access areas; day-use and camping areas; snowmobile, hiking, and ski trails; and bank fishing areas. Aesthetic timber management practices are applied in these areas.

*Project Facilities* - Areas associated with the hydroelectric project developments, including dams, powerhouses, dikes, maintenance staging areas, other project structures, and access roads. Vegetation management is conducted for maintenance and protection of project facilities, and aesthetic management principles are practiced whenever feasible.

*Archeological and Historical Areas* - Archeological and historic areas warranting protection due to their cultural resource values. Individual sites are not identified in the CLWMP to protect the sites from unauthorized collecting or vandalism. Existing archeological and historic sites are protected per the provisions of the Historic Resources Management Plan (HRMP). Prior to any ground disturbance activity, the areas are inventoried to determine if potential effects on cultural resources would occur.

*Endangered Resource Zones* - Tracts of lands or water where endangered plant communities or animal species exist that require specialized management practices and protection. Specific locations are not identified to protect the areas from disturbance. Vegetative and wildlife management in these areas are to maintain the existing condition and perpetuate desirable features for the targeted species and/or habitat.

Table 2 summarizes the existing land classifications and shoreline buffer widths of the lands proposed for conveyance to WDNR. Table 3 summarizes the existing acreages and land management classifications of the parcels associated with the 389 acres proposed for development and a summary of the lands proposed to be removed from each parcel.

**D. Recreation Resources**

The lands within the Peshtigo River projects, with the exception of area occupied by project facilities, are open for public use. Within the project lands, the public participates in fishing, boating, picnicking, water skiing, swimming, canoeing, hiking, and hunting. Popular winter activities include ice fishing, snowmobiling, and cross country skiing. WPSC, Marinette County, the town of Stephenson, and the Marinette County Cross Country Ski Association own and manage various public access areas throughout the area encompassed by the proposed change in project boundaries. Tables 4 through 8 identify the public recreation facilities for each project and the designated area under which WPSC proposes the facilities would be included.

Recreation development within the projects is conducted in accordance with the

Exhibit 2
Page 35 of 107

Project  No. 2525-044, <u>et al.</u>                                    - 32 -

Commission approved Recreation Plan.  The Recreation Plan is integrated and compatible with the CLWMP for the projects.  WPSC has developed land use policies and procedures for the general public to follow when they are using project lands.  In

Exhibit 2
Page 36 of 107

Document Accession #: 20030916-3004     Filed Date: 09/15/2003

Project  No. 2525-044, <u>et</u> <u>al.</u>                                                    - 33 -

Table 2.        Summary of Existing Land Classifications for Proposed Lands for Removal from Project Boundary for Conveyance to WDNR

| Project | Existing Land Classification Category | Existing Shoreline Buffer Width | Existing Road Buffer Width |
|---|---|---|---|
| Caldron Falls | Forest Management<br>Recreation<br>Scenic (shoreline and road areas) | 200-foot buffer in scenic designation | 100-foot buffer |
| High Falls | Wild Reservoir<br>Forest Management<br>Recreation<br>Scenic (shoreline and road areas) | 400-foot buffer in wild reservoir designation<br>200-foot buffer in scenic designation | 100-foot buffer |
| Johnson Falls | Wild Reservoir<br>Wild River<br>Forest Management<br>Recreation<br>Scenic (shoreline and road areas) | 400-foot buffer in wild reservoir designation<br>200-foot buffer in scenic designation | 100-foot buffer |
| Sandstone Rapids | Wild River<br>Forest Management<br>Recreation<br>Scenic (shoreline and road areas) | 200-foot buffer in scenic designation | 100-foot buffer |
| Potato Rapids | Forest Management<br>Recreation<br>Scenic (shoreline and road areas) | 200-foot buffer in scenic designation | 100-foot buffer |

Case 3:22-cv-00533-SI     Document 69-2     Filed 09/13/24     Page 37 of 107

Exhibit 2
Page 37 of 107

Project  No. 2525-044, et al.                                                                                    - 34 -

Table 3.        Summary of Lands Proposed for Removal from Project Boundary for Development

| Project | Parcel No. | Existing Primary Land Management Classifications | Existing Primary Land Use | Existing Shoreline Buffer Width | Acreage to Remain [a] |
|---|---|---|---|---|---|
| High Falls | 34 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet | 4 acres |
| | 12 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet | 11 acres |
| | 13 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet | 9 acres |
| Johnson Falls | 6 | Forest Management/ Scenic (shoreline area) | Timber Production | 400 feet | 6 acres |
| Sandstone Rapids | 9 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet | 4 acres |
| | 8 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet | 5 acres |
| | 7 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet | 1 acres |
| | 6 | Scenic | WPSC Rec. Area | 200 feet | 8 acres |
| Total | | | | | 48 acres |

[a]
  Approximate acreage from parcel proposed to remain in the project boundary as 100-foot shoreline buffer.

Table 4.  Recreation Facilities at the Caldron Falls Project

| Facility | Existing Owner | Proposed Owner | Existing Facilities | Proposed Designation of |
|---|---|---|---|---|

Case 3:22-cv-00533-SI    Document 69-2    Filed 09/13/24    Page 38 of 107

Exhibit 2
Page 38 of 107

Project  No. 2525-044, et al.                                                          - 35 -

| | | | | Facilities |
|---|---|---|---|---|
| Boat Landing No. 8 | WPSC | WDNR | Boat launch, barrier-free fishing pier, parking, restroom | WDNR transfer lands |
| Boat Landing No. 9 | WPSC | WDNR | Boat launch, parking, restroom | WDNR transfer lands |
| Boat Landing No. 10 | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. 11 | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. 12 | WPSC | WDNR | Boat launch, parking, restroom | WDNR transfer lands |
| Boat Landing No. 13 | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Walk-in access | WPSC | WDNR | Unimproved popular shoreline fishing areas | WDNR transfer lands |
| Snowmobile trail | WPSC | WDNR | Marinette County holds a license agreement with WPSC for 3 miles of trail | WDNR transfer lands |
| Outdoor recreation areas | WPSC | WDNR | All WPSC land is open to the public for recreation | WDNR transfer lands |
| Dike, tailwater, and walk-in access areas | WPSC | WPSC | Unimproved popular shoreline fishing areas near the project facilities | Remain within the project boundary |
| Canoe portage | WPSC | WPSC | 0.2 mile canoe portage around Caldron Falls dam | Remain within the project boundary |

Exhibit 2

Page 39 of 107

Project  No. 2525-044, et al.                                                           - 36 -

Table 5.        Recreation Facilities at the High Falls Project

| Facility | Existing Owner | Proposed Owner | Facilities | Proposed Designation of Facilities |
|---|---|---|---|---|
| Boat Landing No. 1 | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. 2 | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. 3 | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. 4 | WPSC | WDNR | Boat launch, parking, restroom | WDNR transfer lands |
| Boat Landing No. 5 | WPSC | WDNR | Boat launch, parking, restroom | WDNR transfer lands |
| Boat Landing No. 6 | WPSC | WDNR | Boat launch, barrier-free fishing pier, parking, restroom | WDNR transfer lands |
| Boat Landing No. 7 | WPSC | WDNR | Boat launch, barrier-free fishing pier, parking, restroom | WDNR transfer lands |
| Town of Stephenson Park | WPSC (lease) | WDNR (lease) | Boat launch, barrier-free skid pier, picnic area, swimming area, water-ski show viewing area, restrooms, parking | WDNR transfer lands |
| Walk-in access | WPSC | WDNR | Unimproved popular shoreline fishing areas | WDNR transfer lands |
| Snowmobile trail | WPSC | WDNR | Marinette County holds a license agreement with WPSC for 5 miles of trail | WDNR transfer lands |
| Outdoor recreation areas | WPSC | WDNR | All WPSC land is open to the public for recreation | WDNR transfer lands |
| Dike, tailwater, and walk-in access areas | WPSC | WPSC | Unimproved popular shoreline fishing areas near the project facilities | Remain within the project boundary |
| Canoe portage | WPSC | WPSC | 0.1 mile canoe portage around High Falls dam | Remain within the project boundary |
| Natural shoreline areas | WPSC | WPSC | 100-foot buffer adjacent to the proposed development areas | Remain within the project boundary |

Exhibit 2
Page 40 of 107

Project  No. 2525-044, et al.                                                    - 37 -

Table 6.        Recreation Facilities at the Johnson Falls Project

| Facility | Existing Owner | Proposed Owner | Facilities | Proposed Designation of Facilities |
|---|---|---|---|---|
| Boat Landing No. 14 | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Walk-in access | WPSC | WDNR | Unimproved popular shoreline fishing areas | WDNR transfer lands |
| Snowmobile trail | WPSC | WDNR | Marinette County holds a license agreement with WPSC for 0.5 mile of trail | WDNR transfer lands |
| Canoe campsites | WPSC | WDNR | 4 primitive campsites accessible only by canoe | WDNR transfer lands |
| Outdoor recreation areas | WPSC | WDNR | All WPSC land is open to the public for recreation | WDNR transfer lands |
| Dike, tailwater, and walk-in access areas | WPSC | WPSC | Unimproved popular shoreline fishing areas near the project facilities, barrier-free fishing pier, parking | Remain within the project boundary |
| Canoe portage | WPSC | WPSC | 0.1 mile canoe portage around Johnson Falls dam | Remain within the project boundary |
| Natural shoreline areas | WPSC | WPSC | 100-foot buffer adjacent to the proposed development areas | Remain within the project boundary |

Exhibit 2
Page 41 of 107

Project No. 2525-044, et al.                                                      - 38 -

Table 7.          Recreation Facilities at the Sandstone Rapids Project

| Facility | Existing Owner | Proposed Owner | Facilities | Proposed Designation of Facilities |
|---|---|---|---|---|
| Walk-in access | WPSC | WDNR | Unimproved popular shoreline fishing areas | WDNR transfer lands |
| Snowmobile trail | WPSC | WDNR | Marinette County holds a license agreement with WPSC for 14 miles of trail | WDNR transfer lands |
| Cross county ski trail | WPSC | WDNR | Marinette County cross country ski association holds a license agreement with WPSC for 6 miles of trail | WDNR transfer lands |
| Seymour Rapids canoe portage | WPSC | WDNR | 0.5 mile canoe portage around Seymour Rapids | WDNR transfer lands |
| Mountain bike trail | WPSC | WDNR | Access trail along river | WDNR transfer lands |
| Scenic overlook and angler access | WPSC | WDNR | 4 mile vehicle trail, lookout parking area, trail | WDNR transfer lands |
| Outdoor recreation areas | WPSC | WDNR | All WPSC land is open to the public for recreation | WDNR transfer lands |
| Canoe campsites | WPSC | WDNR | 6 primitive campsites accessible only by canoe | WDNR transfer lands |
| Sandstone campground | WPSC | WPSC | Campground for the use of WPSC employees | Outside of project boundary |
| Sandstone campground picnic area | WPSC | WPSC | Picnic area for the use of WPSC employees | Outside of project boundary |
| WPSC employee boat launch | WPSC | WPSC | Boat launch, parking, pier | Remain within the project boundary |
| Hideaway Lane Boat Landing | WPSC (lease) | WPSC (lease) | Town of Stephenson operates a boat launch with parking | Remain within the project boundary |
| Dike, tailwater, and walk-in access areas | WPSC | WPSC | Unimproved popular shoreline fishing areas near the project facilities | Remain within the project boundary |
| Canoe portage | WPSC | WPSC | 0.5 mile canoe portage around Caldron Falls dam | Remain within the project boundary |
| Natural shoreline areas | WPSC | WPSC | 100-foot buffer adjacent to the proposed development areas | Remain within the project boundary |

Table 8.          Recreation Facilities at the Potato Rapids Project

Exhibit 2
Page 42 of 107

Project  No. 2525-044, et al.                                                          - 39 -

| Facility | Existing Owner | Proposed Owner | Facilities | Proposed Designation of Facilities |
|---|---|---|---|---|
| Boat Landing No. 1 East | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. 1 West | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Walk-in access | WPSC | WDNR | Unimproved popular shoreline fishing areas | WDNR transfer lands |
| Snowmobile trail | WPSC | WDNR | Marinette County holds a license agreement with WPSC for 2 miles of trail | WDNR transfer lands |
| Outdoor recreation areas | WPSC | WDNR | All WPSC land is open to the public for recreation | WDNR transfer lands |
| Dike, tailwater, and walk-in access areas | WPSC | WPSC | Unimproved popular shoreline fishing areas near the project facilities, restroom | Remain within the Project Boundary |
| Canoe portage | WPSC | WPSC | 0.1 mile canoe portage around Caldron Falls dam | Remain within the project boundary |
| Natural shoreline areas | WPSC | WPSC | 100-foot buffer adjacent to the proposed development areas | Remain within the project boundary |

Exhibit 2
Page 43 of 107

Document Access Case 3:22-cv-00533-SI 4 Document 69-2 Filed 09/13/24 Page 44 of 107
Filed Date: 09/13/2003

Project No. 2525-044, et al.                                                    - 40 -

addition, WPSC has developed acceptable private land use guidelines for project lands that include provisions for lease agreements that are within the scope of those activities allowed under the Commission's Standard Land Use Articles for the projects.

### E.   Cultural Resources

Within the lands to be conveyed to WDNR, there are 29 known archeological or historic properties, comprised of 3 sites within the Caldron Falls Project, 12 sites within the High Falls Project, 3 sites within the Johnson Falls Project, 4 sites within the Sandstone Rapids Project, and 7 sites within the Potato Rapids Project (see table 9).

Within the lands proposed for development, no archeological or historic sites were identified on the 172 acres that were surveyed as a result of previous surveys (AVD Archaeological Services, 2002). WPSC contracted to have the additional 217 acres of the lands proposed for development and removal from the project boundary surveyed. Field techniques of shovel testing and surface collection were used to survey these lands (AVD Archaeological Services, 2002). Artifacts were found at four locations within the lands proposed for development within the Sandstone Rapids Project. Two locations were identified as isolated finds that do not constitute archeological sites, and no further archeological work was recommended at those locations. The other two sites were identified as dumps relating to Euro-American or later activity. Because there are no structural remains within the vicinity of the dumps and many such sites occur in the region, no further investigation was recommended. WPSC submitted this report to the SHPO for review and comment, but as of the time of the filing of the report with the Commission (July 25, 2002), WPSC had not received a response from the WHS.

WPSC manages the historic resources associated with the Peshtigo River projects according to Commission-approved HRMPs.[46] The HRMPs were developed in consultation with the WHS and follow the requirements of a statewide PA that applies to hydroelectric projects within the State of Wisconsin. The PA ensures Commission compliance with Section 106 of the National Historic Preservation Act (NHPA).

Table 9.        Summary of Known Archeological or Historic Properties within the Lands Conveyed to WDNR (Source: WPSC, 2002)

| Project | Number of Known Archeological or Historic Properties |
|---|---|

---

[46] The Caldron Falls Project HRMP was filed June 15, 1998, and approved by the Commission June 26, 1998; the Sandstone Rapids Project HRMP was filed June 8, 1998, and approved by the Commission on June 26, 1998; the High Falls Project HRMP was filed on June 15, 1998, and approved by the Commission on June 26, 1998; the Johnson Falls Project HRMP was filed on June 15, 1998, and approved by the Commission on June 26, 1998; and the Potato Rapids Project HRMP was filed on June 15, 1998, and approved by the Commission on June 25, 1998.

Exhibit 2
Page 44 of 107

Document Accession #: 20090918-3004   Filed Date: 09/19/2003

Project  No. 2525-044, et al.                                                                - 41 -

| Caldron Falls | 1 - Unknown Isolated Find<br>1 - Unknown Woodland Site<br>1 - Unknown Prehistoric Site |
|---|---|
| High Falls | 1 - Historic Euro-American Trapper Site<br>1 - Unknown Historic Trash Dump<br>1 - Unknown Historic Homestead Site<br>1 - Unknown Prehistoric and Homestead Site<br>1 - Unknown Woodland Site<br>1 - Unknown Late Woodland Site<br>1 - Unknown Historic Quarry Site<br>1 - Historic Euro-American Homestead<br>1 - Unknown Lithic Scatter<br>3 - Unknown Prehistoric Site |
| Johnson Falls | 1 - Historic Euro-American Trading Post<br>1 - Historic Euro-American Homestead<br>1 - Unknown Prehistoric Site |
| Sandstone Rapids | 1 - Unknown Prehistoric and Historic Euro-American<br>1 - Historic Euro-American Logging Camp<br>2 - Unknown Prehistoric Site |
| Potato Rapids | 1 - Unknown Burial Mounds<br>1 - Unknown Prehistoric Garden Beds<br>1 - Historic Indian Burial Site<br>1 - Archaic/Woodland Campsite/Village<br>1 - Historic Euro-American Trading Post<br>1 - Unknown Burial Mounds/Grave Sites<br>1 - Unknown Prehistoric Site |

Exhibit 2<br>Page 45 of 107

Project No. 2525-044, <u>et</u> <u>al.</u>                                                                              - 42 -

As stipulated in the HRMPs and Stipulation II.B.1 of the PA, WPSC is required to monitor the Peshtigo River projects' shorelines areas once every 5 years for the duration of the license to monitor for shoreline erosion due to project operations so any potential new archeological sites can be identified as they may become exposed. WPSC submits the monitoring results to the SHPO and the Commission by December 31st of the year in which the monitoring is conducted.

As stipulated in the HRMPs and Stipulation I.C of the PA, if new archeological properties are identified as a result of the monitoring, WPSC applies the Criteria of Evaluation to determine if the property is eligible for listing on the National Register of Historic Places and consults with the SHPO to determine if further documentation is necessary. WPSC then submits the completed eligibility form bearing the SHPO's signature to the Commission with the supporting materials. If archeological properties are eroding due to project operations, WPSC would consult with the SHPO to determine appropriate shoreline stabilization measures.

As stipulated in the HRMPs and Stipulation II.B.2 of the PA, for lands where no prior archeological surveys have been completed, prior to any ground-disturbing activities, WPSC would contract to conduct a Phase I archeological survey and would consult with the SHPO for appropriate evaluation or stabilization measures if any potential historic properties are discovered. WPSC gives priority to preserving historic properties in place, and if preservation in place is not deemed feasible, WPSC would develop and implement a data recovery plan developed in consultation with the SHPO.

WPSC submits an annual historic resources management report to the SHPO reporting WPSC study activities conducted at the projects for the previous year. WPSC also submits all archeological reports prepared under the PA to the Commission and to the SHPO within 6 months of completion.

## VI.     ENVIRONMENTAL EFFECTS

### A.     Proposed Action and Action Alternative

### 1.     Water, Fishery, and Soils Resources

#### Proposed Action

The lands that WPSC proposes to transfer to WDNR would be managed in a similar manner as has been accomplished under WPSC ownership. WPSC developed the current CLWMP as a part of the relicensing process at the request and concurrence of WDNR. WPSC based many of the policies in the CLWMP on WDNR's Silvicultural and Aesthetic Handbook and Best Management Practices for Water Quality. WDNR states that it would manage property conveyed or proposed for conveyance in a similar manner utilizing the same guidelines, including riparian buffers and aesthetic zones in which no timber harvesting would occur (letter

Exhibit 2
Page 46 of 107

Project No. 2525-044, et al.                                                                              - 43 -

from Terrence Gardon, WDNR, March 22, 2022, to Greg Egtvedt, WPSC).

Currently, a vegetative buffer of at least 200 feet occurs on the properties proposed for removal. Riparian buffers can provide the means to slow water runoff; trap sediment, nutrients, and pesticides; and enhance infiltration within the buffer. Buffers can help lower water temperatures by shading a water body and slow out-of bank flood flows. Buffers are a source of food, nesting cover, and shelter for many wildlife species and can provide connecting corridors that enable wildlife to move safely from one habitat area to another (NRCS, 2002; USDA, 1997). While the WDNR management practices would follow the existing policies in the CLWMP, there is no guarantee that a 200-foot shoreline buffer and the beneficial effects of the vegetative buffer on water quality, soil erosion and sedimentation, and fishery resources would remain over the term of the licenses.

On the lands WPSC proposes to develop, a 100-foot buffer would remain within the project boundaries, and development would be restricted to single-family residences with minimum lot sizes. The proposed minimum lot size and single-family residences restrictions would limit the extent of development on these lands and would, therefore, help limit any potential adverse effects on water quality from development in the upland areas of these parcels. There may be some increase in development of shoreline docks and piers associated with the lands proposed for development (see section VI.A.4). This shoreline development would occur within the 100-foot buffer, within the existing project boundaries, and would have the same restrictions that are currently required under the existing conditions. The 100-foot vegetated buffer between the developable areas and the project reservoirs would help minimize potential erosion and sedimentation on these lands as the result of the vegetative clearing restrictions and development restrictions. The proposed 100-foot buffer, however, would provide less protection from potential shoreline erosion and sedimentation along the project shorelines due to the reduction in the shoreline buffers from the existing 200- to 400-foot buffer.

