VitalLaw®

 Wolters Kluwer

# 1 FERC - 75 FERC,  60 FERC ¶61,121, Halecrest Company, Project No. 9401-000, Energy Storage Corporation, Project No. 8595-000, Esperanza Power Limited Partnership, Project No. 9105-000, FERC (Federal Energy Regulatory Commission), (Aug. 4, 1992)

1 FERC - 75 FERC

Click to open document in a browser

**Halecrest Company, Project No. 9401-000, Energy Storage Corporation, Project No. 8595-000, Esperanza Power Limited Partnership, Project No. 9105-000**

**[61,398]**

## [¶61,121]

**Halecrest Company, Project No. 9401-000**

**Energy Storage Corporation, Project No. 8595-000**

**Esperanza Power Limited Partnership, Project No. 9105-000**

**Order Issuing License**

## (Issued August 4, 1992)

**Before Commissioners: Martin L. Allday, Chairman; Charles A. Trabandt, Elizabeth Anne Moler, Jerry J. Langdon and Branko Terzic.**

On August 12, 1985, Halecrest Company filed an application for a license under Part I of the Federal Power Act (FPA) [1] to construct, operate, and maintain the proposed 2000 megawatt (MW) Mount Hope Pumped Storage Project, to be located in Rockaway Township, Morris County, New Jersey, partly on a federal reservation. [2] On April 25, 1991, Halecrest filed an amendment to the application. [3]

The Commission published notice of both the original application and its amendment, and numerous parties intervened. [4] The Commission prepared draft, supplemental, and final environmental impact statements on the project, and held several public hearings in New Jersey. Numerous interested persons have filed comments expressing their views on the project, including local, state, and federal governmental agencies, private organizations and associations, and local residents of the area. The Commission has carefully and fully considered all of these views, comments, and submissions in determining whether to issue the license.

*Background*

Halecrest originally proposed to use Mount Hope Lake [5] as the upper reservoir of the project, and to construct an earth and rockfill dam at the lake for that purpose. In response to concerns expressed by state and federal agencies and local residents with respect to flooding of wetlands and visual and other impacts, Halecrest subsequently proposed an alternative location for the upper reservoir (the upland reservoir alternative), which would be constructed by excavating an adjacent rock quarry site. Water from Mount Hope Lake would be utilized to partially fill the upland alternative reservoir at the outset, but without the dam and wetland flooding. Water to fill the upper reservoir would also come from an adjacent abandoned iron mine, the Mount Hope Mine, [6] which would be dewatered and used for electrical equipment. [7]

The lower reservoir would consist of a series of underground tunnels, which would be excavated as part of the project construction. The upper reservoir would be connected to the lower reservoir by excavating a vertical

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



intake shaft approximately 2800 feet long and 25 feet in diameter, and a set of five penstocks. There would be a turbine and generator at the bottom of each penstock. [8]

Once constructed and filled with water, the project would operate essentially as a closed system. During periods of peak electrical demand during the day, water would flow from the upper reservoir into the intake shaft and penstocks to operate the turbines, and would be

**[61,399]**

stored thereafter in the lower reservoir. At night and on weekends, the water would then be pumped up out of the lower reservoir, through the same penstocks and intake shaft, and back into the upper reservoir. The turbines would be operated in reverse to pump the water out, using electric power supplied from sources outside the project.

In November of 1989, the Commission's staff circulated a draft environmental impact statement (DEIS) for the project and received numerous comments on it. In May of 1991, the Commission's staff circulated a Supplement to the Draft Environmental Impact Statement (SDEIS) analyzing the upland reservoir alternative, and received numerous comments on it. Local hearings were held on both the DEIS and SDEIS. In February of 1991, the Commission issued its final environmental impact statement (FEIS). The FEIS concludes that the upland reservoir alternative is environmentally preferable to the original proposal.

On April 25, 1991, Halecrest filed a request to substitute engineering drawings which would, in effect, amend the application to substitute the upland reservoir alternative for the original proposal. The request indicated (at p. 5) that "the Applicant favors and intends to build the upper reservoir in accordance with one design only, the Upland Alternative. All consideration should thus be focussed on that single design." On August 9, 1991, the Commission issued a notice of Halecrest's filing, construing it as an amendment to the license application.

In 1988, the Township of Rockaway, an intervenor in the proceeding, filed a motion to dismiss Halecrest's application based on an allegation that the proposed project would constitute an "injection well" in violation of the Clean Water Act, the Safe Drinking Water Act, and the Superfund Amendment and Reauthorization Act of 1986 (the Roe Amendment). Halecrest filed an answer, disputing the allegation. On March 27, 1992, the Commission issued an order denying the motion. [9] The order determined that the issuance of a license for the project would not be inconsistent with the Roe Amendment, provided that the license contains certain conditions that implement the central thrust and purpose of the legislation. [10] No rehearing requests were filed.

*Discussion*

A. *Picatinny Arsenal*

Section 4(e) of the FPA [11] authorizes the Commission to issue a license to construct or operate a hydropower project "upon any part of the public lands and reservations of the United States." The primary transmission line for the project traverses the U.S. Army's Picatinny Arsenal. The arsenal is located on lands acquired by the United States that are used for a public purpose. Thus, Picatinny Arsenal is a reservation of the United States within the meaning of Section 3(2) of the FPA. [12]

Section 4(e) of the FPA further provides:

That licenses shall be issued within any reservation only after a finding by the Commission that the license will not interfere or be inconsistent with the purpose for which such reservation was created or acquired, and shall be subject to and contain such conditions as the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation.

On June 3, 1992, the Director, Division of Project Review, Office of Hydropower Licensing (Director), sent a letter to Brig. General William R. Holmes, Commander of the U.S. Army Armament Research, Development and Engineering Center, Picatinny Arsenal, New Jersey, drawing the Army's attention to Section 4(e) of the FPA and inviting the Army to provide terms and conditions to be included in any license issued for the project. [13]

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

**[61,400]**

In response, on July 2, 1992, Brigadier General Holmes filed a letter proposing that the license be conditioned to require that the applicant: (1) complete a wetlands delineation of the area where the project is to traverse Picatinny Arsenal; (2) complete a study of the critical habitats of the Lateral Bluet and any other State threatened and endangered species; (3) undertake whatever mitigation is needed to prevent or minimize injury to the environment satisfactory to the Environmental Protection Agency, the U.S. Fish and Wildlife Service, and the New Jersey Department of Environmental Protection and Energy; and (4) obtain an easement for traversing the arsenal in accordance with army regulations and procedures prior to commencing any action on the federal reservation at Picatinny. [14]

We conclude that a license, as conditioned in accordance with Army's letter, will not interfere or be inconsistent with the purpose for which the arsenal was created or acquired. [15] As discussed below, we have determined that the license should be issued. Accordingly, pursuant to Section 4(e), we will incorporate the above-stated conditions into the license, in Articles 101, 102, and 103 thereof.

B. *Comprehensive Development*

Section 4(e) of the FPA states that, in deciding whether to issue a license, the Commission, in addition to the power and development purposes of the project, shall give equal consideration to the purposes of energy conservation, the protection, mitigation of damage to, and enhancement of, fish and wildlife, the protection of recreational opportunities, and the preservation of other aspects of environmental quality. In addition, Section 10(a)(1) of the FPA [16] states that the project adopted shall be best adapted to a comprehensive plan for improving or developing a waterway, for the improvement and utilization of water power development, and for other beneficial uses.

For the reasons discussed below and in the FEIS, we conclude that the Mount Hope Pumped Storage Project would provide power and energy benefits, would protect, mitigate, and enhance fish and wildlife resources, would enhance recreational opportunities, would preserve other aspects of environmental quality, and would be best adapted to a comprehensive plan for improving or developing the project area. In determining whether to issue a license for the project, we compared the impacts of the project with the no-action alternative, and compared the impacts of the project's transmission line routing with alternative routes.

1. Project Benefits

Halecrest estimated that the project would generate a maximum of 2,628 gigawatthours annually at a plant factor of 15 percent, based on the assumption that the project would generate at about 1,000 MW for ten hours per day, five days per week. The estimated on-line project cost excluding our required mitigation and enhancement measures is about $ 1.88 billion. We believe that the annual project generation and the plant factor estimated by the licensee are reasonable. This energy would displace cycling and peaking power from oil- and gas-fired combustion turbines and combined cycle units. The 1991 New Jersey Energy Master Plan specifically identifies the Mount Hope Project and suggests that the project could benefit the state.

In the FEIS, the Commission conducted an independent evaluation of the economics of the proposed project by comparing two hypothetical systems, one including the project and the other including combined cycle and combustion turbines in lieu of the project. Both systems would have approximately 6,300 MW of coal-fired units. We estimated that the project would have a present worth cumulative net benefit of $206 million (1992) relative to the combined cycle and combustion turbines alternative. The analysis did not account for significant additional dynamic benefits that would accrue to the utility systems. Therefore, the proposed project would be economically beneficial, and the power would be less expensive than the equivalent power produced by oil- and gas-fired plants in the region. Our analysis further shows that, without including the dynamic benefits, the project without our required mitigation would provide a 100-percent-equity internal rate of return of about 10.8 percent. With the inclusion of the dynamic benefits and the cost of our mitigation, the project would have a rate of return greater than 11 percent, thereby making the project secure and attractive to investors.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

In the FEIS, the Commission performed sensitivity studies of the project's projected rate of return in order to get a better understanding of the project's development potential. Numerous

**[61,401]**

cases with various combinations of assumptions were evaluated, including various investor contributions to equity, various interest rates, and various fuel prices. The sensitivity studies show that the project's 100-percent-equity rate of return could go as low as about 8 percent, and the 80-percent-leveraged rate of return could be as high as about 17 percent. [17]

While the 50-year economic and rate-of-return studies show that the project would be economically beneficial and potentially financially feasible, there is a possibility that the project would not be constructed if licensed. In the 1980's, some utilities entered into long-term power purchase agreements when projections of the escalation of future fossil fuel costs were significantly higher than they are now, and they are now having to pay more for their long-term contract power than they would be on a pay-as-you-go basis. Thus, utilities may be reluctant to enter into long-term power-purchase agreements. It may not be possible to finance a $1.88-billion power project that has a projected 100-percent-equity rate of return of about 8 to 11 percent without a long-term power purchase agreement or guarantee. Therefore, Article 307 of the license requires Halecrest to file a project financing plan before commencing construction of the project, to ensure that there is a commitment of funds to complete the construction.

Construction of the project would significantly benefit the local economy through an increase of $255 million in new income in Morris County, through large positive fiscal impacts at the local and regional level, and through a reduction in regional unemployment. This would be a positive effect on the area, which has been adversely affected by a decline of 17 percent in construction employment from 1988 to 1990.

Recreational opportunities would be substantially increased at both the local and regional level. The recreational facilities required by this license would be consistent with the primary regional recreational needs identified in the State Comprehensive Outdoor Recreation Plan. Bicycling, hiking, picnicking, and fishing at the project site would afford new recreational opportunities. Approximately 460 acres in the northern portion of the project site would be converted into Mount Hope Park, and 330 acres in the southern portion would be established as a natural area. Active recreational opportunities also would be enhanced in Jefferson Township, and the recreational land displaced at the Mahlon Dickerson Reservation and Lake Ames Park would be replaced, or the licensee would provide $1.5 million for the construction of new facilities at the Reservation.

The project would have a positive effect on several cultural resources in the project area. Structures in the New Leonard Mine complex would either be stabilized or adaptively re-used. As discussed below, the Ford-Faesch Manor House would be restored, [18] and the abandoned First Methodist Church would be refurbished and used as a visitor's center.

Aesthetically, the Mount Hope Lake area would be enhanced after construction is completed. Constructing berms, landscaping, relocating the gravel processing operations, maintaining a forested buffer along the upper reservoir, and dedicating a permanent greenbelt around Mount Hope Lake would improve the visual quality of the area.

The project would contribute significantly to local watershed protection. Approximately 790 acres would become permanently protected open space, thereby preempting further development of these lands. The existing wetlands north of Mount Hope Lake would be improved by the relocation of the gravel processing operations from the lake.

Traffic would not be adversely affected on Mount Hope Road, Mount Hope Avenue, or other local roads during construction, because Halcrest would implement a park and ride program, would limit on-site parking to 100 spaces, and would perform roadway improvements to reduce traffic impacts.

2. Project Impacts

We have also carefully considered the adverse enviromental impacts of the project.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Exhibit 13A

Page 4 of 46



As discussed in the FEIS, the project would cause increased $CO_2$, $NO_X$, $SO_2$, and particulate emissions from the fossil fuel power plants that would provide the pumping energy needed to pump water from the lower reservoir to the upper reservoir. (FEIS at p. 4-72.)

Clearing of up to 234 acres of mature forest habitat along the transmission line right-of-way and 27 acres of mature forest at the project site would be partially, but not fully, mitigated through the protection and management of a 460-acre forested tract at the site (Mount

**[61,402]**

Hope Park). Halecrest also has committed to minimize cutting of mature forest vegetation.

Two candidate species for federal listing and 12 other state-listed endangered, nine state-listed threatened, and two state-listed rare species could be affected to various degrees by habitat losses along the transmission line right-of-way. We are requiring the licensee to conduct a pre-construction field survey of the project site and the transmission line right-of-way to identify habitat for these species, and to implement measures to protect any such habitat encountered.

The project would reduce the Mount Hope Pond drainage area by 28 percent and could reduce groundwater inflow into Mount Hope Pond during construction. The impact would not be significant, because the applicant would maintain the pond water level during construction and would develop a plan for long-term water level maintenance.

During initial reservoir filling, the flow to White Meadow Lake would be reduced, but Halecrest would protect White Meadow Lake levels and water quality through provision of minimum flows from Mount Hope Lake. Halecrest would maintain the natural outflow from Mount Hope Lake during the months of June, July, and August.

Project-related construction activities would affect the water quality of surface water at the project site and along the transmission line right-of-way as a consequence of increased suspended solids during construction; however, with the implementation of the erosion and sediment control plan, impacts would not be significant. Halecrest would implement specific control measures to protect Hibernia Brook, a designated Trout Production Stream, and the other water bodies that the transmission line would cross, thereby preventing degradation of these waters.

The project's transmission line would displace two seasonal residences at Longwood Lake. Halecrest would financially compensate the owners for the loss of their property. Property values in certain areas adjacent to the project site also would likely experience temporary decreases during project construction. As discussed in greater detail below, affected property owners electing to sell their properties to Halecrest during project construction would receive fair market value.

Aesthetically, the cleared right-of-way and 130-foot high transmission line towers would be visible from numerous visually sensitive sites. The transmission line would intrude on the undeveloped remoteness of 6.3 miles of the route and would increase the visual impacts along 4.3 miles of an existing parallel transmission line. However, the visibility of the transmission line would be reduced through minimizing the acreage of forest clearing and the number of towers, and through landscaping.

Nine properties that are eligible or potentially eligible for listing on the National Register of Historic Places (NRHP) could be disturbed by transmission line construction. The licensee would attempt to avoid each of these and would consult with the New Jersey State Historic Preservation Officer and the Advisory Council on Historic Preservation to develop and implement a program of data recovery at any property eligible for the NRHP that could not be avoided.

To minimize the vegetation and aesthetic impacts along the transmission line, we explored alternative transmission line routes. A route using the existing Wharton substation would avoid the wetlands north of Lake Denmark and aesthetic and land use impacts in Jefferson Township. That route, however, has environmental, engineering, and cost impacts that, on balance, render it inferior to the transmission line routing recommended in

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.
Sep 13, 2024 from VitalLaw®

Wolters Kluwer

the FEIS and adopted herein. The comparative analysis of the transmission line alternatives is discussed below, in the context of the concerns raised by the local communities and residents who will be most directly affected by the routing of the transmission line.

We recognize that the project will have greater quality-of-life impacts on local residents during construction, greater air quality impacts during operation, and greater vegetation and aesthetic impacts along the transmission line than the comparable impacts associated with the no-action alternative. We also recognize the regional importance of the natural resources in this area of New Jersey. Nevertheless, we agree with the conclusions and analysis in the FEIS, for the reasons stated therein, that the economic, social and environmental benefits of the project outweigh its unavoidable adverse environmental impacts.

3. Comprehensive Plans

Section 10(a)(2)(A) of the FPA requires the Commission to consider the extent to which a project is consistent with federal and state comprehensive plans for improving, developing, or conserving waterways affected by the project. Other resource plans are also examined under Section 10(a)(1).

We reviewed two Section 10(a)(2)(A) comprehensive plans for New Jersey, the New Jersey Trails Plan and the Outdoor Recreation Plan of New Jersey. The primary objective of the New Jersey Trails Plan is to provide a framework for development of a unified statewide trail system. The Outdoor Recreation Plan is concerned with the purchase and/or

**[61,403]**

recreational development of open space for public use and enjoyment.

The project would be consistent with the New Jersey Trails Plan. Although there would be no trails included within the transmission line right-of-way, the licensee's recreational plan includes several trails within the project site. These trails could become a link in the proposed West Morris Gateway.

The project would be inconsistent with the Outdoor Recreation Plan, because the transmission line would traverse Green Acres land near Lake Ames and would affect 50 acres within Morris County's Mahlon Dickerson Reservation. We considered route deviations to remove the right-of-way corridor from Green Acres land tracts, but these deviations would have imposed greater land-use impacts than the proposed route.

