VitalLaw®



# [166 FERC to 187 FERC, Ampersand Cranberry Lake Hydro, LLC, Project No. 9685-036, 179 FERC ¶61,037, FERC (Federal Energy Regulatory Commission), (Apr. 21, 2022)](#)

166 FERC to 187 FERC
Project No. 9685-036
166 FERC to 187 FERC ¶61,037

[Click to open document in a browser](#)

p. 61,373

Ampersand Cranberry Lake Hydro, LLC,

Project No. 9685-036

Order Assessing Penalty

April 21, 2022

Before Commissioners: Richard Glick, Chairman; James P. Danly, Allison Clements, Mark C. Christie, and Willie L. Phillips.

1.    In this order, we find that Ampersand Cranberry Lake Hydro, LLC (Ampersand Cranberry Lake or Respondent), licensee for the Cranberry Lake Project No. 9685 (Project), violated Article 5 of the project's license by failing to retain the possession of all project property covered by the license. In light of the violation of Article 5 resulting from Respondent's deliberate decision to abandon all project property, we find that it is appropriate to assess a civil penalty of $600,000.

## I. Background

### A. *The Cranberry Lake Project*

2.    The Cranberry Lake Project is located immediately upstream of Cranberry Lake on the Oswegatchie River in the Town of Clifton, St. Lawrence County, New York. The project consists of: (1) a concrete gravity spillway; (2) an earthen embankment with a fuse plug emergency spillway section; (3) a 57,400 acre-foot reservoir; (4) a short power channel canal; (5) a powerhouse with a 595-kilowatt (kW) generator; (6) a gate structure with two low level outlets; (7) a sluiceway and two stop log openings; and (8) an access road. [1]

3.    The dam was originally constructed in 1917 and modified in 1956 and 1985. The fuse plug emergency spillway was constructed in 1992. The purpose of the project is to regulate river flows and lake levels for downstream water supply, recreation, and flood control, and to provide hydroelectric power generation.

4.    On April 27, 1987, the Commission issued an original license for the project to Trafalgar Power, Inc, which operated the project under a lease agreement with the Oswegatchie River-Cranberry Reservoir Regulating District Corporation (OR-CRRDC) – a New York state municipal corporation and the owner of the dam. [2] After the project fell into disrepair, [3] Trafalgar Power, Inc. (trans

p. 61,373
------
p. 61,374

feror) and Ampersand Cranberry Lake (transferee) filed an application to transfer the project's license. The Commission approved the transfer of the license to Ampersand Cranberry Lake on March 12, 2015. [4] Ampersand Cranberry Lake operated the project under a lease agreement with OR-CRRDC (Lease Agreement) until July 6, 2021 when the parties executed a Settlement and Release Agreement that terminated the lease.

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

 Wolters Kluwer

5.    Commission staff have classified the project's dam as having a high hazard potential, which means that a failure of the project works would result in a probable loss of human life or economic or environmental losses. [5]

**B. *Procedural History***

6.    On October 21, 2021, the Commission issued an Order to Show Cause and Notice of Proposed Penalty to Ampersand Cranberry Lake relating to its apparent violation of Article 5 of the Cranberry Lake Project license by failing to retain the possession of all project property covered by the license. In the Order to Show Cause, the Commission directed Ampersand Cranberry Lake to provide an answer within 30 days, pursuant to Rule 213(a) of the Commission's Rules of Practice and Procedure, and show cause why the Commission should not assess a $600,000 civil penalty. [6] The Commission, under Rule 213(c), required Ampersand Cranberry Lake in its answer to provide "a clear and concise statement regarding any disputed factual issues and any law upon which they rely" [7] and "to the extent practicable, admit or deny, specifically and in detail, each material allegation and set forth every defense relied upon." [8] The Order to Show Cause noted that, under Rule 213(a), the Office of Enforcement (Enforcement staff) may reply to Ampersand Cranberry Lake's answer within 30 days of the filing of the answer. [9] The Order to Show Cause also provided Ampersand Cranberry Lake 30 days, establishing January 8, 2022, as the deadline, to decide whether it was going to elect to have the procedures set forth in section 31(d)(3) of the Federal Power Act (FPA) [10] apply for a prompt penalty assessment by the Commission. [11]

7.    On November 22, 2021, Ampersand Cranberry Lake filed its answer to the Order to Show Cause. [12] In its Answer, Ampersand Cranberry Lake elected to have the procedures set forth in section 31(d)(3) of the FPA apply [13] to this proceeding. [14]

8.    On December 22, 2021, Enforcement staff filed its reply to Ampersand Cranberry Lake's answer. [15]

9.    On January 20, 2022, Ampersand Cranberry Lake filed a motion for leave to answer Enforcement staff's Reply and an answer. [16] The Commission's regulations do not permit an answer to be filed in response to an answer unless ordered by the decisional authority. [17] The Commission declines to waive this provision here, and this pleading is therefore rejected.

**II. Findings of Fact**

10.    The conduct underlying the instant violation is interrelated with both a known dam safety issue and a longstanding dispute between Ampersand Cranberry Lake and OR-CRRDC over who was responsible for the costs of such repairs under the Lease Agreement. Each is discussed below.

**A. *Ampersand Cranberry Lake's Dispute With OR- CRRDC***

11.    As part of its 2014 application for approval of transfer of license, Ampersand Cranberry Lake committed to complete certain dam safety works, including the rehabilitation of the project's fuse plug spillway (fuse plug) in the dam's embankment. [18]

p. 61,374

p. 61,375

12.    In 1992, an emergency fuse plug spillway section was constructed in the earthen embankment adjoining the right abutment of the concrete spillway to provide additional spillway capacity during extreme floods. [19] During a high-water event, the fuse plug is designed to sacrificially fail to prevent overtopping of the reservoir's main dam and save more critical project works from failing. [20]

13.    During its review of the transfer application, Commission staff instructed Ampersand Cranberry Lake to provide additional information demonstrating its ability to meet the project's financial obligations including "repair or replacement of project facilities." [21] In response, Ampersand Cranberry Lake submitted a letter stating that it

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Exhibit 13B
Page 2 of 19

was part of a diversified business group with approximately $28 million in assets and annual revenues in excess of $10 million. [22] In the same letter, Ampersand Cranberry Lake represented that, if granted the license, it "will be positioned to access funding necessary to operate and maintain the Project safely and in accordance with its respective license." [23]

14.    In its 2014 application for transfer of license, Ampersand Cranberry Lake committed to complete work on the fuse plug by the second quarter of 2017. [24] In September 2016, Ampersand Cranberry Lake "received an updated cost estimate for proposed rehabilitation of Cranberry Lake Dam and concluded that the repairs [would] be more expensive than originally thought" after estimating the full cost of rehabilitation to be over $350,000. [25]

15.    At the same time, Ampersand Cranberry Lake reached out to OR-CRRDC to discuss revising the financial terms of the Lease Agreement. [26] In a letter dated September 29, 2016, Ampersand Cranberry Lake notified OR-CRRDC of the $350,000 cost estimates to rehabilitate the fuse plug. Calling the fuse plug issue a "driver for renegotiation of the lease," OR-CRRDC explained that it was "not convinced that this expense should be the responsibility of the lessee." [27] In the same letter Ampersand Cranberry Lake also disputed OR-CRRDC's assertions that it owed OR- CRRDC $5,000 for rent, proposed reducing the lease payment to 2.5% of previous years' gross revenues - equaling $87 for 2015, requested a refund in the amount of $4,913, and insisted that OR-CRRDC's water tax assessment in the amount of $2,674.29 be deducted from the refund.

