VitalLaw®



# 166 FERC to 187 FERC, Andrew Peklo III, Project No. 12790-015, 186 FERC ¶61,208, FERC (Federal Energy Regulatory Commission), (Mar. 21, 2024)

166 FERC to 187 FERC
Project No. 12790-015
166 FERC to 187 FERC ¶61,208

Click to open document in a browser

p. 62,628

Andrew Peklo III,

Project No. 12790-015

Order Amending License, Revising Project Description, Approving Revised Exhibit A, and Revising Installed Capacity

March 21, 2024

Before Commissioners: Willie L. Phillips, Chairman; Allison Clements and Mark C. Christie.

1.   On October 15, 2019, Andrew Peklo III, licensee for the Pomperaug Hydro Project No. 12790, filed an application to amend the project license. [1] Mr. Peklo proposes certain design changes at the unconstructed project. The project will be located at an existing dam on the Pomperaug River, in the town of Woodbury, Litchfield County, Connecticut.

### I. Background

2.   On October 16, 2014, the Commission issued an original license to Andrew Peklo III for a term of 40 years. [2] The Commission authorized the addition of a powerhouse and turbine to an existing penstock. Specifically, the unconstructed project consists of: (1) an existing 15-foot-high, 90-foot-long Pomperaug River dam; (2) an existing 30-inch-high, 30-inch-wide slide gate at the west end of the dam; (3) an existing 48-inch-high, 60-inch-wide drain gate near the middle of the dam; (4) an existing 30-inch-high, 30-inch-wide east gate and intake structure at the east end of the dam with a new trashrack with 0.75-inch clear bar spacing; (5) a new steeppass fish ladder; (6) an existing 3-acre impoundment with a normal water surface elevation of 226.43 feet above mean sea level; (7) an existing 42-inch-high, 50-inch- wide, 40-foot-long stone-lined penstock; (8) a new 10-foot-wide, 25-foot-long, sound-insulated powerhouse and 76-kilowatt (kW) turbine-generating unit located in an existing mill building; (9) a new 3.5-foot-diameter, 33-footlong draft tube to direct water from the turbine back into the river downstream of the dam; and (10) appurtenant facilities. [3] The project will operate in a run-of-river mode.

3.   The original license required the licensee to commence construction of the project works within two years from the issuance date of the license ( *i.e.*, by October 16, 2016) and complete construction within five years from issuance date of the license ( *i.e.*, by October 16, 2019). [4] In subsequent orders, Commission staff granted Mr. Peklo's request to extend the deadlines to commence and complete construction. [5] In his July 2019 extension of time request, Mr. Peklo noted that he intended to reconfigure the project by installing two generating units in place of the authorized one unit. In Commission staff's order on September 27, 2019, extending the construction deadlines, Commission staff informed Mr. Peklo that he would be required to file a license amend

p. 62,628
p. 62,629

ment request to modify the approved license requirements. [6]

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.



4.   The final deadline to commence construction of the project is October 16, 2024, and the deadline to complete construction is October 16, 2027; no further extension of the commencement deadline can be granted pursuant to section 13 of the Federal Power Act (FPA). [7]

### II. Proposed Amendment

5.   Mr. Peklo proposes to install two 45-kW turbine-generator units (for a total generating capacity of 90 kW) instead of the authorized one 76-kW turbine. [8] The two turbine-generator units would be submerged in a reinforced concrete vault attached to two separate draft tubes and then connected to the grid by one pad-mounted 100-kVA [9] transformer. [10] The estimated average yearly generating production of the proposed two turbines is approximately 420,000 kilowatt-hours (kWh) per year, a 40% increase in energy production from the approved one-turbine design of approximately 300,000 kWh per year. [11] There would be no change in the project's hydraulic operating range of 10–100 cubic feet per second (cfs) or the approved run-of-river mode of operation. [12] To reflect the proposed changes, Mr. Peklo filed revised Exhibits A and F. [13]

### III. Consultation

6.   On January 21, 2020, Mr. Peklo held a Joint Agency Meeting with the U.S. Fish and Wildlife Service (FWS), the Connecticut Department of Energy and Environmental Protection (Connecticut DEEP), the Town of Woodbury, and members of the public. On February 12, 2020, Mr. Peklo filed a copy of the audio recording of the meeting.