**Action Alternative**

The 200-foot shoreline buffer along the areas proposed for removal from the project boundaries, would provide shoreline riparian buffer protection similar to that which currently exists. The 200-foot buffer would have beneficial effects on water quality, soil erosion and sedimentation, and fisheries resources because of the vegetated shoreline buffer that would be maintained for the term of the licenses. The removal of lands outside the 200-foot buffer from the project boundaries that have been and are proposed to be transferred to WDNR would be managed similar to the provisions required in the existing CLWMP, and would therefore, have no adverse effects on water quality, fishery resources, or soil erosion and sedimentation within the project areas.

Preservation of a 200-foot buffer between the proposed lands for development and the project reservoirs would help minimize potential adverse effects of development on soil erosion and sedimentation, water quality, and fishery resources along the project shorelines. There may be an increase in construction of shoreline facilities (docks, piers, and similar structures) within

Exhibit 2
Page 47 of 107

Project  No. 2525-044, et al.                                                    - 44 -

the project boundary as a result of the proposed upland development.  However, any shoreline construction would be required to follow the same restrictions as what currently occurs along the project shorelines, and any potential adverse effects on shoreline resources would be minimal and short-term.

2.      **Terrestrial Resources**

        **Proposed Action**

        On the lands that are proposed to be transferred to WDNR, WDNR would manage the lands in a similar manner as under existing conditions.  These lands would be under the State of Wisconsin's management and follow the management plans to be developed by WDNR and existing WDNR land management guidelines, including WDNR's Wildlife Management Operations, Silvicultural and Forest Aesthetics, Best Management Practices for Water Quality, Forestry Operations, Public Forest, Timer Sales, Recreation Area Operations and Maintenance Standards, Recreation Design Standards, and Trail Specifications.  As stated previously, WPSC manages the lands according to the CLWMP, and the CLWMP was developed in consultation with WDNR and drew upon many of WDNR's management guidelines in developing the plan.  The FWS states that implementation of WDNR's management principles would provide a high level of resource protection and management on the lands proposed to be conveyed to WDNR, perhaps even greater than that provided under the CLWMP (FWS, 2002).  The Proposed Action would, therefore, be expected to have no adverse effects on terrestrial, wetlands, and wildlife resources in these areas.  However, there is currently a vegetative buffer of at least 200 feet on the properties proposed for removal.  While WDNR may maintain such a shoreline buffer, there is no guarantee that a shoreline buffer and the beneficial effects of the vegetative buffer on terrestrial, wetland, and wildlife resources would remain over the term of the licenses.

        For the lands to be removed from the project boundary and developed, 389 acres or approximately 4 percent of the area would be altered, resulting in the loss of some of the high quality habitat currently contained on these lands.  WPSC proposes to limit structures on the land to single-family residences not to exceed 35 feet in height.  Overall, the potential loss of 4 percent of forest habitat would have an adverse effect on wildlife species in the area.  However, this adverse effect would be minimized due to the more than 9,000 acres of adjacent lands of high quality wildlife habitat that would be maintained.

        FWS recommended that WPSC stipulate a protective covenant condition on the sale of Parcel No. 13 (located at the High Falls Project) of the lands proposed for sale by WPSC for development in order to protect an emergent wetland of about one acre in size so that the wetland is not disturbed by development.  The identified wetland is about 150 feet from the water's edge.  Under the proposed action, WPSC proposes to maintain a 100-foot shoreline buffer (about a 9-acre area associated with Parcel 13) within the project boundary, which would protect some shoreline resources.  The proposed 100-foot buffer would remain under WPSC's management, and vegetative clearing restrictions would still occur.  The 100-foot would help maintain existing shoreline vegetation and wildlife habitat and would help minimize soil erosion and siltation from

Exhibit 2
Page 48 of 107

Project  No. 2525-044, <u>et</u> <u>al.</u>                                                          - 45 -

the adjacent proposed development areas.  However, the proposed 100-foot buffer would be at least 100-feet less than the existing shoreline buffers.  Therefore, the proposed buffer would not provide the same level of benefits to wildlife habitat, wetlands, and terrestrial resources than what occurs under existing conditions, and would not afford protection for the one-acre wetland associated with Parcel 13.

### *Threatened and Endangered Species*

Bald eagle nesting and foraging habitat is found on lands proposed for transfer to WDNR. WDNR has stated that they will follow the FWS's Bald Eagle Management Guidelines.  In addition, WDNR initiated a contract for an ecological assessment and ecological context overview for the lands acquired or to be acquired as part of the state forest (letter from Terrence Gardon, WDNR, dated March 22, 2002, to Greg Egtvedt, WPSC).  WDNR intends to add the information to the Natural Heritage Inventory records, and the property manager would be required to check the Natural Heritage Inventory prior to initiating any management activity. Furthermore, WDNR is required to follow all federal and state requirements in the protection of threatened and endangered resources.  The FWS states that implementation of WDNR management practices would afford a high level of resource protection and management, however, they state that WDNR should maintain a 200-foot buffer zone along all of the project land to be conveyed.  In addition, FWS supported WDNR's proposal to conduct an ecological assessment of the properties proposed for conveyance to WDNR and request WDNR inform the FWS of any new information regarding federally-listed threatened and endangered species.  The WDNR's proposed management practices would provide the same or greater protection than that which currently exists under the CLWMP.  Therefore, the transfer of lands to the WDNR will not affect bald eagles or their habitat.

The area proposed for development has not been designated as an endangered resource zone, and currently there are no bald eagle nests located on these lands and no other identified federally-listed threatened and endangered species on these lands.  Therefore, there would be no effect to the bald eagle under the Proposed Action.  However, the proposed 100-foot buffer would be at least 100-feet less than the existing shoreline buffers.  Therefore, the proposed buffer would not provide the same level of benefits to federally-listed threatened and endangered species than what occurs under existing conditions.

### <u>Action Alternative</u>

Under the Action Alternative, maintenance of a 200-foot buffer along the project shorelines of the lands conveyed to WDNR would help ensure the protection of the shoreline vegetative buffer similar to that afforded under existing conditions.  As stated under the Proposed Action, the upland areas would be managed by WDNR in a manner consistent to that which currently occurs.  The 200-foot buffer would most likely encompass the area associated with the one-acre wetland, located about 150 feet from the High Falls Project reservoir.  In the event, the entire wetland is not protected by the shoreline buffer, a protective covenant and condition on the sale of the parcel, as recommended by the FWS, would provide adequate protection of the

Exhibit 2
Page 49 of 107

Project No. 2525-044, <u>et</u> <u>al.</u>                                                                                     - 46 -

wetland area. Therefore, there are no anticipated adverse effects on terrestrial resources under the Action Alternative.

For the lands to be removed from the project boundary and developed, 389 acres or approximately 4 percent of the area proposed for removal would be altered resulting in the loss of some of the high quality habitat currently contained on these lands. Overall, the potential loss of 4 percent of forest habitat would have relatively minor adverse effects on wildlife species in the area, based on the amount of high quality forest habitat that would still be available. The 200-foot buffer would provide for a shoreline vegetative buffer similar to the existing conditions.

### *Threatened and Endangered Species*

Under the Action Alternative, maintenance of a 200-foot buffer along the project shorelines of the lands conveyed to WDNR would help ensure that potential nesting and roosting trees within the vegetative buffer would remain. As stated under the Proposed Action, the upland areas would be managed by WDNR in a manner consistent to that which currently occurs. Therefore, there are no effects on threatened and endangered resources under the Action Alternative.

Similar to the Proposed Action, since no identified federally-listed threatened and endangered species are known to exist and no bald eagles are known to nest in the lands proposed for removal and development, the Action Alternative would not have adverse effects on nesting and feeding areas for the threatened bald eagle or on federally-listed threatened and endangered species. There would be an additional 100-foot shoreline buffer maintained along the project shorelines, as compared to the Proposed Action, that would help protect potential bald eagle habitat.

### 3. Land Use and Aesthetic Resources

#### <u>Proposed Action</u>

Under the Proposed Action, similar land uses would be maintained on the lands conveyed to WDNR. These lands would be established as a state park and state forest lands, providing public access to the lands. In addition, these lands would be under the State of Wisconsin's management and follow the management plans to be developed by WDNR and existing WDNR land management guidelines, including WDNR's Silvicultural and Aesthetic Handbook and Best Management Practices for Water Quality. These management plans would be based upon and follow similar land management guidelines as the existing CLWMP, which is required by the existing project licenses. These management measures would help ensure public use and access and that the natural character of the project areas would remain.

Exhibit 2
Page 50 of 107

Project No. 2525-044, et al.                                                          - 47 -

However, WPSC does not propose any specific shoreline buffers along the project reservoirs for the lands conveyed or proposed for conveyance to WDNR. Currently, the existing licenses require that at least a 200-foot buffer be maintained that restricts development and also restricts vegetative clearing other than when agreed to by the licensee, FWS, NPS, and WDNR for aesthetic or other purposes. While WDNR management practices may help preserve the shoreline aesthetic character, there is no guarantee that the beneficial effects of a shoreline buffer would be maintained over the term of the licenses.

For the lands proposed for development, the existing land use would change from undeveloped, natural character to single-family residential. WPSC proposes to maintain building height and color restrictions that would help limit potential adverse aesthetic effects from the proposed development. In addition, the 389 acres would be a small portion of the total project reservoir area, about 3.8 percent of the total proposed for removal from the project boundaries. WPSC proposes to maintain a 100-foot buffer within the existing project boundaries, which would provide some measures for preserving the shoreline's aesthetic character and provide measures for some public access to the project reservoirs. However, under the existing licenses and CLWMP, the shoreline areas associated with the 389 acres proposed for development require a 200- to 400-foot shoreline buffer. The change in the width of the shoreline buffer to 100 feet could, therefore, lead to potential adverse effects on the shoreline character as compared to existing conditions.

### Action Alternative

FWS, NPS, and RAW all recommend that a 200-foot no timber harvest buffer be maintained along the project shorelines of the lands conveyed to WDNR and those proposed by WPSC for development in order to maintain the shoreline aesthetics and vegetative buffer benefits. Maintaining a 200-foot buffer would provide a similar level of shoreline protection and aesthetic benefits as required under existing conditions, with the exception of areas along the High Falls and Johnson Falls reservoirs currently classified within the wild reservoir designation that have a 400-foot buffer. Although the CLWMP provides for land management areas with a 400-foot buffer, under the existing licenses, only a 200-foot buffer is required for the maintenance of a vegetative buffer and protection of shoreline aesthetics. A 200-foot shoreline buffer would help ensure that the natural, undeveloped character of the shoreline aesthetics would be maintained. In addition, maintaining a 200-foot buffer within the project boundaries would help ensure that public access to the project shorelines would remain over the term of the licenses.

### 4.     Recreation Resources

### Proposed Action

WPSC proposes to remove all of the boat launching access areas at the Peshtigo River projects from the project boundaries and transfer the ownership to WDNR, with the exception of the Hideaway Boat Launch, which would continue to be leased to the town of Stephenson and

Exhibit 2
Page 51 of 107

Project  No. 2525-044, et al.                                                                    - 48 -

would remain within the project boundary.  In addition, WPSC proposes to maintain and continue managing the facilities that are located on lands proposed to remain within the project boundaries, including the canoe portages around the project dams, tailwater access areas, and informal access at various shoreline areas.  WPSC proposes to continue to operate the Sandstone campground, picnic area, and boat launch, which are available to WPSC employees.

Public use of the lands associated with the lands transferred to WDNR would be similar to existing conditions and would potentially increase with the addition of the area to be developed as a state park.  WDNR would take over management of 16 boating access areas on the 5 reservoirs and would own the land and maintain the lease with the town of Stephenson for the boat launch at the High Falls Project.  While WDNR proposes to maintain these recreation facilities, WDNR does not have specific mandates to continue the maintenance and operation of these facilities.  The long-term provision of these public access areas would be likely, but not guaranteed.

WPSC proposes to allow limited public recreation opportunities within the 100- foot strip of land that would remain in the project boundary.  Public access and recreation on the remaining lands proposed to be developed would be eliminated.  WPSC proposes to allow landowners on the developed lands to build docks, piers, and similar structures upon written approval from WPSC; place signs not larger than 4 feet square advertising the sale or lease of property upon written approval from WPSC; remove dead or diseased trees, bushes, shrubs, and plants or plant trees or shrubs upon written approval from WPSC; swim; store boats at WPSC-approved structures; and hike, picnic, and fish.  The general public would be permitted to hike; jog; walk; beach comb; bird watch; photograph nature in all areas within the 100-foot buffer except on WPSC-approved structures; and bank fish except within 100 feet of any dock, pier, or similar structure.  This would potentially alter the shoreline use in this area with an increase in private shoreline piers.  However, this would be within a small area of the reservoirs, and would follow WPSC's requirements for permitting shoreline facilities as allowed under the Standard Land Use Article of the project licenses.

### Action Alternative

Tables 10 through 14 summarize the shoreline recreation access areas within each project that would remain within the project boundaries under the Action Alternative.  The retention of a 200-foot buffer and the shoreline recreation access areas within the respective project boundaries would help ensure that public recreation access would remain open and available as provided for in the Recreation Plan for the projects.  As stated under the Proposed Action, public use of the lands associated with the lands transferred to WDNR would be similar to existing conditions and would potentially increase as a result of the development of the proposed state park.  Public use of the lands associated with a 200-foot buffer and shoreline recreation access areas would be similar  to existing conditions and would remain under the provisions of the Recreation Plan and applicable license articles.

Under the Action Alternative, the lands proposed for development would no longer be

Exhibit 2
Page 52 of 107

Project No. 2525-044, et al.                                                      - 49 -

available for public recreation.  However, the 200-foot shoreline buffer would still provide opportunities for public recreation access.  Adjoining landowners would be allowed to build docks, piers, and similar structures upon written approval from WPSC, as proposed by WPSC and allowed under the Standard Land Use Article of the project licenses.

Table 10.     Recreation Facilities at the Caldron Falls Project to Remain within the Project Boundary under the Action Alternative

| Facility | Existing Facilities |
|---|---|
| Boat Landing No. 8 | Boat launch, barrier-free fishing pier, parking, restroom |
| Boat Landing No. 9 | Boat launch, parking, restroom |
| Boat Landing No. 10 | Boat launch, parking |
| Boat Landing No. 11 | Boat launch, parking |
| Boat Landing No. 12 | Boat launch, parking, restroom |
| Boat Landing No. 13 | Boat launch, parking |
| Dike, tailwater, and walk-in access areas | Unimproved popular shoreline fishing areas near the project facilities |
| Canoe portage | 0.2 mile canoe portage around Caldron Falls dam |

Table 11.     Recreation Facilities at the High Falls Project to Remain within the Project Boundary under the Action Alternative

| Boat Landing No. 1 | Boat launch, parking |
|---|---|
| Boat Landing No. 2 | Boat launch, parking |
| Boat Landing No. 3 | Boat launch, parking |
| Boat Landing No. 4 | Boat launch, parking, restroom |
| Boat Landing No. 5 | Boat launch, parking, restroom |
| Boat Landing No. 6 | Boat launch, barrier-free fishing pier, parking, restroom |
| Boat Landing No. 7 | Boat launch, barrier-free fishing pier, parking, restroom |
| Town of Stephenson Park | Boat launch, barrier-free skid pier, picnic area, swimming area, water-ski show viewing area, restrooms, parking |
| Dike, tailwater, and walk-in access areas | Unimproved popular shoreline fishing areas near the project facilities |
| Canoe portage | 0.1 mile canoe portage around High Falls dam |

Table 12.     Recreation Facilities at the Johnson Falls Project to Remain within the Project Boundary under the Action Alternative

| Facility | Facilities |
|---|---|
| Boat Landing No. 14 | Boat launch, parking |
| Canoe campsites | 4 primitive campsites accessible only by canoe |
| Dike, tailwater, and walk-in access areas | Unimproved popular shoreline fishing areas near the project facilities, barrier-free fishing pier, parking |
| Canoe portage | 0.1 mile canoe portage around Johnson Falls dam |

Exhibit 2

Page 53 of 107

Project  No. 2525-044, et al.                                                          - 50 -

Table 13.      Recreation Facilities at the Sandstone Rapids Project to Remain within the Project Boundary under the Action Alternative

| Facility | Facilities |
|---|---|
| Seymour Rapids canoe portage | 0.5 mile canoe portage around Seymour Rapids |
| Scenic overlook and angler access | lookout parking area, trail |
| Canoe campsites | 6 primitive campsites accessible only by canoe |
| Sandstone campground | Campground for the use of WPSC employees |
| Sandstone campground picnic area | Picnic area for the use of WPSC employees |
| WPSC employee boat launch | Boat launch, parking, pier |
| Hideaway Lane Boat Landing | Town of Stephenson operates a boat launch with parking |
| Dike, tailwater, and walk-in access areas | Unimproved popular shoreline fishing areas near the project facilities |
| Canoe portage | 0.5 mile canoe portage around Caldron Falls dam |

Table 14.      Recreation Facilities at the Potato Rapids Project to Remain within the Project Boundary under the Action Alternative

| Facility | Facilities |
|---|---|
| Boat Landing No. 1 East | Boat launch, parking |
| Boat Landing No. 1 West | Boat launch, parking |
| Dike, tailwater, and walk-in access areas | Unimproved popular shoreline fishing areas near the project facilities, restroom |
| Canoe portage | 0.1 mile canoe portage around Caldron Falls dam |

Table 15 summarizes the recreation facilities that are recommended for removal from the project boundaries.  Any portions of these facilities located within the 200-foot buffer or within the recreation areas summarized in tables 10 through 14 would remain within the project boundary.  These recreational facilities include snowmobile, mountain bike, and cross-country ski trails that are not directly associated with public recreational access to project waters or facilities.  The snowmobile trails are currently licensed to Marinette County who works with local snowmobile clubs for maintenance of the trails, and WDNR would continue the agreement with Marinette County.  Mountain biking is permitted on snowmobile trails in the summer (FEIS, March 1997, pg. 3-41).  These trails are part of a larger network of trails within the surrounding area.  There are about 244 miles of snowmobile trails within Oconto County, and about 406 miles of snowmobile trails within Marinette County (Association of Wisconsin Snowmobile Clubs.

Exhibit 2
Page 54 of 107

Project  No. 2525-044, <u>et</u> <u>al.</u>                                                    - 51 -

2003).  In addition, the Marinette Cross County Ski Association would continue to maintain the cross-country ski trail under agreement with WDNR.  Therefore, the snowmobile, mountain biking and cross country ski trails would still remain available for public use.  Also, there are other publically accessible, comparable public recreation opportunities for such activities within the project region.

Table 15.        Recreation Facilities recommended for removal from the Project Boundaries under the Action Alternative

| Reservoir | Facility | Facilities |
|---|---|---|
| Caldron Falls | Snowmobile trail | Marinette County holds a license agreement with WPSC for 3 miles of trail |
| High Falls | Snowmobile trail | Marinette County holds a license agreement with WPSC for 5 miles of trail |
| Johnson Falls | Snowmobile trail | Marinette County holds a license agreement with WPSC for 0.5 mile of trail |
| Sandstone Rapids | Snowmobile trail and mountain bike trail | Marinette County holds a license agreement with WPSC for 14 miles of trail |
|  | Cross county ski trail | Marinette County cross country ski association holds a license agreement with WPSC for 6 miles of trail |
| Potato Rapids | Snowmobile trail | Marinette County holds a license agreement with WPSC for 2 miles of trail |

## 5.    Cultural Resources

### Proposed Action

By letter dated June 25, 2003, WPSC submitted an executed MOU between the WDNR, SHPO, and WPSC for the management of historic properties that would be removed from the existing project boundaries and conveyed to WDNR.  The MOU would provide measures for the long-term management of these lands consistent to that which currently occurs under the existing HRMPs and PA.  The removal of the lands from the project boundary would eliminate the Commission's opportunity to ensure that historic properties are protected as required by the NHPA.  The MOU would help ensure future protection of existing and as yet unidentified historic properties within the lands proposed for conveyance to WDNR.

Under the Proposed Action, a 100-foot shoreline buffer would remain within the project boundaries along the shorelines of the lands proposed for development.  The existing requirements of the HRMPs and PA would remain in place for the areas within the 100-foot buffer, and monitoring of the potential effects of project operations on historic properties along the project shorelines would continue.  On the remaining lands outside of the 100-foot buffer, the

Exhibit 2
Page 55 of 107

Project No. 2525-044, et al.                                                              - 52 -

lands will be managed by the WDNR under the terms of the MOU.

The archeological surveys conducted on the lands intended for development found no eligible historic properties within these parcels, and therefore there would be no adverse effect to historic properties as a result of the removal of the lands proposed for development from the project boundary.

The execution of the PA by the Commission and the Wisconsin SHPO, and implementation of its terms evidence that the Commission has taken into account the effects of this undertaking on historic properties and afforded the ACHP an opportunity to comment.

### Action Alternative

Under the Action Alternative, a 200-foot shoreline buffer would remain within the project boundaries along the shorelines of the properties conveyed to WDNR and those properties proposed for future development and removal from the project boundaries. The existing requirements of the HRMPs and PA would remain in place for the areas within the 200-foot buffer. WPSC activities for shoreline monitoring would continue for all lands surrounding the project reservoirs, and this would allow for continued monitoring by WPSC of the potential effects of project operations on historic properties along the project shorelines. As stated under the Proposed Action, the executed MOU between WPSC, WDNR, and SHPO would ensure the future protection of any existing and any potential as yet undiscovered historic properties on the lands proposed for conveyance to WDNR. As stated under the Proposed Action, there would be no adverse effect on historic properties on the parcels proposed for development. The execution of the PA by the Commission and the Wisconsin SHPO, and implementation of its terms evidence that the Commission has taken into account the effects of this undertaking on historic properties and afforded the ACHP an opportunity to comment.