Halecrest's proposed recreational plan and mitigation for the loss of Green Acres lands would offset the project's impacts on Lake Ames Park and the Mahlon Dickerson Reservation. Public use of the outdoor recreational facilities at the project site would greatly exceed the small number of annual users at both Lake Ames Park and the Mahlon Dickerson Reservation. Further, as mitigation for the loss of 50 acres of public park, Halecrest proposes to provide $1.5 million to the Morris County Park Commission (Park Commission) for the construction of new recreational facilities at the Mahlon Dickerson Reservation. However, Halecrest and the Park Commission have not yet reached formal agreement on compensation. If Halecrest and the Park Commission are unable to agree on the amount of compensation for the loss of Green Acres lands, Halecrest will be required to purchase and donate comparable open space lands to the Park Commission.

Based on our review pursuant to Sections (4)(e), 10(a)(1), and 10(a)(2)(A) of the FPA, and for the reasons discussed herein as well as in the FEIS, which we adopt and incorporate by reference as part of this order, we conclude that the Mount Hope Pumped Storage Project is best adapted to a comprehensive plan for improving and developing the project area. A number of the environmental impacts that we have considered in reaching this determination are discussed in more detail below.

C. *Environmental Considerations*

1. Soil and Geology

The FEIS found that project construction would result in minor erosion and sedimentation (pp. 4-1 and 4-4). Halecrest proposed (1) to implement an erosion and sediment control plan during construction in the project area, including sedimentation controls at the temporary fill storage area, and (2) to use erosion controls during construction of the transmission line (pp. 4-1, 4-2, 4-4, 4-6, and 4-24). Because Halecrest's draft erosion

© 2024 CCH Incorporated and its affiliates and licensors.     6     Sep 13, 2024 from VitalLaw®
All rights reserved.



and sediment control plan was prepared for the original Mount Hope Lake proposal, the FEIS recommended that Halecrest revise the plan to address the project as amended (and as ultimately licensed) (p. 4-1), and incorporate additional control measures (pp. 4-2, 4-3, 4-6, 4-25, and 4-28).

The FEIS also recommended that Halecrest implement specific measures to protect Hibernia Brook, a designated Trout Production Stream, and to prevent degradation of Category 1 waters along the transmission line corridor (pp. 4-3 and 4-17). Article 401 requires Halecrest to prepare a final erosion and sediment control plan for the project in consultation with the New Jersey Department of Environmental Protection and Energy (New Jersey DEPE) and the Morris County Soil Conservation District.

The FEIS found that there is a potential for future slope stability problems on the eastern slope of the upper reservoir (p. 4-6). Halecrest proposed to stabilize, on an individual basis, any exposed irregular joints having the potential to form unstable wedges or blocks (p. 4-6). The FEIS concurred with Halecrest's proposed measures. Article 401 also requires Halecrest to prepare and implement a plan for testing and stabilizing the upper reservoir slope.

2. Groundwater Quantity and Quality

The FEIS found that groundwater inflow through open joints and fractures in the bedrock could cause a short term lowering of nearby groundwater levels in the immediate vicinity of the upper reservoir during its construction (p. 4-19). Halecrest proposed to perform subsurface investigations of permeability (p. 4-19), and to implement measures to reduce groundwater inflow during dewatering, including lining all access shafts (p. 4-3) and sealing any zones of higher conductivity before, during, and after excavation (p. 4-19). The FEIS further recommended that Halecrest seal areas of significant groundwater seepage concurrently with excavation (p. 4-21), and implement a groundwater monitoring program (p. 4-22). Article 402 requires Halecrest, after consultation with the Board of Consultants (established by the license), to prepare and implement a subsurface testing and monitoring plan that addresses groundwater inflow.

The FEIS concluded that five water quality parameters for dissolved metals of the water pumped into the project's upper reservoir could exceed the limits set by New Jersey in its FW-2 water quality standards, and that leakage from the upper reservoir could affect local groundwater quality if the quality of water pumped to

**[61,404]**

the project reservoir does not meet New Jersey FW-2 standards or is of lower quality than nearby groundwater (p. 4-19). The FEIS, therefore, recommended that Halecrest: (1) monitor the quality of local groundwater, Mount Hope Mine water, and Mount Hope Lake water prior to filling the upper reservoir; (2) monitor upper reservoir water quality during reservoir filling and project operation; and (3) treat upper reservoir water, if required, to meet either New Jersey FW-2 standards or local groundwater concentrations, if local groundwater does not meet FW-2 standards (pp. 4-20 and 4-23).

The FEIS found that dewatering of the New Leonard Mine shaft could result in transport of contaminated groundwater from Picatinny Arsenal and, therefore, recommended that Halecrest undertake measures to minimize the risk of such groundwater transport, including monitoring groundwater quality in the vicinity of the Arsenal (p. 4-22). The FEIS found that abandoned mine equipment currently submerged in the New Leonard mine could cause contamination of mine water if the seals on the equipment leaked (p. 4-22). Halecrest proposed to remove the equipment as the mine is dewatered (p. 4-22). The FEIS, therefore, recommended that Halecrest develop and implement a plan to permanently remove and dispose of this equipment, and include in the plan contingency measures for the clean-up of any accidental spills that occur during removal of the equipment (p. 4-22).

Based on the above, Article 403 requires Halecrest, in consultation with the U.S. Environmental Protection Agency and the New Jersey Department of Environmental Protection and Energy (New Jersey DEPE): (1) to prepare and implement a plan to monitor the quality of groundwater; (2) to develop a plan to permanently remove and dispose of the abandoned mine equipment; and (3) to establish measures to prevent groundwater contamination from reservoir leakage, prevent the groundwater transport of contaminants from Picatinny

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



Arsenal, and prevent accidental contamination of groundwater resulting from the removal and disposal of the abandoned mine equipment.

3. Surface Water Quantity and Quality

The FEIS found that the project could affect the water quantity of Mount Hope Pond. The project would reduce the drainage area of Mount Hope Pond and the corresponding flow to the pond by 28 percent (p. 4-8). During project construction, groundwater normally flowing to Mount Hope Pond could flow instead to the project's upper reservoir (p. 4-8). These flow changes could reduce the pond's current water surface elevation. In addition, they could reduce inflow to Mount Hope Lake by five percent during project construction (p. 4-11).

Halecrest proposed to provide make-up water to maintain the water level in Mount Hope Pond at its normal operating level during project construction (p. 4-9). The FEIS recommended that Halecrest provide make-up water to maintain the pond water level at or above the pond's spillway crest elevation during the recreational period (May through September) (p. 4-10), and continue to provide any make-up water needed to keep the pond at its normal operating level during project operation (p. 4-18). Article 404 requires Halecrest, after consultation with the New Jersey DEPE and Rockaway Township, to prepare and implement a plan to manage the water level of Mount Hope Pond.

Halecrest proposed to obtain water for initial reservoir filling by pumping water from Mount Hope Lake (3,000 acre-feet) (p. 4-11) and by dewatering Mount Hope Mine (2,500 acre-feet) (p. 4-19), and to use mine water to supplement reservoir storage during project operation (p. 4-18). Pumping from Mount Hope Lake would alter inflows to White Meadow Lake during the three years that the project's upper reservoir is initially filled (p. 4-15). Halecrest proposed a pumping schedule to maintain minimum flows to White Meadow Lake (p. 4-11).

Based on the staff's analyses, the FEIS recommended: (1) modifications to Halecrest's proposed pumping rates from Mount Hope Lake, minimum flow discharges from Mount Hope Lake, and the installation of a water control structure at Mount Hope Lake's outlet (pp. 4-12, 4-13, and 4-14); (2) that Halecrest consult further with the Fish and Wildlife Service (FWS) of the U.S. Department of the Interior and the New Jersey DEPE regarding the project's maximum pumping capacity and final intake design, the number of pumps to be used, maximum lake levels, controls to prevent over-pumping resulting from equipment malfunction, and lake levels at which the pumps would be turned off (p. 4-14); and (3) that Halecrest monitor and control water withdrawals from Mount Hope Lake by Mount Hope Rock Products, thereby preventing the latter from affecting lake water levels or downstream flows during project construction and operation (pp. 4-11 and 4-18).

Article 405 requires Halecrest to provide minimum flows to White Meadow Lake. Article 406 requires Halecrest, in consultation with the FWS and the New Jersey DEPE, to prepare and implement a plan for pumping water from Mount Hope Lake to the project's upper reservoir, which includes the design and operation of water intake and control structures at Mount Hope Lake. Article 407 requires

**[61,405]**

Halecrest, in consultation with the FWS, the New Jersey DEPE, and Rockaway Township, to prepare and implement a plan for gauging, monitoring, and controlling discharges to and withdrawals from Mount Hope Pond, Mount Hope Lake, and the upper reservoir. Article 408 requires Halecrest, in consultation with the New Jersey DEPE, to develop and implement a contingency plan for obtaining make-up water for the upper reservoir during an extended drought.

Water from the New Leonard Mine has been used previously to augment public water supply during severe drought conditions. Halecrest proposed to place a higher priority on using mine water for public water supply than for reservoir make-up water (p. 4-18), and the FEIS agreed. Article 409 requires Halecrest to establish contingency measures to ensure that mine water is available for public water supply during periods of extreme water supply shortage, and to protect the Jersey City Water Supply Department's water supply.

The FEIS found that the project could increase the eutrophication potential of Mount Hope Pond (p. 4-10) and Mount Hope Lake (p. 4-15) during project construction and operation, and of White Meadow Lake during the initial reservoir filling period (p. 4-15). The FEIS therefore recommended that Halecrest monitor the water quality

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



of the three water bodies and implement appropriate treatment measures, if necessary, to ensure that the water quality of these bodies is not degraded from pre-project conditions (pp. 4-10, 4-15, 4-16, and 4-18). Article 410 requires Halecrest, after consultation with the New Jersey DEPE, Rockaway Township, and the White Meadow Lake Property Owners Association, to prepare and implement a water quality monitoring and control plan for Mount Hope Pond, Mount Hope Lake, and White Meadow Lake.

4. Fisheries Resources

The FEIS concluded that the project would produce minor, adverse impacts to fish populations in Mount Hope Lake during project construction, and long-term beneficial effects to aquatic resources there resulting from the relocation of existing gravel processing operations (p. 4-24). Halecrest proposed to minimize fish impingement and entrainment at Mount Hope Lake by installing on the water intake structure a mesh screen with 3/8-inch wide openings. The intake will be sized to limit water intake velocity to less than 0.1 feet per second at a maximum withdrawal rate of 30 cfs.

The FEIS recommended that, as compensation for unavoidable losses to Mount Hope Lake's fishery resources during reservoir filling, Halecrest should perform annual fish stocking during the initial reservoir filling period (p. 4-24). Article 411 requires Halecrest, in consultation with the FWS and the New Jersey Division of Fish, Game and Wildlife, to implement an annual fish stocking program at Mount Hope Lake during the initial reservoir filling period.

5. Vegetation, Wildlife, and Wetlands

The FEIS indicated that: (1) the project would result in the clearing of approximately 27 acres of forest for the upper reservoir and surface facilities, and up to 234 acres of forest along the transmission line right-of-way; and (2) the project would not result in the filling, construction, or material storage in any wetlands (p. 4-26).

Halecrest intends to minimize impacts to vegetation by implementing the following measures: (1) maintaining a 9-acre forest buffer around the upper reservoir (p. 4-26); (2) controlling clearing for transmission line construction and maintenance by using helicopters for some tower construction, existing roads, and the Public Service Electric and Gas transmission line right-of-way for access (pp. 4-2 and 4-27); (3) conducting a field survey along the entire transmission line right-of-way before construction (p. 4-26); (4) fencing, during project construction, all wetlands and forest areas in the right-of-way that do not have to be clear-cut (p. 4-27); (5) ensuring that fill material is not discharged into wetlands within or near the transmission line right-of-way; (6) revegetating clear-cut areas immediately following construction (p. 4-20); and (7) implementing transmission line maintenance measures that benefit wildlife (pp. 4-30 and 4-31).

The FEIS made additional recommendations to reduce vegetative and wildlife impacts resulting from transmission line construction and maintenance. These measures include the preparation and implementation of transmission line right-of-way clearing and maintenance plans and specific measures for revegetation and transmission line maintenance (pp. 4-27, 4-28, 4-30, and 4-31).

Article 412 requires Halecrest to employ a qualified wildlife biologist and botanist to perform a pre-construction field survey to identify vegetation and wildlife habitat within the entire transmission line right-of-way. Article 413 requires the licensee to develop and implement a transmission line clearing and right-of-way maintenance plan. Halecrest must develop this plan in consultation with the FWS, the New Jersey DEPE, and the New Jersey Natural Heritage Program. The plan must include measures for: (1) fencing, during project construction, wetland and other sensitive habitat; (2) ensuring that wetlands are avoided and that no fill material or transmission towers are placed in wetlands; (3) revegetating cleared areas; (4)

**[61,406]**

enforcing seasonal restrictions on vegetation clearing; and (5) protecting and improving wildlife habitat in cleared areas.

The FEIS found that the project's transmission line would adversely affect local wildlife populations, especially those species dependent upon large tracts of undisturbed mature forest (p. 4-29). As mitigation, Halecrest

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Exhibit 13A

Page 9 of 46

Wolters Kluwer

proposed to: (1) donate to the Park Commission the 460-acre tract (Mount Hope Park) extending from Mount Hope Lake north to Snake Hill Road (p. 4-30); (2) maintain a 330-acre tract (Mount Hope Historical and Environmental Center), which includes Mount Hope Lake and its associated wetlands, for conservation and passive recreation (p. 4-31); and (3) relocate Mount Hope Rock Products gravel processing operations from the Mount Hope Lake shoreline (p. 4-4). The FEIS recommended that Halecrest: (1) lease rather than transfer the 460-acre tract to the Park Commission; (2) develop and maintain the 330-acre tract without disturbing the existing wetland areas; and (3) fund the yearly management and maintenance of the two tracts (pp. 4-30, 4-31, and 4-52).

Article 414 requires Halecrest, in consultation with the FWS, the U.S. Army Corps of Engineers, the New Jersey DEPE, and the Park Commission, to prepare and implement final plans to establish the two tracts for conservation and passive recreation, and to fund the cost of their management and maintenance during the term of the license. Article 414 also requires Halecrest to relocate the Mount Hope Rock Products gravel processing operations from Mount Hope Lake after project construction has been completed, and to stabilize the shoreline. Article 415 requires Halecrest to establish allowable uses at the 460-acre and 330-acre tracts and include these allowable uses in lease agreements.

6. Endangered, Threatened, or Rare Species

The FEIS found that no federally listed endangered or threatened species are known to occur in the project area. Two candidates for federal listing (eastern woodrat and bog turtle), however, are reported to occur along the proposed transmission line corridor (p. 4-32). Additionally, ten state-endangered and one state-rare plant species occur in the area (pp. 4-28 and 4-29), and two state-endangered and nine state-threatened animal species are reported to occur along the transmission line corridor (pp. 4-32 and 4-33). The FEIS recommended that Halecrest include rare species in the pre-construction field survey of the transmission line right-of-way, and develop and implement measures to minimize impacts to such species' habitat (pp. 4-28, 4-29, and 4-33).

Article 412 requires Halecrest to conduct a pre-construction field survey for state-listed threatened, endangered, or rare species within the transmission line right-of-way, in consultation with the New Jersey Natural Heritage Program. Article 413 requires Halecrest to develop and implement measures to avoid impacts to these species' habitats.

7. Land Use and Socioeconomics

The FEIS found that: (1) the project's upper reservoir would convert 55 acres of land zoned for mining and 23 acres of land zoned for residential development to hydropower use (pp. 4-34 and 4-35); (2) the project would preclude the development of a proposed residential project and a proposed school on the 460-acre portion of the project north of Mount Hope Lake to Snake Hill Road (p. 4-36); and (3) the project's transmission line right-of-way would convert approximately 281 acres of mostly undeveloped land to utility use (p. 4-37).

The project's proposed transmission line right-of-way would displace two seasonal homes at Longwood Lake. Halecrest proposed to compensate their owners at fair market value (p. 4-37), and the FEIS concurs with that proposal.

The FEIS found that construction activities at the project site, and construction and operation of the project's transmission line, could adversely affect residential property values in certain areas (p. 4-46). Halecrest proposed to: (1) compensate homeowners in the Weldon Road area for any reduction in the market value of their residences due to the project's transmission line (p. 4-47), and (2) establish an Arbitration and Compensation Committee to compensate any homeowner who can demonstrate a financial loss as a result of project construction. The FEIS, however, recommended that Halecrest be required to offer to purchase any residences within the project impact area that are available for sale for a minimum of four months, and cannot be sold for their 1992 fair market value (p. 4-46). [19]

Article 416 requires Halecrest, after consultation with Jefferson Township, to prepare and implement a plan for compensating Weldon Road area homeowners whose property values are adversely affected by the project's transmission

Exhibit 13A
Page 10 of 46



**[61,407]**

line. Article 417 requires Halecrest, after consultation with Rockaway Township, to prepare and implement a plan for purchasing project impact area homes that cannot be sold for their 1992 fair market value after being made available for sale at their fair market value for a period of five months or longer.