16.    On July 13, 2017, Ampersand Cranberry Lake sent another letter to OR-CRRDC, stating that: (1) if the Commission requires it to repair the fuse plug, "the lease should be reduced to $1 a year, throughout the construction period and for a period of 20 years thereafter;" (2) the annual lease payment during "normal operations" should be reduced to "2% of previous years' gross revenues capped at $5,000 a year;" and (3) its 2016 water tax assessment should be deducted from the $5,000 payment it made in 2015. [28] Ampersand Cranberry Lake also stated that, if the Commission required it to repair the fuse plug, Ampersand Cranberry Lake might surrender its license, forcing OR- CRRDC to bear the cost of repairing the fuse plug:

> Should FERC fail to consider [Ampersand Cranberry Lake]'s objections and issue a final order, [Ampersand Cranberry Lake] will be forced to cope with a financially daunting task, which will require investing over $350,000. In other words, the investments required to keep the plant in service would far exceed the current value of the station. Were [Ampersand Cranberry Lake] to find that making such an investment was commercially unreasonable, the cost could end up being the responsibility of the Corporation should [Ampersand Cranberry Lake] decide to surrender its license. [29]

17.    Ampersand Cranberry Lake sent emails to OR-CRRDC on September 11, 2017 and February 12, 2018 requesting, respectively, feedback on its letter and a phone call to discuss the issues it raised. [30] A call between Ampersand Cranberry Lake and OR-CRRDC took place on March 7, 2018. [31]

18.    On March 16, 2018, Ampersand Cranberry Lake sent another letter to OR-CRRDC proposing revisions to the Cranberry Lake Dam Lease Agreement. [32] Ampersand Cranberry Lake stated

p. 61,375

p. 61,376

that it might surrender its license if OR-CRRDC did not provide financial support for repairing the fuse plug:

> On another note, in a February 27th, 2018 letter …. [Ampersand Cranberry Lake] was requested by FERC to proceed with the remediation of the existing fuse plug because of the potential impact a failure to function could have on downstream residences. Total cost associated with this project is currently estimated at $350,000, which far exceeds the current value of the hydropower station. This investment is likely to significant[ly] endanger the financial viability and the very existence of the

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

project. Without financial support, complying with FERC's requirement could force the company to surrender its license or file for bankruptcy. [33]

19.    On June 12, 2018, Ampersand Cranberry Lake sent another letter to OR-CRRDC proposing revisions to the Cranberry Lake Lease Agreement. [34]

20.    On January 28, 2019, OR-CRRDC filed a complaint in New York state court alleging that Ampersand Cranberry Lake had failed to pay minimum rent (for two years), water tax, and interest as required by the Cranberry Lake Dam Lease Agreement. [35] It sought damages of $16,471.68 or, as an alternative, an order evicting Ampersand Cranberry Lake from the lease property.

**B. *Ampersand Cranberry Lake's Communications with the Commission***

21.    While Ampersand Cranberry Lake was seeking to renegotiate the Lease Agreement with OR-CRRDC, it was in discussions with Commission staff about repairing the fuse plug. In the close to five years between when Ampersand Cranberry Lake acquired the Project license to when OR-CRRDC filed its lawsuit, Ampersand Cranberry Lake failed to obtain Commission staff approval of a design and plan for replacing the fuse plug. As detailed below, discussions between Ampersand Cranberry Lake and Commission staff about repairing the fuse plug continued after OR- CRRDC filed its lawsuit and Commission staff informed Ampersand Cranberry Lake that it must complete all repairs before seeking to transfer or surrender its license.

22.    On January 16, 2020, Ampersand Cranberry Lake disclosed to the Commission that OR- CRRDC had filed a complaint seeking termination of the project's lease and an order directing Ampersand Cranberry Lake to vacate the project premises. [36] Ampersand Cranberry Lake asserted to Commission staff that, if the license were to be terminated, OR-CRRDC would be responsible for the fuse plug modification. Ampersand Cranberry Lake asked for a 60-day extension of existing deadlines (which included deadlines to prepare design and construction documentation for fuse plug replacement) to resolve its legal disputes with OR-CRRDC.

23.    The Regional Engineer granted an extension in a letter dated March 31, 2020, citing the COVID-19 pandemic, and gave Ampersand Cranberry Lake until May 15, 2020, to submit required design and construction documentation related to the fuse plug work. [37] He indicated that no further extensions would be granted and added: "As the licensee, you are responsible for addressing all project safety related matters at the project … The responsibility of addressing the dam safety issue related to the fuse plug is the responsibility of Ampersand." [38]

24.    Ampersand Cranberry Lake provided some design and construction documentation on May 19, 2020, and reported that OR-CRRDC had rejected its settlement offer and was pursuing termination of the lease. [39]

25.    On July 23, 2020, Kimberly Nguyen, Environmental and Project Review Branch Chief for the Division of Hydropower Administration and Compliance (DHAC), notified Ampersand Cranberry Lake that Commission staff had rejected its submitted documentation as being inadequate and required Ampersand to submit revised documentation within 30 days. [40] With respect to the property rights issue, Ms. Nguyen wrote:

> In the event that the project lease with the dam owner is terminated, you would be in violation of Article 5 and subject to appropriate Commission compliance actions. Given this information, it is imperative that you continue to work with the current dam owner to retain the necessary property rights under Article 5 throughout your license term, including the rights necessary to replace the fuse plug spillway and complete other required repairs to the project. [41]
>
> In order to ensure that you are taking appropriate actions to comply with Article 5 to safely operate and maintain the project, please file within 30 days from the date of this letter, a detailed progress report of your compliance with this article. This report must include: (1) a description of the current

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



> effective status of your lease with the dam owner; (2) a description of all specific steps/actions you have taken, since your January 16, 2020 filing, to retain the
>
> ---
> p. 61,376
> ---
> p. 61,377
>
> necessary property rights; and (3) your plan and schedule to implement the future steps/actions necessary to retain the necessary rights under the lease, including any actions that may be necessary should the lease be terminated. [42]

26.    Ampersand Cranberry Lake responded on August 27, 2020, writing that the COVID-19 pandemic had slowed its consultant's progress on the design and construction documents and that it did not anticipate being able to provide final versions of those documents before December 15, 2020. [43] It also reported that it continued to be unable to make any progress in its negotiations with OR- CRRDC and provided a summary of all steps that it had taken since January 15, 2020 to resolve the matter-which were limited to sending two settlement letters, one of which remained outstanding. [44] It closed the report by writing:

> [Ampersand Cranberry Lake] is hopeful that our latest proposal will entice the Regulating District to start a conversation. In case of lease termination however, [Ampersand Cranberry Lake] will be compelled to abide by the terms of the lease and transfer all relevant existing equipment and machinery to the Regulating District at no cost. In that case, [Ampersand Cranberry Lake] will also be forced to either surrender the license or transfer it to the Regulating District. [45]

27.    On October 19, 2020, noting "the extensive delays surrounding the fuse plug spillway," Ms. Nguyen ordered Ampersand Cranberry Lake to submit construction documents in December 2020; start construction by June 30, 2021; and complete construction by December 31, 2021. [46] She added:

> Based on our review of your August 28 filing and our expectation that you will meet the above D2SI-NYRO schedule for completing the necessary dam safety repairs, we find you in compliance with Article 5 at this time.
>
> However, in the event that the project lease with the dam owner is terminated and/or if you are unable to complete the above dam safety repairs due to the on-going dispute ( i.e., unable to access the leased property to complete the required work), you would be in violation of Article 5 and subject to appropriate Commission compliance actions. Given this information, it is imperative that you continue to work with the current dam owner and/or take any other lawful actions necessary to retain the necessary property rights under Article 5 throughout your license term, including the rights necessary to replace the fuse plug spillway and complete other D2SI-NYRO required repairs to the project.
>
> You stated that negotiations over your lease will begin soon. Alternatively, you suggest that it may be necessary for you to transfer the license to the dam owner or surrender the license in the future. Be aware that any application to transfer or surrender your project license would have to be approved by the Commission. Further, all dam safety repairs including the necessary modifications to the fuse plug spillway must be completed prior to your submittal of a transfer or surrender application. [47]

She directed Ampersand Cranberry Lake to file a status report on the lease issue by December 1, 2020, discussing the steps that it has taken to retain the necessary property rights and its plans and schedule for future steps to retain those rights. [48]

© 2024 CCH Incorporated and its affiliates and licensors.    5    Sep 13, 2024 from VitalLaw®
All rights reserved.