7.   FWS has no objection to the proposed change in the number of turbine-generator units at the project. [14] It stated that the proposed amendment raised no resource concerns

that were not addressed in the original license proceeding. Likewise, the Connecticut DEEP has no objection to the proposed changes and stated that the minor changes in the proposed amendment application did not raise any resource issues. [15]

### IV. Public Notice, Interventions, and Comments

8.   On April 16, 2020, the Commission issued public notice of the license amendment application, establishing May 16, 2020, as the deadline for filing comments, interventions, and protests. A timely motion to intervene and protest was filed by a group of landowners: Leon Sherwood, Theresa Sherwood, Peter Wolcott, Kerri Wolcott, Anne P. Delo, Rosemary E. Giuliano, Jerry M. Spotlow, Suzanne Genest, Ruby H. Hewitt, Anne Casey, and Tom Greto (collectively, Landowners). [16]

9.   The Landowners oppose the amendment application, arguing that Mr. Peklo has a long history of non-compliance with Commission deadlines and requirements, including as an example the failure to repair the dam's west gate in compliance with Commission directives. In addition, the Landowners allege that Mr. Peklo has failed to obtain necessary land rights. [17] They also assert that the change from one turbine to two turbines is a significant increase in installed capacity and a material change to the existing license and that Mr. Peklo has not properly analyzed the environmental effects of the amended project on wildlife or critical habitat.

10.   On May 21, 2020, Mr. Peklo filed an answer to the motion to intervene and protest. [18] Rule 213(a)(2) of the Commission's Rules of Practice and Procedure prohibits an answer to a protest unless otherwise ordered by the decisional authority. [19] Accordingly, we reject Mr. Peklo's answer.

11.   On December 14, 2023, Commission staff issued an Environmental Assessment (EA) analyzing the environmental impacts of the proposed amendment, [20] as discussed further below.

### V. Statutory Compliance

**A. *Clean Water Act***

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.


Wolters Kluwer

12.    Under section 401(a) of the Clean Water Act (CWA), [21] the Commission may not authorize

p. 62,629

p. 62,630

construction or operation of a hydroelectric project that may result in a discharge from the project into navigable waters unless the state water quality certifying agency either has issued a water quality certificate for the project or has explicitly waived certification or fails to act on a request for certification within a reasonable period of time, not to exceed one year. Section 401(d) of the CWA [22] provides that the certification shall become a condition of any federal license that authorizes construction or operation of the project. On January 17, 2014, Connecticut DEEP issued the water quality certification for the Pomperaug Project, which was incorporated into the project license as Appendix A. [23]

13.    The proposed amendment does not include any modifications to project operations. Connecticut DEEP, the water quality certifying agency, did not object to the proposed amendment because there are no changes to the minimum or maximum hydraulic capacity. Because the proposed action will have no effect on any discharge from the project into navigable waters and no effect on water quality beyond those already anticipated during licensing, a new certification is not needed. [24]

**B. *Endangered Species Act***

14.    Section 7(a)(2) of the Endangered Species Act (ESA) [25] requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of federally listed threatened and endangered species or result in the destruction or adverse modification of their critical habitat.

15.    On March 28, 2014, Commission staff issued a final Environmental Assessment (2014 EA) in the licensing proceeding. The 2014 EA did not identify any federally listed species or critical habitat in the proposed project vicinity, a finding with which FWS concurred. [26] By letter dated February 12, 2020, the FWS stated that the changes related to this amendment do not raise any new resource concerns that were not already addressed in the original license proceeding.

16.    In the EA for the proposed amendment, Commission staff found that the endangered northern long-eared bat ( *Myotis septentrionalis*), threatened bog turtle ( *Glyptemys muhlenbergii*), and candidate species, monarch butterfly ( *Danaus plexippus*) may occur in the project area; however, no critical habitat for these species occurs there. [27] Contrary to the Landowners' protest, the EA provided a comprehensive analysis of the potential environmental effects of the proposed amendment and concluded that the amendment will not modify any critical habitat. [28] As noted above, FWS agreed with staff's findings in the EA and expressed no concerns based on the proposed amendment. Mr. Peklo proposes no change to project operations, and construction is limited to a small previously-disturbed area.