**B.      No-Action Alternative**

Under the No-Action Alternative, the licensee's proposal would be denied. There would be no change to the existing environment. No project lands would be removed from the project boundaries, and there would be no changes to existing project boundaries.

**VII.    CONCLUSION AND RECOMMENDATIONS**

Based on our analysis described in this EA, we recommend approval of the Action Alternative, which would include the removal of land from the project boundary of the Peshtigo River projects as proposed by WPSC, with the exception of lands associated with the existing shoreline recreation access areas (summarized in Tables 10 through 14) and lands within a 200-foot no timber harvest buffer from the normal high water mark of the project reservoirs within the proposed approximate 9,738 acres for removal. The lands within the 200-foot buffer and shoreline recreation access areas would remain within the respective project boundaries and be managed according to the existing CLWMP land management practices.

Exhibit 2
Page 56 of 107

Project No. 2525-044, et al.                                             - 53 -

The remainder of the 9,738 acres would be removed from the project boundary to be conveyed to WDNR or maintained by WPSC for development purposes as proposed by WPSC. The 200-foot no timber harvest buffer along the project shorelines would protect soil, water quality, fishery, terrestrial, land use, and recreation resources and federally-listed threatened and endangered species in a manner similar to that required under the existing project licenses and the approved CLWMP. The 200-foot buffer would most likely encompass the area associated with the one acre wetland, located about 150 feet from the High Falls Project reservoir. Maintaining the shoreline recreation access areas within the project boundaries would ensure public recreational access to the project reservoirs over the term of the project licenses.

For the lands proposed for removal outside of the 200-foot buffer and shoreline recreation access areas, we recommend the Commission approve the removal of the lands associated with WPSC's proposed phase 1. We also recommend that the Commission approve the removal of the lands outside of the 200-foot buffer and shoreline recreation access areas associated with phase II and phase III that are proposed for conveyance to WDNR. We recommend that WPSC be required to submit to the Commission revised Exhibit G maps, provide new estimates of the lands to remain within the project boundaries for each project (including the land areas associated with the 200-foot buffer and the shoreline recreation access areas), and provide an estimate of the total lands that would be removed from the project boundaries for each project.

We determined that there would be no adverse effect on historic properties as a result of the recommended alternative (see section VI.A.5, cultural resources). The executed MOU between WDNR, SHPO, and WPSC would ensure the future protection of existing or as yet undiscovered historic properties within the lands conveyed to WDNR.

We conclude that granting authorization for removal of lands from the project boundaries at the Caldron Falls (FERC Project No. 2525), High Falls (FERC Project No. 2595), Johnson Falls (FERC Project No. 2522), Sandstone Rapids (FERC Project No. 2546), and Potato Rapids (FERC Project No. 2560) hydroelectric projects with the conditions stipulated above would not constitute a major federal action significantly affecting the quality of the human environment.

Exhibit 2
Page 57 of 107

Project No. 2525-044, <u>et</u> <u>al.</u>                                                                 - 54 -

## VIII. REFERENCES

AVD Archaeological Services, Inc. 2002. An Archaeological Survey of Development Lands on High Falls, Johnson Falls and Sandstone Rapids Hydroelectric Project in Marinette County Wisconsin, May.

Association of Wisconsin Snowmobile Clubs. 2003. Web site - http://awsc.fp.execpc.com/trail.htm#oconto

FERC (Federal Energy Regulatory Commission). 1997. Peshtigo River Multiple Projects Environmental Impact Statement, March.

NRCS (Natural Resources Conservation Service). 2002. Buffer Strips Common Sense, http://www.nrcs.usda.gov/feature/buffers/.

USDA (U.S. Department of Agriculture). 1997. Riparian Forest Buffer Conservation Practice Job Sheet, April.

WPSC (Wisconsin Public Service Corporation). 2002. Project Boundary Modifications, Description, Analysis, and Impact Evaluation for the License Amendment Application for the Caldron Falls (FERC No. 2525), High Falls (FERC No. 2595), Johnson Falls (FERC No. 2522), Sandstone Rapids (FERC No. 2546), and Potato Rapids (FERC No. 2560) Hydroelectric Projects, June.

WPSC. 1998. Comprehensive Land and Wildlife Management Plan for the Peshtigo River Hydroelectric Projects, June.

WPSC. 1998. Recreation Plan for the Peshtigo River Hydroelectric Projects, June 23.

WPSC. 1998. Historic Resource Management Plan for the Caldron Falls Hydroelectric Project (FERC No. 2525), June 15.

WPSC. 1998. Historic Resource Management Plan for the High Falls Hydroelectric Project (FERC No. 2595), June 15.

WPSC. 1998. Historic Resource Management Plan for the Johnson Falls Hydroelectric Project (FERC No. 2522), June 15.

WPSC. 1998. Historic Resource Management Plan for the Sandstone Rapids Hydroelectric Project (FERC No. 2546), June 8.

WPSC. 1998. Historic Resource Management Plan for the Potato Rapids Hydroelectric Project (FERC No. 2560), June 25.

Exhibit 2
Page 58 of 107

Project No. 2525-044, <u>et</u> <u>al.</u>                                                     - 55 -

## IX.    PREPARERS

*Federal Energy Regulatory Commission*
Jean Potvin - Environmental Protection Specialist
B. Peter Yarrington - Fisheries Biologist
Rebecca M. Martin - Environmental Biologist

*Louis Berger Group*
Alynda Foreman - Terrestrial Biologist
Bill Perry - Land Use and Recreation Planner
Karen Klosowski - Land Use and Preservation Planner
Denise Short - Technical Editor

Exhibit 2
Page 59 of 107

Document Accession #: 20030916-3009    Filed Date: 09/16/2003

Project  No. 2525-044, et al.

- 1 -

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION
104 FERC * 61,295

Before Commissioners: Pat Wood, III, Chairman;
                      William L. Massey, and Nora Mead Brownell.


Wisconsin Public Service CorporationProject Nos. 2525-044, 2525-
                            046, and 2525-051; Project Nos.
                            2546-063, 2546-064, and 2546-068;
                            Project Nos. 2560-040, 2560-042,
                            and 2560-047; Project Nos. 2522-
                            066, 2522-068, and 2522-074; and
                            Project Nos. 2595-058, 2595-060,
                            and 2595-065

ORDER GRANTING MOTIONS TO INTERVENE, REINSTATING
REQUEST FOR REHEARING, GRANTING REHEARING IN
PART,

AND GRANTING WITH CONDITIONS APPLICATION TO AMEND
PROJECT BOUNDARIES

(Issued September 15, 2003)

1.    This order deals with an application by Wisconsin Public
Service Corporation (Public Service) to amend the project
boundaries of five of its projects to remove 9,738 acres of land,
of which the licensee is conveying to the State of Wisconsin 174
acres for inclusion in a state park and 9,175 acres for inclusion
in a state forest.  The remaining 389 acres are earmarked for
private development.  The order grants the application, with
certain conditions.

BACKGROUND

2.    Public Service is the licensee for six hydroelectric
projects located along a sixty-mile reach of the Peshtigo River
in Marinette and Oconto Counties, Wisconsin, all of which were
relicensed in 1997.  This proceeding deals with the 6.4-megawatt
(MW) Caldron Falls Project No. 2525, the 3.8-MW Sandstone Rapids
Project No. 2546, the 1.4-MW Potato Rapids Project No. 2560, the
3.5-MW Johnson Falls Project No. 2522, and the 7.0-MW High Falls
Project No. 2595 (collectively, the Peshtigo River Projects).[1]
3.    The Peshtigo River projects include a total of 13,417 acres
within their project boundaries.  Under the terms of the current
licenses, Public Service is required to maintain a 200-foot
buffer zone around project reservoirs and shoreline recreation
areas in order to protect natural resources in these areas.

4.    By order issued December 20, 2001, the Director of the
Division of Hydropower Administration and Compliance of the
Commission's Office of Energy Projects (OEP) granted Public
Service's request for authorization to transfer fee title to
5,740 acres in the Peshtigo River Projects to the Wisconsin
Department of Natural Resources (Wisconsin DNR), but directed the
company to file a separate amendment application with respect to
its request to delete the lands from the project boundaries.[2]
The Director stated that until the Commission approved the
revised project boundaries, the land to be sold would remain
within the boundaries, and Public Service would retain all
necessary rights to operate the projects as required by the
project licenses and the Commission's regulations.  This
directive was consistent with Public Service's understanding:[3]

        The proposed conveyances will not change [Public
    Service's] responsibility to assure that the conveyed
    property is used and managed in accordance with the
    hydropower licenses and the approved land, resource and
    recreation plans. . . .  Thus, the 2001 conveyances will
    change only the titleholder of the property.  The land
    itself will continue to be used and managed in the same
    manner that it has been in the past, unless and until the
    Commission orders the licenses amended to remove property
    that is not necessary for project purposes from the project
    boundaries.

Exhibit 2
Page 60 of 107

Document Accession #: 20030116-3000   Filed Date: 09/16/2003

5.    River Alliance[4] filed a motion to intervene and request for rehearing of the Director's December 20, 2001 order.[5] Public Service filed an answer opposing the motion to intervene, arguing that River Alliance lacks a direct interest in the proceeding because the conveyed lands will continue to be managed in the same manner as before  the conveyance.[6]  On February 22, 2002, the Commission Secretary rejected River Alliance's request for rehearing as untimely.[7]  On March 4, 2002, River Alliance filed a request for rehearing of the February 22 rejection notice.

6.    On June 17, 2002, Public Service filed an application to amend the Peshtigo River Project licenses to remove from the project (1) 5,321 acres[8] whose conveyance the Director's December 20, 2001 order approved, (2) the 389 acres Public Service intends to use for development purposes, and (3) 4,028 additional acres that it intends to convey to Wisconsin DNR in the future; and to revise the project boundaries accordingly. This would remove a total of 9,738 acres from the project, leaving 3,269 acres within the boundaries, of which about 410 acres are "upland," i.e., not inundated.  Public Service proposes to retain a 100-foot buffer zone around the project reservoirs, as opposed to the 200-foot buffer required by the current licenses.  Public Service asks for approval of phased deletions of project lands, to coincide with its phased conveyance schedule.

7.    Public notice of the company's June 17, 2002 application was issued on June 26, 2002, with an intervention/comment deadline of July 31, 2002.  Timely motions to intervene were filed by River Alliance (July 16, 2002), the Department of the Interior (July 29, 2002), and Wisconsin DNR (July 30, 2002).  Interior also filed comments on July 25, 2002, stating that its Fish and Wildlife Service (FWS) is supportive of the proposed amendments, but that both FWS and Interior's National Park Service recommend a 200-foot buffer strip between the water's edge and any proposed development.  The Park Service also supports local efforts to purchase for protection the 389 acres Public Service proposes to be developed.  On August 1, 2002, Public Service filed an answer opposing River Alliance's motion to intervene, again arguing that the Alliance has not established its interest in the proceeding.[9]

8.    Commission staff has prepared an environmental assessment (EA) of the impacts of Public Service's proposed amendment.  The EA is attached to this order.

Project  No. 2525-044, et al.

- 1 -
DISCUSSION

     A.    The Director's Order Authorizing Conveyance
            of Interests in Project Lands

            1.    River Alliance's Motion to Intervene

9.    We grant River Alliance's January 22, 2002 motion to intervene in the proceedings involving Public Service's application for permission to convey interests in project lands. River Alliance states that its members fish, boat, camp, and otherwise recreate on the Peshtigo River, and may be affected by changes in the licenses for the affected projects.  This is a sufficient interest to justify intervention.

            2.    River Alliance's March 4 Request for Rehearing
                  of the Rejection of its Rehearing Request

10.    The Secretary notice rejecting River Alliance's request for rehearing of the Director's December 21, 2001 order stated that, pursuant to Section 313(a) of the Federal Power Act (FPA), 16 U.S.C. * 825l(a), requests for rehearing must be filed within 30 days of issuance of a Commission order.  Thus, requests for rehearing of the Director's order were due by January 22, 2002.[10]  The notice stated that River Alliance's request for rehearing was filed on January 23, 2002,[11] and therefore rejected the filing as late.

11.  In its March 4 request for rehearing of the Secretary's rejection notice, River Alliance explains that it first sent its request for rehearing on January 11, 2002, by priority U.S. Mail.

Exhibit 2
Page 61 of 107

Document Accession #: 20160013006-3003    Filed Date: 09/13/2024

When it learned that the filing had not yet arrived at the Commission, River Alliance resent the pleading via Federal Express.  Attached to its March 4 request for rehearing is confirmation from Federal Express that the package was received by the Commission on January 22.

12.  River Alliance has demonstrated that it timely filed its request for rehearing of the Director's order.  We therefore reinstate its January 22 request for rehearing.

> 3.    River Alliance's January 22, 2002 Request for Rehearing of the Director's December 21, 2001 Order

13.  River Alliance seeks reversal of the Director's order authorizing Public Service to convey fee title to 9,738 acres at the Peshtigo River Projects.  Alliance argues that these lands are needed for project purposes, and that Public Service should continue to administer them pursuant to the licenses' management plans, rather than transferring them to Wisconsin, which may change how they are managed.[12]  River Alliance also asserts that Public Service's proposal to convey these lands should have been subject to public notice and a hearing.

14.  It is useful to review the meaning, in this context, of the terms "project lands" and "project boundaries."  Part I of the FPA directs the Commission, when issuing a license for a hydroelectric project, to require the licensee to undertake appropriate measures on behalf of both developmental and non-developmental public interest uses of the waterway, including fish, wildlife, and recreation.[13]  These requirements, as set forth in a license, constitute the "project purposes."

15.  Standard license Article 5 requires the licensee to acquire and retain all interests in non-federal lands and other property necessary or appropriate to carry out project purposes.[14]  The license may obtain these property interests by contract or, if necessary, by means of federal eminent domain pursuant to FPA Section 21.[15]  A licensee's property interests can range from fee simple to perpetual or renewable leases, easements, and rights-of-way.[16]  If the licensee wishes to convey any of its interests in project property, Article 5 requires it to obtain the Commission's approval.

16.  Project boundaries are used to designate the geographic extent of the lands, waters, works, and facilities that the license identifies as comprising the licensed project and for which the licensee must hold the rights necessary to carry out the project purposes.[17]  A project boundary does not change property rights, nor does the conveyance of a property right change a project boundary.[18]  If a licensee wishes to remove lands from a project - i.e., from the Commission's regulatory control as defined in the project license - it files an application to delete the lands from the license and from the project boundary.[19]

17.  Any transfer by a licensee of an interest in land that is and will remain in the project is authorized or will be approved only if the non-project use for which the interest is being conveyed will not interfere with project purposes, including the protection and enhancement of environmental values.  Conditions to this end are required covenants to conveyances authorized by the standard land use article, and are imposed in Commission approvals as appropriate, so that the Commission, through its licensee, can enforce the conditions and protect the project.[20] 18.  Any application to remove lands from a project boundary will be approved only if the Commission determines that the land is no longer necessary or appropriate for project purposes; that is, that all project purposes will continue to be satisfied in the absence of the lands at issue. If the Commission deletes a parcel of land from the project and its boundary,  the Commission is placing that land outside of its jurisdiction and regulatory reach.  As a consequence, it can neither impose nor enforce any conditions on that removal, including any covenants running with the land.

19.  It follows that if the land in question has already been the subject of the licensee's transfer of property rights, with attendant covenants, then once the land is removed from the project the Commission cannot, either directly or through its licensee, enforce such covenants.[21]  This means that if the

Exhibit 2
Page 62 of 107

ineffectiveness of the covenants to limit activities on the removed land could lead to  adverse effects on project purposes, then either the license should be amended to require appropriate mitigation for such potential adverse effects,[22] or the Commission should deny in part or in whole the application to remove the land in question.[23]

20.  When a licensee wishes to remove a parcel of land from the project and sell it, the licensee should file an application to amend the project license to delete the land from the project boundary.  If the Commission finds that the licensee has demonstrated that the land is not (or no longer) needed for project purposes, the land will be deleted from the project license and boundary, after which the licensee is free to sell or otherwise dispose of the land without any involvement by the Commission.

21.  For its phase one conveyances, Public Service applied both to remove certain lands from the projects' boundaries and to obtain Commission approval of the conveyance to Wisconsin of fee title to the lands.[24]  Thus, Public Service was simultaneously proceeding down two different tracks.  The Director's order, instead of addressing the threshold issue of whether the lands could appropriately be deleted from the project,[25] approved the conveyances with the interim requirement that the lands may only be occupied and used in the manner prescribed by the project licenses.[26]  The order thus deferred to a later proceeding the real issues, which are whether the  acres there at issue must be retained in the project in order to meet licensed project purposes, and, if this question is answered in the affirmative, whether the project purposes may be revised to accommodate the land removal.

22.  We turn now to Public Service's June 14, 2002 application to amend the Peshtigo River Projects to remove the lands at issue from the licenses and, therefore, from the project boundaries.

Project  No. 2525-044, et al.

- 1 -
    B.    Application to Revise Project Boundaries

            1.    River Alliance's Motion to Intervene

23.  For the reasons already stated with respect to River Alliance's other motion to intervene, we grant River Alliance's July 16, 2002 motion to intervene in the proceeding involving Public Service's request to convey interests in project lands.

            2.    The Application

24.  Public Service asks the Commission to approve the removal of the 9,738 acres from the Peshtigo River Projects in three phases: Phase I, involving 5,321 acres to be sold to Wisconsin DNR and the 389 acres to be reserved for development; Phase II, involving 541 acres to be sold to Wisconsin DNR; and Phase III, involving 3,487 acres to be sold to Wisconsin DNR.  See EA at Table 1. Public Service asks that the Commission authorize it to complete Phase I now, and to approve Phases II and III, contingent upon the closing of future sales of the acreage involved.

25.  Public Service's application states that the land it proposes to remove is not needed for current or future hydroelectric generating purposes.[27]  However, it does not discuss why such land is not needed for any project purposes, including recreation.  Located on lands proposed to be removed are a number of licensed recreation facilities, including boat launches, snowmobile trails, fishing areas, hiking trails, and campsites.[28]

26.  In its motion to intervene, River Alliance opposes Public Service's application, asserting that the licensee should not be relieved of its land management responsibilities for nearly three-quarters of Peshtigo River Project lands, and that to remove the lands from the projects would be to "disrupt"the balance between the developmental and non-developmental project purposes that was arrived at when the projects were relicensed only a few years ago.[29]

27.  As we discuss below, the licensee is not being relieved of its responsibilities to protect the reservoir shorelines, and is being required to keep in the project boundary the boat landings,

Exhibit 2

Page 63 of 107

town park, campsites, and portage that are located on Public Service-owned lands it seeks to remove. However, River Alliance's filing raises the question of how the Commission can find, as it must, that a project it licenses is "best adapted to a comprehensive plan" for improving or developing a waterway for developmental and environmental public interest uses,[30] and then, a few years later, amend the license to remove most of the project lands, yet still find, as it must,[31] that the project is still best adapted to a comprehensive plan for beneficial public uses.

28. As noted above, in order to approve an application, such as the one at hand, to remove lands from project boundaries, we must determine that the land is no longer necessary or appropriate for project purposes. In this case, our analysis is somewhat constrained by the fact that Public Service provided no detail in its 1991 relicense applications, in its 1998 recreation plan, or in its applications in the current proceedings as to the reasons for the lands at issue being either included in or withdrawn from the project boundaries. Likewise, neither the 1998 relicense orders, nor the August 13, 1998 order approving the projects' recreation enhancement plans,[32] nor the December 20, 2001 order provides guidance on this matter. We expect licensees seeking to remove lands from project boundaries to provide substantial evidence demonstrating why the public interest no longer requires that those lands remain within the boundary. Likewise, license applicants are to demonstrate why lands proposed for inclusion within project boundaries are necessary or appropriate for project purposes.

29. As discussed below, however, the environmental analysis performed by Commission staff demonstrates that removing the lands in question from the project boundaries will not significantly affect the ability of the projects to meet their purposes, including power production, recreation, protection of historic properties, and management of the environment.[33] We therefore conclude that the lands are not necessary for project purposes, and that their removal will not alter the public interest balancing underlying the 1998 relicensing orders. We next turn to the EA's analysis of Public Service's proposal.

### 3. Buffer Zone

30. Public Service proposes to leave in the project boundaries a 100-foot shoreline buffer strip. Interior and River Alliance assert that the existing 200-foot buffer zones along the projects' shorelines should be retained. The EA concluded that the 200-foot buffer zone along the projects' reservoirs and adjacent to the shoreline recreation access areas should remain in the project boundaries, for the adequate protection of soils, water quality, fishery and terrestrial resources, and public recreation access to the project reservoirs. We agree, and will require retention within the project boundaries the 200-foot buffer zone as described in the EA.[34]

### 4. Recreation

31. As depicted in Tables 4-8 of the EA, Public Service proposes to remove a number of project recreation facilities from the project boundaries, including 16 boat landings, a town park at the High Falls Project, primitive campsites accessible only by canoe at the Johnson Falls and Sandstone Rapids Projects, a canoe portage at the Sandstone Rapids Project, five snowmobile trails, a cross-country skiing trail, and a mountain biking trail. The EA recommends that the boat landings, town park, primitive campsites and canoe portage be retained within the project boundary in order to ensure recreational access to project lands and waters.[35] Retention of the 200-foot buffer zone would also protect access to recreational sites.