The FEIS found that local jurisdictions would receive a net gain in revenues as a result of project construction and operation (pp. 4-41 and 4-43). Moreover, Halecrest proposed to reimburse affected taxing jurisdictions for any incremental public service costs in excess of their project-induced tax revenue (p. 4-44). Article 418 requires Halecrest to enter into agreements with Morris County, Rockaway Township, and Morris Hills Regional [School] District to compensate these jurisdictions for their incremental expenditures in excess of their incremental tax revenues which are attributed to project construction and project construction personnel.

The FEIS found that the project's transmission line would affect 0.1 acre of Green Acres Land at Lake Ames Park and approximately 50 acres of Green Acres Land at Mahlon Dickerson Reservation. The New Jersey DEPE filed a letter on May 21, 1992, stating that the transmission line would affect more Green Acres lands because of a recent gift of 765 acres, but did not indicate the amount of lands affected. Halecrest proposed to provide $1.5 million to the Park Commission for the construction of recreational facilities at Mahlon Dickerson Reservation as compensation for these impacts (p. 4-37), but Halecrest and the Park Commission have not reached any formal agreement. Article 419 therefore requires Halecrest to compensate the Park Commission for the loss of public park land needed for the project's transmission line, including any additional lands that were conveyed by gift to the state.

The FEIS found that, because the main transmission line supplying electric power to Picatinny Arsenal crosses the upper reservoir area, it would have to be relocated (p. 4-35). The FEIS also found that the proposed transmission line right-of-way through the arsenal in the Lake Denmark area would not affect any existing explosives storage areas; nevertheless, the FEIS recommended that Halecrest continue to coordinate with the arsenal to avoid future land use conflicts and to obtain a right-of-way or easement through the arsenal (p. 4-37). Article 420 requires Halecrest, after consultation with Picatinny Arsenal: (1) to prepare and implement a plan for relocating the existing transmission line, and locating the project's transmission line on the Arsenal's property in a manner that minimizes future land use conflicts; and (2) to obtain a right-of-way permit from the Department of the Army for access across Picatinny Arsenal property.

8. Recreational Resources

The FEIS found that the project would have short-term negative effects on existing recreational resources during construction, and long-term beneficial effects on area recreation (p. 4-48). Halecrest proposed to implement a recreational plan that includes three major elements: (1) on-site facilities in Rockaway Township (the 330-acre and 460-acre tracts at the project site) (pp. 2-10, 2-16, 2-17, 4-30, and 4-31); (2) funds for the construction of a new community center in Jefferson Township (pp. 2-16 and 4-51); and (3) as noted above, the contribution of $1.5 million to the Park Commission for new facilities at Mahlon Dickerson Reservation as compensation for the project's transmission line impacts on public park lands (pp. 2-16 and 4-37). The FEIS concurred with Halecrest's draft recreational plan, and made additional recommendations for the final plan (pp. 4-52 and 4-53). The FEIS also recommended that: (1) hunting and the construction of a shooting range be prohibited on the project site; and (2) the on-site recreational facilities be completed and made available for public use within one year after completion of project construction (pp. 4-50 and 4-52).

Article 421 requires Halecrest, after consultation with Rockaway Township, the Park Commission, the New Jersey DEPE, and the National Park Service, to complete the recreational plan for the project. Article 421 also requires Halecrest to complete and open the recreational facilities within one year from the completion date of project construction. Article 422 requires Halecrest to monitor the recreation use of the project area to determine whether the recreation facilities are meeting recreation needs. Article 423 requires Halecrest (1) to formulate a plan that ensures that Halecrest's $1.0 million contribution to Jefferson Township will be used exclusively for the design and construction of a community center; and (2) to file as-built drawings of the completed facilities. Article 419 requires Halecrest to execute an agreement with the Park Commission, or purchase and donate equivalent

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



lands to the Park Commission. The project boundary shown in Exhibit G-1, as approved in ordering paragraph (B)(1) below, includes the 330- and 460-acre tracts of land.

9. Aesthetic Resources

The FEIS found that construction activities at the upper reservoir would affect primarily four residences on Picatinny Arsenal, which are as close as 200 feet from the upper reservoir (p. 4-53), while project operation would have negligible

**[61,408]**

impacts on residences in the project area (p. 4-55).

Halecrest proposes several measures to minimize adverse visual impacts in the project area. These include: (1) maintaining a 50-foot-wide forest buffer around the upper reservoir; (2) relocating Mount Hope Rock Products' gravel processing operations, and the asphalt facilities, away from Mount Hope Lake and stabilizing the shoreline after completion of project construction; (3) storing excess rock in the existing quarry; and (4) blending the project structures and associated site modifications with the surrounding landscape (pp. 4-53, 4-54, and 4-55). The FEIS recommended that Halecrest implement additional measures to reduce visual impacts in the project area, such as additional screening, removal of all temporary works used for reservoir filling and restoration of the area, and completing the earthen berm, if it is not constructed by Mount Hope Rock Products (pp. 4-13, 4-54 and 4-55). Article 424 requires Halecrest to file as-built drawings of the completed berm. Article 425 requires Halecrest to develop and implement a plan to protect visual resources at the project.

The FEIS found that the project's transmission line, with its 130-foot-high towers and 220-foot-wide right-of-way clearing, would have the greatest effect on residences at Longwood Lake during construction (p. 4-54). The constructed transmission line facilities would have a significant visual impact on four visually sensitive and intensive land-use sites: Mahlon Dickerson Reservation, Longwood Lake, Lake Denmark, and Lake Ames Park (p. 4-56). Halecrest proposed several measures to minimize visibility of the transmission towers, such as using a lattice delta design and galvanized finish on tower structures, and recommended additional measures to minimize visual impacts of the transmission line (p. 4-60). Article 425 requires Halecrest to prepare and implement a plan to minimize the transmission line's visual impacts.

10. Cultural Resources

The FEIS found (p. 4-60) that the project would not adversely affect the Mount Hope Mine Historic District, which is eligible for listing on the National Register of Historic Places (NRHP). Halecrest proposed to implement an historic preservation plan to (1) stabilize and reuse the New Leonard Mine complex, (2) convert the First Methodist Church into a visitors' center, and (3) contribute to the restoration of the Ford-Faesch Manor House (pp. 2-17, 2-20, 4-60, and 4-61). The New Jersey State Historic Preservation Officer (SHPO), the Advisory Council on Historic Preservation, Halecrest, and the Commission have executed a programmatic agreement to establish an Historical-Environmental Center and Museum Complex at the New Leonard Mine complex, to convert the first Methodist Church into a visitors' center, and to restore the Ford-Faesch House. Article 426 requires the licensee to implement the programmatic agreement.

The FEIS found (p. 4-62) that transmission line construction could adversely affect four properties eligible for listing on the NRHP (Weldon Mine, Snake Hill Road, and Lake Denmark Road sites, and the Ground Bee Rockshelter), and five potentially eligible properties (Ogden Mine Railroad, Anomaly Mine, a dynamite shack, and two unevaluated archaeological sites reported in the FEIS). The FEIS recommended that Halecrest: (1) site the transmission line towers to avoid these properties; (2) consult with the SHPO on the final transmission line design; and (3) undertake data recovery, if the sites cannot be avoided during transmission line construction (p. 4-62). The programmatic agreement includes measures to prevent or mitigate adverse effects to these and any other National Register or eligible properties as a result of transmission line construction.

11. Transportation

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



The FEIS found that, during the project's six-year construction period, local traffic generated by the maximum on-site workforce of 1,300 workers could cause delays for motorists at several intersections between Interstate 80 at Mount Hope Avenue and the project site (p. 4-63). Halecrest proposed to provide on-site parking for 100 vehicles, and implement a park and ride program during construction (pp. 4-63 and 4-64). The FEIS concluded that these proposals would not fully mitigate for traffic impacts on Mount Hope Avenue and Mount Hope Road. The FEIS therefore recommended that Halecrest finance signalization and other highway safety improvements (pp. 4-68, 4-69, and 4-70). The FEIS also recommended that Halecrest, after consultation with Rockaway Township, the Morris County Department of Transportation, and the New Jersey Department of Transportation, develop and implement a traffic mitigation plan (pp. 4-63, 4-68, and 4-69). Article 427 requires Halecrest, after consultation with the New Jersey Department of Transportation, the Morris County Department of Transportation, and Rockaway Township, to prepare and implement a traffic mitigation plan.

12. Air Quality, Noise, and Vibration

The FEIS found that: (1) reduced air quality could result from fugitive dust during project construction; (2) project operation would result in additional air emissions from the coal-fired facilities used to generate pumping energy (p. 4-72); and (3) fog emanating from the upper

**[61,409]**

reservoir would not likely be a problem for traffic on Mount Hope Road (p. 4-73). Halecrest proposed measures to control fugitive dust (pp. 4-71 and 4-72). Article 428 requires Halecrest, after consultation with the New Jersey DEPE and Rockaway Township, to prepare and implement a detailed materials handling plan and monitoring program.

The FEIS found that project construction would result in increased noise levels, most significantly at the four closest residences on Picatinny Arsenal, where noise levels would exceed New Jersey noise standards, and that construction noise could exceed desirable levels at nearby residences south and east of the project site (p. 4-74). Halecrest proposed measures to reduce noise levels, such as transporting rock excavated underground to the storage area via conveyors and rubber lined hoist skips and hoppers (p. 4-75). The FEIS recommended that noise levels be monitored at residential receptors, and engineering controls or restricted construction hours be implemented as necessary (pp. 4-75 and 4-76). Article 429 requires Halecrest, in consultation with Picatinny Arsenal and Rockaway Township, to prepare and implement a noise monitoring and control plan.

The FEIS found that project construction would result in vibration effects, which would be most significant at the four residences on Picatinny Arsenal. Halecrest proposed to control blast charges and to blast only during the day (p. 4-77). The FEIS recommended that Halecrest assess potential vibration effects at these residences, at the Ford-Faesch House, and at other sensitive receptor sites situated in or near Picatinny Arsenal within 1,000 feet of the project boundary, and perform mitigation if vibration levels exceed applicable criteria for damage risk to buildings and annoyance (p. 4-79). Article 429 requires Halecrest, in consultation with Picatinny Arsenal and Rockaway Township, to prepare and implement a vibration monitoring and control plan.

13. Electromagnetic Field Effects

The FEIS found that the 500 kV transmission lines would introduce electric and magnetic field effects in the surrounding atmosphere at ground level which would be lower than the New Jersey guidelines, and lower than standards adopted in other states. The FEIS also noted (p. 3-47) that there are no schools, hospitals, churches, or emergency facilities near the transmission line right-of-way. To avoid any potential health effects as much as possible, the FEIS recommended that Halecrest use conductor spacing and line placement to minimize electromagnetic field (EMF) effects (pp. 4-77 and 4-78). Article 430 requires Halecrest to incorporate measures to reduce EMF effects into the project's transmission line design.

D. *The Clean Water Act*

Halecrest has consulted extensively with the New Jersey DEPE with respect to the applicability and requirements of Section 401(a)(1) of the Clean Water Act. [20] The New Jersey DEPE is the state agency in New

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Jersey that is responsible for issuing water quality certification for the project, waiving that requirement, [21] or determining that no certification is required.

In a series of letters, [22] the New Jersey DEPE has advised Halecrest of its determination that no water quality certification would be required with respect to the upper and lower reservoirs (and their connecting conduits), because the reservoirs will operate as a closed system. In its January 10, 1992 letter, the New

**[61,410]**

Jersey DEPE reserved the right to require a water quality certification "in conjunction with a freshwater wetlands permit in the event that the approved transmission line corridor impacts wetlands regulated by the State of New Jersey." In its March 12, 1992 letter, the New Jersey DEPE stated that, "[i]f the transmission line *is* designed and constructed such that no fill is discharged into freshwater wetlands or waters of the State of New Jersey; then no Water Quality Certificate is required pursuant to section 401 of the Clean Water Act for its construction." [23] In its April 10, 1992 letter, the New Jersey DEPE reiterated the above-quoted statement, outlined several procedures it wants Halecrest to follow after issuance of a license, and expressed the view that Halecrest will still need to obtain a freshwater wetlands permit.

On April 22, 1992, the Director sent Halecrest a letter requiring Halecrest, in consultation with the New Jersey DEPE and Picatinny Arsenal, to delineate the wetlands along the entire length of the proposed transmission line corridor. In particular, the letter instructed Halecrest to survey and map these wetlands and identify the locations of transmission line towers in relation to these wetlands. On May 20, 1992, Halecrest sent the New Jersey DEPE a letter requesting water quality certification. On May 22, 1992, Halecrest submitted extensive data in response, delineating the wetlands along the transmission line corridor. We have reviewed this data, and have determined that the transmission line as currently proposed, and as licensed herein, has been designed, and can be constructed, in such a manner that no fill will be discharged into freshwater wetlands or waters of the State of New Jersey.

On June 19, 1992, in a letter to the Director, Division of Project Review, the New Jersey Department's Administrator, Land Use Regulation Program, concluded as follows (at p. 2):

I recognize your agency's position that a Water Quality Certificate or waiver must be obtained prior to licensing. However, we find ourselves caught in a vicious circle. While I am not familiar with FERC regulations, it seems reasonable to defer Water Quality Certification until later in the design process. To that end, it would seem reasonable for FERC to issue its license conditioned upon Mount Hope securing all necessary approvals from the State of New Jersey, including a Water Quality Certificate prior to the actual construction of the transmission line? [sic]

While the various statements of the New Jersey DEPE impart some ambiguity to the matter, we interpret its position to be that no water quality certification is required for the project if the project's transmission line will not affect wetlands or waters of New Jersey. As discussed above, we have determined, based on our review of the data submitted by Halecrest, that the transmission line has been designed, and can be constructed, in such a manner that no fill will be discharged into freshwater wetlands or waters of the State of New Jersey. Moreover, Article 413 of the license specifically precludes Halecrest from discharging fill into wetlands or waters of New Jersey. [24] Accordingly, we find that the requirements of Section 401 of the Clean Water Act are not invoked, because there will be no discharges into New Jersey waters. [25]

E. *The Roe Amendment*

In its March 27, 1992 order denying the motion to dismiss the application, the Commission concluded that: [26]

if a license were to be issued, and if it were conditioned in such a manner as to require the licensee to treat all water used to fill the upper reservoir (and, thus, used to fill the intake shaft and lower reservoir) throughout the life of the project so that the water pumped into the upper reservoir is of a quality equal to or better than the

© 2024 CCH Incorporated and its affiliates and licensors.    14    Sep 13, 2024 from VitalLaw®
All rights reserved.



FW-2 standards or the quality of the existing groundwater, as described above, then issuance of such a license would not be precluded by the Roe Amendment.

These conditions, to satisfy the purpose of the Roe Amendment, are contained in Article 403 of the license.

F. *Recommendations of Federal and State Fish and Wildlife Agencies*

Section 10(j) of the FPA requires the Commission to include license conditions based on the recommendations submitted by federal and

**[61,411]**

state fish and wildlife agencies pursuant to the Fish and Wildlife Coordination Act for the protection, mitigation, and enhancement of fish and wildlife resources, unless it believes that the recommendations are inconsistent with Part I of the FPA or other applicable law. The FWS and the New Jersey DEPE filed fish and wildlife recommendations. The FEIS addresses the concerns of the federal and state fish and wildlife agencies, and the license includes conditions consistent with the recommendations of these agencies.

G. *Protests by Nearby Residents*

Many of the intervenors who opposed the issuance of a license intervened before November 1990, when the proposed project involved the construction of a 9,000-foot-long, 45-foot-high, earth and rockfill dam on Mount Hope Lake. Opposition to the original project design was particularly vocal among nearby residents on Mill Pond Road and Everment Road, located immediately southwest of Mount Hope Lake, and South Brookside Drive and Cayuga Avenue within the White Meadow Lake Community, located immediately east of Mount Hope Lake. Under the original project configuration, these persons and their neighbors would have experienced substantial increases in noise, dust, vibration, and local traffic during a seven-and-one-half year construction period. After construction, the project dam would have become a major visual intrusion to residents of Mill Pond Road on the lake's southwestern shore and to some residents located along the lake's eastern shore. Several of these residents asserted that reduced aesthetics would result in a significant negative impact on the market values of affected properties. These persons also expressed concern for their safety because of the potential for project dam failure.

As discussed above, the current project design provides for the excavation of a 57-acre upper reservoir on a 110-acre tract situated west of Mount Hope Lake, thereby preserving Mount Hope Lake's fishery resources and its 65 acres of surrounding wetlands. Because the project no longer includes the construction of another dam at Mount Hope Lake, the severe long-term impacts to residences adjacent to the lake will be avoided. Also, as discussed above, we have included in the license articles which require Halecrest to implement measures to minimize the effects of project-induced noise, dust, vibration, and local traffic during the project's six-year construction period.

1. *The White Meadow Lake Community*

The White Meadow Lake Property Owners Association represents 2,600 households surrounding the 137-acre, manmade White Meadow Lake, and manages three community beaches and other facilities at the lake. The Association intervened in opposition to the originally-proposed Mount Hope Project because of concerns that dewatering Mount Hope Mine, constructing a dam at Mount Hope Lake, and reducing flows to White Meadow Lake during the five years needed to fill the project's upper reservoir would cause a significant adverse impact on the water quality of White Meadow Lake. Specifically, the Association asserted that: (1) dewatering of Mount Hope Mine would increase existing levels of suspended sediment and heavy metals in White Meadow Lake; (2) construction of a dam at Mount Hope Lake would continue to produce increased levels of suspended sediment; and (3) reservoir filling would cause the average annual inflow to White Meadow Lake from Mount Hope Lake to decline from 3.0 cubic feet per second (cfs) to 0.375 cfs, which, in turn, would reduce White Meadow Lake's flushing rate and, correspondingly, increase its phosphorus loading and eutrophication.