 **Wolters Kluwer**

28.  Ampersand Cranberry Lake submitted the required design documents in December 2020. [49] That submission also purported to provide the status report on the lease issue, which did not identify any specific steps that it had taken to retain necessary property rights nor plans for future steps:

> As of December 1, 2020, Ampersand Cranberry Lake Hydro still has control over the lease and is continuing to operate the Cranberry lake hydro according to its license. However, recent discussions with counsel of the Regulating District, confirmed the likelihood that the ongoing lawsuit will be resolved with a termination of the lease and the obligation of Ampersand Cranberry Lake to vacate the property, and turn over the equipment and machine to the Regulating District per the termination conditions. This is still a fluid situation with further updates expected by the end of this week of November 30, 2020.

29.  On January 28, 2021, Robert Fletcher, Chief of the DHAC Land Resources Branch, responded to that update, referencing a January 21, 2021 telephone conversation in which Ampersand Cranberry Lake "confirmed that the current status of this matter has not changed." [50] He continued:

> Based on our review of your December 2, 2020 filing, we find that you remain in compliance with Article 5 at this time. Please note that should the project lease be terminated and/or if you are unable to complete the fuse plug spillway modifications due to the on-going lease dispute, you would be in violation of Article 5
>
> ------------------------------------------------------------------------------------------------- p. 61,377
> p. 61,378
>
> and subject to appropriate compliance actions. In order for us to monitor the situation, please keep us informed of any changes regarding your lease with the dam owner.

He repeated Commission staff's earlier reminder that "any application to transfer or surrender your project license would have to be approved by the Commission. Further, all dam safety repairs including the necessary modifications to the fuse plug spillway must be completed prior to your submittal of a transfer or surrender application." [51]

30.  Ampersand Cranberry Lake submitted pre- construction documents for the fuse plug and embankment work on April 7, 2021. [52] The next week, on April 16, 2021, Ampersand Cranberry Lake requested that all preconstruction work be delayed by 90 days because OR-CRRDC had proposed to immediately terminate the lease and Ampersand Cranberry Lake needed "sufficient time to work with [OR-CRRDC] toward a definite and acceptable outcome with respect to the outstanding issues between the parties." [53] Commission staff did not respond to that request.

31.  On July 6, 2021, Ampersand Cranberry Lake and OR-CRRDC executed a Settlement and Release Agreement resolving the New York State litigation. [54] Pursuant to that agreement, OR- CRRDC relinquished claims to, among other things, outstanding rental and water tax payments in exchange for Ampersand Cranberry Lake's agreement to terminate the lease and to convey by quitclaim sale to OR-CRRDC "all equipment, furniture, fixtures, and assets currently used by Lessee to operate the Project." [55]

32.  On July 21, 2021, OR-CRRDC filed a notice with the New York State court that it was discontinuing the litigation with Ampersand Cranberry Lake. [56] It did so before any orders were issued in that litigation.

33.  On July 29, 2021, Ampersand Cranberry Lake called Commission Regional Office staff and reported that OR-CRRDC had terminated the lease and that OR-CRRDC had revoked Ampersand Cranberry Lake's access to the Project Site as of July 25, 2021, with both Ampersand and OR- CRRDC signing that termination. [57] At OR-

© 2024 CCH Incorporated and its affiliates and licensors.    6    Sep 13, 2024 from VitalLaw®
All rights reserved.



CRRDC's request, Ampersand Cranberry Lake surrendered the keys and access equipment for the dam and powerhouse and no longer has physical access to either one. [58] Ampersand Cranberry Lake represents that it was told that OR-CRRDC was working with National Grid to de-energize the powerhouse. [59] At the time of that telephone call, Commission staff was reviewing Ampersand Cranberry Lake's pre-construction documents.

34.    Ampersand Cranberry Lake has not performed any work on the outstanding fuse plug and embankment work since it lost possession of the project works.

### III. Determination of Violation

35.    Article 5 of the Project license states, in pertinent part:

> The Licensee or its successors and assigns shall, during the period of the license, retain the possession of all project property covered by the license as issued or as later amended, including the project area, the project works, and all franchises, easements, water rights, and rights of occupancy and use ….

36.    On July 29, 2021, Ampersand Cranberry Lake notified Commission staff that it had lost possession of the project works as of July 25, 2021. In its Answer, Ampersand Cranberry Lake "concedes that it is technically in violation of Article 5." [60]

#### A. *Defense: Alleged Involuntary Relinquishment of Project Property*

37.    Although Ampersand Cranberry Lake does not dispute that its actions constitute a violation of Article 5, it claims that the violation was caused by "circumstances beyond its control." [61] Specifically, Ampersand Cranberry Lake argues that it did not "voluntarily" enter into the Settlement and Release Agreement with OR-CRRDC in which it relinquished access to the Project property. [62] In support of this claim, Ampersand Cranberry Lake asserts that it "had no choice" but to enter into the settlement because OR-CRRDC had rejected its "efforts to resolve the contractual dispute." [63] Because it did not "voluntarily" violate Article 5, Ampersand Cranberry Lake argues that "the appropriate remedy in this case is immediate

p. 61,378
p. 61,379

termination of the license and transition of the [OR-CRRDC] Dam to state jurisdiction," not a civil penalty. [64]

38.    Enforcement staff argues that Ampersand Cranberry Lake "voluntarily entered into that settlement agreement and had multiple options available to it that did not require abandoning its property rights, even if it believed that OR- CRRDC's demands were unreasonable or legally incorrect." [65] Enforcement staff asserts, for example, that Ampersand Cranberry Lake could have paid the rent and tax payments it owed into escrow while the parties attempted to resolve their dispute or could have continued to litigate the matter in court. [66] Enforcement staff also asserts that "there is no evidence in the record that those rights were taken by force or under duress—Respondent entered into an arms-length contract to trade its property rights for economic value, in violation of Article 5 of its license." [67] Enforcement staff also notes that had Ampersand Cranberry Lake actually believed it had been forced to execute the Settlement and Release Agreement, it could have asked a court to void the settlement on grounds of duress, but it has not done so.

39.    As an initial matter, we are not persuaded that Ampersand Cranberry Lake's decision to settle the lawsuit brought by OR-CRRDC and relinquish possession of the Project property to OR- CRRDC was "involuntary." If Ampersand Cranberry Lake had "legitimate arguments," as it claims, it could have litigated its dispute. Instead, it chose to terminate the lease and relinquish possession of the Project property in exchange for OR-CRRDC's agreement to relinquish its claims to, among other things, outstanding rental and water tax payments. Further, Ampersand Cranberry Lake's prior correspondence with OR- CRRDC makes clear that it had a significant



incentive to agree to terminate the Lease Agreement: doing so allowed it to avoid spending $350,000 to repair the fuse plug (an amount that dwarfed the less than $16,500 sought in the lawsuit). Indeed, Ampersand Cranberry Lake had previously told OR-CRRDC that it intended to surrender its Project license and shift the cost of repairing the fuse plug onto OR-CRRDC if it did not renegotiate the Lease Agreement. [68]

40.    We also agree with Enforcement staff that there is no evidence in the record that Ampersand Cranberry Lake's property rights were taken by force or under duress. If Ampersand Cranberry Lake believes it was forced to execute the settlement, it should seek to void the settlement on grounds of duress. Because Ampersand Cranberry Lake has not taken steps to do so or even indicated that it plans to do so, we will not excuse Ampersand Cranberry Lake from its license obligations based on its unsupported claim that it did not voluntarily exchange its property rights for economic value.