**C. *National Historic Preservation Act***

17.    Section 106 of the National Historic Preservation Act (NHPA) [29] and its implementing regulations [30] require federal agencies to take into account the effect of any proposed undertaking [31] on properties listed or eligible for listing in the *National Register of Historic Places* and afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on any undertaking. This generally requires the Commission to consult with the State Historic Preservation Officer (SHPO), to determine whether and how a proposed action may affect historic properties and to seek ways to avoid or minimize any adverse effects. In the 2014 EA, the Connecticut SHPO determined there would be "no effect on historic, architectural, or archaeological resources" for the proposed project. In his February 18, 2020 filing, Mr. Peklo says that the proposed amendment does not involve any additional effects not previously assessed in the 2014 EA regarding historic or archaeological resources. Furthermore, Article 408 of the license requires Mr. Peklo to stop work and consult with the Connecticut SHPO if previously unidentified archaeological or cultural artifacts are discovered during project construction, operation, or other project-related activities that require land-disturbing activities.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Exhibit 13C
Page 3 of 10

18.    By letter issued September 6, 2023, Commission staff requested the Connecticut SHPO to respond whether it concurred with Commission staff's determination under section 106 that Commission action on the proposed license amendment application would not affect any historic properties. By letter dated October 5, 2023, the Connecticut SHPO states that it "concurs that the proposed turbine amendment will have no adverse effect to historic properties," and encouraged Mr. Peklo to limit ground disturbance to the greatest extent possible.

p. 62,630

p. 62,631

**VI. Discussion**

**A. Environmental Analysis**

19.    To satisfy the requirements of the National Environmental Policy Act (NEPA), Commission staff issued an EA analyzing the proposed amendment on December 14, 2023. The EA evaluated the potential environmental effects of the proposal and recommended measures to minimize any potential effects. The EA found that the proposal would have no adverse effects on geology and soils, water quantity, water quality, aquatic resources, terrestrial resources, threatened and endangered species, recreation, cultural resources, land use and aesthetic resources, or environmental justice communities. [32]

20.    The EA found that there would be minor effects on aesthetic resources and noise. Project construction would result in temporary, short- term effects on these resources resulting from the presence of a small work crew, operating equipment, construction vehicles, dust, and storage of materials. [33] With regard to operations, the EA concluded that the proposed amendment would not affect aesthetic flow requirements and would improve aesthetics by eliminating the use of three pole-mounted transformers in favor of a single pad-mounted transformer located below the grade of Pomperaug Road. [34] The EA also concluded that the proposed design changes would minimize effects on noise in that they would result in a minor decrease in ambient noise levels compared to the original design. [35] Based on the analysis in the EA we find that the proposal would not constitute a major federal action significantly affecting the quality of the human environment.

**1. Property rights**

21.    The Landowners assert that Mr. Peklo does not have the necessary property rights for the project, in violation of Standard Article 5, [36] and has not complied with Article 204 of the License Order, which requires the filing of a progress report within four years of license issuance regarding the acquisition of necessary property rights. [37] This issue may be relevant to whether Mr. Peklo is in compliance with the terms of his license, but it has no bearing on the merits of the amendment application.

22.    In any event, on February 22 and 24, 2016, as supplemented on March 1, 2016, Mr. Peklo filed the required progress report under Article 204. In the report, Mr. Peklo asserts that he has the necessary land and flowage rights for construction and operation of the project. [38] The report includes the necessary information to satisfy the requirements of Article 204 of the license. In their protest, the Landowners dispute the approved Exhibit G, arguing that the licensee does not own all property in the project boundary, specifically Lot 9 in the impoundment area. We again note that property rights disputes are not within the Commission's jurisdiction but are a matter for the appropriate court to resolve. [39]

**2. Environmental Justice**

23.    In conducting NEPA reviews of proposed hydropower projects, the Commission follows the instruction of Executive Order 12898, which directs federal agencies to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on minority and low-income populations ( i.e., environmental justice communities). [40] Executive Order 14008 also directs agencies to develop "programs,

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Exhibit 13C

Page 4 of 10

policies, and activities to address the disproportionately high and adverse human health, environmental, climate-related and other cumulative impacts on disadvantaged communities, as well as the accompanying economic challenges of such impacts." [41] Environmental justice

is "the fair treatment and meaningful involvement of all people regardless of race, color, national origin, or income with respect to the development, implementation, and enforcement of environmental laws, regulations, and policies." [42]

p. 62,631

p. 62,632

24.    In the EA, Commission staff identified one environmental justice community within a one- mile radius of the project boundary and considered how the proposal could affect the community. [43] The EA concluded that the proposal would have no adverse effect on geology and soils, water quantity, water quality, aquatic resources, terrestrial resources, threatened and endangered species, recreation, cultural resources, land use, and any increases in noise or effects on aesthetic resources would be short-term and temporary. [44] Therefore, we find that the proposal will not result in disproportionately high and adverse impacts on the identified environmental justice community.