32. The EA does not recommend retention within the project boundaries of the snowmobile, cross-county skiing, and mountain biking trails (other than the portions of these facilities within the 200-foot buffer zone), because these facilities are not directly associated with public recreational access to project waters or facilities, and because there are other comparable, publically accessible opportunities for such activities in the region.[36]

33. We agree with the EA's recommendations. The retention within the project boundaries of the boating, camping, and

Exhibit 2

Page 64 of 107

fishing areas will ensure public access to  recreation related to the projects' reservoirs.  The snowmobile, skiing, and biking trails that the EA recommends for deletion have less of a nexus to reservoir-based recreation and are found elsewhere in the area.[37]  We conclude that, in light of Wisconsin DNR's assumption of management of most of the lands at issue for public park and forest uses,  the public recreational developments at the projects comply with the Commission's recreation policy and the meet the public interest standard of FPA Section 10(a)(1).

### 5.    Cultural Resources

34.     Public Service manages the historic resources associated with the Peshtigo River Projects according to Commission-approved historic management plans.  These plans were developed in consultation with the Wisconsin State Historic Preservation Officer (Wisconsin SHPO) and follow the requirements of a statewide programmatic agreement applicable to hydroelectric projects in Wisconsin.

35.  The EA states that, within the lands to be conveyed to Wisconsin DNR, there are 29 known archeological or historic properties.[38]  Licensee surveys of the lands proposed for development revealed artifacts at four sites, two of which were identified as isolated finds that do not constitute archeological sites, and two of which were identified as dumps relating to Euro-American or later activity, which were not recommended for further investigation because there were no structural remains within the vicinity of the dumps, and because there are many such sites in the region.[39]

36.  On June 26, 2003, Public Service filed with the Commission an executed memorandum of understanding (MOU) among itself, the Wisconsin SHPO, and Wisconsin DNR.  The MOU provides that the Wisconsin SHPO and Wisconsin DNR will develop a cultural resources management plan for the lands transferred to the state. On June 30, 2003, the Wisconsin SHPO and the Commission executed a programmatic agreement stating that the Commission has taken into account the effects of the removal of lands from the project boundaries on historic properties and has afforded the Advisory Council on Historic Preservation an opportunity to comment.[40]

37.  The EA concludes that granting Public Service's application will have no adverse impacts to cultural resources, based on the MOU among Wisconsin DNR, the Wisconsin SHPO, and Public Service with respect to the lands to be transferred to the State; the fact that no archeological or historic sites warranting further investigation were found on the lands that will be developed; and the continued existence of a 200-foot buffer zone.[41]  In light of the foregoing, the Commission has adequately analyzed the proposal to removal the lands in question from the project boundaries and has fulfilled the consultation requirements of the National Historic Preservation Act.

Project  No. 2525-044, et al.

- 1 -

### 6.    Endangered Species

38.  Lands within the current project boundaries provide suitable nesting or foraging habitat for the endangered bald eagle (Haliaeetus leucocephalus).  With respect to the lands to be transferred to the state, Wisconsin DNR has stated that it will follow FWS' Bald Eagle Management Guidelines and will conduct an ecological assessment and ecological context overview for the lands acquired as part of the state forest.  In its comments, FWS states that implementation of  the management practices proposed by Wisconsin DNR would, with the maintenance of a 200-foot buffer zone, afford a high level of resource protection and management. The lands proposed for development have not been designated as an endangered resource zone, and currently there are no bald eagle nests located on these lands.  Under the alternative recommended by the EA, maintenance in the project boundaries of a 200-foot buffer along the project shorelines would help ensure that potential nesting and roosting trees within the vegetative buffer would remain.  Therefore, as the EA concludes, approval of the alternative recommended by staff will have no effects on the threatened bald eagle.[42]

CONCLUSION

Exhibit 2
Page 65 of 107

Document Accession #: 20030306-3005    Filed Date: 09/03/2003

For the reasons discussed above, we find that Public Service's application to remove project lands from the licenses and project boundaries, as conditioned herein, meets the FPA Section 10(a)(1) standard and is approved.

The Commission orders:

(A)  The motions to intervene filed by River Alliance on January 22, 2002, and July 16, 2002, are granted.

(B)  The request for rehearing filed by River Alliance on January 22, 2002, is reinstated, is granted to the extent discussed above, and is otherwise denied.

(C)  The application to amend the project boundaries of Project Nos. 2525, 2595, 2522, 2560, and 2546, filed by Wisconsin Public Service Corporation on June 17, 2002, is granted, subject to the requirement that the licensee shall retain within the project boundaries (1) a 200-foot buffer zone along the projects' reservoirs, in the area proposed for development, and along all of the shoreline recreation access areas that will remain in the project boundaries; (2) the recreation facilities listed in Tables 10-14 of the environmental assessment attached to this order; and (3) all lands for which the licensee holds flowage rights.

(D) Wisconsin Public Service Corporation shall, within six months of the date of issuance of this order, file for Commission approval revised Exhibit G maps for Project Nos. 2525, 2595, 2522, 2560, and 2546, reflecting revised project boundaries and detailing the acreage remaining within those boundaries.

By the Commission.

( S E A L )


                              Magalie R. Salas,
                                Secretary.


                          ENVIRONMENTAL ASSESSMENT
                       FOR APPLICATION TO AMEND LICENSES
                         TO CHANGE PROJECT BOUNDARIES


                      CALDRON FALLS PROJECT NO. 2525-051

                       HIGH FALLS PROJECT NO. 2595-065

                      JOHNSON FALLS PROJECT NO. 2522-074

                     SANDSTONE RAPIDS PROJECT NO. 2546-068

                      POTATO RAPIDS PROJECT NO. 2560-047


Exhibit 2
Page 66 of 107

Document Accession #: ... 6-300... Filed...09/...2...

WISCONSIN


Federal Energy Regulatory Commission
Office of Energy Projects
Division of Hydropower Administration and Compliance
888 First Street, NE
Washington, DC 20426


September 2003
Project No. 2525-044, et al.

- 1 -

## I.   APPLICATION

A.   Application:   License amendment application to amend the
existing licenses to remove project lands and
revise the existing project boundaries for
the Caldron Falls (FERC Project No. 2525-
051), High Falls (FERC Project No. 2595-065),
Johnson Falls (FERC Project No. 2522-074),
Sandstone Rapids (FERC Project No. 2546), and
Potato Rapids (FERC Project No. 2560-047)
Hydroelectric Projects
B.   Date Filed:   June 17, 2002
C.   Applicant:   Wisconsin Public Service Corporation
D.   Water Body:   Peshtigo River
E.   County and State:Marinette and Oconto, Wisconsin

## II.   PURPOSE AND NEED FOR ACTION

Wisconsin Public Service Corporation (WPSC) filed an
application with the Federal Energy Regulatory Commission (FERC
or Commission) on June 17, 2002, to amend the existing licenses
to remove project lands and revise the existing project
boundaries for the Caldron Falls, High Falls, Johnson Falls,
Sandstone Rapids, and Potato Rapids projects (Peshtigo River
projects).  The Peshtigo River projects are located on the
Peshtigo River in the counties of Marinette and Oconto, Wisconsin
(see figure 1).  The U.S. Bureau of Land Management (BLM) owns
and manages approximately 10 acres of federal lands (consisting
of islands in the Peshtigo River) within the boundaries of the
High Falls, Sandstone Rapids, and Potato Rapids projects.

WPSC proposes to remove approximately 9,738 acres of land
from the project boundary of the Peshtigo River projects, of
which it proposes to use 389 acres for development and to convey
approximately 9,349 acres to the Wisconsin Department of Natural
Resources (WDNR).  WPSC proposes to accomplish the proposed
action in three phases over the next 3 years.  WPSC requests
approval for the proposed boundary change for phase I and,
contingent upon the closing of each planned future conveyance to
WDNR, approval of the proposed boundary changes for phases II and
III.

This environmental assessment (EA) was prepared to satisfy
responsibilities under the National Environmental Policy Act.
This EA examines the environmental effects associated with the
licensee's proposal (Proposed Action), any identified Action
Alternatives, and the No-Action Alternative.


Figure 1. Project Location Map (Source: WPSC and Clarkson Map Co.
Wisconsin
County Maps, 1989, as modified by staff)


## III. PROPOSED ACTION AND ALTERNATIVES

Exhibit 2
Page 67 of 107

A.    Location and Description of Projects

The Peshtigo River basin is located in northeastern Wisconsin and drains an area of about 1,080 square miles.  The Peshtigo River flows southeasterly about 107 miles, descending in elevation about 800 feet, and empties directly into Green Bay of northwestern Lake Michigan.  The Peshtigo River projects (Caldron Falls, High Falls, Johnson Falls, Sandstone Rapids, and Potato Rapids) and the Peshtigo Project (FERC No. 2581) (not part of this proposal)[43] occupy about a 68-mile stretch of the Peshtigo River and are the only dams on the Peshtigo River.  The Peshtigo River is free flowing above the Caldron Falls Project, the most upstream project on the river.  There are also stretches of free-flowing reaches on the Peshtigo River between the projects, which include about 1 RM below the Caldron Falls Project, about 6 RM below the Johnson Falls Project, and about 30 RM below the Sandstone Rapids Project.  We summarize the key characteristics for the Peshtigo River projects in the following section.

Caldron Falls Project (FERC Project No. 2525)

The Commission issued a 40-year license to WPSC for the Caldron Falls Project on June 26, 1997.  The Caldron Falls Project is located at RM 70 and consists of a dam, reservoir, powerhouse, substation, and appurtenant facilities.  At the normal pool elevation of 982.0 feet National Geodetic Vertical Datum (NGVD), the reservoir surface area encompasses 1,180 acres, extends about 7 miles, and has a storage volume of about 11,570 acre-feet.  The total installed capacity of the project is 6.4 megawatts (MW).  There are about 4,268 acres, including upland and submerged lands, within the Caldron Falls Project boundary.

High Falls Project (FERC Project No. 2595)

The Commission issued a 40-year license to WPSC for the High Falls Project on June 26, 1997.  The High Falls Project is located at RM 62 and consists of a dam, reservoir, powerhouse, substation, and appurtenant facilities.  At the normal pool elevation of 897.0 feet NGVD, the reservoir surface area encompasses 1,670 acres, extends about 7 miles, and has a storage volume of about 15,810 acre-feet.  The total installed capacity of the project is 7.0 MW.  There are about 4,623 acres, including upland and submerged lands, within the High Falls Project boundary.

Johnson Falls Project (FERC Project No. 2522)

The Commission issued a 40-year license to WPSC for the Johnson Falls Project on June 26, 1997.  The Johnson Falls Project is located at RM 60 and consists of a dam, reservoir, powerhouse, and appurtenant facilities.  At the normal pool elevation of 814.1 feet NGVD, the reservoir surface area encompasses 130 acres, extends about 2 miles, and has a storage volume of about 2,200 acre-feet.  The total installed capacity of the project is 3.5 MW.  There are about 1,078 acres, including upland and submerged lands, within the Johnson Falls Project boundary.

Sandstone Rapids Project (FERC Project No. 2546)

The Commission issued a 40-year license to WPSC for the Sandstone Rapids Project on June 26, 1997.  The Sandstone Rapids Project is located at RM 50 and consists of a dam, reservoir, powerhouse, substation, and appurtenant facilities.  At the normal pool elevation of 724.1 feet NGVD, the reservoir surface area encompasses 150 acres, extends about 3.7 miles, and has a storage volume of about 1,640 acre-feet.  The total installed capacity of the project is 3.8 MW.  There are about 2,310 acres, including upland and submerged lands, within the Sandstone Rapids Project boundary.

Potato Rapids Project (FERC Project No. 2560)

The Commission issued a 40-year license to WPSC for the Potato Rapids Project on June 26, 1997.  The Potato Rapids Project is located at RM 15 and consists of a dam and spillway, reservoir, powerhouse, substation, and appurtenant facilities.  At the normal pool elevation of 621.5 feet NGVD, the reservoir surface area encompasses 350 acres, extends about 4 miles, and has a storage volume of about 2,800 acre-feet.  The total installed capacity of the project is 1.4 MW.  There are about 1,138 acres, including upland and submerged lands, within the

Exhibit 2
Page 68 of 107

Document Accession #: 20120306-3009    Filed Date: 09/16/2002

Potato Rapids Project boundary.

B.    Proposed Action

WPSC proposes to remove approximately 9,738 acres of land from the project boundary of the Peshtigo River projects.  These lands include about 389 acres of land WPSC proposes to develop, and about 9,349 acres already conveyed or proposed to be Project No. 2525-044, et al.

- 1 -

Table 1.   Summary of Lands Proposed for Removal from Project Boundary for Each Phase (Source: WPSC, 2002)

| | Total Amount Proposed for Removal | Upland Project Acreage | Flowage Rights | Acreage to Remain within Project Boundary if Removal is Approved | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Existing Project Acreage within the Project Boundarya | Lands Conveyed to WDNR | Lands for Development | Lands to be Conveyed to WDNR | Phase I | Phase II | Phase III |
| Caldron Falls | 3,016 acres | 139 acres | 1,113 acres | 4,268 acres | 1,569 acres | | | 541 acres | 906 acres |
| High Falls | 2,931 acres | 108 acres | 1,584 acres | 4,623 acres | 704 acres | 130 acres | | | 2,097 acres |
| Johnson Falls | 920 acres | 25 acres | 133 acres | 1,078 acres | 533 acres | 73 acres | | 314 acres | |
| Sandstone Rapids | 2,101 acres | 49 acres | 160 acres | 2, 310 acres | 1,915 acres | 186 acres | | | |
| Potato Rapids | 770 acres | 89 acres | 279 acres | 1,138 acres | 600 acres | | | 170 acres | |

Exhibit 2
Page 69 of 107

Document Accession #: 20021126-3003    FERC PDF (Unofficial) 09/15/2004

| | Total | 13,417 | 5,321 | 389 acres | 541 acres | 3,487 | 9,738 | 410 | 3,269 |
| | | | acres | acres | | | acres | acres | acres |

---------------------------------------------------------------------------------------

a Includes both upland and submerged land acreage.

Project No. 2525-044, et al.

- 1 -

conveyed to WDNR (lands conveyed to WDNR). WPSC proposes to accomplish the Proposed Action in three phases over the next 3 years. Table 1 summarizes the proposed acreage of the lands to be removed for each project under each phase and the amount of lands proposed to be retained within the project boundaries for each project, if the Commission approves the project boundary modification.

Phase I would include the removal of approximately 5,321 acres of project lands from the Caldron Falls, High Falls, Johnson Falls, Sandstone Rapids, and Potato Rapids projects that were conveyed to WDNR.[44] WDNR would use about 178 acres from the Caldron Falls Project for development of a state park and the remaining 5,143 acres for creation of a new state forest. Also under Phase I, WPSC proposes to remove about 389 acres for development purposes.

Phase II would include the removal of approximately 541 acres from the Caldron Falls Project to be conveyed to WDNR in the future, contingent upon the actual transfer of land. The targeted date for the conveyance is between January 1 and June 30, 2003, with the closing for this conveyance to occur no later than December 31, 2003, unless otherwise delayed by mutual agreement.

Phase III would include removal of about 3,487 acres from the Caldron Falls, High Falls, Johnson Falls, and Potato Rapids projects, as a combination of purchase by WDNR and donation by WPSC, if WDNR exercises its option to carry out this phase.

WPSC proposes no changes to existing project operations and proposes to retain flowage rights on all lands proposed for ownership transfer. WPSC would obtain easements for access and ancillary project facilities necessary for operation (e.g., sirens) from WDNR. WPSC proposes that the upland areas transferred to WDNR be removed from the project boundaries, and that the islands located within the project reservoirs that are transferred from BLM to WDNR remain within the respective project boundaries.[45] For the lands conveyed to WDNR, WDNR proposes to use the CLWMP as the basis for the master planning process for the development of a master plan for the future management of the conveyed lands. WDNR would manage the property in a similar manner to the current management techniques, including riparian buffers and aesthetic zones in which no timber would be harvested (letter from Terrence Gardon, WDNR, March 22, 2022, to Greg Egtvedt, WPSC).

For the lands proposed for development, WPSC proposes to maintain an undeveloped buffer 100 feet from the normal high water mark of the reservoirs. This area of about 48 acres would remain within the respective project boundaries under WPSC ownership with a scenic easement to WDNR. The terms of this scenic easement would include: no structures or buildings other than authorized piers and docks; no excavation, drainage, filling, or dumping; no dumping of ashes, trash, sawdust, or any unsightly material; no signs or billboards other than signs smaller than 4 feet square advertising the sale or lease of the property; and no vegetation removed without the authorization of WDNR, other than land and forest management activities conducted by WPSC in accordance with the Commission-approved management plans.

WPSC proposes that, within the 100-foot buffer, the public would be permitted to engage in the following activities: hiking; jogging; walking; beach combing; bird watching; natural observation or photography; bank fishing except within 100 feet of any dock, pier, or area identified by signage or buoys as a swimming beach; and foot travel associated with lawful hunting

Exhibit 2
Page 70 of 107

Document Accession #: 20021216-3009    Filed Date: 09/19/2002

activities.  WPSC proposes that all other uses by the general public would be prohibited.  On the remainder of the lands to be developed, WPSC proposes that no commercial, industrial, or mining activities would be allowed, and a minimum lot size would be established.  Development would be restricted to single-family residences with limits on color selections of buildings and a 35-foot height restriction.

If the project boundary changes are approved, and upon completion of the proposed three phases of land transfer, WPSC would retain about 410 acres of upland lands and about 3,269 acres with flowage rights (see table 1).  These lands would primarily be areas surrounding the project reservoirs and facilities that are necessary for operation of the hydroelectric projects.

C.    Action Alternative

The U.S. Department of Interior (Interior), the U.S. Fish and Wildlife Service (FWS), the National Park Service (NPS), and the River Alliance of Wisconsin (RAW) provided comments on the proposed application (see section IV, consultation) recommending that 200-foot no timber harvest buffer zones be maintained along the projects' shorelines for all the lands proposed for removal from the project boundaries.  This EA includes, as an alternative to the Proposed Action, assessment of removal of land from the project boundary of the Peshtigo River projects as proposed by WPSC, with the exception of lands within a 200-foot no timber harvest buffer from the normal high water mark of project reservoirs and the lands associated with the existing shoreline recreation access areas.  Under this Action Alternative, the lands within the 200-foot buffer and shoreline recreation access areas would remain within the respective project boundaries.  The remainder of the 9,738 acres would be removed from the project boundaries to be conveyed to WDNR or maintained by WPSC for development purposes as proposed by WPSC.

D.    No-Action Alternative

The No-Action Alternative would deny the licensee's proposal.  Under the No-Action alternative, there would be no change to the existing environment.  No project lands would be removed, and there would be no changes to the existing project boundaries.

IV.   CONSULTATION

Commission staff issued a public notice of WPSC's proposed application on    June 26, 2002, with a comment closing date of July 31, 2002.  The following entities commented on the proposed application:

| Entity | Date of Filing |
|---|---|
| RAW | July 12, 2002 |
| Interior | July 24, 2002 |
| Interior | July 29, 2002 |
| WDNR | July 29, 2002 |

The Commission staff issued a Scoping Document on July 25, 2002, soliciting comments and suggestions on the preliminary list of issues and alternatives to be addressed in this EA, with a comment closing date of August 23, 2002.  The following entities provided comments:

| Entity | Date of Filing |
|---|---|
| RAW | August 8, 2002 |
| WDNR | August 9, 2002 |

On September 10, 2002, FERC issued an additional information request (AIR) to WPSC for the clarification of the specific acreages of lands proposed by WPSC to be removed from the project boundary for each project and for each phase.  On    September 19, 2002, WPSC provided the response to the AIR, clarifying the proposed acreages for removal from the Peshtigo River projects (see table 1 for summary).

Comments from Interior

In the July 24, 2002, filing, Interior commented that, on the properties proposed to be removed from the project boundaries, forest harvest practices and recreational use should

Exhibit 2

Page 71 of 107

be compatible with wildlife management, including protection of the bald eagle and its habitat, that the public should be allowed continued access to the land for recreational use, and that the proposed development of the 389 acres of project land should be undertaken so that minimal disturbance occurs to the Peshtigo River and river shoreline. Interior recommended the establishment of a 200-foot no timber harvest buffer on the parcel proposed for development, and that the buffer be incorporated into WDNR's management plan for the properties conveyed to WDNR.

In the July 29, 2002, filing, Interior filed a motion to intervene on behalf of FWS, NPS, and BLM to become a party to the proceeding.