The current project design, which calls for an excavated upper reservoir rather than a dam at Mount Hope Lake, will not affect the water quality of White Meadow Lake. Halecrest will pump the 2,500 acre-feet of water

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



from Mount Hope mine directly to the project's upper reservoir rather than releasing it into Mount Hope Lake. Consequently, White Meadow Lake will not receive inflows with potentially high levels of heavy metals. Because 2,500 acre-feet of mine water will be pumped into the project's upper reservoir, only 3,000 acre-feet, rather than 5,500 acre-feet, of water will be withdrawn from Mount Hope Lake to fill the upper reservoir. Therefore, reservoir filling will reduce inflow to White Meadow Lake from Mount Hope Lake for a period of three rather than five years, and during reservoir filling this inflow will average 1.5 cfs rather than 0.375 cfs. Moreover, Halecrest will be required to implement a plan to control erosion and sedimentation during project construction. Consequently, project-related construction activities will not produce significantly increased levels of suspended sediment in White Meadow Lake. Finally, during reservoir filling Halecrest will be required to provide continuous minimum flows to White Meadow Lake that are sufficient to maintain existing water quality, and to develop and implement a plan to monitor the lake's water quality.

2. *The Green Pond Community*

The Green Pond Corporation, an intervenor representing 386 homeowners whose residences are situated at the northern end of Green Pond, opposed a proposed alignment that would locate the project's transmission line along the

**[61,412]**

ridge of Cooperas Mountain parallel to the southeast portion of Green Pond. That route, discussed in the SDEIS, was developed in response to Picatinny Arsenal's request that the transmission line go around the northern boundary of the arsenal in order to avoid potential quantity/distance arcs (safety zones for ordinance) that the arsenal might establish in the future.

After publication of the SDEIS in April 1991, the staff eliminated the transmission line segment near Green Pond. The FEIS recommended an alignment that would traverse arsenal property. Arsenal planners indicated that this proposed (Route 6) transmission line alignment would not affect the arsenal's quantity/distance arcs, because the arsenal no longer plans to store explosives in the northern portion of its property. Consequently, the license adopts and approves the alignment, which would locate the line on Picatinny Arsenal property, sufficiently far from the developed areas around Green Pond to alleviate the effect upon residents there.

3. Rockaway Township

Rockaway Township intervened in opposition to the originally proposed development scheme because of the project's potentially significant impacts on nearby residents. After the publication of the SDEIS, Rockaway Township continued to express concerns regarding the project's impacts on quality of life, water quantity and quality, recreational opportunities, and local government revenues and expenditures. In this regard, Rockaway Township's environmental consultant, Camp, Dresser, and McKee, Incorporated, filed a 21-page letter that included 61 separate comments. The staff's responses to these comments were published in Volume II of the FEIS, and are incorporated here by reference.

4. Transmission Line Routing

The Farny Highlands Watershed Coalition, in a letter dated March 10, 1992, asserts that the FEIS "fails to fully assess the West Wharton alternative for the transmission line." The Coalition prefers this alternative because it would avoid impacts to critical habitats, particularly at Lake Denmark, which has a concentration of state-listed rare and endangered species.

The Department of the Army's Armament Research, Development and Engineering Center at Picatinny Arsenal, in a letter dated April 10, 1992, expressed the view that the FEIS fails to provide an environmental assessment of the selected transmission line alignment, and that the route described therein as the preferred route runs through Lake Denmark Bog, a state-designated Natural Heritage Priority Site, and "perhaps the best breeding habitat for the lateral bluet, a rare damselfly, and a number of other state threatened and endangered species, according to the Morris County Park Commission." [27] (As discussed above, we have incorporated into the

© 2024 CCH Incorporated and its affiliates and licensors.          16          All rights reserved.



license the mitigative conditions proposed by the Army pursuant to Section 4(e) of the FPA with respect to the portion of the transmission corridor that traverses the Arsenal.)

The Commission's analysis of the alternative transmission line alignments [28] evaluated: (1) a 4.9-mile-long overhead line along an existing right-of-way from the project to the Wharton substation, and required upgrading of both the Wharton substation and the 6.1-mile-long existing transmission line from Wharton substation to Jefferson substation; and (2) a combination underground transmission line along the Mount Hope Mineral Railroad right-of-way and overhead segment to interconnect the project with the Wharton substation, the upgrading of the Wharton substation, and the installation of a new 500-kV line from Wharton to Jefferson substation.

The FEIS concluded that the total cost of constructing the all-overhead line to the Wharton and Jefferson substations would be substantially greater than the cost of constructing the recommended 10.6-mile-long direct route to the Jefferson substation (Route 6). The staff also determined that the combined under- and above-ground line using the Wharton substation would cost at least six times the cost of constructing the preferred alternative (Route 6).

The FEIS concluded that both routes using the Wharton substation would produce serious long-term environmental consequences. The all-overhead route would necessitate the widening of 11.0 miles of existing right-of-way and the installation of new towers that are at least 50 feet higher than those currently in place, causing aesthetic and property value impacts to many existing residences located near interchange 33 of Interstate Route 80, and along the Route 15 corridor, particularly in the areas of Berkshire Valley and Lake Hopatcong. In addition, this route would affect two proposed housing developments to be located south of Mount Hope Lake.

The transmission line alternative incorporating a 4.5-mile-long underground segment along the Mount Hope Mineral Railroad would still require upgrading the existing 6.1-mile-long line between the Wharton and Jefferson substations.

**[61,413]**

In addition, an underground cable has the potential to leak coolant oil, thereby adversely affecting groundwater quality.

The major adverse impact of the staff's recommended transmission line alignment is the loss of up to 230 acres of 100-year-old forest. The FEIS indicates that this impact would be mitigated by requiring the permanent conservation of 790 acres of land, to include the 460-acre Mount Hope Park and the 330-acre Mount Hope Historical and Environmental Center.

Impacts to Lake Denmark Bog resulting from the construction of Route 6 would be avoided by requiring the transmission line to span this area. In addition, the license includes articles to implement the recommendation in the FEIS [29] that Halecrest implement a Commission-approved plan for protecting state-designated rare, threatened, or endangered species along the transmission line corridor.

H. *Declaratory Order*

On June 4, 1992, Mount Hope Development Associates (Development Associates), an intervenor, filed a petition for a declaratory order with respect to the Commission's jurisdiction over certain claims it seeks to press against Halecrest. Development Associates has been involved with Halecrest in a series of real estate transactions and related contractual arrangements and litigation thereof. Most recently, on May 7, 1992, the Superior Court of New Jersey issued an order dismissing without prejudice a complaint filed by Development Associates against Halecrest and related entities. [30]

Development Associates wants to argue, in a state judicial forum, that it has certain real property and/or contractual rights to certain lands that, under the upland alternative amendment to the license application, Halecrest now intends to use for the project's reservoirs. Development Associates states that it intended to use these lands to construct homes, and that Halecrest may seek to use its license, once issued, to acquire these

© 2024 CCH Incorporated and its affiliates and licensors.    17    Sep 13, 2024 from VitalLaw®
All rights reserved.

Wolters Kluwer

lands through eminent domain. Development Associates seeks to argue, in a state judicial forum, that Halecrest and related entities "violated their contractual obligations, breached their fiduciary duties, and made fraudulent misrepresentations" with respect to these lands, [31] and seeks an order from this Commission declaring that we do not have jurisdiction to consider and resolve such a private dispute between these parties. [32]

On June 16, 1992, Halecrest filed an answer to Development Associates' petition. While objecting to certain factual allegations, Halecrest "requests the Commission to find that it has no jurisdiction to interpret the private contracts between Associates and [Halecrest] and that this issue ... be removed from this proceeding." [33] Thus, while the parties have a disagreement between themselves on matters involving real estate and contracts, they appear to agree that the Commission lacks jurisdiction to resolve their dispute.

Pursuant to Section 21 of the FPA, [34] the license issued herein confers on Halecrest, as the licensee, the authority to utilize eminent domain proceedings (in either federal or state courts) to acquire the property interests needed to construct and operate the project. The FPA does not, however, confer on this Commission any jurisdiction or authority to resolve disputes between the licensee and third parties that concern interests in real property, contractual obligations, fiduciary relationships, or fraudulent misrepresentation not entailing any alleged violation of the FPA or the Commission's regulations. [35] Thus, although a state or federal court would not have jurisdiction (except within the appellate parameters authorized by the FPA itself) [36] to narrow or alter the project boundaries prescribed in the license, or to preclude the licensee's authority under the license to acquire the property interests necessary to construct and operate the project, such state and federal courts would nevertheless retain their customary jurisdiction, whatever it may be, with respect to resolving disputes arising out of the relationships between and among such parties, including, but not limited to, contractual relationships, fiduciary responsibilities, tortious conduct, and any financial

**[61,414]**

consequences that may flow from either the consummation or breach of these relationships.

*The Commission orders*:

(A) This license is issued to the Halecrest Company (Licensee) for a period of 50 years, effective the first day of the month in which this order is issued, to construct, operate, and maintain the Mount Hope Pumped Storage Project. This license is subject to the terms and conditions of the Federal Power Act (FPA), which is incorporated by reference as part of this license, and subject to the regulations the Commission issues under the provisions of the FPA.

(B) The project consists of:

(1) All lands, to the extent of the Licensee's interests in those lands, enclosed by the project boundary shown by exhibit G-1, FERC No. 9401-19, showing the Project Boundary.

(2) Project works consisting of: (a) an excavated upper reservoir with a surface area of 57 acres and a 5,500 acre-foot storage capacity at normal maximum water surface elevation 900 feet above mean sea level (msl); (b) a reinforced concrete intake/outlet capable of discharging 10,400 cubic feet per second (cfs); (c) a 2,800-foot-long, 25-foot-diameter concrete-lined vertical intake shaft bifurcating into five 11-foot-diameter penstocks; (d) a 60-foot-wide, 400-foot-long, 120-foot-high underground powerhouse at elevation 2,072 feet below msl containing 5 pump/turbine units with a total installed generating capacity of 2,000 megawatts (MW) at a net head of 2,500 feet; (e) a lower reservoir with a storage capability of 5,500 acre-feet; (f) a ventilation shaft and ventilation building at the northern end of the lower reservoir; (g) access shafts; (h) two parallel 10.6-mile-long, 500-kilovolt (kV) overhead transmission lines interconnecting to the Jefferson substation; (i) temporary access roads; (j) onsite and offsite recreational facilities; (k) the 1,252-foot-long earthen embankment, known as Mount Hope Dam, with crest elevation 802 feet msl having a 22-foot-long uncontrolled concrete spillway with crest elevation 796.5 feet msl; (l) the reservoir, known as Mount Hope Lake, having a 190-acre surface area and a 600 acre-foot capacity at water surface elevation 797 feet msl; and (m) appurtenant facilities.

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

The project works generally described above are more specifically shown and described by those portions of exhibits A and F below:

*Exhibit A* - The following sections of the Exhibit A filed on March 31, 1992:

Section A.3, pages A-8 and A-9, entitled "Turbines/Generators", Section A.4, page A-9, entitled "Primary Transmission Line"; and Section A.5, pages A-9 and A-10, entitled "Appurtenant Equipment".

*Exhibit F* - The following drawings of exhibit F filed on August 7, 1991, and March 31, 1992:

```
Exhibit FERC No.        Showing

  F-1    9401-10  General Plan

                  Conceptual Facilities

  F-2    9401-11  General Plan

                  Conceptual

  F-3    9401-12  Sections of Upper

                  Reservoir

  F-4    9401-18  Cross-Section of

                  Surface and

                  Underground

                  Facilities

  F-5    9401-14  Machine & Transformer

                  Halls - Plan

  F-6    9401-15  Machine & Transformer

                  Halls - Sections

  F-7    9401-16  Tunnels and Caverns -

                  Sections and Profile
```

(3) All of the structures, fixtures, equipment or facilities used to operate or maintain the project and located within the project boundary, all portable property that may be employed in connection with the project and located within or outside the project boundary, and all riparian or other rights that are necessary or appropriate in the operation or maintenance of the project.

(C) The Exhibits A, F, and G described above are approved and made part of the license.

© 2024 CCH Incorporated and its affiliates and licensors.        19        Sep 13, 2024 from VitalLaw®
All rights reserved.

**Wolters Kluwer**

(D) This license is subject to the articles set forth in Form L-2 [54 FPC 1808] (October 1975), entitled "Terms and Conditions of License for Unconstructed Major Project Affecting Lands of the United States", and the following additional articles:

*Article 101.* The Licensee shall: (1) complete a wetlands delineation of the area where the project is to traverse Picatinny Arsenal; (2) perform a study of the critical habitats of the Lateral Bluet and any other State threatened and endangered species; and (3) undertake mitigation to prevent or minimize injury to the environment which is satisfactory to the Environmental Protection Agency, the U.S. Fish and Wildlife Service, and the New Jersey Department of Environmental Protection and Energy.

*Article 102.* The Licensee shall obtain an easement for traversing Picatinny Arsenal in accordance with U.S. Army regulations and procedures prior to commencing any action on the federal reservation at the arsenal.

*Article 103.* The conditions stated in Articles 101 and 102 shall be implemented in accor-dance

**[61,415]**

with the filing deadlines and other terms of Articles 412 and 420, respectively.

*Article 201.* The Licensee shall pay the United States the following annual charges as determined by the Commission, effective the first day of the month in which this license is issued, for the purposes of:

a. Reimbursing the United States for the cost of administration of Part I of the FPA. The authorized installed capacity for that purpose is 2,670,000 horsepower.

b. Recompensing the United States for the use, occupancy and enjoyment of 62 acres of its lands for transmission line right-of-way.

*Article 202.* Pursuant to Section 10(d) of the FPA, after the first 20 years of operation of the project under license, a specified reasonable rate of return upon the net investment in the project shall be used for determining surplus earnings of the project for the establishment and maintenance of amortization reserves. One-half of the project surplus earnings, if any, accumulated after the first 20 years of operations under the license, in excess of the specified rate of return per annum on the net investment, shall be set aside in a project amortization reserve account at the end of each fiscal year. To the extent that there is a deficiency of project earnings below the specified rate of return per annum for any fiscal year after the first 20 years of operation under the license, the amount of that deficiency shall be deducted from the amount of any surplus earnings subsequently accumulated, until absorbed. One-half of the remaining surplus earnings, if any, cumulatively computed, shall be set aside in the project amortization reserve account. The amounts established in the project amortization reserve account shall be maintained until further order of the Commission.

The annual specified reasonable rate of return shall be the sum of the annual weighted costs of long-term debt, preferred stock, and common equity, as defined below. The annual weighted cost for each component of the reasonable rate of return is the product of its capital ratio and cost rate. The annual capital ratio for each component of the rate of return shall be calculated based on an average of 13 monthly balances of amounts properly includable in the Licensee's long-term debt and proprietary capital accounts as listed in the Commission's Uniform System of Accounts. The cost rates for long-term debt and preferred stock shall be their respective weighted average costs for the year, and the cost of common equity shall be the interest rate on 10-year government bonds (reported as the Treasury Department's 10-year constant maturity series) computed on the monthly average for the year in question plus four percentage points (400 basis points).

*Article 301.* The Licensee shall commence construction of the project works within two years from the issuance date of the license and shall complete construction of the project within eight years from the issuance date of the license.

*Article 302.* Within 90 days of completion of construction, the Licensee shall file for approval revised Exhibits A, F, and G to describe and show the project as built.

*Article 303.* Before starting construction, the Licensee shall review and approve the design of contractor-designed cofferdams and deep excavations, and shall make sure construction of cofferdams and deep

© 2024 CCH Incorporated and its affiliates and licensors.    20    Sep 13, 2024 from VitalLaw®
All rights reserved.

excavations is consistent with the approved design. At least 30 days before starting construction of the cofferdam, the Licensee shall submit one copy to the Commission's Regional Director and two copies to the Commission (one of these copies shall be a courtesy copy to the Commission's Director, Division of Dam Safety and Inspections) of the approved cofferdam construction drawings and specifications and the letters of approval.

*Article 304.* The Licensee shall, at least 60 days prior to the start of construction, submit one copy to the Commission's Regional Director and two copies to the Commission (one of these shall be a courtesy copy to the Director, Division of Dam Safety and Inspections) of the final contract drawings and specifications along with an accompanying supporting design report for pertinent features of the project, such as water retention structures, powerhouse, and water conveyance structures. The supporting design report should be consistent with the Commission's Engineering Guidelines. The Commission may require changes in the plans and specifications to assure a safe and adequate project. If the Licensee plans substantial changes to location, size, type, or purpose of the water retention structures, powerhouse, or water conveyance structures, the plans and specifications must be accompanied by revised Exhibit F and G drawings, as necessary.

*Article 305.* Before starting construction, the Licensee shall retain a board of three or more qualified independent engineering consultants experienced in critical disciplines such as geotechnical, mechanical and civil engineering, to review the design, specifications, and construction of the project for safety and adequacy. The Licensee shall submit two copies of a letter with the names and qualifications of the Board members (one of these shall be a courtesy copy sent to the Director, Division of Dam Safety and Inspections) for the Commission's approval of the Board, and one copy shall be sent to the Commission's New York Regional Director.