### IV. Determination of Remedy

41.    Having concluded that Ampersand Cranberry Lake violated Article 5 of the Project license, we now must determine the appropriate remedies to assess.

42.    Section 31(c) of the FPA [69] states that "[a]ny licensee, permittee, or exemptee who violates or fails or refuses to comply with any rule or regulation under this subchapter, any term, or condition of a license, permit, or exemption under this subchapter … shall be subject to a civil penalty in an amount not to exceed $10,000 for each day that such violation or failure or refusal continues." Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, [70] as of the date of this order, the maximum penalty has been increased to $25,075 per-day for each violation. [71]

43.    A total of 270 days have elapsed since Ampersand Cranberry Lake lost possession of Project property (as defined by the license). At $25,075 per-day, the maximum civil penalty for this violation as of today is $6,770,250.

44.    Ampersand Cranberry Lake contends in its Answer that the appropriate remedy in this case is termination of its license by either "constructive termination" or implied surrender, not a civil penalty. [72] Each of these options is discussed below.

**A. *Constructive Termination of the License***

   **a. *Show Cause Answer***

45.    Ampersand Cranberry Lake contends that "[d]ue to circumstances beyond its control, and against its wishes, [it] lost possession and access to the [Cranberry Lake] Dam." [73] Ampersand Cranberry Lake states that it "consequently no longer has any interest in the Project properties, or any ability to take action with respect to them." [74] Ampersand Cranberry Lake therefore argues that termination of the Lease Agreement or OR-CRRDC's repossession of the Project property resulted in the "constructive termination" of the license effective July 25, 2021.

p. 61,379
p. 61,380

   **b. *Enforcement Staff Reply***

46.    Enforcement staff asserts that the Commission does not recognize the constructive termination of licenses, and the FPA does not allow licensees to terminate their own licenses. [75] Enforcement staff notes that Section 6 of the FPA allows surrender of a license "only upon mutual agreement between the licensee and the Commission after thirty days' public notice." [76] Enforcement staff argues that "[t]he Commission never agreed to accept surrender of Respondent's license, and surrender would have been particularly inappropriate here in light of Respondent's outstanding dam safety obligations." [77] Enforcement staff also argues that allowing Ampersand

© 2024 CCH Incorporated and its affiliates and licensors.    8    Sep 13, 2024 from VitalLaw®
All rights reserved.

Cranberry Lake to terminate its license here would create a "troubling precedent." [78] Enforcement staff explains that, if Ampersand Cranberry Lake were "allowed to terminate its license simply jettisoning its property rights, any licensee who finds the burdens of its license to be inconvenient or undesirable would be able to do the same." [79]

### c. *Commission Determination*

47.  We agree with Enforcement staff that a license may only be terminated upon mutual agreement between the licensee and the Commission; that is, in fact, what the statue expressly provides. [80] Here, Commission staff repeatedly and consistently informed Ampersand Cranberry Lake that terminating its Lease Agreement with the dam owner would constitute a violation of Article 5 as described above. At no point did Commission staff indicate that termination of the Lease Agreement would result in termination of Ampersand Cranberry Lake's license and its obligations thereunder; nor, under the statute, could Commission staff conclude otherwise. [81] On the contrary, Commission staff repeatedly informed Ampersand Cranberry Lake that it would be in violation of its license if it failed to maintain access to the Project property and that it had to complete all repairs before seeking to surrender its license.

48.  Given these circumstances, we find that Ampersand Cranberry Lake's license was not "constructively terminated." Ampersand Cranberry Lake was on notice that its failure to maintain access to the Project property would cause it to violate Article 5 of its license. Ampersand Cranberry Lake cannot shirk its license obligations, and ignore Commission staff's directives, by entering into an agreement that effectively renders it incapable of carrying out its license obligations.

### B. *Implied Surrender of the License*

### a. *Show Cause Answer*

49.  Ampersand Cranberry Lake alternatively argues that, if the Commission does not find that its license was constructively terminated, it should find that the lease termination and loss of access to the Project property "resulted in the constructive abandonment and implied surrender of the license." [82]

50.  Ampersand Cranberry Lake states that the implied surrender provisions of a project license are invoked "when a licensee, by action or inaction, has clearly indicated its intent to abandon the project, but has not filed a surrender application." [83] Ampersand Cranberry Lake asserts that it meets the requirements for implied surrender because it "suffered (but not caused) a loss of essential Project property as a result of termination of the lease with [OR-CRRDC]." [84] Ampersand Cranberry Lake claims that the effect of this loss of access to the Project property is a "type of event contemplated by the 'implied surrender' provisions of the license." [85] Ampersand Cranberry Lake also argues that because OR-CRRDC has not indicated that it intends to operate the Project as a hydroelectric facility under the Commission's jurisdiction, "continuation of the license is not in the public interest." [86]

51.  Lastly, Ampersand Cranberry Lake argues that, in other cases where the Commission has found that licensees violated Standard Article 5, it has terminated the licenses without a civil penalty. [87] Specifically, Ampersand Cranberry Lake cites the Commission's orders in *Imman Mills* and *Aquamac Corp.* [88] Ampersand Cranberry Lake argues that "[i]n light of the circumstances of this case and consistent with prior Commission precedent," the Commission "should terminate the license retroactive to July 25, 2021, the day [Ampersand Cranberry Lake] lost access to the [OR-CRRDC] Dam due to circumstances outside of its control." [89]

### b. *Enforcement Staff Reply*

52.  Enforcement staff argues that termination of a license by implied surrender is discretionary, and the facts here do not support the Commission's use of its discretion. Enforcement staff states that, in *Boyce Hydro*, the

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Commission stated that it "look[s] with great disfavor on [a licensee's] deliberate abandonment of these projects following extensive harm being caused to the pub

p. 61,380
p. 61,381

lic." [90] Enforcement staff also states that, in *Boyce Hydro*, the Commission said it was willing to terminate the licensee's licenses "only under the unique facts of th[at] case," including the fact that the licensee was in the process of being liquidated and a local community entity had acquired the project property and was in the process of rehabilitating it. Enforcement staff asserts that none of these mitigating facts are present here.

53.    Enforcement staff further distinguishes the situation here from the cases cited by Ampersand Cranberry Lake on the ground that "[n]one of the implied surrender cases cited by Respondent involved matters in which a licensee voluntarily transferred its property rights or a project with significant dam safety issues." [91] Enforcement staff also asserts that Ampersand Cranberry Lake admits in its Answer that it "did not pursue a license surrender earlier because Commission staff had warned that all repairs had to be completed prior to submittal of a surrender application." [92] Enforcement staff argues that the Commission should not "reward Respondent's attempt to make an end run around Staff's warning to not submit a surrender application until outstanding dam safety work was complete." [93]

### c. *Commission Determination*

54.    We agree with Enforcement staff that the circumstances here do not support the exercise of our discretion to terminate a license by implied surrender. Indeed, the record suggests that Ampersand Cranberry Lake deliberately attempted to shirk its obligations under the Project license by voluntarily entering into an agreement to terminate its access to the Project property. [94]

55.    Among other considerations, the Commission notes the following record facts:

- Just over a year after accepting transfer of the Project license—after it learned that repairing the fuse plug would cost more than it had anticipated—Ampersand Cranberry Lake began attempting to renegotiate the Lease Agreement with OR-CRRDC, stating in a letter to OR-CRRDC that it is "not convinced that [the cost of repairing the fuse plug] should be the responsibility of the lessee." [95]
- On two subsequent occasions, Ampersand Cranberry Lake threatened to surrender its license and push the cost of repairing the fuse plug onto OR-CRRDC *unless* OR-CRRDC first agreed to renegotiate the Lease Agreement on terms more favorable to Ampersand Cranberry Lake. [96]
- After learning that OR-CRRDC had sued Ampersand Cranberry Lake, Commission staff twice told Ampersand Cranberry Lake that "all dam safety repairs including the necessary modifications to the fuse plug spillway must be completed prior to your submittal of a transfer or surrender application." [97]

56.    Further, Commission staff have classified the Project as having a high hazard potential. This means that a failure of the project works would result in a probable loss of human life or economic or environmental losses. Allowing the owner of a high hazard project with a known safety issue to terminate a license by implied surrender could thus pose a serious risk to the public.