### B. *Compliance with Commission Requirements*

25.    The Landowners assert that Mr. Peklo has a history of failing to comply with Commission deadlines and conditions. [45] They point to Mr. Peklo's compliance with Commission directives related to his repair of the dam's west gate as an example of his inability to comply with Commission deadlines and license conditions. Specifically, Landowners allege that Mr. Peklo did not comply with the Commission's Division of Dam Safety and Inspection New York Regional Office (D2SI- NYRO) directions after he requested permission to repair the dam's west gate and that he limited flow over the dam by raising the height of the dam beyond what is allowed in the license. [46] D2SI- NYRO authorized the emergency repairs of the gate structure on July 10, 2019, noting that the repair had to be consistent with the license requirements. [47] Commission staff has not identified any compliance issues regarding these repairs.

26.    The Landowners also state generally that Mr. Peklo's alleged history of non-compliance with Commission requirements and license conditions demonstrates that the Commission cannot conclude that the project will be safe when constructed, operated, and maintained. [48] The License Order addresses dam safety and requires Mr. Peklo to comply with safety regulations and coordinate with D2SI-NYRO. [49] Staff from D2SI-NYRO last inspected the project on June 28, 2023. By letter dated October 17, 2023, D2SI-NYRO required that Mr. Peklo maintain vegetation in the project area at 4 inches or less, remove woody vegetation within 15 feet of any project structure, and provide photographs of a boat barrier that is referenced in the approved Public Safety Plan once it is installed. No additional safety issues have been identified. We note that Commission staff monitors compliance with deadlines and license conditions and has done so since the license was issued. [50]

### VII. Administrative Provisions

### A. *Revised Exhibits*

27.    Mr. Peklo included a revised Exhibit A in the amendment application to reflect the description of new turbines. The revised Exhibit A, filed on January 17, 2020, accurately reflects the two- unit configuration. The Exhibit A conforms to the Commission's rules and regulations and should be approved, superseding any previous Exhibit A, as shown in ordering paragraph (D) of this order. Ordering paragraph (B) of this order revises the project description in ordering paragraph (B)(2) of the license to reflect the new two-unit configuration.

28.    Mr. Peklo included three new Exhibit F drawings with the amendment application showing plans, elevations, and sections of the configuration of the powerhouse to include the two units. The new Exhibit F drawings do not conform to the Commission's regulations and cannot be approved as filed. The exhibit drawings

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Sep 13, 2024 from VitalLaw®

Exhibit 13C
Page 5 of 10

(F-1 through F-4) do not have any elevations. All drawings must contain dimensions and elevations ( *e.g.*, normal water surface, top of flashboard, and dam crest elevations noted on elevations, profiles, and sections). Elevations should be provided in a vertical datum such as North American Vertical Datum of 1988 or National Geodetic Vertical Datum of 1929, and the datum for all elevations should be noted on the drawing(s). In addition, although the drawings do have a graphical scale, there is no North Arrow depicted on the plans. Therefore, the Exhibit F drawings must be revised to include the elevation datum on all drawings that have elevations as well as a north arrow where appropriate. Ordering paragraph (E) of this order requires Mr. Peklo to re- file the Exhibit F drawings within 90 days from the issuance date of this order, for Commission approval. All information on the drawings must be legible and conform to the standards and specifications under the Commission's regulations at 18 C.F.R. §§4.39 and 4.41 (g).

29.   No change to the approved project boundary is proposed, therefore, Mr. Peklo did not include a revised Exhibit G with the amendment application. [51] Mr. Peklo is reminded to update the

p. 62,632
p. 62,633

exhibit drawings, if needed, after the proposed facilities are completed to reflect as built conditions.