Comments from FWS

In a letter dated May 7, 2002, to WPSC, FWS provided comments on WPSC's draft application to amend the Peshtigo River project licenses. FWS identified the bald eagle as the only federally-listed threatened or endangered species within the lands to be conveyed to WDNR. FWS recommended that the lands conveyed to WDNR be managed consistent with several of WDNR's existing land management plans and that implementation of these management principles would provide a high level of resource protection and management. FWS recommended that, in the event of the land transfer, WDNR maintain a 200-foot no timber harvest buffer zone along the shoreline of all land conveyed. FWS stated that the bald eagle currently does not nest on the project lands proposed for sale by WPSC for development. FWS recommended that a 200-foot no development and no timber harvest zone be maintained on the 389 acres proposed for sale by WPSC for development. In addition, FWS recommended that WPSC stipulate a protective covenant condition on sale of Parcel No. 13 of the lands proposed for sale by WPSC for development in order to protect an emergent wetland of about one acre in size so that the wetland is not disturbed by development.

Comments from NPS

In a letter dated May 8, 2002, to WPSC regarding the draft application, NPS stated a preference for protection of the 389-acre parcel proposed for development and support of the local initiative to raise funds to preserve the parcel for protection. NPS stated that protection of the parcel would be in keeping with the agreements reached by the stakeholders during the relicensing proceeding. NPS also stated that, if WPSC sells the lands for development, the shoreline buffer should be expanded from the proposed 100-foot to a 200-foot buffer to protect visual and ecological resources along the shoreline. NPS also recommended that a 200-foot no timber harvest buffer be maintained on the lands conveyed to WDNR.

Comments from WDNR

In its July 29, 2002, filing, WDNR filed a motion to intervene to become a party to the proceeding.

In its August 9, 2002, filing, WDNR commented that FERC should consider the existing CLWMP and Recreation Plan for the projects in the development of the EA. WDNR also recommended that the EA include an evaluation of the potential effects of the project boundary changes on water quality and on fishery resources.

Comments from RAW

In its July 12, 2002, filing, RAW filed a motion to intervene in protest of WPSC's license amendment application. RAW stated strong opposition to the removal of the 389 acres for residential development, stating that the development of these lands would change the wilderness character of the projects' shoreline areas. In addition, RAW commented that the proposed 100-foot buffer zone is in conflict with the approved CLWMP. RAW stated that the CLWMP designates that portions of the lands proposed for development by WPSC require a 200- to 400-foot preservation zone along the riparian corridor rather than the 100-foot riparian buffer zone proposed by WPSC. RAW also protests the conveyance and sale of lands to WDNR, stating that WPSC, as a condition of operating hydroelectric facilities on waters of the State of Wisconsin, should incur the costs of

Exhibit 2
Page 72 of 107

property taxes and operation and maintenance of the recreational facilities on these lands, not the people of the State of Wisconsin.  RAW also states that the terms and conditions contained in the licenses were considered by the Commission and the negotiating parties in the balance between developmental and non-developmental resources and that this balance would be disrupted if the license amendment were granted.

In its August 8, 2002, filing responding to the scoping document, RAW commented that the EA should consider the costs incurred to the citizens of the State of Wisconsin for the purchase; property taxes; and funds for operation, development, and maintenance of the recreational facilities for the lands proposed by WPSC to be conveyed to WDNR and removed from the project boundaries.  RAW also stated that the EA should assess extending the shoreline buffer to 200 or 400 feet and assess the socioeconomic effects of the removal of the project lands.

This EA considers the effects of the extended buffer along the project shorelines associated with the properties proposed for removal from the project boundaries.  Socioeconomic effects of land purchases by the State of Wisconsin are outside of the Commission's purview and jurisdiction, however, and therefore, we do not assess these effects in the EA.  This EA includes an assessment of the proposed action on water quality and fishery resources and considers the existing CLWMP and Recreation Plan.

Consultation with the Wisconsin State Historical Society (SHPO)

The Commission consulted with the SHPO (letter to Alicia L. Goehring, SHPO
Wisconsin State Historical Society dated February 10, 2003) stating the Commission's determination of effect and requesting that the SHPO provide its determination regarding the effects of the proposed action on historic properties.  In a letter dated March 12, 2003, the SHPO concurred with the Commmission's determination that the proposed development of the 389 acres would result in no historic properties affected pursuant to 36 CFS 800.4 (d) (1).  However, the SHPO also responded that 36 CFR 800 requires the Commission to be a signatory on the proposed Memorandum of Agreement (MOA) filed by the licensee on September 11, 2002 which would be executed between WPSC, WDNR and the SHPO for the parcels to conveyed to the WDNR.  A conference call with interested parties was conducted on April 11, 2003, to discuss this matter.  The Advisory Council on Historic Preservation (ACHP) stated that it would review WPSC's proposed MOA.  On April 30, 2003, the Commission sent a draft Programmatic Agreement (PA) to the SHPO and the ACHP for comment that would fulfill the Commission's responsibilities under Section 106 of the National Historic Preservation Act.  Both the ACHP and the SHPO requested changes to the licensee's proposed MOA and the Commission's draft PA, by electronic mail dated May 15, 2003, and May 23, 2003, respectively.  By letter dated June 25, 2003, the WPSC filed with the Commission an executed Memorandum of Understanding (MOU), (which replaced the proposed MOA) between the SHPO, WDNR, and WPSC.  The executed MOU would ensure the long-term protection of historic properties within the lands to be conveyed to the WDNR.  On June 25, 2003, Commission staff electronically mailed to the SHPO, WDNR, and WPSC a final PA for signature.  The PA was executed on July 1, 2003.  The PA would provide the means for the protection of historic properties on the project lands to be removed up until the time that the Commission approves their removal and the MOU would provide long-term protection of historic properties on these lands after the lands have been removed from the project boundary.  The execution of the PA and the implementation of its terms evidence that the Commission has taken into account the effects of this undertaking on historic properties and afforded the ACHP an opportunity to comment.

V.    AFFECTED ENVIRONMENT

MM. Water, Fishery, and Soils Resources

The Peshtigo River exhibits good overall water quality, largely because of the rural, undeveloped nature of the watershed.  The presence of humic and fulvic acids in organic matter such as leaves and wood gives the river a brownish color and decreased clarity.  The color is not an indicator of a water quality problem, and total nutrient concentrations are in a range indicating good water quality.  Principal water uses of the

Exhibit 2
Page 73 of 107

Peshtigo River within the project area are fishing, recreation, and hydroelectric power generation.  There are no known or proposed consumptive uses of the water of the Peshtigo River within the project areas (FERC, 1997).

As the river enters the Sandstone Rapids Reservoir, the topography becomes more gently rolling to flat.  Sand becomes a more dominant component of the soils, and soils become more poorly drained and acidic, with organic deposits of more than 40 inches occurring in many areas.  Reservoir and river shorelines throughout the basin are mostly gently sloping and well vegetated, with little evidence of excessive erosion.

The Peshtigo River within the project area supports a diverse assemblage of fishes that include about 70 species in 18 families.  The principal sport fish are walleye, muskellunge, northern pike, smallmouth bass, and largemouth bass.  The main panfish species include bluegill, pumpkinseed, rock bass, black crappie, and yellow perch.  Brown trout, rainbow trout, and brook trout are present in and downstream of Johnson Falls Reservoir, and in several larger tributaries of the Peshtigo River (FERC, 1997).

NN.  Terrestrial Resources

Wetlands are abundant throughout the projects and encompass an estimated 325 acres of project lands and waters (FERC, 1997).  Wetlands in Marinette County occupy up to 25 percent of the land cover and comprise a variety of wetland types, including northern wet/mesic forests, shrub wetlands, bog wetlands, marshes, and open water habitats.  The northern wet/mesic forests (palustrine) wetlands are vegetated primarily by black spruce, balsam fir, and tamarack.  Shrub wetlands include shrub-carrs dominated by willows and dogwood, and alder thickets dominated by speckled alder, high bush cranberry, and sweet gale.  Bog wetlands are characterized by acid peat soils and a vegetative mixture of sedges, sphagnum moss, and sparse cover of black spruce and tamarack trees.  Deep and shallow marsh habitats also occur in the project area.  Shallow systems are dominated by emergent species, such as bulrushes, sedges, cattails, and grasses.  Deep marshes are composed of some species of attached and floating aquatic plants, including water lily, water shield, pondweed, and coontail.

The CLWMP indicates that there are about 100 acres of wetlands within the Caldron Falls Project, 150 acres within the High Falls Project, no identified wetlands within the Johnson Falls Project, 3 acres of wetlands within the Sandstone Rapids Project, and 72 acres of wetlands within the Potato Rapids Project.  The FWS in their review of the parcels proposed by WPSC for development, identified an emergent wetland of about one acre in size in Parcel 13, near the public access site about 150 feet landward of the water's edge.

In addition to wetland habitats, vegetation communities within the project boundaries are dominated by second-growth, northern mesic forests that comprise a mixture of hardwoods and conifers.  Forests in this region are similar to forests across the northern portions of the eastern United States.  Historically, major fires and commercial logging have modified original vegetative community structure, resulting in a second-growth system that is dominated by aspen rather than white pine.

Wildlife in the area of the Peshtigo River projects consists mainly of species associated with early successional and second-growth hardwood and coniferous forests, and species associated with a variety of wetland types.  The undeveloped shorelines and adjoining forests and wetlands of the reservoirs and the Peshtigo River provide high quality habitat for many of the wildlife species indigenous to this area of northern Wisconsin.  At various times of year, this includes about 55 species of mammals, 245 species of birds, and 32 species of amphibians and reptiles (FERC, 1997).

Threatened and Endangered Species

The bald eagle (Haliaeetus leucocephalus) is a federally listed and state listed threatened species and is the only identified federally-listed threatened or endangered species within the lands proposed for removal from the project boundary.

Exhibit 2
Page 74 of 107

Bald eagles typically nest in supercanopy trees near lakes or large rivers and require nearby open water for feeding on fish, waterfowl, and small mammals.  WPSC developed a Bald Eagle Management Plan in association with project relicensing, and components of the plan are incorporated in the CLWMP.  The CLWMP includes a land management category of "endangered resource zone," which includes areas where endangered plant communities or animal species exist (see section V.C, land use and aesthetic resources).  Specialized management practices are required in these designated areas to ensure continued maintenance and protection of the threatened or endangered resources.  Bald eagle management areas fall under the endangered resource zone land management category.

C.    Land Use and Aesthetic Resources

Land use within the region surrounding the Peshtigo River projects consists of primarily timber production, outdoor recreation, rural residential development, and widely dispersed municipal and industrial uses.  Urban communities within or adjacent to the projects include Marinette, Peshtigo, and Crivitz, Wisconsin.  The majority of the reservoir shorelines are undeveloped and, with the exception of the areas occupied by project facilities, all project lands are open for public use.

There are a total of 13,417 upland and submerged acres located within the Peshtigo River projects boundaries.  Of this, 4,268 acres are within the Caldron Falls Project; 4,623 acres are within the High Falls Project; 1,078 acres are within the Johnson Falls Project; 2,310 acres are within the Sandstone Rapids Project; and 1,138 acres are within the Potato Rapids Project. Within the Caldron Falls Project, about 640 acres lies within the Nicolet National Forest; however, WPSC owns and manages these lands.  BLM owns and manages a total of about 10 acres of federal lands, consisting of islands in the Peshtigo River, within the boundaries of the High Falls, Sandstone Rapids, and Potato Rapids projects.  Legislation has been drafted, but not yet submitted to Congress for action, that would transfer those lands from BLM to WDNR.

The project lands are managed according to a Commission-approved CLWMP, which was developed in consultation with FWS, NPS, and WDNR.  The project lands are managed under a "wild shores" philosophy that promotes the balance of the human needs and the protection of the wilderness atmosphere of the area. There are eight land management classifications for the project lands, described as follows:

Wild Reservoir - Project reservoir with exceptional visual qualities characterized by a shoreline with minimal development.  The wild reservoir zone includes a 400-foot preservation zone in which no vegetation or wildlife management beyond aesthetic management is permitted. Hunting, fishing, and trapping and designated public access areas are permitted.

Wild River - Section of free-flowing, unpolluted river with adjacent lands located in sparsely populated, natural environment.  In the wild river zone designated areas no vegetation management occurs on lands between the river and tops of adjacent slopes other than for aesthetic management purposes.  Existing and future recreational areas are permitted as long as the scenic values of the area are maintained.  Hunting, fishing, and trapping are permitted.

Forest Management - Land areas managed for saw timber, pulpwood, fuel wood, and other forest products using acceptable forest management practices in an integrated resource management program.

Scenic Areas - Land areas with unique aesthetic qualities or distinctive landscapes, but not considered to be a type of wild resource area.  Scenic areas are buffer zones for intensive public use areas; reservoir, river, and stream shorelines; and scenic highways or roads.  Aesthetic management techniques are applied to the extent possible within those areas designated as scenic areas.  Aesthetic management techniques are modifications of normal timber management techniques that are designed to minimize the negative effects on aesthetics and recreational values. Shoreline buffers are designated scenic areas, 200-feet

Exhibit 2
Page 75 of 107

wide, and any active vegetative management in these areas must be approved first by the licensee, FWS, NPS, and WDNR.

Recreational Development - Includes lands where recreational use occurs, such as boat access areas; day-use and camping areas; snowmobile, hiking, and ski trails; and bank fishing areas. Aesthetic timber management practices are applied in these areas.

Project Facilities - Areas associated with the hydroelectric project developments, including dams, powerhouses, dikes, maintenance staging areas, other project structures, and access roads. Vegetation management is conducted for maintenance and protection of project facilities, and aesthetic management principles are practiced whenever feasible.

Archeological and Historical Areas - Archeological and historic areas warranting protection due to their cultural resource values. Individual sites are not identified in the CLWMP to protect the sites from unauthorized collecting or vandalism. Existing archeological and historic sites are protected per the provisions of the Historic Resources Management Plan (HRMP). Prior to any ground disturbance activity, the areas are inventoried to determine if potential effects on cultural resources would occur.

Endangered Resource Zones - Tracts of lands or water where endangered plant communities or animal species exist that require specialized management practices and protection. Specific locations are not identified to protect the areas from disturbance. Vegetative and wildlife management in these areas are to maintain the existing condition and perpetuate desirable features for the targeted species and/or habitat.

Table 2 summarizes the existing land classifications and shoreline buffer widths of the lands proposed for conveyance to WDNR. Table 3 summarizes the existing acreages and land management classifications of the parcels associated with the 389 acres proposed for development and a summary of the lands proposed to be removed from each parcel.

D.   Recreation Resources

The lands within the Peshtigo River projects, with the exception of area occupied by project facilities, are open for public use. Within the project lands, the public participates in fishing, boating, picnicking, water skiing, swimming, canoeing, hiking, and hunting. Popular winter activities include ice fishing, snowmobiling, and cross country skiing. WPSC, Marinette County, the town of Stephenson, and the Marinette County Cross Country Ski Association own and manage various public access areas throughout the area encompassed by the proposed change in project boundaries. Tables 4 through 8 identify the public recreation facilities for each project and the designated area under which WPSC proposes the facilities would be included.

Recreation development within the projects is conducted in accordance with the Commission approved Recreation Plan. The Recreation Plan is integrated and compatible with the CLWMP for the projects. WPSC has developed land use policies and procedures for the general public to follow when they are using project lands. In
Project No. 2525-044, et al.

- 1 -

Table 2.  Summary of Existing Land Classifications for Proposed Lands for Removal from Project Boundary for Conveyance to WDNR

--------------------------------------------------------------------------------

| |Existing<br>| Road<br>| Buffer<br>| | Project | Existing Land<br>Classification<br>Category | Existing Shoreline Buffer<br>Width |
|---|---|---|---|

Exhibit 2<br>Page 76 of 107

| Width | | | |
|-------|--|--|--|
| 100-foot buffer | Caldron Falls | Forest Management Recreation Scenic (shoreline and road areas) | 200-foot buffer in scenic designation |
| 100-foot buffer | High Falls | Wild Reservoir Forest Management Recreation Scenic (shoreline and road areas) | 400-foot buffer in wild reservoir designation 200-foot buffer in scenic designation |
| 100-foot buffer | Johnson Falls | Wild Reservoir Wild River Forest Management Recreation Scenic (shoreline and road areas) | 400-foot buffer in wild reservoir designation 200-foot buffer in scenic designation |
| 100-foot buffer | Sandstone Rapids | Wild River Forest Management Recreation Scenic (shoreline and road areas) | 200-foot buffer in scenic designation |
| 100-foot buffer | Potato Rapids | Forest Management Recreation Scenic (shoreline and road areas) | 200-foot buffer in scenic designation |

Project  No. 2525-044, et al.

- 1 -

Table 3.  Summary of Lands Proposed for Removal from Project Boundary for Development

| Acreage to Remain a | Project | Parcel No. | Existing Primary Land Management Classifications | Existing Primary Land Use | Existing Shoreline Buffer |
|---------------------|---------|-----------|--------------------------------------------------|---------------------------|---------------------------|

Exhibit 2

Page 77 of 107

| | | | | | Width |
|---|---|---|---|---|---|
| | | | | | |
| 4 acres | High Falls | 34 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet |
| 11 acres | | 12 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet |
| 9 acres | | 13 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet |
| 6 acres | Johnson Falls | 6 | Forest Management/ Scenic (shoreline area) | Timber Production | 400 feet |
| 4 acres | Sandstone Rapids | 9 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet |
| 5 acres | | 8 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet |
| 1 acres | | 7 | Forest Management/ Scenic (shoreline area) | Timber Production | 200 feet |
| 8 acres | | 6 | Scenic | WPSC Rec. Area | 200 feet |
| 48 acres | Total | | | | |

a  Approximate acreage from parcel proposed to remain in the project boundary as 100-foot shoreline buffer.

Table 4.  Recreation Facilities at the Caldron Falls Project

| Proposed Designation | Facility | Existing Owner | Proposed Owner | Existing Facilities |
|---|---|---|---|---|
| | | | | |

Exhibit 2
Page 78 of 107

Document Access: 3:22-cv-00533-SI-3006-3006   Filed 69-2: 09/13/24

| | | | | |
|---|---|---|---|---|
| of Facilities | | | | |
| |WDNR transfer lands |Boat Landing No. 8 |WPSC |WDNR |Boat launch, barrier-free fishing pier, parking, restroom |
| |WDNR transfer lands |Boat Landing No. 9 |WPSC |WDNR |Boat launch, parking, restroom |
| |WDNR transfer lands |Boat Landing No. 10 |WPSC |WDNR |Boat launch, parking |
| |WDNR transfer lands |Boat Landing No. 11 |WPSC |WDNR |Boat launch, parking |
| |WDNR transfer lands |Boat Landing No. 12 |WPSC |WDNR |Boat launch, parking, restroom |
| |WDNR transfer lands |Boat Landing No. 13 |WPSC |WDNR |Boat launch, parking |
| |WDNR transfer lands |Walk-in access |WPSC |WDNR |Unimproved popular shoreline fishing areas |
| |WDNR WPSC|transfer lands |Snowmobile trail |WPSC |WDNR |Marinette County holds a license agreement with for 3 miles of trail |
| |WDNR |Outdoor |WPSC |WDNR |All WPSC land is open to |

Exhibit 2
Page 79 of 107

Document Accession #: 20160316-300...   Filed Date: 09/...

| | Facility | Existing Owner | Proposed Owner | Facilities | Proposed Designation of Facilities |
|---|---|---|---|---|---|
| | recreation areas | | | the public for recreation | transfer lands |
| Dike, tailwater, and walk-in project access areas | | WPSC | WPSC | Unimproved popular shoreline fishing areas near the project | Remain within the facilities project boundary |
| Canoe portage | | WPSC | WPSC | 0.2 mile canoe portage around Caldron Falls dam | Remain within the project boundary |

Project  No. 2525-044, et al.