**[61,416]**

Among other things, the Board of Consultants shall assess the following: the geology of the project site and surroundings; the design, specifications, and construction of the dike(s), dam(s), spillway(s), powerhouse(s), electrical and mechanical equipment, and emergency power supply; instrumentation; the filling schedule for the reservoir(s), and plans and surveillance during the initial filling; and construction procedures and progress.

Before each meeting, the Licensee shall furnish members of the Board the following: (1) a statement of the specific level of review the board is expected to provide; (2) an agenda for the meeting; (3) a list of the items to be discussed with the board; (4) a discussion of significant events in the design and construction that have occurred since the last board meeting; (5) drawings of the design and construction features; and (6) documentation for the details, and analyses of the design and construction features to be discussed. The Licensee shall ensure that the Board has sufficient time to review these items before each meeting. At the same time as a copy of these items is provided to the Board, the Licensee shall also send two copies to the Commission (one of these shall be a courtesy copy sent to the Director, Division of Dam Safety and Inspections) and one copy to the Director of the Commission's New York Regional Office.

Within 30 days after each Board meeting, the Licensee shall submit to the Commission copies of the Board's report, and a statement of intent to comply with the Board's recommendations or a statement of a plan to resolve the issue(s). The Licensee must provide detailed reasons for any recommendation of the Board not implemented. The Licensee shall send two copies of this submission to the Commission (one of these shall be a courtesy copy sent to Director, Division of Dam Safety and Inspections) and one copy to the Director of the Commission's New York Regional Office.

The Board's review comments shall be submitted prior to or simultaneously with the submission of the final contract drawings and specifications accompanied by a supporting design report required to be filed with the Commission in accordance with Article 304. Within one year after completion of construction, the Licensee shall file two copies with the Commission (one of these shall be a courtesy copy to the Director, Division of Dam Safety and Inspections) of the board's final report, which shall contain a statement indicating the board's opinion with respect to the construction, safety, and adequacy of the project structures.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



*Article 306.* The Licensee, within four months from the date of issuance of this license, shall prepare and submit for approval by the Director, Office of Hydropower Licensing, a dambreak study to determine the appropriate inflow design flood (IDF) for the Mount Hope Lake Dam. The IDF study shall be performed in accordance with Chapter II of the Commission's Engineering Guidelines. The hypothetical dam failure should be evaluated under a series of flood flow conditions up to the point where project failure would not significantly increase the hazard to downstream life and property. This may require evaluation of failure during floods up to the probable maximum flood (PMF). The results of the downstream routing should be clearly shown on inundation maps with the breach wave travel time and incremental depths indicated at critical downstream locations. The inundation maps should be developed at a scale sufficient to identify downstream habitable structures within the affected area. The study shall include (1) a list and location of all downstream structures which would be affected by the flooding caused by a dam failure; (2) first-floor elevations of all structures listed in item 1; (3) flood water elevations on each structure listed in item 1 before and after the dam breach; and (4) the function of the structures (i.e., residence, firehouse, etc.) listed in item 1. The dambreak studies should be supported with detailed information, including all assumptions and parameters used in the analysis, appropriate computations, and exhibits in sufficient detail to substantiate the results of the studies. No construction shall commence until the IDF has been established by the Director, Office of Hydropower Licensing. The Director may require modifications to the dam and appurtenant structures to assure a safe and adequate project.

*Article 307.* At least 90 days before starting construction, the Licensee shall file for approval with the Director, Office of Hydropower Licensing, three copies of a project financing plan. The plan must show that the Licensee has acquired the funds, or commitment for funds, necessary to construct the project in accordance with this license. The Licensee shall not start any project construction or ground-disturbing activities that are inseparably associated with the project (other than those required for subsurface site exploration) before the project financing plan is approved.

*Article 401.* At least 90 days before the start of any landdisturbing or land-clearing activities at the project site, the Licensee shall file with the Commission, for approval, a final plan to control erosion and sedimentation, and maintain slope stability. The plan must: (1) propose project-specific measures to control erosion and sedimentation and to detect and

**[61,417]**

stabilize any exposed irregular joints that have the potential to form unstable wedges or blocks; (2) describe actual-site geological, soil, slope, groundwater, and surface water conditions; (3) provide functional design drawings of control measures; and (4) include schedules for implementing the proposed measures and monitoring the success of these measures.

The plan shall incorporate the measures proposed by the Licensee in the draft erosion and sedimentation control plan for the original Mount Hope Lake Project (i.e., the project proposed in the license application before it was amended to include the upland alternative), as well as measures for: (1) stabilizing and protecting exposed soils in areas where soils will be disturbed; (2) coordinating revegetation with the optimal growing periods; (3) reseeding and revegetating with native and wildlife-preferred local plants; (4) using fast-growing, short-lived plant species immediately following tree removal along the transmission line right-of-way and temporary construction access roads; (5) providing slope protection where vegetation is slow to recover, or fails; (6) protecting existing downslope vegetation from sidecast debris; (7) prohibiting removal of woody vegetation less than 30 feet in height from within 30 feet of streams; (8) using temporary bridges above streams for construction access roads; (9) preventing sedimentation of Hibernia Brook and degradation of Category 1 waters; (10) controlling sedimentation at transmission line stream crossings; and (11) monitoring the success of the implemented measures.

The Licensee shall prepare the plan after consultation with the New Jersey Department of Environmental Protection and Energy and the Morris County Soil Conservation District. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Sep 13, 2024 from VitalLaw®



are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project site until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission. If the results of monitoring indicate that changes in project structures or operations are necessary to ensure compliance with the plan's objectives, the Commission may direct the Licensee to modify project structures or operations.

*Article 402.* No later than 180 days from the date of issuance of this license, the Licensee shall file with the Commission, for approval, a plan to perform subsurface testing at the project site to determine groundwater levels and potential groundwater flow rates into and out of the project's upper reservoir and access shafts. The plan shall include, at a minimum, the following elements: (1) a rock investigation plan, including pressure testing boreholes, to identify zones of higher conductivity between Mount Hope Pond and the upper reservoir; (2) monthly monitoring of potentiometric levels in the area surrounding the site during construction operations; and (3) a schedule for providing the results of testing and monitoring to the Board of Consultants (Board) and the Commission.

The Licensee shall prepare the plan after consultation with the Board of Consultants, as established under Article 305. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the Board, and specific descriptions of how the Board's comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the Board to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information. The Commission reserves the right to require changes to the plan. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

No later than 120 days after completing the subsurface testing, the Licensee shall file with the Commission, for approval, a plan for addressing areas of potential groundwater leakage into and out of the upper reservoir and access shafts. The plan shall include, at a minimum, the following measures: (1) concrete-lining all access shafts and penstocks; (2) sealing all zones of higher conductivity between Mount Hope Pond and the upper reservoir encountered before and during excavation; (3) treating all areas of potential leakage from the upper reservoir using state-of-the-art sealing techniques and testing the continuity of the seals to confirm their effectiveness; and (4) monitoring, including the filing of monitoring reports.

The filing shall include comments and recommendations on the plan provided by the Board.

**[61,418]**

If the Licensee does not adopt a recommendation made by the Board, the filing shall include the Licensee's reasons for rejection, based upon project-specific information. Within 30 days after each Board meeting, the Licensee shall submit to the Director, Office of Hydropower Licensing, copies of the Board's report and a statement of intent to comply with the Board's recommendations, or a statement identifying a plan to resolve the issue(s).

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission. If the results of the testing or monitoring indicate that changes in project structures or operations are necessary to control groundwater seepage, the Commission may direct the Licensee to modify project structures or operations.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Sep 13, 2024 from VitalLaw®

Wolters Kluwer

*Article 403.* No later than 180 days from the date of issuance of this license, the Licensee shall file with the Commission, for approval, a plan to implement groundwater quality monitoring for the project area, and to protect groundwater quality during project construction and operation. The groundwater quality protection plan shall include, at a minimum, the following elements: (1) measures for monitoring local groundwater quality, mine water quality, and Mount Hope Lake water quality, prior to pumping to the project's upper reservoir, and reservoir water quality during filling and operation for, at a minimum, iron, chromium, zinc, copper, manganese, vanadium, and thallium; (2) contingency measures for treating the pumped water and the reservoir water to meet New Jersey FW-2 standards (or local groundwater concentrations, if local groundwater conditions do not meet FW-2 standards); (3) measures to identify existing levels of contamination along the boundary of the Picatinny Arsenal upgradient from the New Leonard Mine shaft, and to conduct weekly groundwater quality monitoring, if a significant change in groundwater gradient in the vicinity of the Arsenal is observed during dewatering; (4) contingency measures to prevent transport of contaminated groundwater from Picatinny Arsenal; (5) measures for the removal and disposal of abandoned equipment from the mine, including contingency measures for clean-up of any accidental spills during equipment removal; and (6) a schedule for submitting the monitoring results to the Commission and the consulted agencies.

The Licensee shall prepare the plan after consultation with the U.S. Environmental Protection Agency and the New Jersey Department of Environmental Protection and Energy. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities at the project site shall begin until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission. If the results of monitoring indicate that changes in project structures or operations are necessary to ensure compliance with applicable water quality standards, the Commission may direct the Licensee to modify project structures or operations.

*Article 404.* At least 90 days before the start of any land-disturbing or land-clearing activities, the Licensee shall file with the Commission, for approval, a plan: (1) to monitor the water level of Mount Hope Pond during project construction and operation; and (2) to provide any makeup water needed to maintain the Mount Hope Pond water level at or above the spillway crest elevation during the recreational months (May through September) throughout project construction and operation. The plan shall include the source, testing, and any necessary treatment of makeup water, and measures for maintaining records (summer pond levels, well water levels at the beginning and end of each pumping season, number of pumping days, and quantity of water pumped) and a schedule for submitting a report to the Commission and the New Jersey Department of Environmental Protection and Energy at the end of each pumping season.

The Licensee shall file the plan after consultation with the New Jersey Department of Environmental Protection and Energy and Rockaway Township. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted entities, and specific descriptions of how the entities' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the entities to comment and make recommendations before filing the plan with the Commission.

**[61,419]**

If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 405.* The Licensee, during reservoir filling, shall release from Mount Hope Lake Dam into the unnamed tributary discharging into White Meadow Lake the following continuous minimum flows or inflow to Mount Hope Lake, whichever is less, for the protection of water quality in White Meadow Lake: (1) 1.0 cubic feet per second (cfs) in January; (2) 1.1 cfs in February until the start of White Meadow Lake refilling; (3) natural outflow during the filling of White Meadow Lake; (4) 1.6 cfs in March, after White Meadow Lake is refilled; (5) 1.5 cfs in April; (6) 1.1 cfs in May; (7) natural outflow in June, July and August; (8) 0.5 cfs in September; (9) 0.9 cfs in October and November when White Meadow Lake is not being drawn down; (10) 0.5 cfs during October and November when White Meadow Lake is being drawn down; and (11) 1.1 cfs in December.

These flows may be temporarily modified, if required by operating emergencies beyond the control of the Licensee, and for short periods upon agreement between the Licensee and the New Jersey Department of Environmental Protection and Energy. If the flow is so modified, the Licensee shall notify the Commission as soon as possible, but no later than 10 days after each such incident.

*Article 406.* No later than one year before the start of any reservoir-filling activities, the Licensee shall file with the Commission, for approval, a plan to pump water from Mount Hope Lake to the project's upper reservoir.

The plan shall include, as a minimum, the following: (1) the final design of the water intake structure with maximum intake velocities of 0.1 foot per second (fps) at a maximum withdrawal rate of 30 cfs (including water intake screens with 3/8-inch wide openings or less), (2) total maximum pump capacity, (3) number of pumps to be used, (4) controls to prevent overpumping resulting from equipment malfunction, (5) lake levels at which pumping would cease and at which all pumps would operate, and (6) the final design of the water control structure at the outlet from Mount Hope Lake.

The Licensee shall prepare the plan after consultation with the U.S. Fish and Wildlife Service and the New Jersey Department of Environmental Protection and Energy. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and make recommendations prior to filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No reservoir-filling activities shall begin until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 407.* No later than 180 days from the date of issuance of this license, the Licensee shall file with the Commission, for approval, a plan to gauge, monitor, and control discharges and withdrawals from Mount Hope Pond, Mount Hope Lake, and the project's upper reservoir.

The plan shall include the following elements: (1) gauging, monitoring, and controlling water withdrawals by Mount Hope Rock Products or other entities at Mount Hope Lake on a daily basis during construction and project operation to limit withdrawals to (i) less than 394 acre-feet per year, (ii) 100,000 gallons per day during June, July and August, and (iii) no withdrawal when Mount Hope Lake is below the level at which discharges to White Meadow Lake would cease (*i.e.*, 797.1 msl); (2) gauging and monitoring of daily average flows from Mount Hope Lake to White Meadow Lake and from Mount Hope Pond to Mount Hope Lake; (3) gauging and monitoring of water withdrawals daily from Mount Hope Lake to fill the project's upper reservoir; (4) monitoring the water level daily at Mount Hope Lake and Mount Hope Pond; (5) gauging and monitoring the discharge of any excess water from the upper reservoir to Mount Hope Rock Products water impoundment in the gravel processing area; and (6) filing semi-annual reports of the monitoring results.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

The Licensee shall prepare the plan after consultation with the U.S. Fish and Wildlife Service, the New Jersey Department of Environmental Protection and Energy, and Rockaway Township. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and

**[61,420]**

provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and make recommendations prior to filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No reservoir filling activities shall begin until the Licensee is notified that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission. If the results of monitoring indicate that changes in project structures or operations are necessary, the Commission may direct the Licensee to modify project structures or operations.

*Article 408.* No later than one year before the start of project operation, the Licensee shall file with the Commission, for approval, a contingency plan for obtaining makeup water for the project's upper reservoir during an extended drought.

The Licensee shall prepare the plan after consultation with the New Jersey Department of Environmental Protection and Energy. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agency, and specific descriptions of how the agency's comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agency to comment and make recommendations prior to filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 409.* At least 90 days before the start of any land-disturbing or land-clearing activities, the Licensee shall file with the Commission, for approval, a plan to protect the water supply of the Jersey City Department of Water at Boonton Reservoir, which is downstream from the project.

The water supply plan shall include, as a minimum, contingency measures to protect inflow to the Boonton Reservoir in the event of an extreme water supply shortage during initial reservoir filling.

The Licensee shall prepare the plan after consultation with the Jersey City Department of Water and the New Jersey Department of Environmental Protection and Energy. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 410.* No later than 180 days from the date of issuance of this license, the Licensee shall file with the Commission, for approval, a plan: (1) to monitor the water quality (i) of Mount Hope Pond prior to and during project construction, (ii) of Mount Hope Lake prior to and during project construction and operation, and (iii) of White Meadow Lake prior to and during the initial reservoir filling period; and (2) to prevent water quality degradation of Mount Hope Pond, Mount Hope Lake and White Meadow Lake. The plan shall include measures for monitoring: (1) phosphates, nitrates, dissolved solids, turbidity, dissolved oxygen, and water temperature in

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



Mount Hope Pond prior to and during project construction; and (2) phosphates, nitrates, and dissolved solids (i) in Mount Hope Lake prior to and during project construction and operation, and (ii) in White Meadow Lake during the initial reservoir filling period. The plan shall include a schedule for submitting the monitoring results to the Commission and the consulted entities. The plan shall also include contingency measures to prevent water quality degradation from pre-project conditions of Mount Hope Pond and Mount Hope Lake during project construction and operation, and White Meadow Lake during the initial reservoir filling period.

The Licensee shall prepare the plan after consultation with the New Jersey Department of Environmental Protection and Energy, Rockaway Township, and the White Meadow Lake Property Owners Association. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted

**[61,421]**

entities, and specific descriptions of how the entities' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project site until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission. If the results of monitoring indicate that changes in project structures or operations are necessary to ensure that degradation of Mount Hope Pond, Mount Hope Lake, and White Meadow Lake water quality is prevented, the Commission may direct the Licensee to modify project structures or operations.

*Article 411.* At least one year before the start of any reservoir filling activities, the Licensee shall file with the Commission, for approval, a plan for annual fish stocking of Mount Hope Lake during the initial reservoir filling period.

The Licensee shall prepare the plan after consultation with the New Jersey Division of Fish, Game and Wildlife. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agency, and specific descriptions of how the agency's comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agency to comment and make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No reservoir-filling activities shall begin until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 412.* At least 240 days before the start of any land-disturbing or land-clearing activities for the project transmission line, the Licensee shall file with the Commission, for approval, a report of a field survey of (1) the 460-acre tract north of Mount Hope Lake to Snake Hill Road, and (2) the entire transmission line right-of-way, that identifies vegetation, wildlife habitat, and endangered, threatened, or rare species for the purpose of developing a management plan to protect vegetation and wildlife. The field survey, to be performed by qualified wildlife biologists and botanists, shall include (1) vegetation (including the ten state-endangered species and one state-rare species reported in the project area), (2) wildlife habitat (including habitat for the two candidate species for federal listing and the two other state-endangered species and nine state-threatened species), and (3) nesting raptors.