57.    In light of these circumstances, the Commission declines to terminate Ampersand Cranberry Lake's license by implied surrender.

### C. *Application of the Section 1505 Factors*

58.    Having concluded that neither constructive termination nor termination by implied surrender is an appropriate remedy here, we now must determine the appropriate civil penalty to assess for the violation.

59.    In determining an appropriate penalty, we take into consideration the nature and seriousness of the violations and the efforts (or lack thereof) of Ampersand Cranberry Lake to remedy the violations in a timely

© 2024 CCH Incorporated and its affiliates and licensors.    10    Sep 13, 2024 from VitalLaw®
All rights reserved.



manner, as required by section 31(c) of the FPA, as well as the factors set out 18 C.F.R. §385.1505 (2021) which provides:

> (a) In determining the amount of a proposed penalty, the Commission will consider the nature and seriousness of the violation, and the efforts of the licensee, exemptee, permittee or one who should possess appropriate authority but does not, to remedy the violation in a timely manner.
>
> ------------------------------------------------------------------------------------------------------- p. 61,381
> p. 61,382
>
> (b) In making its determination under paragraph (a), the Commission will consider the following factors: (1) Whether the person had actual knowledge of the violation; (2) Whether the person had constructive knowledge of the violation deemed to be possessed by a reasonable individual acting under similar circumstances; (3) Whether the person has a history of previous violations; (4) Whether the violation caused loss of life or injury to persons; (5) Whether economic benefits were derived because of the violation; (6) Whether the violation caused damage to property or the environment; (7) Whether the violation endangered persons, property or the environment; (8) Whether there were timely remedial efforts; (9) Whether there were untimely remedial efforts; (10) Whether there were no remedial efforts; and (11) Whether there are any other pertinent considerations.

60.    Both Ampersand Cranberry Lake and Enforcement staff addressed these 11 factors in their filings, as discussed below.

61.    With respect to Factors (1) and (2), Ampersand Cranberry Lake concedes that it had actual knowledge of the violation but argues that "it was forthcoming to the Commission regarding this possibility and frequently reported its efforts to avoid it." [98] As set forth above in Section IV(C), we find that Ampersand Cranberry Lake intentionally and willfully violated the terms of Article 5 of its license and that Ampersand Cranberry Lake's interactions with OR-CRRDC were at least in part motivated by its desire to avoid Commission-directed safety work on the fuse plug. That Ampersand Cranberry Lake informed the Commission that its actions might produce the effects it intended does not weigh against assessment of a civil penalty.

62.    With respect to Factors (3), (4), and (6), Ampersand Cranberry Lake states, and Enforcement staff does not dispute, that it does not have a prior history of violations and the violation has not caused any loss of life or injury to persons or property or the environment. [99] While the absence of these factors argue against further increases in a civil penalty, they do not mitigate the other factors indicating that a civil penalty is appropriate here.

63.    Ampersand Cranberry Lake and Enforcement staff dispute the applicability of the remaining Factors.

64.    *Factor (5) – Economic Benefits.* Ampersand Cranberry Lake argues that "[t]here were no economic benefits derived from the violation" and that it, in fact, had not received any revenue for months as a result of losing access to the Project's site. [100] Enforcement staff argues that this claim "ignores the money that [Ampersand Cranberry Lake] saved by transferring its property rights to OR-CRRDC in the [Settlement and Release Agreement]" and that its "true economic benefits include the avoided rent and water tax payments and … the cost of dam safety work that it claims to have no ongoing obligation to perform." [101] We agree with Enforcement staff that Ampersand Cranberry Lake benefitted economically from its violation by not only avoiding having to make back rent and water tax payments to OR-CRRDC but, equally and arguably even more important, spend significant money (estimated by Ampersand Cranberry Lake in its correspondence with OR-CRRDC to be $350,000) to repair the fuse plug. We find that this Factor provides significant support for the assessment of a significant civil penalty here.

65.    *Factor (7)–Endangerment of Persons, Property, or the Environment.* Respondent argues that "[n]ot withstanding its obligation to retain possession of Project property" it "believed that when faced with no other

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

choice, transfer of possession of the Project site to [OR-CRRDC] was a reasonable outcome under the circumstances." [102] Ampersand Cranberry Lake claims that it "expected [transfer of possession] would lead to a faster resolution than remaining in limbo while the litigation ran its course through the legal system." [103] Respondent also claims that "[w]hile [OR- CRRDC] is not subject to the Commission's jurisdiction, [Ampersand Cranberry Lake] believes that [OR-CRRDC], the local governmental entity with sole control over the regulation and flow of water through the gates of the dam, is poised to ensure the facility will not endanger persons, property or the environment until the Commission terminates the license and the [OR-CRRDC] Dam transitions to New York state jurisdiction." [104] Lastly, Ampersand Cranberry Lake argues that "the unlikely event of a fuse plug breach at the dam would cause minor flooding that is unlikely to pose a threat to public safety." [105]

66.    Enforcement staff disagrees and notes that "Respondent does not address the potential risk to human life, property, and the environment resulting from its failure to complete the required dam safety work and to operate the project consistent with license conditions (as a consequence of its loss of property rights)." [106] Enforcement staff also asserts that while "OR-CRRDC may happen to perform work on the dam and manage environmental conditions in the same way that Respondent was required by the environmental and dam safety requirements accompanying Respondent's license, OR-CRRDC owes no obligation to [the

p. 61,382
p. 61,383

Commission] to do so." [107] Lastly, Enforcement staff argues that "there is no information in the record suggesting that OR-CRRDC intends to complete the delayed dam safety work on its own." [108]

67.    We find that this Factor also weighs in favor of assessing a substantial civil penalty here. As Enforcement staff notes, there is no information in the record suggesting that OR-CRRDC intends to repair the fuse plug. [109] We therefore must infer that Ampersand Cranberry Lake's loss of property rights will further delay any repair of the fuse plug, exacerbating the potential risk the dam poses to human life, property, and the environment. Indeed, Ampersand Cranberry Lake's loss of property rights has already caused a delay in remediation as there is no information in the record that any progress toward remediation has been made during the more than 98 months since the July 9, 2021 settlement. Further, Ampersand Cranberry Lake's claim that a breach would cause only minor flooding is inadequately supported and, in any event, irrelevant. When the Commission orders a licensee to make dam safety repairs, a licensee must make the repairs. It is not a defense that the licensee believes its failure to complete the repairs would be unlikely to pose a threat to public safety. The Commission, not licensees, is the entity authorized to determine the threat to public safety and the remedies to be taken to maintain public safety. [110]

68.    *Factors (8), (9), and 10) – Remedial Efforts*. Ampersand Cranberry Lake claims that it engaged in appropriate remedial efforts because it attempted to resolve the contractual dispute with OR-CRRDC and retain access to the OR-CRRDC Dam. [111] We find this argument unavailing. As discussed at PP 38-39, 53-55, Ampersand Cranberry Lake voluntarily relinquished access to the property. Its claimed attempts to resolve its contractual dispute *before* relinquishing the property do not demonstrate remedial efforts. To the contrary, Ampersand Cranberry Lake made the conscious decision to tie a financial resolution of the Commission-ordered safety repairs to its willingness to resolve its contractual dispute with OR-CRRDC. [112] In effect, Ampersand Cranberry Lake used the pretext of the contractual dispute as a means to avoid the significant expenditures to perform the dam safety remediation it had agreed to conduct when it undertook transfer of the license from Trafalgar. Accordingly, we do not find that Ampersand Cranberry Lake conducted sufficient remedial efforts such that a significant civil penalty should not be assessed.