**B.** *Installed Capacity and Annual Charges*

30.   The Commission collects annual charges from licensees for the administration of the FPA, and Article 201 provides for the collection of these charges. Under regulations currently in effect, projects with an authorized installed capacity of less than or equal to 1,500 kW will not be assessed an annual charge. [52]

31.   The proposal to replace the 76-kW turbine with two 45-kW turbine/generator units would result in an authorized installed capacity of 90 kW. Ordering paragraph (B) of this order revises the project description in ordering paragraph (B)(2) of the license to reflect this amendment and to be consistent with the revised Exhibit A described above. However, Mr. Peklo will not be assessed annual charges because the proposed installed capacity of the project is less than 1,500 kW. Ordering paragraph (C) of this order revises Article 201 of the license to reflect the revised authorized installed capacity of 90 kW.

**C.** *Construction Related Articles*

32.   Mr. Peklo is reminded of his obligations set forth in the license, including the requirements that he consult with D2SI-NYRO regarding project construction, and that he not begin construction until the D2SI-NYRO Engineer has reviewed and commented on the plans and specifications, determined that all preconstruction requirements have been satisfied, and authorizes start of construction. Ordering paragraph (F) of this order requires Mr. Peklo to submit Final Design Documents to the Commission before he can receive approval to start construction from D2SI-NYRO. Additionally, ordering paragraph (G) of this order requires Mr. Peklo to start and complete the upgrades by October 16, 2024, and October 16, 2027, respectively. [53] Mr. Peklo is reminded that he must complete and receive Commission approval for all pre-construction related articles required in the license before commencing construction. [54]

### VIII. Conclusion

33.   Based on the information, analysis, and evaluations in the EA, we conclude that approval of the license amendment would not constitute a major federal action significantly affecting the quality of the human environment. The proposal would provide benefits, including increasing the project's capacity and improving aesthetics by replacing three pole-mounted transformers with a single pad-mounted transformer. Therefore, the amendment application, with the additional modifications and requirements stated herein, is approved.

*The Commission orders*:

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Exhibit 13C
Page 6 of 10



(A) Andrew Peklo III's amendment application for the Pomperaug Hydro Project No. 12790, filed October 15, 2019, and as supplemented on January 17, 2020, February 12, 2020, February 18, 2020, May 21, 2020, and March 15, 2021, is approved.

(B) Ordering paragraph (B)(2) of the license is revised to read as follows:

> Project works consisting of: (1) the existing 15-foot-high, 90-foot-long granite block and masonry Pomperaug River dam; (2) an existing 30-inch-high, 30-inch-wide slide gate at the west end of the dam; (3) an existing 48-inch-high, 60-inch-wide drain gate near the middle of the dam; (4) an existing 30-inch-high, 30-inch-wide east gate and intake structure at the east end of the dam with a new trashrack with 0.75- inch clear bar spacing; (5) a new steeppass fish ladder; (6) an existing 3-acre impoundment with a normal water surface elevation of 226.43 feet above mean sea level; (7) an existing 42-inch- high, 50-inch-wide, 40-foot-long stone-lined penstock; (8) a new 10-foot-wide, 25-foot-long sound-insulated powerhouse and two 45 kilowatt (kW) turbine-generating units (for a total generating capacity of 90 kW) located in an existing mill building and submerged in a reinforced concrete vault; (9) two new 1.5-foot-diameter draft tubes with individual lengths of 10-feet and 12-feet to direct water from the turbine back into the river downstream of the dam; (10) one pad-mounted 100-kVA transformer; and (11) appurtenant facilities.

(C) Article 201 of the license is revised, effective the date of this order, to read:

*Article 201*. *Administrative Annual Charges*. The licensee must pay the United States the following annual charges, as determined in accordance with provisions of the Commission's regulations in effect from time to time: effective as of the date the licensee is required to commence project construction, or as that deadline may be extended, to reimburse the United States for the cost of administration of Part 1 of the Federal Power Act. The authorized installed capacity for that purpose is 90 kilowatts (kW). Under the regulations currently in effect, projects with an authorized installed capac

p. 62,633
-------------------------------------------------------------------------------------------------
p. 62,634

ity of less than or equal to 1,500 kW will not be assessed an annual charge.

(D) The licensee's revised Exhibit A, filed on January 17, 2020, is approved, and made part of the license, superseding the previous Exhibit A.