- 1 -
Table 5.  Recreation Facilities at the High Falls Project

| | Facility | Existing Owner | Proposed Owner | Facilities | Proposed Designation of Facilities |
|---|---|---|---|---|---|
| Boat Landing No. 1 | | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. 2 | | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. 3 | | WPSC | WDNR | Boat launch, parking | WDNR transfer lands |
| Boat Landing No. | | WPSC | WDNR | Boat launch, restroom | parking, WDNR |

Exhibit 2
Page 80 of 107

```
         |transfer    |
         |4          |          |                |               |
         |lands      |

         ------------------------------------------------------------------------

         |Boat       |WPSC      |WDNR            |Boat launch,
parking, |WDNR        |
         |Landing No.|          |                |restroom
         |transfer    |
         |5          |          |                |
         |lands      |

         ------------------------------------------------------------------------

         |Boat       |WPSC      |WDNR            |Boat launch,
barrier- |WDNR        |
         |Landing No.|          |                |free fishing pier,
         |transfer    |
         |6          |          |                |parking, restroom
         |lands      |

         ------------------------------------------------------------------------

         |Boat       |WPSC      |WDNR            |Boat launch,
barrier- |WDNR        |
         |Landing No.|          |                |free fishing pier,
         |transfer    |
         |7          |          |                |parking, restroom
         |lands      |

         ------------------------------------------------------------------------

         |Town of    |WPSC (lease)|WDNR          |Boat launch,
barrier- |WDNR        |
         |Stephenson |          |(lease)         |free skid pier,
         |transfer    |
         |Park       |          |                |picnic area,
swimming |lands       |
         |           |          |                |area, water-ski show |
         |           |          |                |viewing area,        |
         |           |          |                |restrooms, parking   |

         ------------------------------------------------------------------------

         |Walk-in    |WPSC      |WDNR            |Unimproved popular
|WDNR     |
         |access     |          |                |shoreline fishing
|transfer  |
         |           |          |                |areas
|lands    |

         ------------------------------------------------------------------------

         |Snowmobile |WPSC      |WDNR            |Marinette County
|WDNR     |
         |trail      |          |                |holds a license
|transfer  |
         |           |          |                |agreement with WPSC  |
|lands    |
         |           |          |                |for 5 miles of trail |

         ------------------------------------------------------------------------

         |Outdoor    |WPSC      |WDNR            |All WPSC land is
open|WDNR    |
         |recreation |          |                |to the public for
|transfer  |
         |areas      |          |                |recreation
|lands    |

         ------------------------------------------------------------------------

         |Dike,      |WPSC      |WPSC            |Unimproved popular
|Remain   |
         |tailwater, |          |                |shoreline fishing
|within the|
         |and walk-in|          |                |areas near the
```

Exhibit 2

Page 81 of 107

| | | | | |
|---|---|---|---|---|
| |project access areas|boundary | | |project facilities |

| | | | | |
|---|---|---|---|---|
| Remain within the project boundary |Canoe portage|WPSC|WPSC|0.1 mile canoe portage around High Falls dam |
| Remain within the project boundary |Natural shoreline areas|WPSC|WPSC|100-foot buffer adjacent to the proposed development areas |

Project  No. 2525-044, et al.

- 1 -

Table 6.  Recreation Facilities at the Johnson Falls Project

| Proposed Designation of Facilities |Facility|Existing Owner|Proposed Owner|Facilities |
|---|---|---|---|---|
| WDNR transfer lands |Boat Landing No. 14|WPSC|WDNR|Boat launch, parking |
| WDNR transfer lands |Walk-in access|WPSC|WDNR|Unimproved popular shoreline fishing areas |
| WDNR WPSC transfer lands |Snowmobile trail|WPSC|WDNR|Marinette County holds a license agreement with for 0.5 mile of trail |
| WDNR transfer lands |Canoe campsites|WPSC|WDNR|4 primitive campsites accessible only by canoe |

Exhibit 2

Page 82 of 107

```
-------------------------------------------------------------------------
        |Outdoor     |WPSC    |WDNR         |All WPSC land is open to
|WDNR    |           |        |             |the public for recreation
|transfer|recreation |        |             |
        |areas       |        |             |
|lands   |           |        |             |
-------------------------------------------------------------------------
        |Dike,       |WPSC    |WPSC         |Unimproved popular
|Remain  |           |        |             |shoreline fishing areas
|within the|tailwater,|        |             |near the project
        |and walk-in |        |             |
|project |           |        |             |facilities, barrier-free
|boundary|access      |        |             |fishing pier, parking      |
        |areas       |        |             |
-------------------------------------------------------------------------
        |Canoe       |WPSC    |WPSC         |0.1 mile canoe portage
|Remain  |           |        |             |around Johnson Falls dam
|within the|portage   |        |             |
|project |           |        |             |
|boundary|           |        |             |
-------------------------------------------------------------------------
        |Natural     |WPSC    |WPSC         |100-foot buffer adjacent
to|Remain|shoreline   |        |             |the proposed development
|within the|areas     |        |             |areas
|project |           |        |             |
|boundary|           |        |             |
-------------------------------------------------------------------------


        Project  No. 2525-044, et al.

        - 1 -
        Table 7.  Recreation Facilities at the Sandstone Rapids Project


-------------------------------------------------------------------------
        | Facility  | Existing  |Proposed Owner|    Facilities         |
Proposed|           |  Owner    |              |                       |
|Designation|        |           |              |                       |
  of    |           |           |              |                       |
Facilities|          |           |              |                       |
-------------------------------------------------------------------------
        |Walk-in     |WPSC       |WDNR          |Unimproved popular
|WDNR    |           |           |              |shoreline fishing
areas|transfer|access |          |              |
        |           |           |              |
|lands   |           |           |              |
-------------------------------------------------------------------------
        |Snowmobile |WPSC        |WDNR          |Marinette County holds
|WDNR    |           |           |              |a license agreement
|transfer|trail      |           |              |
        |           |           |              |with WPSC for 14 miles
```

Exhibit 2

Page 83 of 107

| | | | | |
|---|---|---|---|---|
| lands | | | | of trail |
| WDNR association lands | Cross county ski transfer trail | WPSC | WDNR | Marinette County cross country ski holds a license agreement with WPSC for 6 miles of trail |
| WDNR transfer lands | Seymour Rapids canoe portage | WPSC | WDNR | 0.5 mile canoe portage around Seymour Rapids |
| WDNR transfer lands | Mountain bike trail | WPSC | WDNR | Access trail along river |
| WDNR transfer lands | Scenic overlook and angler access | WPSC | WDNR | 4 mile vehicle trail, lookout parking area, trail |
| WDNR transfer lands | Outdoor recreation areas | WPSC | WDNR | All WPSC land is open to the public for recreation |
| WDNR transfer lands | Canoe campsites | WPSC | WDNR | 6 primitive campsites accessible only by canoe |
| Outside of project boundary | Sandstone campground | WPSC | WPSC | Campground for the use of WPSC employees |
| Outside of project boundary | Sandstone campground picnic area | WPSC | WPSC | Picnic area for the use of WPSC employees |

Exhibit 2

Page 84 of 107

Document Accession #: 20160306-3005   Filed Date: 09/16/2016

```
|boundary    |

--------------------------------------------------------------------------------
            |WPSC       |WPSC       |WPSC        |Boat launch, parking,
|Remain      |
            |employee   |           |            |pier
|within the  |
            |boat launch|           |            |
|project     |
            |           |           |            |
|boundary    |

--------------------------------------------------------------------------------
            |Hideaway   |WPSC (lease)|WPSC (lease)|Town of Stephenson
|Remain      |
            |Lane Boat  |           |            |operates a boat launch
|within the  |
            |Landing    |           |            |with parking
|project     |
            |           |           |            |
|boundary    |

--------------------------------------------------------------------------------
            |Dike,      |WPSC       |WPSC        |Unimproved popular
|Remain      |
            |tailwater, |           |            |shoreline fishing
areas|within the  |
            |and walk-in|           |            |near the project
|project     |
            |access     |           |            |facilities
|boundary    |
            |areas      |           |            |                        |
            |

--------------------------------------------------------------------------------
            |Canoe      |WPSC       |WPSC        |0.5 mile canoe portage
|Remain      |
            |portage    |           |            |around Caldron Falls
|within the  |
            |           |           |            |dam
|project     |
            |           |           |            |
|boundary    |

--------------------------------------------------------------------------------
            |Natural    |WPSC       |WPSC        |100-foot buffer
|Remain      |
            |shoreline  |           |            |adjacent to the
|within the  |
            |areas      |           |            |proposed development
|project     |
            |           |           |            |areas
|boundary    |

--------------------------------------------------------------------------------

        Table 8.  Recreation Facilities at the Potato Rapids Project

--------------------------------------------------------------------------------
           | Facility  |Existing|Proposed Owner|      Facilities        |
Proposed    |
           |           | Owner  |              |
|Designation |
           |           |        |              |                        |
   of       |
           |           |        |              |                        |
Facilities |

--------------------------------------------------------------------------------
           |Boat       |WPSC    |WDNR          |Boat launch, parking
|WDNR        |
           |Landing No.|        |              |
|transfer    |
```

Exhibit 2

Page 85 of 107

Document Accession #: 20050316-3003   Filed Date: 09/14/2005

| | | | | |
|---|---|---|---|---|
| |1 East<br>lands | | | |
| |Boat<br>Landing No.<br>1 West<br>lands | WPSC | WDNR | Boat launch, parking |
| WDNR<br>transfer | | | | |
| |Walk-in<br>access | WPSC | WDNR | Unimproved popular<br>shoreline fishing areas |
| WDNR<br>transfer<br>lands | | | | |
| WDNR<br>WPSC transfer<br>lands | Snowmobile<br>trail | WPSC | WDNR | Marinette County holds a<br>license agreement with<br>for 2 miles of trail |
| WDNR<br>transfer<br>lands | Outdoor<br>recreation<br>areas | WPSC | WDNR | All WPSC land is open to<br>the public for recreation |
| Remain<br>within the<br>Project<br>Boundary | Dike,<br>tailwater,<br>and walk-in<br>access<br>areas | WPSC | WPSC | Unimproved popular<br>shoreline fishing areas<br>near the project<br>facilities, restroom |
| Remain<br>within the<br>project<br>boundary | Canoe<br>portage | WPSC | WPSC | 0.1 mile canoe portage<br>around Caldron Falls dam |
| to Remain<br>within the<br>project<br>boundary | Natural<br>shoreline<br>areas | WPSC | WPSC | 100-foot buffer adjacent<br>the proposed development<br>areas |

Project  No. 2525-044, et al.

- 1 -

Exhibit 2<br>Page 86 of 107

addition, WPSC has developed acceptable private land use guidelines for project lands that include provisions for lease agreements that are within the scope of those activities allowed under the Commission's Standard Land Use Articles for the projects.

E.   Cultural Resources

Within the lands to be conveyed to WDNR, there are 29 known archeological or historic properties, comprised of 3 sites within the Caldron Falls Project, 12 sites within the High Falls Project, 3 sites within the Johnson Falls Project, 4 sites within the Sandstone Rapids Project, and 7 sites within the Potato Rapids Project (see table 9).

Within the lands proposed for development, no archeological or historic sites were identified on the 172 acres that were surveyed as a result of previous surveys (AVD Archaeological Services, 2002).  WPSC contracted to have the additional 217 acres of the lands proposed for development and removal from the project boundary surveyed.  Field techniques of shovel testing and surface collection were used to survey these lands (AVD Archaeological Services, 2002).  Artifacts were found at four locations within the lands proposed for development within the Sandstone Rapids Project.  Two locations were identified as isolated finds that do not constitute archeological sites, and no further archeological work was recommended at those locations. The other two sites were identified as dumps relating to Euro-American or later activity.  Because there are no structural remains within the vicinity of the dumps and many such sites occur in the region, no further investigation was recommended. WPSC submitted this report to the SHPO for review and comment, but as of the time of the filing of the report with the Commission (July 25, 2002), WPSC had not received a response from the WHS.

WPSC manages the historic resources associated with the Peshtigo River projects according to Commission-approved HRMPs.[46]  The HRMPs were developed in consultation with the WHS and follow the requirements of a statewide PA that applies to hydroelectric projects within the State of Wisconsin.  The PA ensures Commission compliance with Section 106 of the National Historic Preservation Act (NHPA).

Table 9. Summary of Known Archeological or Historic Properties within the Lands Conveyed to WDNR (Source: WPSC, 2002)

| Project | Number of Known Archeological or Historic Properties |
|---|---|
| Caldron Falls | 1 - Unknown Isolated Find |
| | 1 - Unknown Woodland Site |
| | 1 - Unknown Prehistoric Site |
| High Falls | 1 - Historic Euro-American Trapper Site |
| | 1 - Unknown Historic Trash Dump |
| | 1 - Unknown Historic Homestead Site |
| | 1 - Unknown Prehistoric and Homestead Site |
| | 1 - Unknown Woodland Site |
| | 1 - Unknown Late Woodland Site |
| | 1 - Unknown Historic Quarry Site |
| | 1 - Historic Euro-American Homestead |
| | 1 - Unknown Lithic Scatter |
| | 3 - Unknown Prehistoric Site |

Exhibit 2
Page 87 of 107

```
------------------------------------------------------------------------
           |Johnson Falls  |1 - Historic Euro-American Trading Post
   |
   |       |               |1 - Historic Euro-American Homestead
   |
   |       |               |1 - Unknown Prehistoric Site
   |

------------------------------------------------------------------------
           |Sandstone Rapids|1 - Unknown Prehistoric and Historic
Euro-American  |
   |       |               |1 - Historic Euro-American Logging Camp
   |
   |       |               |2 - Unknown Prehistoric Site
   |

------------------------------------------------------------------------
           |Potato Rapids  |1 - Unknown Burial Mounds
   |
   |       |               |1 - Unknown Prehistoric Garden Beds
   |
   |       |               |1 - Historic Indian Burial Site
   |
   |       |               |1 - Archaic/Woodland Campsite/Village
   |
   |       |               |1 - Historic Euro-American Trading Post
   |
   |       |               |1 - Unknown Burial Mounds/Grave Sites
   |
   |       |               |1 - Unknown Prehistoric Site
   |

------------------------------------------------------------------------
```

Project  No. 2525-044, et al.

- 1 -

As stipulated in the HRMPs and Stipulation II.B.1 of the PA, WPSC is required to monitor the Peshtigo River projects' shorelines areas once every 5 years for the duration of the license to monitor for shoreline erosion due to project operations so any potential new archeological sites can be identified as they may become exposed.  WPSC submits the monitoring results to the SHPO and the Commission by December 31st of the year in which the monitoring is conducted.

As stipulated in the HRMPs and Stipulation I.C of the PA, if new archeological properties are identified as a result of the monitoring, WPSC applies the Criteria of Evaluation to determine if the property is eligible for listing on the National Register of Historic Places and consults with the SHPO to determine if further documentation is necessary.  WPSC then submits the completed eligibility form bearing the SHPO's signature to the Commission with the supporting materials.  If archeological properties are eroding due to project operations, WPSC would consult with the SHPO to determine appropriate shoreline stabilization measures.

As stipulated in the HRMPs and Stipulation II.B.2 of the PA, for lands where no prior archeological surveys have been completed, prior to any ground-disturbing activities, WPSC would contract to conduct a Phase I archeological survey and would consult with the SHPO for appropriate evaluation or stabilization measures if any potential historic properties are discovered. WPSC gives priority to preserving historic properties in place, and if preservation in place is not deemed feasible, WPSC would develop and implement a data recovery plan developed in consultation with the SHPO.

WPSC submits an annual historic resources management report to the SHPO reporting WPSC study activities conducted at the projects for the previous year.  WPSC also submits all archeological reports prepared under the PA to the Commission and to the SHPO within 6 months of completion.

VI.  ENVIRONMENTAL EFFECTS

Exhibit 2
Page 88 of 107

A.    Proposed Action and Action Alternative

1.    Water, Fishery, and Soils Resources

Proposed Action

The lands that WPSC proposes to transfer to WDNR would be managed in a similar manner as has been accomplished under WPSC ownership.  WPSC developed the current CLWMP as a part of the relicensing process at the request and concurrence of WDNR.  WPSC based many of the policies in the CLWMP on WDNR's Silvicultural and Aesthetic Handbook and Best Management Practices for Water Quality.  WDNR states that it would manage property conveyed or proposed for conveyance in a similar manner utilizing the same guidelines, including riparian buffers and aesthetic zones in which no timber harvesting would occur (letter from Terrence Gardon, WDNR, March 22, 2022, to Greg Egtvedt, WPSC).

Currently, a vegetative buffer of at least 200 feet occurs on the properties proposed for removal.  Riparian buffers can provide the means to slow water runoff; trap sediment, nutrients, and pesticides; and enhance infiltration within the buffer.  Buffers can help lower water temperatures by shading a water body and slow out-of bank flood flows.  Buffers are a source of food, nesting cover, and shelter for many wildlife species and can provide connecting corridors that enable wildlife to move safely from one habitat area to another (NRCS, 2002; USDA, 1997).  While the WDNR management practices would follow the existing policies in the CLWMP, there is no guarantee that a 200-foot shoreline buffer and the beneficial effects of the vegetative buffer on water quality, soil erosion and sedimentation, and fishery resources would remain over the term of the licenses.

On the lands WPSC proposes to develop, a 100-foot buffer would remain within the project boundaries, and development would be restricted to single-family residences with minimum lot sizes.  The proposed minimum lot size and single-family residences restrictions would limit the extent of development on these lands and would, therefore, help limit any potential adverse effects on water quality from development in the upland areas of these parcels.  There may be some increase in development of shoreline docks and piers associated with the lands proposed for development (see section VI.A.4).  This shoreline development would occur within the 100-foot buffer, within the existing project boundaries, and would have the same restrictions that are currently required under the existing conditions.  The 100-foot vegetated buffer between the developable areas and the project reservoirs would help minimize potential erosion and sedimentation on these lands as the result of the vegetative clearing restrictions and development restrictions.  The proposed 100-foot buffer, however, would provide less protection from potential shoreline erosion and sedimentation along the project shorelines due to the reduction in the shoreline buffers from the existing 200- to 400-foot buffer.

Action Alternative

The 200-foot shoreline buffer along the areas proposed for removal from the project boundaries, would provide shoreline riparian buffer protection similar to that which currently exists.  The 200-foot buffer would have beneficial effects on water quality, soil erosion and sedimentation, and fisheries resources because of the vegetated shoreline buffer that would be maintained for the term of the licenses.  The removal of lands outside the 200-foot buffer from the project boundaries that have been and are proposed to be transferred to WDNR would be managed similar to the provisions required in the existing CLWMP, and would therefore, have no adverse effects on water quality, fishery resources, or soil erosion and sedimentation within the project areas.

Preservation of a 200-foot buffer between the proposed lands for development and the project reservoirs would help minimize potential adverse effects of development on soil erosion and sedimentation, water quality, and fishery resources along the project shorelines.  There may be an increase in construction of shoreline facilities (docks, piers, and similar structures) within the project boundary as a result of the proposed upland development.  However, any shoreline construction would be required to follow the same restrictions as what currently occurs

Exhibit 2
Page 89 of 107

Document A3E22-icv-00533-030536-300.00   Filed 09213/2024

along the project shorelines, and any potential adverse effects
on shoreline resources would be minimal and short-term.

2.    Terrestrial Resources

    Proposed Action

    On the lands that are proposed to be transferred to WDNR,
WDNR would manage the lands in a similar manner as under existing
conditions.  These lands would be under the State of Wisconsin's
management and follow the management plans to be developed by
WDNR and existing WDNR land management guidelines, including
WDNR's Wildlife Management Operations, Silvicultural and Forest
Aesthetics, Best Management Practices for Water Quality, Forestry
Operations, Public Forest, Timer Sales, Recreation Area
Operations and Maintenance Standards, Recreation Design
Standards, and Trail Specifications.  As stated previously, WPSC
manages the lands according to the CLWMP, and the CLWMP was
developed in consultation with WDNR and drew upon many of WDNR's
management guidelines in developing the plan.  The FWS states
that implementation of WDNR's management principles would provide
a high level of resource protection and management on the lands
proposed to be conveyed to WDNR, perhaps even greater than that
provided under the CLWMP (FWS, 2002).  The Proposed Action would,
therefore, be expected to have no adverse effects on terrestrial,
wetlands, and wildlife resources in these areas.  However, there
is currently a vegetative buffer of at least 200 feet on the
properties proposed for removal.  While WDNR may maintain such a
shoreline buffer, there is no guarantee that a shoreline buffer
and the beneficial effects of the vegetative buffer on
terrestrial, wetland, and wildlife resources would remain over
the term of the licenses.

    For the lands to be removed from the project boundary and
developed, 389 acres or approximately 4 percent of the area would
be altered, resulting in the loss of some of the high quality
habitat currently contained on these lands.  WPSC proposes to
limit structures on the land to single-family residences not to
exceed 35 feet in height.  Overall, the potential loss of 4
percent of forest habitat would have an adverse effect on
wildlife species in the area.  However, this adverse effect would
be minimized due to the more than 9,000 acres of adjacent lands
of high quality wildlife habitat that would be maintained.

    FWS recommended that WPSC stipulate a protective covenant
condition on the sale of Parcel No. 13 (located at the High Falls
Project) of the lands proposed for sale by WPSC for development
in order to protect an emergent wetland of about one acre in size
so that the wetland is not disturbed by development.  The
identified wetland is about 150 feet from the water's edge.
Under the proposed action, WPSC proposes to maintain a 100-foot
shoreline buffer (about a 9-acre area associated with Parcel 13)
within the project boundary, which would protect some shoreline
resources.  The proposed 100-foot buffer would remain under
WPSC's management, and vegetative clearing restrictions would
still occur.  The 100-foot would help maintain existing shoreline
vegetation and wildlife habitat and would help minimize soil
erosion and siltation from the adjacent proposed development
areas.  However, the proposed 100-foot buffer would be at least
100-feet less than the existing shoreline buffers.  Therefore,
the proposed buffer would not provide the same level of benefits
to wildlife habitat, wetlands, and terrestrial resources than
what occurs under existing conditions, and would not afford
protection for the one-acre wetland associated with Parcel 13.