The Licensee shall perform the field survey after consultation with the U.S. Fish and Wildlife Service, the New Jersey Department of Environmental Protection and Energy, and the New Jersey Natural Heritage Program. The Licensee shall include with the report documentation of consultation, copies of comments and recommendations on the completed report after it has been prepared and provided to the consulted agencies, and specific

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

descriptions of how the agencies' comments are accommodated by the report. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the report with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

*Article 413.* At least 90 days before the start of transmission line construction, the Licensee shall file with the Commission, for approval, a plan to clear vegetation within the transmission line right-of-way (ROW) to protect the habitat of state-designated rare species located in the ROW, to maintain the ROW, and to avoid affecting wetlands by prohibiting any filling of or placement of transmission towers in wetlands within the ROW.

The plan shall include, but not be limited to, the following elements: (1) fencing wetland areas within and adjacent to the transmission line ROW and ensuring that fill material is not discharged into wetlands within or near the transmission line ROW and that transmission towers are not placed within wetlands; (2) using helicopters to construct the Burnt Meadow Brook portion and those sections of the transmission line that cross steep terrain east and west of Green Pond Brook; (3) using the existing Public Service Electric and Gas (PSE&G) ROW and access roads west of Green Pond Brook during transmission line construction; (4) specifying the acreage of forest to be cleared, and the vegetation to be preserved; (5) revegetating cleared sections of the ROW and access roads with native vegetation having wildlife value; (6) using selective clearing (cutting no more than 0.25 mile per right-of-way mile per year) and avoiding herbicides to maintain

**[61,422]**

cleared portions of the ROW in an early woods seral state; (7) providing brush piles and nesting snags along the cleared sections of ROW; (8) maintaining seasonal restrictions on ROW clearing within 100 meters of an active raptor nest tree; (9) implementing measures (such as gates and locks on access roads, and brush piles at road crossings) to control vehicular access to project access roads and the transmission line ROW; and (10) implementing measures to minimize impacts to the habitat of any (i) federally listed endangered or threatened species, (ii) candidate for federal listing, and (iii) state-listed endangered, threatened, or rare species identified as a result of the field survey.

The Licensee shall prepare the plan after consultation with the U.S. Fish and Wildlife Service, the New Jersey Department of Environmental Protection and Energy, and the New Jersey Natural Heritage Program. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plans after they have been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities for the project transmission line shall begin until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 414.* Within one year after the start of land-disturbing activities, the Licensee shall file with the Commission, for approval, a plan to manage vegetation, maintain trails and other facilities, and control public access within (1) the 460-acre tract north of Mount Hope Lake to Snake Hill Road and (2) the 330-acre tract that includes Mount Hope Lake and its surrounding wetlands, for the purpose of optimizing the value of these areas to wildlife.

The plan shall include the Licensee's plans for: (1) funding the yearly maintenance of the two properties; (2) leasing the tracts to a public or quasi-public agency that will administer and manage the lands and facilities; (3) improving wildlife habitat; (4) relocating the Mount Hope Rock Products' gravel processing operations from the lake shoreline after project construction has been completed, and stabilizing the shoreline; and (5) locating all new facilities outside wetland areas.

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

The Licensee shall prepare the plan after consultation with the U.S. Fish and Wildlife Service, the U.S. Army Corps of Engineers, the New Jersey Department of Environmental Protection and Energy, and the Morris County Park Commission. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 415.* At least 90 days before leasing the 460-acre tract (identified in Article 414) to the Morris County Park Commission, the Licensee shall prepare and file, for Commission approval, a lease agreement establishing allowable uses and activities at the 460-acre tract, and the circumstances under which the parcel would be returned to the Licensee for management if the Morris County Park Commission is unable to manage it as planned.

At least 90 days before leasing the 330-acre tract (identified in Article 414) to any state or conservation organization, the Licensee shall prepare and file, for Commission approval, a lease agreement establishing allowable uses and activities at the 330-acre tract, and the circumstances under which the parcel would be returned to the Licensee for management if the leasing entity is unable to manage it as planned.

The Licensee shall prepare each lease agreement after consultation with the New Jersey Department of Environmental Protection and Energy and the Morris County Park Commission. The Licensee shall include with each agreement documentation of consultation, copies of comments and recommendations on the completed agreement after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the agreement. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing each

**[61,423]**

agreement with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to each lease agreement. Upon Commission approval, the Licensee shall implement each agreement, including any changes required by the Commission.

*Article 416.* No later than one year after the issuance of this license, the Licensee shall file with the Commission, for approval, a plan for compensating owners of homes in the Weldon Road area for any reduction in the market value of their residences due to the construction and operation of the project's transmission line.

The Licensee shall prepare the plan after consultation with Jefferson Township. The Licensee shall include in the filing documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to Jefferson Township, and specific descriptions of how the Township's comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the Township to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 417.* No later than one year after issuance of this license, the Licensee shall file with the Commission, for approval, a plan to purchase each home located on (1) South Brookside Drive west of Cayuga Avenue, (2) the west side of Cayuga Avenue from Brookside Drive north to 300 feet north of Apache Trail, (3) Mill Pond Road, (4) Everment Road, and (5) Beaver Dam Road, which has been listed at its current (1992) fair market value for

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Sep 13, 2024 from VitalLaw®

a minimum of five months but cannot be sold for this amount. The plan shall include the Licensee's method for determining fair market value.

The Licensee shall prepare the plan after consultation with Rockaway Township. The Licensee shall include in the filing documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to Rockaway Township, and specific descriptions of how the Township's comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the Township to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 418.* The Licensee shall consult and cooperate with Morris County, Rockaway Township, and Morris Hills Regional [School] District regarding the fiscal impact of project construction, and shall take reasonable measures to compensate these jurisdictions for their public service expenses that are in excess of the revenues received directly or indirectly from the project during its construction. The fiscal impact analysis shall consider incremental revenues and expenditures during the entire construction period.

The Licensee shall meet with appropriate representatives of the jurisdictions and shall prepare a plan to carry out the requirements of this article. This plan shall be consummated and filed with the Commission not later than one year after the date of issuance of this license. The Commission reserves the right to require changes to the plan. Within six months after initiation of commercial operation of the project, the Licensee shall file a report with the Commission indicating whether the aforementioned jurisdictions and the Licensee are in agreement that the financial compensation requirements of this article have been or are being fulfilled.

*Article 419.* The Licensee shall consult with the Morris County Park Commission (MCPC) regarding the public lands at Mahlon Dickerson Reservation and Lake Ames Park needed for the project's transmission line, and shall take reasonable measures to compensate MCPC for the loss of such lands. The Licensee shall meet with representatives of the MCPC and shall negotiate an agreement to carry out obligations under this article. The agreement shall be consummated and filed with the Commission not later than one year after the date of issuance of this license. If the Licensee and the MCPC cannot reach agreement, the Licensee shall purchase and donate equivalent lands adjacent to and contiguous to the Mahlon Dickerson Reservation to replace those needed for the transmission line. At least 90 days prior to construction of the project's transmission line, the Licensee shall file a report with the Commission indicating that the requirements of this article have been fulfilled.

*Article 420.* At least 90 days before the start of any land-disturbing or land-clearing activities at the project, the Licensee shall obtain a

**[61,424]**

right-of-way permit for crossing Picatinny Arsenal property from the Department of the Army, and shall file with the Commission, for approval, a plan (1) to relocate the existing 34.5-kV transmission line from the project's upper reservoir site, and (2) to construct the project's transmission line on Picatinny Arsenal property in a manner that is acceptable to the Department of the Army. The plan shall include: (1) final drawings of the transmission line to be relocated and the project's transmission lines; and (2) measures to prevent power supply interruption to the Arsenal.

The Licensee shall prepare the plan after consultation with Picatinny Arsenal personnel. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the Arsenal, and specific descriptions of how the Arsenal's comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the Arsenal personnel to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 421.* The Licensee's draft recreational plan filed August 16, 1991, as amended November 29, 1991, is approved subject to the revisions required by this article. At least 90 days before the start of any land-disturbing or land-clearing activities at the project, the Licensee shall file with the Commission, for approval, a final recreational plan for the project. The final recreational plan shall include the measures specified in the draft plan, provided, however, that the Licensee will: (1) lease the 460-acre tract north of Mount Hope Lake to the Morris County Park Commission (MCPC) and provide annual funding to MCPC for the management of the tract; (2) lease the 330-acre tract that includes Mount Hope Lake and its associated wetlands to a state or conservation organization; (3) prohibit hunting and the construction of a shooting range on project lands; (4) provide schematic drawings and specific details on the capacity, usage, timing, and maintenance of recreational facilities at the project site; (5) include facilities for accommodating the disabled at the project site; and (6) open the Mount Hope Lake recreational facilities to the public within one year of completion of project construction.

The Licensee shall prepare the final recreational plan after consultation with the National Park Service, the New Jersey Department of Environmental Protection and Energy, the Morris County Park Commission, and Rockaway Township. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission. Within 90 days after completion of the construction of the recreational facilities at the site, the Licensee shall file with the Commission, for approval, a report which includes the as-built drawings and identifies the entity responsible for the operation and maintenance of the facilities.

*Article 422.* The Licensee, after consultation with the National Park Service, the New Jersey Department of Environmental Protection and Energy, the Morris County Park Commission, and Rockaway Township, shall monitor recreation use of the project area to determine whether existing recreation facilities are meeting recreation needs. Monitoring studies shall begin within five years of the issuance date of this license. Monitoring studies shall include, at a minimum, the collection of annual recreation use data.

Every five years during the term of the license, the Licensee shall file a report with the Commission on the monitoring results. This report shall include: (1) annual recreation use figures; (2) a discussion of the adequacy of the Licensee's recreation facilities at the project site to meet recreation demand; (3) a description of the methodology used to collect all study data; (4) if there is a need for additional facilities, a recreation plan proposed by the Licensee to accommodate recreation needs in the project area; (5) documentation of agency consultation and agency comments on the report after it has been prepared and provided to

**[61,425]**

the agencies; and (6) specific descriptions of how the agencies' comments are accommodated by the report. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations prior to filing the report with the Commission.

*Article 423.* The Licensee shall provide $1.0 million to Jefferson Township for the design and construction of a community center that includes a variety of recreational facilities, including basketball and volleyball courts. The

© 2024 CCH Incorporated and its affiliates and licensors.    31    Sep 13, 2024 from VitalLaw®
All rights reserved.



center and facilities will provide off-site mitigation for adverse impacts to recreationists in Jefferson Township resulting from the project's transmission line.

No later than one year after issuance of this license, the Licensee shall file with the Commission, for approval, an implementation plan that ensures that the Licensee's $1.0 million payment to Jefferson Township will be used exclusively for the design and construction of the community center. The Licensee shall not however be responsible for post-construction operation and maintenance.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities for the project transmission line shall begin until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall execute the plan, including any changes required by the Commission. Within 90 days after completion of the construction of the recreational facilities in Jefferson Township, the Licensee shall file with the Commission, for approval, a report which includes the as-built drawings and identifies the entity responsible for the operation and maintenance of the facilities.

*Article 424.* At least 90 days before the start of any land-disturbing or land-clearing activities at the project, the Licensee shall file with the Commission, for approval, as-built drawings of the earthen berm proposed by Mount Hope Rock Products, Inc. or a plan and construction schedule for completing the berm if it has not yet been constructed by Mount Hope Rock Products, Inc.

The Licensee shall prepare the plan after consultation with the New Jersey Department of Environmental Protection and Energy and Rockaway Township. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission. Within 90 days after completion of the construction of the berm, the Licensee shall file with the Commission, as-built drawings of the berm.

*Article 425.* At least 90 days before the start of any land-disturbing or land-clearing activities at the project, the Licensee shall file with the Commission, for approval, a plan to avoid or minimize disturbance to the quality of the existing visual resources in the project area.

The filing shall include, at a minimum, the following: (1) measures to blend the project works exclusive of the transmission line into the existing landscape character, including treatment of exterior structure surfaces; (2) a plan (i) to revegetate, stabilize, and landscape new construction areas, and areas within the project boundary disturbed by previous construction or that currently adversely affect the visual resources of the surrounding area; (ii) to grade, plant grasses, and repair slopes damaged by erosion and to prevent future erosion; (iii) to maintain the forested buffer around the upper reservoir, supplemented with non-deciduous plantings; and (iv) to perform landscape maintenance; (3) a plan for visual buffers in areas such as the entrance road to the Mount Hope Project site, the earthen berm, and the First United Methodist Church; (4) measures to minimize transmission line tower and right-of-way impacts, including a visual resources assessment of the final right-of-way alignment, final tower design, and conductor surface finish; (5) relocation of the gravel processing operations and asphalt facilities away from Mount Hope Lake; (6) removal of all temporary works used to pump water from Mount Hope Lake to the project's upper reservoir during initial filling, and restoration of areas affected by pumping activities; and (7) an implementation schedule for all the aforementioned measures.

The Licensee shall prepare the plan after consultation with the New Jersey Department of Environmental Protection and Energy and Rockaway Township. The Licensee shall include with the plan documentation of

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Sep 13, 2024 from VitalLaw®

Wolters Kluwer

consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies'

**[61,426]**

comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

*Article 426.* The Licensee shall implement the provisions of the "Programmatic Agreement among the Federal Energy Regulatory Commission, the Advisory Council on Historic Preservation, and the New Jersey State Historic Preservation Office for the Management of Historic Properties Affected by the Mount Hope Project" that was executed on June 1, 1992. The Commission reserves the authority to require changes to any Cultural Resource Management Plan or plans at any time during the term of the license.

*Article 427.* No later than 180 days from the date of issuance of this license, the Licensee shall file with the Commission, for approval, a plan to control project-related traffic.

The traffic control plan shall include the following measures: (1) the final park and ride program for construction workers, specifying locations for the park and ride lots, parking spaces per lot, the number of transport vehicles, who will be responsible for driving the transport vehicles, provisions to ensure success, including methods to limit on-site parking and parking adjacent to the site, a monitoring program, and provisions for the program's periodic review and revision; (2) all roadway improvements needed to maintain satisfactory levels of service on local roadways affected by project-related truck traffic; (3) roadway capacity improvements, including signalization (for the intersections of Mount Hope Avenue and Mount Hope Road, of Mount Hope Road and Mount Hope Quarry Road, and of Mount Hope Avenue and Richard Mine Road), adding a right turning lane to south-bound Mount Hope Avenue at Mount Hope Road, and signal timing improvements at Mount Hope Avenue and the two signalized intersections at the Interstate 80 interchanges; (4) coordinating with Rockaway Township, the Morris County Department of Transportation, and the New Jersey Department of Transportation to identify additional intersection improvements; (5) financing highway safety improvements along Mount Hope Avenue and Mount Hope Road from the Interstate 80 interchange to the project site (seasonal right-of-way clearings to improve line-of-sight, reduced speed limits around curves and downgrades, roadway appurtenances such as reflectorized centerlines, guardrails, road scarification, and warning signs) to be performed under an agreement between the Licensee and the agency in ownership of the location; and (6) monitoring measures to ensure the success of the plan and a schedule for submitting the monitoring results to the consulted agencies and the Commission.

The Licensee shall prepare the plan after consultation with the New Jersey Department of Transportation, the Morris County Department of Transportation, and Rockaway Township. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

**Wolters Kluwer**

*Article 428.* At least 90 days before the start of any land-disturbing or land-clearing activities at the project, the Licensee shall file with the Commission, for approval, a materials handling and monitoring plan to control fugitive dust.

The materials handling and monitoring plan shall include, at a minimum, the following: (1) protective clothing requirements; (2) water spraying and other techniques for dust suppression; (3) procedures for asbestos handling; and (4) a monitoring plan, which includes a schedule for providing the monitoring results to the consulted agencies and the Commission.

The Licensee shall prepare the materials handling and monitoring plan after consultation with the New Jersey Department of Environmental Protection and Energy and Rockaway Township.

The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to

**[61,427]**

the consulted agencies, and specific descriptions of how the agencies' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the agencies to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

If the results of monitoring indicate that changes in project structures or operations are necessary to ensure compliance with the plan's objectives, the Commission may direct the Licensee to modify project structures or operations.

*Article 429.* At least 90 days before the start of any land-disturbing or land-clearing activities at the project, the Licensee shall file with the Commission, for approval, a plan to control project-related noise and vibration.

The noise and vibration control plan shall include, at a minimum, the following measures: (1) monitoring noise and vibration levels on a periodic basis at residential and other sensitive receptors, including the Ford-Faesch House and the four residences at Picatinny Arsenal that are within 1,000 feet of the project boundary; (2) controlling blast charges to limit levels to 2,000 inches per second or less; (3) limiting blasting to daytime hours; (4) proposing contingency measures, including engineering controls, work scheduling, and appropriate mitigation, if applicable criteria for damage risk and annoyance are exceeded, to reduce unacceptable project-related noise and vibration levels at residential receptors. The plan shall include a schedule for submitting the monitoring results to the consulted entities and the Commission.

The Licensee shall prepare the noise and vibration control plan after consultation with Picatinny Arsenal and Rockaway Township. The Licensee shall include with the plan documentation of consultation, copies of comments and recommendations on the completed plan after it has been prepared and provided to the consulted entities, and specific descriptions of how the entities' comments are accommodated by the plan. The Licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission. If the Licensee does not adopt a recommendation, the filing shall include the Licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. No land-disturbing or land-clearing activities shall begin at the project until the Licensee is notified by the Commission that the plan is approved. Upon Commission approval, the Licensee shall implement the plan, including any changes required by the Commission.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Wolters Kluwer

*Article 430.* The Licensee shall design and construct the transmission line in accordance with the guidelines set forth in "Suggested Practices for Raptor Protection on Power Lines--the State of the Art in 1981" by Raptor Research Foundation, Inc.