69.    *Factor (11) – Other Pertinent Considerations*. Ampersand Cranberry Lake argues that the Commission failed to apply its policy for reducing or waiving civil penalties for small entities. [113] Enforcement staff argues that the Commission's Small Business Policy Statement here is inapplicable because Ampersand Cranberry Lake's violation of Article 5 was willful. [114] We agree that the Small Business Policy Statement does not

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.


Wolters Kluwer

apply here, because Ampersand Cranberry Lake's violation was willful. Commission staff repeatedly notified Respondent that, if it lost its property rights, it would be in violation of Section 5 of the Project license. Yet Ampersand Cranberry Lake chose to enter into a settlement that did just that.

70.    Further, while the Commission is willing to consider Ampersand Cranberry Lake's ability to pay pursuant to the Small Business Policy Statement, Respondent has provided no information demonstrating that it lacks the ability to pay. Its bare statement that "revenues from Project generation have ceased and [Ampersand Cranberry Lake] does not have funds available to pay a penalty" is insufficient. [115] For the Commission to consider an entity's ability to pay, the entity must provide evidence of its (as well as any affiliated companies') ability to pay. Such evidence is particularly important here as Ampersand Cranberry Lake previously assured the Commission that it was part of a "diversified business group with approximately $28 million in assets and annual revenues in excess of $10 million" and "will be positioned to access funding necessary to operate

p. 61,383

----------------------------------------------------------------------------------------

p. 61,384

and maintain the Project safely and in accordance with its respective license." [116]

71.    In light of the above discussion, weighing the eleven required Factors, we find that a civil penalty of $600,000 should be assessed. Ampersand Cranberry Lake intentionally entered into an agreement that directly led to its violation of Article 5 of its license. Ampersand Cranberry Lake economically benefitted by this resolution by avoiding having to pay both amounts owing under its dam lease and amounts it knew it would need to expend on Commission-directed safety repairs it had voluntarily undertaken to make when it took transfer of the license. Ampersand Cranberry Lake's action continued to expose those downstream of its project to the risks of these un- remediated safety issues and at best delayed, and at worst indefinitely postponed, the performance of these necessary safety repairs. And its actions demonstrate that, rather than being motivated to remediate the potential license violations, Ampersand Cranberry Lake instead sought to precipitate those violations in hopes of avoiding the consequences of an economic arrangement with the dam owner that it no longer found to be advantageous. For all of these reasons, we find a $600,000 penalty to be warranted here. [117]

**D. *Applicability of the Commission's Penalty Guidelines***

   **a. *Show Cause Answer***

72.    Ampersand Cranberry Lake argues that, in determining any civil penalty in this case, the Commission "must apply its Penalty Guidelines to calculate the appropriate penalty." [118] Specifically, Ampersand Cranberry Lake argues that "in applying the factors in section 385.1505 in a hydropower case, the Commission also must apply the rationale for evaluating the factors under the Penalty Guidelines." [119] Ampersand Cranberry Lake claims that it would be "unreasonable to apply a transparent, mechanical, and predictable set of guidelines based on the same factors to calculate penalties under FPA Part II and the Natural Gas Act (NGA), but ignore the Penalty Guidelines and solely apply the [Section 1505] factors in hydropower cases.

   **b. *Enforcement Staff Reply***

73.    Enforcement staff argues that Respondent's argument "fails to account for the fact that unlike Part II of the FPA and the NGA, the Commission adopted a regulation that specifically identifies the factors (the Section 1505 Factors) that it must consider in determining a penalty in hydropower matters" and that the "Commission must follow those regulations." [120] In support of its position, Enforcement staff cites to cases holding that agencies are required to follow their own regulations and that policy statements do not amend regulations. [121]

74.    Enforcement staff also asserts that, even if the Commission could disregard the Section 1505 Factors, it "does not appear that the Commission intended for the Penalty guidelines to control calculation of civil penalties for hydropower licensing violations originating under Part I of the FPA." [122] Enforcement staff notes that in its initial Policy Statement adopting the Penalty Guidelines, the Commission stated that "it had adopted the guidelines in response to Congress's expansion of the Commission's civil penalty authority to *Part II of the FPA*

© 2024 CCH Incorporated and its affiliates and licensors.        13        Sep 13, 2024 from VitalLaw®
All rights reserved.

and *the NGA* and its granting of new authority to assess penalties of up to $1,000,000 per violation, per day for such violations and for violations of the Natural Gas Policy Act (NGPA)." Enforcement staff claims that this specificity signified that the purpose of the Penalty Guidelines "was not to establish guidelines for the application of the Commission's existing authority to assess $11,000 per day for violations of Part I of the FPA."

75.    Lastly, Enforcement staff notes that "since the adoption of the Penalty Guidelines, the Commission has approved settlements for hydropower licensing violations determined under the Section 1505 Factors, not the Penalty Guidelines." [123]

### c. *Commission Determination*

76.    We find that the Section 1505 Factors, and not the Penalty Guidelines, apply in enforcement actions under Part I of the FPA. The Penalty Guidelines were adopted through a Policy Statement and "[a]pplication of the Penalty Guidelines …is discretionary, not mandatory[.]" [124] Section 1505, by contrast, was adopted through the Commission's rulemaking process, included in the *Code of Federal Regulations*, and therefore must be applied under Part I of the FPA. [125]

p. 61,384

p. 61,385

77.    Moreover, it is not "unreasonable" for the Commission to apply different guidelines in cases brought under Part I of the FPA than under Part II of the FPA and the NGA. First, the Commission has a different, much lower penalty authority under Part I of the FPA than under Part II of the FPA and the NGA. [126] Second, hydropower license violations present a different circumstance, including unique risks of damage to persons, property, and the environment that do not ordinarily arise under Part II of the FPA, in particular, and it is therefore reasonable to apply a set of factors specific to those unique risks in enforcement actions brought under Part I of the FPA.

### V. Rehearing

78.    Given Respondent's election under section 31(d)(3)(A) of the FPA, this Order will not be subject to rehearing. [127] If a person elects the procedure under section 31(d)(3) of the FPA, the statute provides for: (i) prompt assessment of a penalty by Commission order; (ii) if the penalty is unpaid within 60 days, the Commission shall institute a proceeding in the appropriate district court seeking an order affirming the assessment of a civil penalty and that court shall have the authority to review de novo the law and facts involved; and (iii) the district court shall have the jurisdiction to enforce, modify, or set aside, in whole or in part, such penalty assessment. Following this process, a person can appeal to a United States Court of Appeals within the appropriate time for review of the district court order. [128]

### VI. Conclusion

79.    In sum, we find that Ampersand Cranberry Lake, licensee for the Cranberry Lake Project No. 9685, violated Article 5 of the project's license, and that, in light of the violation of Article 5, it is appropriate to assess a civil penalty of $600,000.

*The Commission orders:*

Ampersand Cranberry Lake is hereby directed to pay to the United States Treasury by wire transfer a civil penalty in the sum of $600,000 within 60 days of the issuance of this order, as discussed in the body of this order.

Commissioner Danly is concurring with a separate statement attached.