(E) Within 90 days of the issuance date of this order, the licensee must file, for Commission approval, revised Exhibit F drawings. The Exhibit F drawings should include: the elevation datum on all drawings that have elevations as well as the North Arrow on the appropriate drawings. All information on the drawings must be legible and conform to the standards and specifications under the Commission's regulations at 18 C.F.R. §§4.39 and 4.41 *(g)*. The licensee must **label and file the Exhibit F drawings as Critical Energy Infrastructure Information (CEII) material under** 18 C.F.R. §388.113**.**

(F) *Final Design Documents*. At least 60 days prior to the start of any construction, the licensee must file final design documents with the Commission by eFiling to the appropriate Regional Office. The design documents must include: final plans and specifications, supporting design report, Quality Control and Inspection Program, Temporary Construction Emergency Action Plan, and Soil Erosion and Sediment Control Plan. The licensee may not begin construction until the Division of Dam Safety and Inspections - Regional Engineer has reviewed and commented on the documents, determined that all preconstruction requirements have been satisfied, and authorized start of construction.

(G) Andrew Peklo III's May 21, 2020 answer is rejected.

(H) The licensee must start construction of the proposed work authorized in this order by October 16, 2024, and complete all construction by October 16, 2027.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.         Sep 13, 2024 from VitalLaw®

Exhibit 13C
Page 7 of 10



(I) This order constitutes final agency action. Any party may file a request for rehearing of this order within 30 days from the date of its issuance, as provided in section 313(a) of the Federal Power Act, 16 U.S.C. §825 *l*, and the Commission's regulations at 18 C.F.R. §385.713 (2023). The filing of a request for rehearing does not operate as a stay of the effective date of this order, or of any other date specified in this order. The licensee's failure to file a request for rehearing shall constitute acceptance of this order.

---

**Footnotes**

1    Mr. Peklo supplemented the amendment application in subsequent filings on January 17, 2020, February 12, 2020, February 18, 2020, May 21, 2020, and March 15, 2021.

2    *Andrew Peklo III*, 149 FERC ¶61,037 (2014) (License Order).

3    On April 16, 2015, Commission staff issued an order amending the license to remove the transmission line because the interconnection to the grid is located within the powerhouse. *Andrew Peklo III*, 151 FERC ¶62,022 (2015).

4    License Order, 149 FERC ¶61,037 at Article 301.

5    Commission staff issued orders granting Mr. Peklo's requests for extensions of time to commence and complete construction on July 7, 2016, September 27, 2019, and March 22, 2023. *See Andrew Peklo III*, Project No. 12790-002 (July 7, 2016) (delegated order); *Andrew Peklo III*, Project No. 12790-002 (Sept. 27, 2019) (delegated order); *Andrew Peklo III*, Project No. 12790-002 (Mar. 22, 2023) (delegated order).

6    *Andrew Peklo III*, Project No. 12790-002 (Sept. 27, 2019) (delegated order) at P 8.

7    16 U.S.C. §806. In 2018, section 3001(b) of the America's Water Infrastructure Act amended section 13 of the FPA to allow the Commission to extend the deadline for commencement of construction for up to eight additional years. America's Water Infrastructure Act of 2018, Pub. L. No. 115-270, §3001, 132 Stat 3765, 3862 (2018). Section 13 does not limit the Commission's ability to extend the completion deadline.

8    Application at 2.

9    Mr. Peklo's application states that the transformer capacity is 100 kW. Application at 6. We assume that this is a typographical error, and the correct capacity is 100 kVA.

10    This will eliminate the use of three pole-mounted transformers. Application at 5–6.

11    Application at Ex. A.

12    Application at 6.

13    January 17, 2020 Filing of Revised Exhibits A and F.

14    February 18, 2020 Filing, attaching FWS February 12, 2020 Comment Letter.

15    February 18, 2020 Filing, attaching Connecticut DEEP February 14, 2020 Comment Letter.

16    Timely, unopposed motions to intervene are granted by operation of Rule 214(c)(1) of the Commission's Rules of Practice and Procedure. 18 C.F.R. §385.214(c)(1) (2023).

17    Landowners May 15, 2020 Protest.

18    Mr. Peklo states that he does not oppose the Landowners' intervention. Answer at P 30.

19    18 C.F.R. §385.213(a)(2) (2023).

20    December 14, 2023 Environmental Assessment (EA).

21    33 U.S.C. §1341(a)(1).

22    *Id*. §1341(d).

23    License Order, 149 FERC ¶61,037 at Appendix A.

24    *See Alabama Rivers All. v. FERC*, 325 F.3d 290, 300 (D.C. Cir. 2003) (holding that section 401 of the CWA is triggered and a new water quality certificate is required when an amendment may result in increased or new discharge into navigable waters).

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

25   16 U.S.C. §1536(a).