    Threatened and Endangered Species

    Bald eagle nesting and foraging habitat is found on lands
proposed for transfer to WDNR.  WDNR has stated that they will
follow the FWS's Bald Eagle Management Guidelines.  In addition,
WDNR initiated a contract for an ecological assessment and
ecological context overview for the lands acquired or to be
acquired as part of the state forest (letter from Terrence
Gardon, WDNR, dated March 22, 2002, to Greg Egtvedt, WPSC).  WDNR
intends to add the information to the Natural Heritage Inventory
records, and the property manager would be required to check the
Natural Heritage Inventory prior to initiating any management
activity.  Furthermore, WDNR is required to follow all federal
and state requirements in the protection of threatened and
endangered resources.  The FWS states that implementation of WDNR
management practices would afford a high level of resource

Exhibit 2
Page 90 of 107

Document Accession #: 20010706-3000    Filed Date: 09/27/2000

protection and management, however, they state that WDNR should maintain a 200-foot buffer zone along all of the project land to be conveyed.  In addition, FWS supported WDNR's proposal to conduct an ecological assessment of the properties proposed for conveyance to WDNR and request WDNR inform the FWS of any new information regarding federally-listed threatened and endangered species.  The WDNR's proposed management practices would provide the same or greater protection than that which currently exists under the CLWMP.  Therefore, the transfer of lands to the WDNR will not affect bald eagles or their habitat.

The area proposed for development has not been designated as an endangered resource zone, and currently there are no bald eagle nests located on these lands and no other identified federally-listed threatened and endangered species on these lands.  Therefore, there would be no effect to the bald eagle under the Proposed Action.  However, the proposed 100-foot buffer would be at least 100-feet less than the existing shoreline buffers.  Therefore, the proposed buffer would not provide the same level of benefits to federally-listed threatened and endangered species than what occurs under existing conditions.

Action Alternative

Under the Action Alternative, maintenance of a 200-foot buffer along the project shorelines of the lands conveyed to WDNR would help ensure the protection of the shoreline vegetative buffer similar to that afforded under existing conditions.  As stated under the Proposed Action, the upland areas would be managed by WDNR in a manner consistent to that which currently occurs.  The 200-foot buffer would most likely encompass the area associated with the one-acre wetland, located about 150 feet from the High Falls Project reservoir.  In the event, the entire wetland is not protected by the shoreline buffer, a protective covenant and condition on the sale of the parcel, as recommended by the FWS, would provide adequate protection of the wetland area.  Therefore, there are no anticipated adverse effects on terrestrial resources under the Action Alternative.

For the lands to be removed from the project boundary and developed, 389 acres or approximately 4 percent of the area proposed for removal would be altered resulting in the loss of some of the high quality habitat currently contained on these lands.  Overall, the potential loss of 4 percent of forest habitat would have relatively minor adverse effects on wildlife species in the area, based on the amount of high quality forest habitat that would still be available.  The 200-foot buffer would provide for a shoreline vegetative buffer similar to the existing conditions.

Threatened and Endangered Species

Under the Action Alternative, maintenance of a 200-foot buffer along the project shorelines of the lands conveyed to WDNR would help ensure that potential nesting and roosting trees within the vegetative buffer would remain.  As stated under the Proposed Action, the upland areas would be managed by WDNR in a manner consistent to that which currently occurs.  Therefore, there are no effects on threatened and endangered resources under the Action Alternative.

Similar to the Proposed Action, since no identified federally-listed threatened and endangered species are known to exist and no bald eagles are known to nest in the lands proposed for removal and development, the Action Alternative would not have adverse effects on nesting and feeding areas for the threatened bald eagle or on federally-listed threatened and endangered species.  There would be an additional 100-foot shoreline buffer maintained along the project shorelines, as compared to the Proposed Action, that would help protect potential bald eagle habitat.

3.    Land Use and Aesthetic Resources

Proposed Action

Under the Proposed Action, similar land uses would be maintained on the lands conveyed to WDNR.  These lands would be

Exhibit 2
Page 91 of 107

established as a state park and state forest lands, providing public access to the lands.  In addition, these lands would be under the State of Wisconsin's management and follow the management plans to be developed by WDNR and existing WDNR land management guidelines, including WDNR's Silvicultural and Aesthetic Handbook and Best Management Practices for Water Quality.  These management plans would be based upon and follow similar land management guidelines as the existing CLWMP, which is required by the existing project licenses.  These management measures would help ensure public use and access and that the natural character of the project areas would remain.

However, WPSC does not propose any specific shoreline buffers along the project reservoirs for the lands conveyed or proposed for conveyance to WDNR.  Currently, the existing licenses require that at least a 200-foot buffer be maintained that restricts development and also restricts vegetative clearing other than when agreed to by the licensee, FWS, NPS, and WDNR for aesthetic or other purposes.  While WDNR management practices may help preserve the shoreline aesthetic character, there is no guarantee that the beneficial effects of a shoreline buffer would be maintained over the term of the licenses.

For the lands proposed for development, the existing land use would change from undeveloped, natural character to single-family residential.  WPSC proposes to maintain building height and color restrictions that would help limit potential adverse aesthetic effects from the proposed development.  In addition, the 389 acres would be a small portion of the total project reservoir area, about 3.8 percent of the total proposed for removal from the project boundaries.  WPSC proposes to maintain a 100-foot buffer within the existing project boundaries, which would provide some measures for preserving the shoreline's aesthetic character and provide measures for some public access to the project reservoirs.  However, under the existing licenses and CLWMP, the shoreline areas associated with the 389 acres proposed for development require a 200- to 400-foot shoreline buffer.  The change in the width of the shoreline buffer to 100 feet could, therefore, lead to potential adverse effects on the shoreline character as compared to existing conditions.

Action Alternative

FWS, NPS, and RAW all recommend that a 200-foot no timber harvest buffer be maintained along the project shorelines of the lands conveyed to WDNR and those proposed by WPSC for development in order to maintain the shoreline aesthetics and vegetative buffer benefits.  Maintaining a 200-foot buffer would provide a similar level of shoreline protection and aesthetic benefits as required under existing conditions, with the exception of areas along the High Falls and Johnson Falls reservoirs currently classified within the wild reservoir designation that have a 400-foot buffer.  Although the CLWMP provides for land management areas with a 400-foot buffer, under the existing licenses, only a 200-foot buffer is required for the maintenance of a vegetative buffer and protection of shoreline aesthetics.  A 200-foot shoreline buffer would help ensure that the natural, undeveloped character of the shoreline aesthetics would be maintained.  In addition, maintaining a 200-foot buffer within the project boundaries would help ensure that public access to the project shorelines would remain over the term of the licenses.

4.    Recreation Resources

Proposed Action

WPSC proposes to remove all of the boat launching access areas at the Peshtigo River projects from the project boundaries and transfer the ownership to WDNR, with the exception of the Hideaway Boat Launch, which would continue to be leased to the town of Stephenson and would remain within the project boundary.  In addition, WPSC proposes to maintain and continue managing the facilities that are located on lands proposed to remain within the project boundaries, including the canoe portages around the project dams, tailwater access areas, and informal access at various shoreline areas.  WPSC proposes to continue to operate the Sandstone campground, picnic area, and boat launch, which are available to WPSC employees.

Public use of the lands associated with the lands transferred to WDNR would be similar to existing conditions and

Exhibit 2
Page 92 of 107

Document Accession #: 20161216-3003    Filed Date: 09/16/2016

would potentially increase with the addition of the area to be developed as a state park.  WDNR would take over management of 16 boating access areas on the 5 reservoirs and would own the land and maintain the lease with the town of Stephenson for the boat launch at the High Falls Project.  While WDNR proposes to maintain these recreation facilities, WDNR does not have specific mandates to continue the maintenance and operation of these facilities.  The long-term provision of these public access areas would be likely, but not guaranteed.

WPSC proposes to allow limited public recreation opportunities within the 100-foot strip of land that would remain in the project boundary.  Public access and recreation on the remaining lands proposed to be developed would be eliminated. WPSC proposes to allow landowners on the developed lands to build docks, piers, and similar structures upon written approval from WPSC; place signs not larger than 4 feet square advertising the sale or lease of property upon written approval from WPSC; remove dead or diseased trees, bushes, shrubs, and plants or plant trees or shrubs upon written approval from WPSC; swim; store boats at WPSC-approved structures; and hike, picnic, and fish.  The general public would be permitted to hike; jog; walk; beach comb; bird watch; photograph nature in all areas within the 100-foot buffer except on WPSC-approved structures; and bank fish except within 100 feet of any dock, pier, or similar structure.  This would potentially alter the shoreline use in this area with an increase in private shoreline piers.  However, this would be within a small area of the reservoirs, and would follow WPSC's requirements for permitting shoreline facilities as allowed under the Standard Land Use Article of the project licenses.

### Action Alternative

Tables 10 through 14 summarize the shoreline recreation access areas within each project that would remain within the project boundaries under the Action Alternative.  The retention of a 200-foot buffer and the shoreline recreation access areas within the respective project boundaries would help ensure that public recreation access would remain open and available as provided for in the Recreation Plan for the projects.  As stated under the Proposed Action, public use of the lands associated with the lands transferred to WDNR would be similar to existing conditions and would potentially increase as a result of the development of the proposed state park.  Public use of the lands associated with a 200-foot buffer and shoreline recreation access areas would be similar  to existing conditions and would remain under the provisions of the Recreation Plan and applicable license articles.

Under the Action Alternative, the lands proposed for development would no longer be available for public recreation. However, the 200-foot shoreline buffer would still provide opportunities for public recreation access.  Adjoining landowners would be allowed to build docks, piers, and similar structures upon written approval from WPSC, as proposed by WPSC and allowed under the Standard Land Use Article of the project licenses.

Table 10. Recreation Facilities at the Caldron Falls Project to
         Remain within the Project Boundary under the Action
         Alternative

| Facility | Existing Facilities |
|---|---|
| Boat Landing No. 8 | Boat launch, barrier-free fishing pier, parking, restroom |
| Boat Landing No. 9 | Boat launch, parking, restroom |

Exhibit 2
Page 93 of 107

Document Accession #: 20210706-3009    Filing Date: 09/14/2011

```
          |Boat Landing No. 10   |Boat launch, parking
          |
--------------------------------------------------------------------------------
          |Boat Landing No. 11   |Boat launch, parking
          |
--------------------------------------------------------------------------------
          |Boat Landing No. 12   |Boat launch, parking, restroom
          |
--------------------------------------------------------------------------------
          |Boat Landing No. 13   |Boat launch, parking
          |
--------------------------------------------------------------------------------
          |Dike, tailwater, and   |Unimproved popular shoreline fishing areas
near the  |
          |walk-in access areas   |project facilities
          |
--------------------------------------------------------------------------------
          |Canoe portage          |0.2 mile canoe portage around Caldron
Falls dam    |
--------------------------------------------------------------------------------
```

Table 11. Recreation Facilities at the High Falls Project to Remain within the Project Boundary under the Action Alternative

```
--------------------------------------------------------------------------------
          |Boat        |Boat launch, parking
          |
          |Landing No.|
          |
          |1          |
          |
--------------------------------------------------------------------------------
          |Boat        |Boat launch, parking
          |
          |Landing No.|
          |
          |2          |
          |
--------------------------------------------------------------------------------
          |Boat        |Boat launch, parking
          |
          |Landing No.|
          |
          |3          |
          |
--------------------------------------------------------------------------------
          |Boat        |Boat launch, parking, restroom
          |
          |Landing No.|
          |
          |4          |
          |
--------------------------------------------------------------------------------
          |Boat        |Boat launch, parking, restroom
          |
          |Landing No.|
          |
          |5          |
```

Exhibit 2
Page 94 of 107

| Facility | Facilities |
|---|---|
| Boat Landing No. 6 | Boat launch, barrier-free fishing pier, parking, restroom |
| Boat Landing No. 7 | Boat launch, barrier-free fishing pier, parking, restroom |
| Town of Stephenson Park | Boat launch, barrier-free skid pier, picnic area, swimming area, water-ski show viewing area, restrooms, parking |
| Dike, tailwater, and walk-in access areas | Unimproved popular shoreline fishing areas near the project facilities |
| Canoe portage | 0.1 mile canoe portage around High Falls dam |

Table 12. Recreation Facilities at the Johnson Falls Project to Remain within the Project Boundary under the Action Alternative

| Facility | Facilities |
|---|---|
| Boat Landing No. 14 | Boat launch, parking |
| Canoe campsites | 4 primitive campsites accessible only by canoe |
| Dike, | Unimproved popular shoreline fishing areas near the project |

Exhibit 2
Page 95 of 107

Document Accession #: 20190306-3003    Filed Date: 09/06/2019

```
                       |tailwater, |facilities, barrier-free fishing pier, parking
                       |
                       |and walk-in|
                       |
                       |access     |
                       |
                       |areas      |
                       |

        ------------------------------------------------------------------------

                       |Canoe      |0.1 mile canoe portage around Johnson Falls dam
                       |
                       |portage    |
                       |

        ------------------------------------------------------------------------
```

        Table 13. Recreation Facilities at the Sandstone Rapids Project
                  to Remain within the Project Boundary under the Action
                  Alternative

```
        ------------------------------------------------------------------------
               |        Facility        |                        Facilities
               |
        ------------------------------------------------------------------------
               |Seymour Rapids canoe    |0.5 mile canoe portage around Seymour
        Rapids |
               |portage                 |
               |
        ------------------------------------------------------------------------
               |Scenic overlook and     |lookout parking area, trail
               |
               |angler access           |
               |
        ------------------------------------------------------------------------
               |Canoe campsites         |6 primitive campsites accessible only by
        canoe  |
        ------------------------------------------------------------------------
               |Sandstone campground    |Campground for the use of WPSC employees
               |
        ------------------------------------------------------------------------
               |Sandstone campground    |Picnic area for the use of WPSC employees
               |
               |picnic area             |
               |
        ------------------------------------------------------------------------
               |WPSC employee boat      |Boat launch, parking, pier
               |
               |launch                  |
               |
        ------------------------------------------------------------------------
               |Hideaway Lane Boat      |Town of Stephenson operates a boat launch
        with   |
               |Landing                 |parking
               |
        ------------------------------------------------------------------------
               |Dike, tailwater, and    |Unimproved popular shoreline fishing areas
        near the|
               |walk-in access areas    |project facilities
               |
```

Exhibit 2

Page 96 of 107

Document Accession #: 20050316-3003   Filed Date: 09/14/2009

```
--------------------------------------------------------------------------------
         |Canoe portage          |0.5 mile canoe portage around Caldron
Falls dam       |
--------------------------------------------------------------------------------
```

Table 14. Recreation Facilities at the Potato Rapids Project to Remain within the Project Boundary under the Action Alternative

```
--------------------------------------------------------------------------------
         |     Facility     |                     Facilities
         |
--------------------------------------------------------------------------------
         |Boat Landing No. 1|Boat launch, parking
         |
         |East              |
         |
--------------------------------------------------------------------------------
         |Boat Landing No. 1|Boat launch, parking
         |
         |West              |
         |
--------------------------------------------------------------------------------
         |Dike, tailwater,  |Unimproved popular shoreline fishing areas near
the      |
         |and walk-in access|project facilities, restroom
         |
         |areas             |
         |
--------------------------------------------------------------------------------
         |Canoe portage     |0.1 mile canoe portage around Caldron Falls dam
         |
--------------------------------------------------------------------------------
```

Table 15 summarizes the recreation facilities that are recommended for removal from the project boundaries. Any portions of these facilities located within the 200-foot buffer or within the recreation areas summarized in tables 10 through 14 would remain within the project boundary. These recreational facilities include snowmobile, mountain bike, and cross-country ski trails that are not directly associated with public recreational access to project waters or facilities. The snowmobile trails are currently licensed to Marinette County who works with local snowmobile clubs for maintenance of the trails, and WDNR would continue the agreement with Marinette County. Mountain biking is permitted on snowmobile trails in the summer (FEIS, March 1997, pg. 3-41). These trails are part of a larger network of trails within the surrounding area. There are about 244 miles of snowmobile trails within Oconto County, and about 406 miles of snowmobile trails within Marinette County (Association of Wisconsin Snowmobile Clubs. 2003). In addition, the Marinette Cross County Ski Association would continue to maintain the cross-country ski trail under agreement with WDNR. Therefore, the snowmobile, mountain biking and cross country ski trails would still remain available for public use. Also, there are other publically accessible, comparable public recreation opportunities for such activities within the project region.

Table 15. Recreation Facilities recommended for removal from the Project Boundaries under the Action Alternative

Exhibit 2
Page 97 of 107

```
-------------------------------------------------------------------------------
          |Reservoir | Facility  |                    Facilities
          |

-------------------------------------------------------------------------------
          |Caldron   |Snowmobile |Marinette County holds a license agreement
with WPSC |
          |Falls     |trail      |for 3 miles of trail
          |

-------------------------------------------------------------------------------
          |High Falls|Snowmobile |Marinette County holds a license agreement
with WPSC |
          |          |trail      |for 5 miles of trail
          |

-------------------------------------------------------------------------------
          |Johnson   |Snowmobile |Marinette County holds a license agreement
with WPSC |
          |Falls     |trail      |for 0.5 mile of trail
          |

-------------------------------------------------------------------------------
          |Sandstone |Snowmobile |Marinette County holds a license agreement
with WPSC |
          |Rapids    |trail and  |for 14 miles of trail
          |
          |          |mountain   |
          |
          |          |bike trail |
          |

-------------------------------------------------------------------------------
            |                |Cross      |Marinette County cross country ski
association holds |
            |                |county ski |a license agreement with WPSC for 6 miles
of trail    |
            |                |trail      |
            |

-------------------------------------------------------------------------------
          |Potato    |Snowmobile |Marinette County holds a license agreement
with WPSC |
          |Rapids    |trail      |for 2 miles of trail
          |

-------------------------------------------------------------------------------
```

5.    Cultural Resources

      Proposed Action

      By letter dated June 25, 2003, WPSC submitted an executed
MOU between the WDNR, SHPO, and WPSC for the management of
historic properties that would be removed from the existing
project boundaries and conveyed to WDNR.  The MOU would provide
measures for the long-term management of these lands consistent
to that which currently occurs under the existing HRMPs and PA.
The removal of the lands from the project boundary would
eliminate the Commission's opportunity to ensure that historic
properties are protected as required by the NHPA.  The MOU would
help ensure future protection of existing and as yet unidentified
historic properties within the lands proposed for conveyance to
WDNR.

      Under the Proposed Action, a 100-foot shoreline buffer would
remain within the project boundaries along the shorelines of the
lands proposed for development.  The existing requirements of the
HRMPs and PA would remain in place for the areas within the 100-
foot buffer, and monitoring of the potential effects of project
operations on historic properties along the project shorelines
would continue.  On the remaining lands outside of the 100-foot
buffer, the lands will be managed by the WDNR under the terms of
the MOU.

Exhibit 2
Page 98 of 107

The archeological surveys conducted on the lands intended for development found no eligible historic properties within these parcels, and therefore there would be no adverse effect to historic properties as a result of the removal of the lands proposed for development from the project boundary.

The execution of the PA by the Commission and the Wisconsin SHPO, and implementation of its terms evidence that the Commission has taken into account the effects of this undertaking on historic properties and afforded the ACHP an opportunity to comment.

Action Alternative

Under the Action Alternative, a 200-foot shoreline buffer would remain within the project boundaries along the shorelines of the properties conveyed to WDNR and those properties proposed for future development and removal from the project boundaries. The existing requirements of the HRMPs and PA would remain in place for the areas within the 200-foot buffer. WPSC activities for shoreline monitoring would continue for all lands surrounding the project reservoirs, and this would allow for continued monitoring by WPSC of the potential effects of project operations on historic properties along the project shorelines. As stated under the Proposed Action, the executed MOU between WPSC, WDNR, and SHPO would ensure the future protection of any existing and any potential as yet undiscovered historic properties on the lands proposed for conveyance to WDNR. As stated under the Proposed Action, there would be no adverse effect on historic properties on the parcels proposed for development. The execution of the PA by the Commission and the Wisconsin SHPO, and implementation of its terms evidence that the Commission has taken into account the effects of this undertaking on historic properties and afforded the ACHP an opportunity to comment.

B.    No-Action Alternative

Under the No-Action Alternative, the licensee's proposal would be denied. There would be no change to the existing environment. No project lands would be removed from the project boundaries, and there would be no changes to existing project boundaries.

VII. CONCLUSION AND RECOMMENDATIONS

Based on our analysis described in this EA, we recommend approval of the Action Alternative, which would include the removal of land from the project boundary of the Peshtigo River projects as proposed by WPSC, with the exception of lands associated with the existing shoreline recreation access areas (summarized in Tables 10 through 14) and lands within a 200-foot no timber harvest buffer from the normal high water mark of the project reservoirs within the proposed approximate 9,738 acres for removal. The lands within the 200-foot buffer and shoreline recreation access areas would remain within the respective project boundaries and be managed according to the existing CLWMP land management practices.

The remainder of the 9,738 acres would be removed from the project boundary to be conveyed to WDNR or maintained by WPSC for development purposes as proposed by WPSC. The 200-foot no timber harvest buffer along the project shorelines would protect soil, water quality, fishery, terrestrial, land use, and recreation resources and federally-listed threatened and endangered species in a manner similar to that required under the existing project licenses and the approved CLWMP. The 200-foot buffer would most likely encompass the area associated with the one acre wetland, located about 150 feet from the High Falls Project reservoir. Maintaining the shoreline recreation access areas within the project boundaries would ensure public recreational access to the project reservoirs over the term of the project licenses.