Further, the Licensee, after consulting with the U.S. Fish and Wildlife Service and the New Jersey Department of Environmental Protection and Energy, and within 90 days prior to the start of construction of the project transmission line, shall file with the Commission, for approval, a transmission line design plan that considers the following: (1) adequate separation of energized conductors, groundwires, and other metal hardware, adequate insulation, and other measures necessary to protect raptors from electrocution hazards; and (2) conductor spacing and transmission line placement to minimize electromagnetic field effects.

Agency comments on the design plan shall be included in the filing. Unless the Commission instructs otherwise within 60 days after the filing, the Licensee may begin transmission line construction at the end of the 60-day period.

*Article 431.* (a) In accordance with the provisions of this article, the licensee shall have the authority to grant permission for certain types of use and occupancy of project lands and waters and to convey certain interests in project lands and waters for certain types of use and occupancy, without prior Commission approval. The licensee may exercise the authority only if the proposed use and occupancy is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project. For those purposes, the licensee shall also have continuing responsibility to supervise and control the use and occupancies for which it grants permission, and to monitor the use of, and ensure compliance with the covenants of the instrument of conveyance for, any interests that it has conveyed, under this article. If a permitted use and occupancy violates any condition of this article or any other condition imposed by the licensee for protection and enhancement of the project's scenic, recreational, or other environmental values, or if a covenant of a conveyance made under the authority of this article is

**[61,428]**

violated, the licensee shall take any lawful action necessary to correct the violation. For a permitted use or occupancy, that action includes, if necessary, cancelling the permission to use and occupy the project lands and waters and requiring the removal of any non-complying structures and facilities.

(b) The type of use and occupancy of project lands and water for which the licensee may grant permission without prior Commission approval are: (1) landscape plantings; and (2) embankments, bulkheads, retaining walls, or similar structures for erosion control to protect the existing shoreline. To the extent feasible and desirable to protect and enhance the project's scenic, recreational, and other environmental values, the licensee shall require multiple use and occupancy of facilities for access to project lands or waters. The licensee shall also ensure, to the satisfaction of the Commission's authorized representative, that the use and occupancies for which it grants permission are maintained in good repair and comply with applicable state and local health and safety requirements. Before granting permission for construction of bulkheads or retaining walls, the licensee shall: (1) inspect the site of the proposed construction, (2) consider whether the planting of vegetation or the use of riprap would be adequate to control erosion at the site, and (3) determine that the proposed construction is needed and would not change the basic contour of the reservoir shoreline. To implement this paragraph (b), the licensee may, among other things, establish a program for issuing permits for the specified types of use and occupancy of project lands and waters, which may be subject to the payment of a reasonable fee to cover the licensee's costs of administering the permit program. The Commission reserves the right to require the licensee to file a description of its standards, guidelines, and procedures for implementing this paragraph (b) and to require modification of those standards, guidelines, or procedures.

(c) The licensee may convey easements or rights-of-way across, or leases of, project lands for: (1) replacement, expansion, realignment, or maintenance of bridges and roads for which all necessary state and federal approvals have been obtained; (2) storm drains and water mains; (3) sewers that do not discharge into project waters; (4) minor access roads; (5) telephone, gas, and electric utility distribution lines; (6) non-project overhead electric transmission lines that do not require erection of support structures within the project boundary; (7) submarine,

© 2024 CCH Incorporated and its affiliates and licensors.    35    Sep 13, 2024 from VitalLaw®
All rights reserved.

Exhibit 13A

**Wolters Kluwer**

overhead, or underground major telephone distribution cables or major electric distribution lines (69-kV or less); and (8) water intake or pumping facilities that do not extract more than one million gallons per day from a project reservoir. No later than June 30 of each year, the licensee shall file three copies of a report briefly describing for each conveyance made under this paragraph (c) during the prior calendar year, the type of interest conveyed, the location of the lands subject to the conveyance, and the nature of the use for which the interest was conveyed.

(d) The licensee may convey fee title to, easements or rights-of-way across, or leases of project lands for: (1) construction of new bridges or roads for which all necessary state and federal approvals have been obtained; (2) sewer or effluent lines that discharge into project waters, for which all necessary federal and state water quality certification or permits have been obtained; (3) other pipelines that cross project lands or waters but do not discharge into project waters; (4) non-project overhead electric transmission lines that require erection of support structures within the project boundary, for which all necessary federal and state approvals have been obtained; (5) recreational development consistent with an approved Exhibit R or approved report on recreational resources of an Exhibit E; and (6) other uses, if: (i) the amount of land conveyed for a particular use is five acres or less; (ii) all of the land conveyed is located at least 75 feet, measured horizontally, from the edge of the project reservoir at normal maximum surface elevation; and (iii) no more than 50 total acres of project lands for each project development are conveyed under this clause (d)(6) in any calendar year. At least 45 days before conveying any interest in project lands under this paragraph (d), the licensee must submit a letter to the Director, Office of Hydropower Licensing, stating its intent to convey the interest and briefly describing the type of interest and location of the lands to be conveyed (a marked exhibit G or K map may be used), the nature of the proposed use, the identity of any federal or state agency official consulted, and any federal or state approvals required for the proposed use. Unless the Director, within 45 days from the filing date, requires the licensee to file an application for prior approval, the licensee may convey the intended interest at the end of that period.

(e) The following additional condition applies to any intended conveyance under paragraphs (c) or (d) of this article:

(1) Before conveying the interest, the licensee shall consult with federal and state fish and wildlife or recreation agencies, as appropriate, and the State Historic Preservation Officer.

(2) Before conveying the interest, the licensee shall determine that the proposed use of

**[61,429]**

the lands to be conveyed is not inconsistent with any approved Exhibit R or approved report on recreational resources of an Exhibit E; or, if the project does not have an approved Exhibit R or approved report on recreational resources, that the lands to be conveyed do not have recreational value.

(3) The instrument of conveyance must include covenants running with the land adequate to ensure that: (i) the use of the lands conveyed shall not endanger health, create a nuisance, or otherwise be incompatible with overall project recreational use; and (ii) the grantee shall take all reasonable precautions to ensure that the construction, operation, and maintenance of structures or facilities on the conveyed lands will occur in a manner that will protect the scenic, recreational, and environmental values of the project.

(4) The Commission reserves the right to require the licensee to take reasonable remedial action to correct any violation of the terms and conditions of this article, for the protection and enhancement of the project's scenic, recreational, and other environmental values.

(f) The conveyance of an interest in project lands under this article does not itself change the project boundaries. The project boundaries may be changed to exclude land conveyed under this article only upon approval of revised Exhibit G or K drawings (project boundary maps) reflecting exclusion of that land. Lands conveyed under this article will be excluded from the project only upon a determination that the lands are not necessary for project purposes, such as operation and maintenance, flowage, recreation, public access, protection of environmental resources, and shoreline control, including shoreline aesthetic values. Absent extraordinary

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Exhibit 13A
Page 36 of 46

Wolters Kluwer

circumstances, proposals to exclude lands conveyed under this article from the project shall be consolidated for consideration when revised exhibit G or K drawings would be filed for approval for other purposes.

(g) The authority granted to the licensee under this article shall not apply to any part of the public lands and reservations of the United States included within the project boundary.

(E) The Licensee shall serve copies of any Commission filing required by this order on any entity specified in this order to be consulted on matters related to that filing. Proof of service on these entities must accompany the filing with the Commission.

(F) The Licensee shall, within 60 days of the issuance of this order, submit the following information for each county that contains federal lands utilized by the project: (1) the number of non-transmission line acres of U.S. lands; and (2) the number of transmission line acres of U.S. lands. Revisions to this information shall be filed concurrently with any future requests for approval of revisions to Exhibit G.

(G) The application for a preliminary permit for Project No. 8595, filed by Energy Storage Corporation on September 11, 1984, is denied.

(H) The application for a preliminary permit for Project No. 9105, filed by Esperanza Power Limited Partnership on April 12, 1985, is denied.

(I) This order is final unless a request for rehearing is filed within 30 days from the date of its issuance, as provided in Section 313(a) of the FPA. The filing of a request for rehearing does not operate as a stay of the effective date of this license or of any other date specified in this order, except as specifically ordered by the Commission. The Licensee's failure to file a request for rehearing shall constitute acceptance of this license.

## Appendix A

The following persons and organizations intervened as parties to the proceeding:

Jefferson Township, New Jersey

Rockaway Township, New Jersey

White Meadow Lake & Country Club, Inc. and White Meadow Lake Property Owners Association, Inc.

Lake End Corporation of Green Pond, New Jersey

Longwood Lake Cabin Owners Association, Inc.

Green Pond Corporation

Mount Hope Development Associates

GPU Service Corporation

Radiation Technology, Inc.

Energy Storage Corporation

Sussmor Corporation

Paul A. Mifsud

Seth L. Taylor

Robert B. Cherry

Michael B. Procelan

Kenneth Klausner

Daniel J. Plant and Janet M. Plant

Pauline Chrenko

Forrest A. Burger



**Appendix B**

**Safety and Design Assessment**

**Mount Hope Pumped-Storage Hydroelectric Project**

**FERC No. 9401-000, NJ**

**May 8, 1992**

*Project Design*

Halecrest Company, Edison, New Jersey (Halecrest), is the applicant for the Mount Hope Pumped-Storage Hydroelectric Project. The proposed project would be constructed using

**[61,430]**

part of the inactive Mount Hope Mine Complex, the largest of a number of iron ore mines located in Rockaway and Jefferson Townships, Morris County, New Jersey.

The applicant's proposed project would consist of: (1) a newly excavated upper reservoir with a surface area of 57 acres and a 5,500 acre-foot storage capacity at normal maximum water surface elevation 900 feet above mean sea level (msl); (2) a reinforced concrete intake/outlet capable of discharging 10,400 cubic feet per second (cfs); (3) a new 2,800-foot-long, 25-foot-diameter concrete-lined vertical intake shaft bifurcating into five 11-foot-diameter penstocks; (4) a new 60-foot-wide, 400-foot-long, 120-foot-high underground powerhouse at elevation 2,072 feet below msl containing 5 pump/turbine units with a total installed generating capacity of 2,000 megawatts (MW) at a net head of 2,500 feet; (5) a lower reservoir with a storage capability of 5,500 acre-feet; (6) a ventilation shaft and ventilation building at the northern end of the lower reservoir; (7) access shafts; (8) appurtenant facilities; (9) two parallel 10.6-mile-long, 500-kilovolt (kV) overhead transmission lines interconnecting to the future Jefferson substation, approximately 5.5 miles north-northwest of Mount Hope Lake; (10) the construction of temporary access roads; and (11) onsite and offsite recreational facilities.

The project would also include the existing Mount Hope Lake and Dam as a central feature of the recreation plan. The Mount Hope Lake dam is an earthen embankment, approximately 1,252 feet long with a maximum height of about 18 feet above the stream bed. The upstream and downstream slopes are 2.5 horizontal (H) to 1 vertical (V) and 3 (H) to 1 (V) respectively. The upstream slope is protected by dumped riprap. The crest of the dam is at 802 feet msl. Water from Mount Hope Lake is discharged over an uncontrolled concrete spillway located near the left bank, approximately 22 feet long with a crest elevation of 796.5 feet msl. A 12-inch-diameter cast iron pipe, fitted with a gate valve, provides a low flow outlet from the lake and is located near the right bank.

Mount Hope Lake has a volume of 600 acre-feet, a surface area of approximately 190 acres, a normal water surface elevation of 797 feet msl, and a maximum depth of 8 feet. The lake has a drainage area of approximately 1,200 acres and has a single surface feeder from the Mount Hope Pond. The lake was created to provide water supply to the mining operations.

At the maximum pool, the project upper reservoir would have a water surface elevation of 900 feet msl, a volume of 5,500 acre-feet and a surface area of 57 acres. At the minimum pool, the upper reservoir would have a surface elevation of 800 feet msl, a volume of 400 acre-feet, and a surface area of 30 acres. The upper reservoir would be located off-stream and would not result in any direct flow exchange with any surface water bodies.

The upper reservoir would have no emergency spillway with which to pass flows in case of overpumping or heavy precipitation, as is normally required for a pumped-storage project. Overpumping would not be a problem for this project since the upper reservoir would have at least as great a storage volume as the lower reservoir. Also, the upper reservoir would have sufficient freeboard to store the entire runoff from a probable maximum precipitation event.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Wolters Kluwer

New access shafts and the existing New Leonard Mine shaft would be used to provide access to the lower reservoir, powerhouse cavern, and transformer hall. Halecrest would excavate approximately 18 million cubic yards of rock for the reservoirs, powerhouse, transformer hall, shafts, penstocks, and tunnels. Roof support may be required in the powerhouse and lower reservoir caverns. Halecrest would use pneumatically-applied concrete, rock bolts, and possibly formed concrete on an as-needed basis to stabilize underground excavations. All the shafts would be fully lined with concrete. Halecrest would construct the upper reservoir as a series of 60-foot-high rock cuts at 45 degrees with 25-foot wide benches to ensure stability of the slopes. The site geology is discussed in Section 3.1.2 of the Final Environmental Impact Statement (FEIS).

At the maximum pool, the lower reservoir would have a water surface elevation of -1,628 feet msl, and a volume of 5,500 acre-feet. At the minimum pool, the lower reservoir would have a water surface elevation of -1,733 feet msl, and a negligible volume. The design of the project facilities is further described in Section 2.1 of the FEIS.

Halecrest has indicated that construction would start approximately 1 year after issuance of a license and the project would be in full commercial operation 7 years after issuance of a license. Article 301 in the license should allow Halecrest ample time to construct the project.

*Project Safety*

The upper reservoir would be constructed entirely by excavating in rock. There would be no embankment of any kind. A perimeter road for maintenance and security patrol would be constructed and the entire reservoir perimeter fenced to prevent unauthorized access.

The upper reservoir would be constructed at the top of an existing hill forming part of the

**[61,431]**

Mount Hope Lake watershed. Hence, the drainage basin for the upper reservoir would be that of the reservoir itself and a cleared area of up to 23 acres, for a total of 78 acres.

The probable maximum precipitation (PMP) for a 72-hour storm is 38.5 inches based on Hydro-meteorological Report (HMR) No. 52. At its maximum water surface elevation, the upper reservoir can store the entire PMP with about 2 feet of freeboard for wave run-up. Additionally, the reservoir could be lowered quickly during an extreme storm event. The maximum turbine discharge capability of approximately 10,400 cfs would far exceed the probable maximum flood discharge into the upper reservoir.

Halecrest has conducted initial studies to assess the stability of the granite rock in the upper reservoir. Geotechnical analysis of the rock in the area shows that the rock is competent, exhibits high strength and low permeability. However, there is a potential for future slope stability problems on the eastern slope of the reservoir. Halecrest proposes to stabilize on an individual basis, any exposed irregular joints that have the potential to form unstable wedges or blocks. This would involve either scaling to remove loose material, or rock mass reinforcement with state-of-the-art rockbolting techniques.

We have reviewed the analysis and underlying assumptions and found the proposed stabilization measures to be adequate for slope stability. Halecrest's analysis, however, should be considered preliminary. Before final analyses can be performed, Halecrest would have to conduct a comprehensive investigation and testing program to determine slope stabilities.

Halecrest has not performed any geotechnical investigation in the powerhouse and the lower reservoir locations at this time. However, based on the general geology of the area and the numerous stable existing mines, we conclude that construction of the underground facilities should not pose safety issues.

The project lies in Seismic Zone 1. We concluded that a design acceleration of about 0.05g is appropriate for all permanent surface structures. The tectonics and seismic activity are discussed in detail in Section 3.1.2.5 of the FEIS. The FEIS concludes that the level of seismic activity in the project area is unlikely to have any significant impact on the project safety. The FEIS also found that reservoir-induced seismicity should not significantly affect the safety of the project structures and the project area.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Halecrest's analyses and our review are preliminary in nature. Before any final analyses can be performed for the upper reservoir and underground structures, Halecrest would have to conduct a comprehensive geotechnical investigation and testing program to determine rock quality, shear strength and other parameters.

The Mount Hope Pumped-storage Project would be a very complex and costly project to design and construct. Because of all the engineering complexities of the project, we are recommending article 305 be included in any license order issued requiring Halecrest to retain an independent board of consultants to review the design and construction of the project.

Currently, the Mount Hope Lake dam is under the jurisdiction of the New Jersey Department of Environmental Protection and Energy (DEPE). The dam has been classified as having a high hazard potential by the U.S. Army Corps of Engineers (Corps) and the DEPE. Licensing the Mount Hope Pumped-storage Project would bring the Mount Hope Lake dam under the jurisdiction of the Commission. The New York Regional Office (NYRO) made a special inspection of the project on February 18, 1992, to evaluate the Mount Hope Lake dam. Based on NYRO observations, the dam may have a lower hazard classification than already assigned by the Corps and the DEPE. However, we cannot modify the existing classification without an appropriate basis.