James P. DANLY, Commissioner, *concurring*:

I concur with today's order assessing Ampersand Cranberry Lake Hydro, LLC (Ampersand) a civil penalty of $600,000 for violating Standard Article 5 of Ampersand's license. [1] I write separately to highlight my

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



prior statement for the Show Cause Order in which I explained that licensees cannot thwart their license obligations by forfeiting the property rights necessary to comply with those obligations and how critical it is for the Commission to ensure that licensees have the financial wherewithal (and incentive) to physically maintain their facilities. [2]

For these reasons, I respectfully concur.

---

**Footnotes**

1    June 24, 2016 Dam Safety Inspection Report of Cranberry Lake Project by the Commission's Division of Dam Safety New York Regional Office (D2SI-NYRO).

2    *See Trafalgar Power, Inc.*, 39 FERC ¶62,088 (1987).

3    *See, e.g.*, Joint December 5, 2014 Application for Approval of Transfer of License at 1 ( "The Cranberry Lake Project consists of a single unit which is currently not operating due to the failure of the high speed shaft couplings in addition to potential damage to the gearbox, seals, and generator bearings.").

4    *See Trafalgar Power, Inc.*, 150 FERC ¶62,146 (2015).

5    March 17, 1986 initial pre-license site inspection report of Cranberry Lake Project by D2SI-NYRO. The hazard potential of a dam is based on the potential for loss of human life or economic, environmental, and/ or lifeline losses in the area downstream of the dam in the event of failure of the dam or mis-operation of the dam or appurtenances. Hazard potential does not refer to the condition or hydraulic capacity of the dam or appurtenances themselves, but rather the incremental impacts should failure occur. Also, the hazard potential assigned to a dam is based on consideration of the effects of a failure during both normal and variable flood flow conditions. FERC, *Engineering Guidelines for the Evaluation of Hydropower Projects*, Chapter 1 – General Requirements, 1-2.2 Definitions, https://www.ferc.gov/sites/default/files/2020-04/chap1.pdf.

6    *Ampersand Cranberry Lake*, 177 FERC ¶61,028 (2021) (Order to Show Cause).

7    *Id.* at P 11 n.41 (citing 18 C.F.R. §385.213(c) (2021)).

8    *Id.* (citing 18 C.F.R. §385.213€).

9    *Id.* at P 2.

10   16 U.S.C. §823b(d)(3).

11   Order to Show Cause, 177 FERC ¶61,028 at P 30, ordering para. (D).

12   Ampersand Cranberry Lake's November 22, 2021 Response to Order to Show Cause and Notice of Proposed Penalty (Answer).

13   16 U.S.C. §823b(d)(3).

14   Answer at 24.

15   Enforcement Staff Reply to Response Submitted by Ampersand Cranberry Lake (filed December 22, 2021) (Reply).

16   Ampersand Cranberry Lake's January 20, 2022 Motion for Leave to Answer and Answer.

17   18 C.F.R. §385.213(a)(2).

18   *See, e.g.*, Letter from John Spain, Regional Engineer, to Sayad Moudachirou, Asset Manager, Docket No. P-9685-000 (July 12, 2018); Letter from John Spain to Ian Chow, Asset Manager, Docket No. P-9685-000 (Feb. 28, 2017); Letter from John Spain, to Ian Chow, Docket No. P-9685-000 (Apr. 27, 2016); Letter from Gerald L. Cross, Regional Engineer, to Ian Chow, Docket No. P-9685-000 (Sept. 29, 2015).

19   Trafalgar Power Inc. January 23, 1992 Application to U.S. Army Corp of Engineers (permit to install fuse plug in Cranberry Lake Dam under P-9685); *Trafalgar Power, Inc .*, Docket No. P-9685-000 (Feb. 21, 1992) (delegated order) (accepting schedule for fuse plug scenario for Cranberry Lake Project under P-9685).

---

© 2024 CCH Incorporated and its affiliates and licensors.    15    Sep 13, 2024 from VitalLaw®
All rights reserved.

20  *See Trafalgar Power, Inc*. Docket No. ER02-1059-000 (Jan. 30, 1992) (delegated order) (D2SI-NYRO letter order to Trafalgar Power, Inc. accepting schedule refuse plug scenario for Cranberry Lake Project under P-9685).

21  Letter from Charles K. Cover to Arthur Steckler and Lutz Loegters, Docket No. P-9685-000 (Dec. 23, 2014).

22  Letter from Lutz Loegters to Charles K. Cover, Docket No. P-9685-000 (Jan. 13, 2015).

23  *Id*.

24  Joint December 5, 2014 Application for Approval of Transfer of License at 1.

25  Answer at Ex. A (September 29, 2016 Letter from Ian Chow to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease").

26  *See, e.g*., *id*.

27  *Id*.

28  Answer at Ex. A (July 13, 2017 Letter from Sayad Moudachirou to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease").

29  *Id*.

30  Answer at Ex. A (September 11, 2017 email from Sayad Moudachirous to Charles Gardner); Response, Ex. A (February 12, 2018 email from Sayad Moudachirous to Charles Gardner).

31  Answer at Ex. A (March 16, 2018 letter from Sayad Moudachirous to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease").

32  *Id*.

33  *Id*.

34  *Id*.

35  *See Oswegatchie River-Cranberry Reservoir Regulating District Corporation v. Ampersand Cranberry Lake Hydro, LLC* , No. EFCV-2019-0154668, Compl. at ¶¶14-23 (N.Y. Sup. Ct. Jan. 28, 2019).

36  *See* Letter from Sayad Moudachirou to John Spain, Docket No. P-9685-000 (Jan. 17, 2020).

37  *See* Letter from John Spain to Sayad Moudachirou, Docket No. P-9685-000 (Mar. 31, 2020).

38  *Id*.

39  *See* Ampersand Cranberry Lake May 19, 2020 Untitled Filing.

40  *See* Letter from Kimberly Nguyen to Sayad Moudachirou, Docket No. P-9685-033 (July 23, 2020).

41  *Id*. at 2.

42  *Id*. at 4.

43  Letter from Sayad Moudachirou to Kimberly Nguyen, Docket No. P-9685-033 (Aug. 27, 2020).

44  *See id*. at 2.

45  *Id*.

46  *See* Letter from Kimberly Nguyen to Sayad Moudachirou, Docket No. P-9685-033 (Oct. 19, 2020).

47  *Id*. at 3-4 (footnotes omitted).

48  *See id*. at 4.

49  *See, e.g*., Letter from Sayad Moudachirou to Kimberly Nguyen, Docket No. P-9685-033 (Dec. 1, 2020).

50  *See* Letter from Robert Fletcher, Branch Chief, to Sayad Moudachirou, Docket No. P-9685-033 (Jan. 28, 2021).

51  *Id*. n.5.

52  *See* Ampersand Cranberry Lake April,7 2021 Untitled Filing.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

53 Letter from Sayad Moudachirou, to Kimberly Nguyen, Docket No. P-9685-033 (Apr. 16, 2021).

54 *See* Ampersand Cranberry Lake September 15, 2021 Settlement and Release Agreement.

55 *Id*.

56 *Oswegatchie River-Cranberry Reservoir Regulating District Corporation v. Ampersand Cranberry Lake Hydro, LLC*, No. EFCV-2019-0154668, Notice of Discontinuance (July 21, 2021).

57 Memorandum by Patrick M. Kelly, Civil Engineer, Docket No. 9685-000 (Aug. 17, 2021).

58 *See id*. In its Answer, Ampersand Cranberry Lake claims that the Commission's description in the Order to Show Cause "of a voluntary surrender of the keys at OR-CRD's request is inaccurate," asserting that they had been "seized." Answer at 14. But whether the keys were "surrendered" or "seized" is irrelevant to the violation here—Ampersand Cranberry Lake admits that it entered into the Settlement and Release Agreement pursuant to which it relinquished its right to access the Project property in violation of Section 5 of the project license. *See* Answer at 4-5, 7.