26   2014 EA at 7; A-2.

27   EA at A-2.

28   *Id*. at 14.

29   54 U.S.C. §306108.

30   36 C.F.R. pt. 800.5(a)(2)(vii) (2023).

31   An undertaking means "a project, activity, or program funded in whole or in part under the direct or indirect jurisdiction of a federal agency, including those carried out by or on behalf of a federal agency; those carried out with federal financial assistance; and those requiring a federal permit, license, or approval." 36 C.F.R. §800.16(y) (2023).

32   EA at 24.

33   *Id*. at 18.

34   *Id*.

35   *Id*. at 18–19.

36   Under Standard Article 5, the licensee has five years to acquire sufficient property rights to construct, maintain, and operate the project to enable the Commission, through the licensee, to carry out its regulatory responsibilities under the FPA. License Order, 149 FERC ¶61,037 at P 54; *see also N.Y. Irrigation Dist.*, 58 FERC ¶61,271, at 61,856 (1992). A licensee may acquire property rights by contract, purchase, or lease, and section 21 of the FPA authorizes licensees to acquire property rights by eminent domain if negotiations fail. 16 U.S.C. §814.

37   Landowners Protest at 3–5.

38   February 22, 2016 Filing.

39   *See, e.g., Appalachian Power Co* ., 112 FERC ¶61,026 at P 89 (2005); *Halecrest Co*., 60 FERC ¶61,121, at 61,413 (1992) (finding the FPA does not confer on the Commission any jurisdiction or authority to resolve disputes between the licensee and third parties that concern interests in real property).

40   Exec. Order No. 12,898, 59 *Fed. Reg*. 7629 (Feb. 16, 1994). While the Commission is not one of the specified agencies in Executive Order 12898, the Commission nonetheless addresses environmental justice in its analysis, in accordance with our statutory duties.

41   Exec. Order No. 14,008, 86 *Fed. Reg*. 7619 (Jan. 27, 2021). The term "environmental justice community" includes disadvantaged communities that have been historically marginalized and overburdened by pollution. *Id*. The term also includes, but may not be limited to, minority populations, low-income populations, or indigenous peoples. *See* EPA, *EJ 2020 Glossary* (Aug. 18, 2022), https://www.epa.gov/environmentaljustice/ ej-2020-glossary.

42   EPA, *Learn About Environmental Justice* (Sept. 6, 2022), https://www.epa.gov/environmentaljustice/learn-about-environmental-jus tice#:~:text=Environmental%20justice%20(EJ)%20is%20

the,environmental%20laws%2C%20

regulations%20and%20policies.

43   EA at 22–23.

44   *Id*. at 23.

45   Landowners Protest at 1.

46   *Id*.

47   Commission staff's July 10, 2019 Letter. [C. Deschamps 3.18.23]

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



48    Landowners Protest at 6.

49    License Order, 149 FERC ¶61,037 at PP 68–73. For example, Article 302 of the license states that Mr. Peklo may not begin construction until D2SI-NYRO has reviewed and commented on the plans, determined all preconstruction requirements have been satisfied, and authorized the start of construction.

50    *See, e.g.*, *Andrew Peklo III* , Project No. 12790-002 (July 27, 2018) (delegated order) (denying extension of time request and finding Mr. Peklo out of compliance with his license); *Andrew Peklo III*, Project No. 12790-002 (Mar. 22, 2023) (delegated order) (granting extension of time request).

51    The April 6, 2015 Order Amending License and Project Description, and Approving Revised Exhibit G Drawing approved the current Exhibit G. *Peklo*, 151 FERC ¶62,022 at ordering para. (B).

52    18 C.F.R. §11.1 (2023).

53    The March 22, 2023 Extension of Time established these final extensions of time to commence and complete construction and explained that no further extensions would be granted.

54    The Debris Management Plan required under Article 403 was approved on October 2, 2019. *Andrew Peklo III* , 169 FERC ¶62,002 (2019) (delegated order). The Run of River and Impoundment Refill Operation Monitoring Plan, Erosion and Sediment Control Plan, Fish Passage and Eel Passage Plans, and Water Quality Monitoring Plan were filed on March 11, 2021, and are under review in a separate proceeding. Documentation of project financing pursuant to Article 204 and a Noise Monitoring Plan pursuant to Article 407 have yet to be filed.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Sep 13, 2024 from VitalLaw®