For the lands proposed for removal outside of the 200-foot buffer and shoreline recreation access areas, we recommend the Commission approve the removal of the lands associated with WPSC's proposed phase 1. We also recommend that the Commission approve the removal of the lands outside of the 200-foot buffer and shoreline recreation access areas associated with phase II and phase III that are proposed for conveyance to WDNR. We recommend that WPSC be required to submit to the Commission

Exhibit 2
Page 99 of 107

revised Exhibit G maps, provide new estimates of the lands to remain within the project boundaries for each project (including the land areas associated with the 200-foot buffer and the shoreline recreation access areas), and provide an estimate of the total lands that would be removed from the project boundaries for each project.

We determined that there would be no adverse effect on historic properties as a result of the recommended alternative (see section VI.A.5, cultural resources). The executed MOU between WDNR, SHPO, and WPSC would ensure the future protection of existing or as yet undiscovered historic properties within the lands conveyed to WDNR.

We conclude that granting authorization for removal of lands from the project boundaries at the Caldron Falls (FERC Project No. 2525), High Falls (FERC Project No. 2595), Johnson Falls (FERC Project No. 2522), Sandstone Rapids (FERC Project No. 2546), and Potato Rapids (FERC Project No. 2560) hydroelectric projects with the conditions stipulated above would not constitute a major federal action significantly affecting the quality of the human environment.

Project  No. 2525-044, et al.

- 1 -
VIII.REFERENCES

AVD Archaeological Services, Inc.  2002.  An Archaeological Survey of Development Lands on High Falls, Johnson Falls and Sandstone Rapids Hydroelectric Project in Marinette County Wisconsin, May.

Association of Wisconsin Snowmobile Clubs.  2003.  Web site - http://awsc.fp.execpc.com/trail.htm#oconto

FERC (Federal Energy Regulatory Commission).  1997.  Peshtigo River Multiple Projects Environmental Impact Statement, March.

NRCS (Natural Resources Conservation Service).  2002.  Buffer Strips Common Sense, http://www.nrcs.usda.gov/feature/buffers/.

USDA (U.S. Department of Agriculture).  1997.  Riparian Forest Buffer Conservation Practice Job Sheet, April.

WPSC (Wisconsin Public Service Corporation).  2002.  Project Boundary Modifications, Description, Analysis, and Impact Evaluation for the License Amendment Application for the Caldron Falls (FERC No. 2525), High Falls (FERC No. 2595), Johnson Falls (FERC No. 2522), Sandstone Rapids (FERC No. 2546), and Potato Rapids (FERC No. 2560) Hydroelectric Projects, June.

WPSC.  1998.  Comprehensive Land and Wildlife Management Plan for the Peshtigo River Hydroelectric Projects, June.

WPSC.  1998.  Recreation Plan for the Peshtigo River Hydroelectric Projects, June 23.

WPSC.  1998.  Historic Resource Management Plan for the Caldron Falls Hydroelectric Project (FERC No. 2525), June 15.

WPSC.  1998.  Historic Resource Management Plan for the High Falls Hydroelectric Project (FERC No. 2595), June 15.

WPSC.  1998.  Historic Resource Management Plan for the Johnson Falls Hydroelectric Project (FERC No. 2522), June 15.

WPSC.  1998.  Historic Resource Management Plan for the Sandstone Rapids Hydroelectric Project (FERC No. 2546), June 8.

WPSC.  1998.  Historic Resource Management Plan for the Potato Rapids Hydroelectric Project (FERC No. 2560), June 25.

IX.  PREPARERS

Federal Energy Regulatory Commission
Jean Potvin - Environmental Protection Specialist
B. Peter Yarrington - Fisheries Biologist

Exhibit 2
Page 100 of 107

Rebecca M. Martin - Environmental Biologist

Louis Berger Group
Alynda Foreman - Terrestrial Biologist
Bill Perry - Land Use and Recreation Planner
Karen Klosowski - Land Use and Preservation Planner
Denise Short - Technical Editor

Footnotes

[1]See 79 FERC * 62,218 (Potato Rapids); 79 FERC * 62,219
(Caldron Falls); 79 FERC * 62,220 (Peshtigo); 79 FERC * 62,221
(Sandstone Rapids); 79 FERC * 62,222 (Johnson Falls); 79 FERC *
62,223 (High Falls).  The sixth project is the 0.6-MW Peshtigo
Project No. 2581.

[2]Wisconsin Public Service Co., 97 FERC * 62,257 (2001).  The
Director's order was in response to Public Service's filing of
November 6 and filings of November 14, 2001 (one dated November
13, the other dated November 14).  The filings (1) applied to
amend the project boundary to remove lands to be conveyed; (2)
asserted the company's authority, under the standard land use
article of its licenses, to convey the lands without prior
Commission approval, and asked for Commission confirmation of
this authority; and (3) stated that, pursuant to the proposed
conveyance instruments, Wisconsin DNR would manage the conveyed
land according to the Commission-approved project management
plans for recreation, land and wildlife, and historic resources
until the Commission amended the licenses to remove the lands
from the project boundary.

    The Director's order did not address the question of whether
Public Service had the authority to convey the lands without
prior Commission approval.  The company does not have such
authority.  The standard land use article authorizes licensees to
convey, for certain specified purposes, no more than five acres
of project lands in one transaction, and no more than a total of
50 acres each year.  See Article 413 of the Potato Rapids and
High Falls Projects, Article 414 of the Johnson Falls Project,
Article 415 of the Sandstone Rapids Project, and Article 416 of
the Caldron Falls Project.

[3]Public Service filing of December 14, 2001, at 2.  This filing
followed a meeting, referenced in the December 14 filing, between
the company and Commission staff.

[4]River Alliance is a coalition of groups and individuals whose
interest is the protection and enhancement of Wisconsin rivers.

[5]Where, as here, there is no public notice of an application, a
person who is aggrieved may file a motion to intervene, which
will be timely if it is filed no later than the deadline for
requests for rehearing of an order issued in the proceeding.  See
Great Northern Paper, Inc., 88 FERC * 61,042 at 61,108 (1999).

[6]Public Service filing of January 23, 2002.

[7]98 FERC * 61,185 (2002).

[8]After the Director approved the conveyance of 5,740 acres, the
parties made revisions to their agreement, with the result that
5,321 acres were sold to Wisconsin DNR in what the parties call
the phase one conveyances.

[9]Public Service also asserts that Rivers Alliance has not given
the legal or factual basis for some of its positions, as required
by the Commission's intervention regulations, 18 C.F.R. *
385.214(b) (2003).  However, the rule requires a statement of the
basis in fact and law for the movant's position only "to the
extent known."

[10]Monday, January 21, was a federal holiday (Martin Luther
King, Jr.'s birthday); therefore, the deadline was the next
business day, Tuesday, January 22.  See 18 C.F.R. *
385.2007(a)(2) (2003).

[11]The Secretary's file stamp indicated that the pleading was
received on       January 23, 2002.

[12]The Alliance also argues that Public Service lacks authority
under the standard land use article of its licenses to convey the

Exhibit 2
Page 101 of 107

interests in project property without prior Commission approval. We addressed this point above, in n. 2.

[13] FPA Section 10(a)(1), 16 U.S.C. * 803(a)(1), states:

> That the project adopted, including the maps, plans, and specifications, shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the improvement and utilization of waterpower development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public purposes, including irrigation, flood control, water supply, and recreational and other purposes referred to in Section 4(e); and if necessary in order to secure such plan the Commission shall have the authority to require the modification of any project and of the plans and specifications of the project works before approval.

Section 4(e) of the FPA, 16 U.S.C. * 797(e), states in part:

> In deciding whether to issue any license under this Part for any project, the Commission, in addition to the power and development purposes for which licenses are issued, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife (including related spawning grounds and habitat), the protection of recreational opportunities, and the preservation of other aspects of environmental quality.

[14] Standard Article 5 appears in what are called "L-Forms," which are published at 54 FPC 1792-1928 (1975) and are incorporated into project licenses by an ordering paragraph. See 18 C.F.R. * 2.9 (2003). Article 5 states in pertinent part:

> The Licensee, within five years from the date of issuance of the license, shall acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction, maintenance, and operation of the project. The Licensee or its successors and assigns shall, during the period of the license, retain the possession of all project property covered by the license as issued or as later amended, including the project area, the project works, and all franchises, easements, water rights, and rights of occupancy and use; and none of such properties shall be voluntarily sold, leased, transferred, abandoned, or otherwise disposed of without the prior written approval of the Commission, except that the Licensee may lease or otherwise dispose of interests in project lands or property without specific written approval of the Commission pursuant to the then current regulations of the Commission. . . .

The Commission has regulatory authority only over the licensee, and thus can administer and enforce the terms of the license only through the licensee and the licensee's property rights.

[15] 16 U.S.C. * 814. Section 21 states in part:

> That when any licensee can not acquire by contract or pledges an unimproved dam site or the right to use or damage the lands or property of others necessary to the construction, maintenance, or operation of any dam, reservoir, diversion structure, or the works appurtenant or accessory thereto, in conjunction with an improvement which in the judgment of the Commission is desirable and justified in the public interest for the purpose of improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce, it may acquire the same by the exercise of the right of eminent domain . . . .

Courts have held that Section 21 is available to obtain not only lands necessary for the dam, reservoir, and other project works, but also lands for other project purposes, including recreation. See, e.g., Louisiana v. Sabine River Authority, 524 F.2d 934 (5th Cir. 1975); Alabama Power Co. v. Curry, Ala., 420 So.2d 48 (1982).

Exhibit 2
Page 102 of 107

[16] Thus, title to lands within the boundary can be owned by someone other than the licensee, so long as the licensee holds the necessary property interests (e.g., flowage easements) and permits (e.g., a Forest Service special use permit) to carry out licensed project purposes.  The license covers only those property interests held by the licensee; each license with a project boundary states (in an ordering paragraph) that "[t]he project consists [inter alia] of (1) All lands, to the extent of the licensee's interests in those lands, enclosed by the project boundary shown by [a designated exhibit] . . . ."  Thus, neither the Commission nor the licensee can interfere with the property interests of the non-licensee.

If the Commission requires additional control in order to accomplish a project purpose, or amends the license to expand or add a project purpose, it can direct its licensee to obtain any necessary additional property rights, whether inside or outside the existing project boundary, and amend the boundary as appropriate.  See, e.g., FPL Energy Maine Hydro LLC, 88 FERC * 61,116 at 61,274 (1999); PacifiCorp, 80 FERC * 61,330 at 62,113-14 (1997); Great Northern Paper, Inc., 77 FERC * 61,066 at 61,247-48 (1996); Niagara Mohawk Power Corp., 77 FERC * 61,306 at 62,391 (1996); Georgia Power Co., 32 FERC * 61,237 (1985).  If the Commission determines that less land is needed to meet project purposes, or if it redefines project purposes, it can remove land from the boundary.

[17] Until 1986, the FPA did not mention project boundaries, although they were implicitly needed for purposes of FPA Section 24, 16 U.S.C. * 818 (power site withdrawals), and FPA Section 10(e), 16 U.S.C. * 803(e) (annual charges for use of federal lands), and useful for purposes of FPA Section 4(f), 16 U.S.C. * 797(e) (public notice in local newspapers).  Section 14 of the Electric Consumers Protection Act of 1986 (ECPA) amended FPA Section 9 to require an applicant for an original license to make a good-faith effort to notify owners of lands "within the bounds" of the proposed project.  Section 4 of ECPA amended FPA Section 15 to require an incumbent relicense applicant to identify federal and Indian lands located within the project boundary, and the fees paid under the FPA for project occupancy of such lands.

The Commission's regulations have required project boundaries for licensed  projects since early in its history. See, e.g., the 1938 regulations of the predecessor Federal Power Commission (Commission), which required (at Section 4.41, Exhibit K) a detail map showing "the project area and the project boundary."  This regulation also stipulated that the project boundary was to be no more than 200 feet (horizontal measurement) from the exterior (high-water level) margin of reservoirs.  The current regulations require boundaries for  projects over 1.5 MW (major projects) (18 C.F.R. ** 4.41(h)(2) and * 4.51(h)(2)), but do not require boundaries for projects under 1.5 MW (minor projects) (18 C.F.R. * 4.61(f)), unless they contain federal land.  The current regulations continue to stipulate a project boundary no more than 200 feet from the exterior margin of reservoirs, but make an exception where additional lands are "necessary for project purposes, such as recreation, shoreline control, or protection of environmental resources."

[18] See, e.g., Niagara Mohawk Power Corp., 77 FERC * 61,306 (1996).  Property rights are governed by state law, whereas project boundaries are determined by the Commission.

[19] These are applications to amend the license by revising the license's description of project lands and the exhibits showing the project works and (if applicable; see n. 17, supra) boundaries (both referenced in a license's ordering paragraphs). See 18 C.F.R. ** 4.200 - 4.202 (2003).

[20] The standard land use article (referenced in n. 2, supra), which delegates to licensees the authority to convey property interests for certain minor non-project uses of project lands and waters, tracks these principles.  See, e.g., Article 416 of the license for the Caldron Falls Project No. 2525, 79 FERC * 62,219 at 64,686-87.  Paragraph (a) provides that:

the Licensee shall have the authority to convey certain interests in project lands and waters for certain . . . types of use and occupancy, without prior Commission approval.  The Licensee may exercise the authority only if the proposed use and occupancy is consistent with the

Exhibit 2
Page 103 of 107

purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project. [The developmental project purposes are already protected by the very limited nature of the authority delegated to the licensee.]  For these purposes, the Licensee shall also have continuing responsibility to . . . monitor the use of, and ensure compliance with the covenants [in Paragraph (e)(3)] of the instrument of conveyance for, any interests that it has conveyed under this article.  . . . [I]f a covenant of a conveyance made under the authority of this article is violated, the Licensee shall take any lawful action necessary to correct the violation.  . . .

Paragraph (e)(2) requires the licensee to determine that the proposed use of the lands to be conveyed (pursuant to Paragraph (d)) is not inconsistent with any approved Exhibit R (recreation plan) or that the lands to be conveyed do not have recreational value.

Paragraph (d)(3) requires that the instrument of conveyance contain three covenants:  (I) that the use of the lands shall not endanger health, create a nuisance, or otherwise be incompatible with overall project recreational use; (ii) that the grantee's activities will not harm the scenic, recreational, and environmental values of the project; and (iii) that the grantee shall not unduly restrict public access to project waters.

[21]The standard land article addresses the distinction. Paragraph (f) states:

The conveyance of an interest in project lands under this article does not in itself change the project boundaries.  The project boundaries may be changed to exclude land conveyed under this article only upon approval of revised Exhibit G or K drawings (project boundary maps) reflecting exclusion of that land.  Lands conveyed under this article will be excluded from the project only upon a determination that the lands are not necessary for project purposes, such as operation and maintenance, flowage, recreation, public access, protection of environmental resources, and shoreline control, including shoreline aesthetic values.  . . .

The article does not address the fate of covenants placed on the conveyance of the interest in project lands.  However, it appears that the Commission did not intend that land removed from the project would be subject to such covenants.  In the early 1970s the Commission issued two notices of a proposed rulemaking to codify standards for the approval of conveyances of interests in project lands.  The second notice proposed a regulation establishing covenants in such conveyances, "[u]nless the land to be conveyed is shown to be no longer necessary for project purposes . . . ."  See Disposal of Interests in Project Lands, and Applications for Certain Uses of Project Property Requiring Commission Approval (Docket No. R-417), 38 F.R. 21652 (Aug. 10, 1973) (proposed Section 2.15(a)).  The rulemaking docket was subsequently terminated as unnecessary, in light of the Commission's development of the first version of the standard land use article, which the Commission staff sent to all licensees on November 7, 1974.  See Termination of Various Proposed Rulemaking Proceedings, 8 FERC * 61,025 at 61,068-69 (1979).

[22]See New York State Electric & Gas Corp., 102 FERC * 61,086 at 61,234 (2003), requiring licensee to undertake certain measures at the project to mitigate for new use on land deleted from project boundary.

[23]See, e.g., Marquette Board of Light and Power, 101 FERC * 62,014 (2002).

[24]See n. 2, supra.  In connection with its proposed phase two and phase three conveyances, Public Service correctly applied only to delete the affected lands from the project boundary.

[25]Public Service's application had stated, without elaboration, that the lands "are not needed for project purposes."  November 14, 2001 filing (dated November 14) at 2.  The Director's order stated that the proposed conveyances were in the public interest, but contained no discussion or findings as to whether the lands to be conveyed were needed for project purposes.  Both Public

Exhibit 2

Page 104 of 107

Service and the Director asserted instead  the public benefit of placing land in a state park and forest.

[26]The Director's order did not articulate the standard for granting a proposed conveyance of an interest in lands that are in and will remain in the project:  that the proposed use of the lands to be conveyed is not inconsistent with any licensed project purpose, including recreation.

[27]June 14, 2002 application at 4.  Public Service also states that it will retain flowage rights on some of the transferred lands.  Lands for which the licensee retains flowage rights must remain in the license.

[28]See EA, Tables 4-8, showing which project recreation facilities Public Service proposes to transfer and which it proposes to retain.

[29]July 16, 2002 filing at 2.  River Alliance asserts that the land transfers will result in the people of the State of Wisconsin, rather than Public Service, having to bear the cost of maintaining the lands.  While the amount of cost-shifting, if any, is not clear, since Public Service's ratepayers presumably would receive some benefit from any savings realized by the company, Wisconsin has voluntarily chosen to acquire and maintain the lands at issue.  Any issue River Alliance has with the cost of these transactions is with the state.

[30]See n. 12, supra.

[31]The Commission's obligation under FPA Section 10(a)(1) is a continuing one throughout the term of the license.  See, e.g., Pacific Gas & Electric Co., 46 FERC * 61,249 at 61,732 (1989).

[32]84 FERC * 61,133 (1998).

[33]No party has asserted that removal of the lands will have an adverse impact on any specific project purpose.

[34]Retention of the 200-foot buffer zone will keep some 575 additional acres within the project boundaries, although it will not be possible to determine these figures exactly until Public Service files revised exhibits showing the project acreage following the transfers.  Public Service may, by delegated authority or Commission approval, convey property rights in the project buffer zone, subject to the licensee's retention of rights adequate to fulfill the license requirements.

[35]The facilities that staff recommends remain within the project boundaries are set forth in Tables 10-14 of the EA.

[36]The facilities that staff recommends be authorized to be removed from the project boundaries are set forth in Table 15 of the EA.

[37]The EA states, at 36-37, that these trails are part of a larger network of trails within the surrounding area, which includes some 244 miles of snowmobile trails within Oconto County, and 406 miles of snowmobile trails within Marinette County.

[38]EA at 24.

[39]Id.

[40]As discussed earlier, the Commission will have no jurisdiction over the lands at issue once they been removed from the project boundaries, and therefore will have no role in enforcement of the terms of the MOU among Wisconsin DNR, the Wisconsin SHPO, and Public Service (which is essentially an agreement between the two state agencies as to how to handle issues regarding historic properties).

[41]EA at 38-39.

[42]EA at 31.

[43]  The Peshtigo Project, consisting of a dam, a reservoir, a powerhouse, and appurtenant facilities, is the last dam on the river at river mile (RM) 12, before the Peshtigo River empties into Green Bay.  No project boundary modifications are proposed

Exhibit 2

Page 105 of 107

for the Peshtigo Project.

[44]  On November 6, and 14, 2001, WPSC filed applications with the Commission proposing to convey certain lands to the WDNR.  On December 20, 2001, the Commission issued an order approving the conveyance of fee title interest to the WDNR  of 174 acres within the Caldron Falls Project and 5,740 acres within the Caldron Falls, High Falls, Johnson Falls, Sandstone Rapids, and Potato Rapids projects with the condition that, until the Commission approves removal of the lands from the project boundaries, the properties would remain within the project boundaries and would be managed according to the licensee's Commission-approved Comprehensive Land and Wildlife Management Plan (CLWMP) (June 19, 1998), Recreation Plan (June 23, 1998), and Historic Resource Management Plans (HRMPs) (June 1998) for the Peshtigo River projects.

[45]  BLM owns, but does not actively manage, numerous small islands within the project areas.  Legislation has been drafted, but not yet submitted to Congress for action, that would transfer those lands from BLM to WDNR (letter from the U.S. Department of Interior, dated July 24, 2002).

[46]  The Caldron Falls Project HRMP was filed June 15, 1998, and approved by the Commission June 26, 1998; the Sandstone Rapids Project HRMP was filed June 8, 1998, and approved by the Commission on June 26, 1998; the High Falls Project HRMP was filed on June 15, 1998, and approved by the Commission on June 26, 1998; the Johnson Falls Project HRMP was filed on June 15, 1998, and approved by the Commission on June 26, 1998; and the Potato Rapids Project HRMP was filed on June 15, 1998, and approved by the Commission on June 25, 1998.

Exhibit 2
Page 106 of 107

Document Accession #: 20030918-5004    Filed Date: 09/15/2003

Document Content(s)

10379068.WPD.......................................................................1
3953323.TXT.......................................................................60

Exhibit 2
Page 107 of 107