Accordingly, we need the applicant to conduct a dambreak analysis to assess the downstream hazard potential. If the Commission accepts the dambreak analysis and if the analysis indicates that a change in downstream hazard potential is warranted, we could then modify the existing hazard classification. Therefore, we recommend that special article 306 be included in any license issued which would require the licensee to prepare and file a dambreak analysis with the Director, Office of Hydropower Licensing (OHL).

The Mount Hope Lake dam and the new project-related civil works elements would be subject to Part 12 safety inspection requirements of the Commission's regulations.

We conclude that the project would be safe and adequate if constructed in accordance with sound engineering practice and the terms and conditions of a license.

*Water Resource Planning*

The proposed powerhouse would contain five reversible pump/turbine-generator units rated at 400 MW each for a total installed capacity of 2,000 MW. Each of the units would have a maximum hydraulic capacity of 2,080 cfs in the generating mode and 1,650 cfs in the pumping mode. The combined maximum project hydraulic capacity would be 10,400 cfs in the generating mode and 8,200 cfs in the

**[61,432]**

pumping mode. The gross head would range between a maximum of 2,633 feet and a minimum of 2,428 feet. Average net head for generation is estimated to be 2,594 feet.

The project would generate 2,628 gigawatthours (GWh) of energy annually generating up to 2,000 MW during peak demand periods. The project would be on standby on the weekends. The Mount Hope Project would be capable of providing spinning reserve capacity for a significant portion of the available generating period.

We have reviewed the Mount Hope Project's energy estimate and believe it is reasonable.

The project would operate from a control building located on the surface adjacent to the main power plant access shafts. Load dispatching would be coordinated through the local utility. Local (manual) operation of the units would be available in the powerhouse below ground.

The project would be located off stream with no natural stream runoff contribution to the project's generating capability. Hence, no minimum flow releases are proposed. The operation of the project is discussed in Section 2.1.5 of the FEIS.

We believe the project is properly sized. Sizing of the project and design alternatives are discussed in Section 2.2 of the FEIS.

The 1991 New Jersey Energy Master Plan specifically identifies the Mount Hope Project and suggests that the project could benefit the state. Further, the Plan suggests that due to the project's size and unique

© 2024 CCH Incorporated and its affiliates and licensors.        40        Sep 13, 2024 from VitalLaw®
All rights reserved.

characteristics, the State of New Jersey Board of Regulatory Commissioners may need to review how the project would fit into the overall least-cost planning processes of the state's utilities outside of the established competitive bidding procedures.

There are no competing applications for the project currently pending before the Commission. Approximately 20 parties have filed petitions to intervene in the licensing proceedings. Many of the parties objected to the project in their respective petitions.

Section 10(a)(2)(A) of the Federal Power Act (Act) requires the Commission to consider the extent to which a project is consistent with federal or state comprehensive plans for improving, developing, or conserving a waterway or waterways affected by the project. We have identified two comprehensive plans--the New Jersey Trails Plan and the Outdoor Recreation Plan of New Jersey--that meet the requirements of Section 10(a)(2)(A); however, neither addresses the various resources in New Jersey in relation to the engineering considerations of the hydropower development at the site.

The consistency of the proposed Mount Hope Project with comprehensive and other resource plans is discussed in further detail in Section 5.3 of the FEIS.

The DEPE provided comments on the DEIS and supplement to the DEIS in letters dated February 20, 1990 and July 8, 1991 respectively. The DEPE noted that Halecrest must obtain Section 401 water quality certification, wetlands permits, NPDES permits and approval from Green Acres Program for the use of parklands for transmission line construction. The DEPE subsequently determined in a letter dated January 10, 1992 that 401 water certification did not apply to the project because the project would operate as a closed loop system. We are not conditioning the license to require Halecrest to obtain a state wetlands permit, NPDES permits, and approval from the Green Acres Program because the project would not cause the filling of wetlands, would not discharge to water bodies of the United States, and would fully mitigate for the loss of Green Acres lands.

The state and federal agencies have made no specific comments or recommendations addressing flood control, or navigation. DEPE and the City of Jersey raised concerns regarding potential impact of the project upper reservoir on the water supply to the Rockaway River downstream of the project. We do not expect significant long term impact of the project on the downstream water supply and have addressed the issue in detail in Section 4.1.2 of the FEIS.

In summary, our analyses show that the proposed project adequately develops the hydropower potential of the site and that installation of the additional capacity, beyond that proposed, is not warranted at this time. Based on the agency comments and our own independent studies, we conclude that the Mount Hope Pumped-Storage Project is best adapted to the comprehensive development of the region, from a power development perspective.

*Economic Evaluation*

The proposed project would be economically beneficial, so long as its projected levelized cost is less than that of alternative power.

We have reviewed the construction cost estimate and believe the costs are reasonable.

Halecrest estimates the proposed project could generate a maximum of 2,628 GWh of peaking energy annually. The estimate is based on the assumption that there would be sufficient economical pumping energy available to justify operating the project at a plant factor of 15 percent. Under this scheme of operation, the project would generate at a capacity of from

**[61,433]**

1,000 to 2,000 MW for 5 to 10 hours each weekday.

Halecrest does not have a power sales contract, but has indicated that it plans to sell the project energy storage capability to utilities on a long-term fixed price contract and does not plan to buy and sell energy on a daily basis. Since Halecrest does not have a power sales contract, we evaluated the economic benefits of the project based on the cost of providing alternative peaking and cycling capacity through combustion turbine and combined cycle plants.

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

We made an independent evaluation of the economics of the project by comparing two hypothetical systems, one including the Mount Hope Project and the other with combined cycle and combustion turbines in place of the Mount Hope Project. Both systems would have approximately 6,300 MW of coal units. Details of the systems and their characteristics are discussed in Section 2.5 of the FEIS.

Assuming the project would commence commercial operation in 1999, we compared the net present value of the stream of annual costs of the systems with and without the Mount Hope Project using a discount rate of 11 percent. The economic analysis shows that the cost advantage of the system with Halecrest's proposal is $206 million (1992 dollars) over the alternative for a 50-year analysis. We conducted a sensitivity analysis on the discount rate which indicates that the project would break-even with the alternative system at a discount rate of 15.3 percent.

We also conducted an analysis of the project to assess its financial feasibility. Assuming 100-percent equity, we calculated a rate of return of 10.8 percent for the project. At this level, the investment would be risky and only marginally attractive. However, our economic studies do not account for the significant, but hard to quantify, dynamic operation benefits that would accrue to the purchasing utility system or systems. These dynamic benefits would result from the presence of such a large rapidly-responding hydroelectric storage project in the generating resource mix. We believe that if the value of the dynamic benefits are considered in power sales contract negotiations, the value of the project power will be greater than we calculated, and the project would be shown to be a fairly secure and attractive investment.

We performed sensitivity studies of the project's projected rate of return in order to get a better understanding of the project's development potential. We evaluated numerous cases with various combinations of assumptions, including various investor contributions to equity, various interest rates, and various fuel prices. Our sensitivity studies show that the project's 100-percent-equity rate of return could go as low as about 8 percent, and the 80-percent-leveraged rate of return could be as high as about 17 percent. The results of the sensitivity studies are shown in Section 2.5 and Appendix A of the FEIS.

While our 50-year economic and rate-of-return studies show that the project would be economically beneficial and potentially financially feasible, there is a very real possibility that the project would not be constructed if licensed.

In the 1980's, some utilities entered into long-term power purchase agreements when projections of the escalation of future fossil fuel costs were significantly higher than they are now. They are now having to pay more for their long-term contract power than they would be on a pay-as-you-go basis. Therefore, utilities may be reluctant to enter into long-term power-purchase agreements. We don't believe it's possible to finance a $1.88-billion power project, such as the Mount Hope Project, that has a projected 100-percent-equity rate of return of about 8 to 11 percent, without a long-term power purchase agreement or guarantee. If the project could not be financed, then the project construction could not be completed and the licensee would have to surrender the project license, for failure to construct the project within the time constraints of the license.

Halecrest has begun excavating in the upper reservoir area under a state permit to quarry stone. This activity does not require a project license and is separable from project development.

In order to protect the environment from any unnecessary disturbance that is inseparably associated with the project development, we are including a special article 307 in the license requiring the licensee to file a financing plan for Commission approval before any project construction or inseparable ground-disturbing activities begin (other than that required for subsurface site exploration). Such a financing plan would have to include proof that the licensee has the funds necessary, or has a commitment for the funds necessary, to complete the project construction.

We conclude that the proposed project would be economically beneficial based on the projected alternative energy costs of utilities in the region, and the project would be potentially financially feasible. The financial feasibility of the project would be ultimately determined by Halecrest's efforts to secure project financing, favorable construction bids, and power sales contracts with utilities.

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



**[61,434]**

*Exhibits*

The following portions of exhibit A and the exhibit F drawings conform to the Commission's rules and regulations and are approved and made a part of the license:

*Exhibit A* - The following sections of the exhibit A filed on March 31, 1992:

Section A.3, pages A-8 and A-9, entitled "Turbines/ Generators"; Section A.4, page A-9, entitled "Primary Transmission Lines"; and Section A.5, pages A-9 and A-10, entitled "Appurtenant Equipment".

*Exhibit F* - The following drawings of exhibit F filed on August 7, 1991, and March 31, 1992:

```
Exhibit FERC No.        Showing


  F-1   9401-10  General Plan -


                 Conceptual Facilities


  F-2   9401-11  Plan of Upper


                 Reservoir


  F-3   9401-12  Sections of Upper


                 Reservoir


  F-4   9401-18  Cross-Section of


                 Surface and


                 Underground


                 Facilities


  F-5   9401-14  Machine & Transformer


                 Halls - Plan


  F-6   9401-15  Machine & Transformer


                 Halls - Sections


  F-7   9401-16  Tunnels and Caverns -


                 Sections and Profile
```

*Preparers*

Krish G. Krishnan, Civil Engineer

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Sep 13, 2024 from VitalLaw®



Wayne M. Dyok, Civil Engineer

## -- Footnotes --

**[61,398]**

---

**Footnotes**

1  16 U.S.C. §§791 (a)-823(b) (1988).

2  Two competing applications for a preliminary permit, filed by Energy Storage Corporation and Esperanza Power Limited Partnership, were dismissed without prejudice by unpublished orders issued on February 9, 1987. *See* 38 FERC ¶61,312 (1987). In this order we deny them.

3  The project, as licensed herein, consists of: (1) a new 57-acre upper reservoir; (2) a 2,800-foot-long intake shaft bifurcating into five 11-foot-diameter penstocks; (3) an underground powerhouse with a total installed capacity of 2,000 MW; (4) a lower reservoir; (5) two parallel 10.6-mile-long, 500-kilovolt (kV) transmission lines; and (6) appurtenant facilities. As discussed below, the project boundary encompasses several parcels of land owned by Halecrest that it will lease out for recreational purposes.

4  The intervenors are listed in Appendix A to this order.

5  Mount Hope Lake is an existing 190-acre man-made lake that was created in the 1940s.

6  Surface mining of iron ore at the site of the proposed project began in the colonial era. Underground mining began before 1855 and continued with minor interruption until 1959. It briefly resumed for a year in 1977-1978. The New Leonard Mine complex represents the last stage of this industrial tradition. It was active from the 1940s to the 1970s. The New Leonard Mine shaft is 2,700 feet deep, and connects with mine workings at various levels. *See* the Final Environmental Impact Statement (FEIS, identified and discussed below) at pp. 3-9 to 3-11 and 3-67 to 3-70.

7  The New Leonard Mine shaft would be used as a busbar shaft. FEIS at p. 4-4.

8  *See* FEIS at pp. 2-1 to 2-6.

**[61,399]**

9  58 FERC ¶61,335 .

10  On April 16, 1992, Rockaway Township filed a letter withdrawing its motion to dismiss the application.

11  16 U.S.C. §797 (e) (1988).

12  Sections 3(1) and 3(2) of the FPA, 16 U.S.C. §796 (1) and (2) (1988), define "public lands" and "reservations" as follows:

(1) "public lands" means such lands and interest in lands owned by the United States as are subject to private appropriation and disposal under public land laws. It shall not include "reservations," as hereinafter defined;

(2) "reservations" means national forest, tribal lands embraced within Indian reservations, military reservations, and other lands and interests in lands owned by the United States, and withdrawn, reserved, or withheld from private appropriation and disposal under the public land laws; also lands and interests in lands acquired and held for any public purposes; but shall not include national monuments or national parks.

13  The arsenal had previously participated in the environmental review process. *See*, *e.g.*, the letters from Peter J. Rowland, Chief, External Affairs, Picatinny Arsenal, to Lois D. Cashell, the Commission's Secretary, dated June 28, 1991, and April 10, 1992, expressing comments on the SDEIS and the FEIS, respectively. Also, as noted in the Director's June 3, 1992 letter to General Holmes, the arsenal cooperated with Halecrest in the latter's preparation of a wetlands delineation study of the proposed transmission line right-of-way.

**[61,400]**

14  Letter from William R. Holmes, Brigadier General, U.S. Army, to the Commission's Secretary, June 26, 1992. The letter does not express any opposition to the pumped storage project.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



The arsenal contains laboratories for testing munitions. The only portion of the project that will be on the arsenal's property is the transmission line, which will run along the northern and eastern edge of the arsenal.

16 U.S.C. §803 (a)(1) (1988).

**[61,401]**

The results of the sensitivity studies are shown in section 2.5 and Appendix A of the FEIS.

In 1772, ironmaster John Jacob Faesch constructed the Mount Hope Furnace, which became an important source of American munitions during the Revolutionary War. The Ford-Faesch Manor House, the ironmaster's residence, is located immediately outside the project boundary. This structure is the only cultural resource in the area currently listed on the National Register of Historic Places (FEIS at p. 3-67).

**[61,406]**

After the FEIS was published, Halecrest provided to the Commission previously unavailable information concerning the number of months required to sell homes in Rockaway Township that are similar to those in the project impact area during a non-recessionary period. Based on this information, we believe that Halecrest should be required to offer to purchase homes that (1) have been listed "Available for Sale" for at least five months rather than four months, and (2) cannot be sold for their 1992 fair market value.

**[61,409]**

33 U.S.C. §1341(a)(1). Section 401(a)(1) states in pertinent part:

Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with the [water quality] provisions of this Act. . . . If the State . . . fails or refuses to act on a request for certification, within a reasonable period of time (which shall not exceed one year) after receipt of such request, the certification requirements of this subsection shall be waived with respect to such Federal application. No license or permit shall be granted until the certification required by this section has been obtained or has been waived as provided in the preceding sentence. . . . The Clean Water Act defines "navigable waters" as "waters of the United States, including the territorial seas." 33 U.S.C. §1362(7).

On August 17, 1989, the Director, Office of Hydropower Licensing, sent a letter to the attorney for Rockaway Township indicating that New Jersey had waived the water quality certification requirement by not acting on Halecrest's May 22, 1985 application for certification within one year of its filing. That application for certification, however, was for the project as originally proposed, using Mount Hope Lake as the upper reservoir. When Halecrest subsequently amended its proposal to substitute the upland alternative, the Commission's staff advised Halecrest that the waiver did not apply to the upland alternative, which used an entirely different upper reservoir. *See*, *e.g.*, the Director's March 15, 1991 letter to Halecrest.

*See* letters to Frank S. Fisher, President, Mt. Hope Hydro, Inc., from Lawrence Schmidt, Administrator, Office of Program Coordination, New Jersey DEPE, dated January 10, 1992, and from Robert A. Tudor, Administrator, Land Use Regulation Program, New Jersey DEPE, dated March 12 and April 10, 1992.

**[61,410]**

Emphasis is in the original letter.

The first sentence of Article 413 requires Halecrest to file for Commission approval, prior to the start of transmission line construction, "a plan . . . to avoid affecting wetlands by prohibiting any filling of or placement of transmission towers in wetlands within the ROW [right-of-way]."

If Halecrest subsequently determines that it needs to discharge fill into New Jersey waters or wetlands in order to complete its construction of the project, then Halecrest will need to file an application to amend the license, and such an application for amendment would have to be accompanied by evidence that New Jersey had granted or waived water quality certification for such discharge.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



26 [58 FERC at pp. 62,074](#) -75.

**[61,412]**

27 Lake Denmark Bog is described on p. 3-38 of the FEIS.

28 FEIS at pp. 2-22 through 2-27.

**[61,413]**

29 FEIS at pp. 4-32 and 33, and 5-4.

30 *Mt. Hope Development Associates v. Mt. Hope Mining Company, et al.*, Chancery Division, Docket No. MRS C-262-91.

31 Petition at p. 5. The court indicated, in effect, that the lawsuit could be reinstituted if and when the Commission issued a final order in the license proceeding.

32 *Id.* at p. 12.

33 Answer at pp. 2-3.

34 [16 U.S.C. §814](#)  (1988).

35 *See*, *e.g.*, *New York Irrigation District*, [46 FERC ¶61,379 at p. 62,183](#) (1989) (Commission is not the proper forum to adjudicate allegations of breach of contract and breach of fiduciary duty); *Mary C. Heather and Joseph A. Guerrieri*, [54 FERC ¶61,329](#)  (1991) (Commission is not the proper forum in which to resolve dispute over title to land). *Cf. Clifton Power Corporation*, [39 FERC ¶61,117 at pp. 61,455](#) -58 (1987) (fitness of applicant to hold license).

36 *See* Section 313 of the FPA, [16 U.S.C. §825](#) l (1988).

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.