59 *See id*.

60 Answer at 7.

61 *Id*.

62 *See id*. at 5, 13, 14.

63 *Id*. at 13.

64 *Id*. at 7-8.

65 Reply at 9.

66 *Id*.

67 *Id*.

68 *See, e.g.*, Answer at Ex. A (July 13, 2017 Letter from Sayad Moudachirou to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease.").

69 16 U.S.C. §823b(c).

70 Public Law 114-74, §701, 129 Stat. 584, 599.

71 18 C.F.R. §385.1602 (2021).

72 Answer at 7.

73 *Id*. at 8.

74 *Id*.

75 Reply at 4.

76 Answer at 4 (quoting 16 U.S.C. §799).

77 *Id*. at 5.

78 *Id*.

79 *Id*.

80 16 U.S.C. §799.

81 *Id*.

82 *Id*. at 9.

83 *Id*.

84 *Id*. at 10.

85 *Id*.

86 *Id*.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



87    *Id*. at 10.

88    *Inman Mills*, 153 FERC ¶62,231 (2015); *Aquamac Corp*., 140 FERC ¶62,081 (2012).

89    Answer at 11.

90    Reply at 6 (quoting *Boyce Hydro Power, LLC* , 175 FERC ¶61,143 at P 18 (2021) (alteration in original)).

91    *Id*. at 6.

92    *Id*. (quoting Answer at 17).

93    *Id*. at 7.

94    The cases cited by Ampersand Cranberry Lake are entirely inapposite. In *Inman Mills*, we terminated a license by implied surrender where the licensee filed an application to transfer the project license, and the Commission approved the transfer, but the licensee failed to file the required conveyance documents with the Commission. 153 FERC ¶62,231 at P 4. In *Aquamac Corp*., we terminated a license by implied surrender because the licensee had dissolved more than five years earlier. 140 FERC ¶62,081 at P 4. Neither case involved a licensee, as here, that voluntarily transferred its property rights to a project with significant dam safety issues while in active discussions with Commission staff to remediate those safety issues.

95    Answer at Ex. A (September 29, 2016 Letter from Ian Chow to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease").

96    Answer at Ex. A (July 13, 2017 Letter from Sayad Moudachirou to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease"); Answer at Ex. A (July 13, 2017 Letter from Sayad Moudachirou to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease").

97    *See* Letter from John Spain to Sayad Moudachirou, Docket No. P-9685-000 (Mar. 31, 2020); Letter from Kimberly Nguyen to Sayad Moudachirou, Docket No. P-9685-033 (Oct. 19, 2020).

98    Answer at 16.

99    *Id*. at 16; Reply at 12.

100    Answer 16.

101    Reply at 12-13.

102    Answer at 16-17.

103    *Id*.

104    *Id*.

105    *Id*. at 18.

106    *Id*. at 13

107    Reply at 13.

108    Reply at 13-14.

109    Even were there such evidence, at minimum Ampersand Cranberry Lake's actions have further delayed important safety remediation by at least nine months since the July 9, 2021 settlement, and by as much as five years if the delay caused by their interjection of financial responsibility for these repairs into their contract dispute with OR-CRRDC is properly attributed to them.

110    18 C.F.R. §12.4 (2021) (setting forth the authority of the Regional Engineer or other authorized Commission representative to ensure dam safety).

111    Answer at 18.

112    *See* Answer at Ex. A (July 13, 2017 Letter from Sayad Moudachirou to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease"); Answer at Ex. A (March 16, 2018 letter from Sayad Moudachirous to OR-CRRDC regarding "Cranberry Lake Hydro (FERC No. P-9685) lease" ).

113    *Id*.; *see* Statement of Compliance with Section 223 of the Small Business Regulatory Enforcement Fairness Act of 1996, Policy Statement, 62 *Fed. Reg*. 15,827, 15829 (Apr. 3, 1997) (Small Business Policy Statement) (

© 2024 CCH Incorporated and its affiliates and licensors.    18    Sep 13, 2024 from VitalLaw®
All rights reserved.

"It is the policy of the Commission that any small entity is eligible to be considered for a reduction or waiver of a civil penalty if it has no history of previous violations, and the violations at issue are not the product of willful or criminal conduct, have not caused loss of life or injury to persons, damage to property or the environment or endangered persons, property or the environment. An eligible small entity will be granted a waiver if it can also demonstrate that it performed timely remedial efforts, made a good faith effort to comply with the law and did not obtain an economic benefit from the violations. An eligible small entity that cannot meet the criteria for waiver of a civil penalty may be eligible for consideration of a reduced penalty. Upon the request of a small entity, the Commission will consider the entity's ability to pay before assessing a civil penalty." ).

114   Reply at 14.

115   Answer at 20.

116   Ampersand Cranberry Lake January 13, 2015 Additional Information Request Letter Response at 1-2. In its Answer, Ampersand Cranberry Lake claims that the Commission has "commingled this case with its Financial Assurance Initiative." Answer at 18. Ampersand Cranberry Lake provides no evidence or explanation for this claim. We find that we have not. In fact, we have made no findings or representations regarding the state of Ampersand Cranberry Lake's finances or any financial limitations prohibiting it from complying with its license obligations.

117   The reasonableness of this penalty is underscored by the fact that it is substantially below the statutory maximum penalty of $6,770,250.

118   Answer at 21.

119   *Id*. at 22.

120   Reply at 16.

121   *Id*. at 16 nn.39 & 40.

122   *Id*. at 17.

123   *Id*. at 18.

124   *Enforcement of Statutes, Orders, Rules, and Regulations* , 132 FERC ¶61,216 at P 2 (2010).

125   *See, e.g.*, *Service v. Dulles* , 354 U.S. 363, 388 (1957) (reversing judgment upholding agency action where agency failed to comply with its own regulations); *Frizelle v. Slater* , 111 F.3d 172, 177 (D.C. Cir. 1997) (reiterating that agencies are required to follow their own regulations).

126   *Compare* FPA section 31 , 15 U.S.C. §823b ("Any licensee … who violates … any rule or regulation under this part, any term, or condition of a license … shall be subject to a civil penalty in an amount not to exceed $10,000 for each day that such violation … continues.) *with* FPA section 316A, 16 U.S.C. §825o-1 ( "Any person who violates any provision of part II … shall be subject to a civil penalty of not more than $1,0000,00 for each day that such violation continues.") and NGA section 22, 15 U.S.C. §7 §717t-1 ( "Any person that violates this chapter … shall be subject to a civil penalty of not more than $1,000,000 per day per violation for as long as the violation continues.").

127   *See* Process for Assessing Civil Penalties, 117 FERC ¶61,317 at P 5 (2006); *see also Vitol Inc* ., 169 FERC ¶61,070 at PP 246- 247; *ETRACOM LLC*, 155 FERC ¶61,284 at P 200; *Coaltrain*, 155 FERC ¶61,204 at P 365; *Chen*, 151 FERC ¶61,179 at P 193; *Barclays*, 144 FERC ¶61,041 at P 152; *Competitive Energy Services, LLC*, 144 FERC ¶61,163 at P 104; *Richard Silkman*, 144 FERC ¶61,164 at P 96; *Lincoln Paper and Tissue, LLC*, 144 FERC ¶61,162 at P80.

128   16 U.S.C §823b(d)(3).

1   *See Ampersand Cranberry Lake Hydro, LLC*, 179 FERC ¶61,037 (2022).

2   *Ampersand Cranberry Lake Hydro, LLC*, 177 FERC ¶61,028 (2021) (Danly, Comm'r, concurring at PP 2-3) (Show Cause Order).

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.