VitalLaw®



# 166 FERC to 187 FERC, Sacramento Municipal Utility District, Project No. 2101-178, 178 FERC ¶61,112, FERC (Federal Energy Regulatory Commission), (Feb. 17, 2022)

166 FERC to 187 FERC
Project No. 2101-178
166 FERC to 187 FERC ¶61,112

Click to open document in a browser

p. 61,786

Sacramento Municipal Utility District,

Project No. 2101-178

Order Addressing Arguments Raised on Rehearing

February 17, 2022

Before Commissioners: Richard Glick, Chairman; James P. Danly, Allison Clements, Mark C. Christie, and Willie L. Phillips.

1.    On September 23, 2021, the Commission approved the Slab Creek Recreation Streamflow Parking and Access Plan (Parking and Access Plan or Plan) filed by Sacramento Municipal Util

-------------------------------------------------------------------------------

p. 61,786

p. 61,787

ity District (SMUD), the licensee for the Upper American River Hydroelectric Project No. 2101 (Upper American Project). [1] In relevant part, the Commission accepted SMUD's proposal to construct a whitewater boating take-out facility on the South Fork American River at the Rock Creek Powerhouse. [2]

2.    On October 25, 2021, American Whitewater, American River Recreation Association, California Outdoors, California Sportfishing Protection Alliance, Foothill Conservancy, Friends of the River, Theresa Lorejo-Simsiman, and Hilde Schweitzer (collectively, American Whitewater) jointly requested rehearing of the September 2021 Order. [3]

3.    Pursuant to *Allegheny Defense Project v. FERC*, [4] the rehearing request filed in this proceeding may be deemed denied by operation of law. However, as permitted by section 313(a) of the Federal Power Act (FPA), [5] we are modifying the discussion in the September 2021 Order and setting aside the order, in part, as discussed below. [6]

### I. Background

**A. *License Requirements***

4.    In 2005, SMUD filed an application for a new license to continue to operate and maintain the Upper American Project. The project comprises seven developments on the Rubicon River, Silver Creek, and South Fork American River in El Dorado and Sacramento Counties, California. [7] The project occupies federal lands administered by the U.S. Forest Service (Forest Service) within the Eldorado National Forest and federal lands administered by U.S. Bureau of Land Management (BLM).

5.    In 2007, fifteen stakeholders executed a Relicensing Settlement Agreement [8] that informed the Forest Service's proposed conditions and recommendations for the forthcoming license. [9] The Forest Service explained that its final June 11, 2008 proposal, combined conditions under section 4(e) of the FPA and

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Wolters Kluwer

recommendations under section 10(a) of the FPA. [10] The Forest Service distinguished the section 10(a) recommendations in italicized text based on Forest Service's determination that those terms were not within its jurisdiction. [11]

6.    Reproducing language from the Relicensing Settlement Agreement, Forest Service Condition 50.1 addresses whitewater recreation on the Slab Creek reach of the South Fork American River below Slab Creek Reservoir. [12] In relevant part, Condition 50.1 requires that SMUD create a plan to provide access and parking near White Rock Powerhouse or, if necessary, at an alternate location:

> The licensee shall, in cooperation with FS [Forest Service], *SWRCB [ Water Control Board ] , BLM, and the Consultation Group,* [13] prepare, implement, and update as necessary, a plan that will provide easement for access and parking in the immediate vicinity of White Rock Powerhouse for recreational streamflows described above. The licensee shall make a good faith effort to purchase at fair market value suitable real property as such property becomes available, or to obtain a long-term lease or easement for use of such property, if necessary for these
>
> ------------------------------------------------------------------------------- p. 61,787
> p. 61,788
>
> facilities. If easements cannot be obtained, licensee shall consult with [Forest Service], [ *Water Control Board*] *, BLM, and the Consultation Group* to determine an alternate location for access. The plan shall be approved by [Forest Service], [ *Water Control Board*] *, BLM, and the Consultation Group* and implemented no later than year 2 after license issuance. [14]

Article 401(a) of the new license, issued in July 2014, required SMUD to obtain Commission approval of the Parking and Access Plan before its implementation. [15]

7.    In 2016, the Forest Service, BLM, and the Commission again addressed the future whitewater boating take-out facility as part of a proceeding to amend the license. In relevant part, BLM filed 4(e) conditions that included Specific Resource Condition 1:

> If the Licensee finds a suitable location to build a whitewater boating takeout on BLM lands the Licensee shall fund and conduct the NEPA analysis, and construct and maintain the boating takeout(s) within three years. The take-out needs to include vehicular access, parking, onsite water gage sign, and a Kiosk sign that is acceptable and approved by BLM. Funding provided from SMUD will be required to pay for BLM involvement in managing this activity if the takeout occurs on BLM land. The funding amount has not been determined yet because the BLM cannot assess our costs associated with this amendment until more information is known about location of required boating put- ins and take-outs are finalized. [16]

8.    SMUD began studying potential locations for a new whitewater boating take-out facility as early as 2010, before the Commission had issued the new license, based on the Relicensing Settlement Agreement with stakeholders including American Whitewater. On February 26, 2019, SMUD submitted its Parking and Access Plan to develop the Rock Creek Powerhouse site, located on BLM land. The Parking and Access Plan describes the existing physical conditions at the Rock Creek Powerhouse site, proposes improvements to develop a suitable whitewater boating take-out facility, and discusses the process, after Commission approval, to develop the final design plans and construct the facility.

9.    In the September 2021 Order, the Commission found that SMUD has satisfied the requirements regarding consultation on the Parking and Access Plan, and that the Plan is consistent with BLM's Specific Resource

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Condition 1 in the 2016 Amendment Order. [17] Thus, the Commission found it in the public interest to approve the Parking and Access Plan. [18]

10.    On October 25, 2021, American Whitewater requested rehearing, arguing that SMUD's Parking and Access Plan did not satisfy the requirements in Condition 50.1 of the License Order.

## II. Discussion

### A. *Determining the site of the whitewater boating take-out facility*

#### 1. *Rejecting White Rock Powerhouse*

11.    As quoted above, Condition 50.1 contemplates that SMUD and the Consultation Group will determine an alternate location for parking and access for recreational stream flows if SMUD has made "a good faith effort to purchase at fair market value suitable real property [at the White Rock Powerhouse] as such property becomes available, or to obtain a long-term lease or easement for use of such property, if necessary for [access and parking] facilities," yet such easements cannot be obtained. [19] In the September 2021 Order, the Commission stated that SMUD conducted outreach to the owners of the two private access roads to the White Rock Powerhouse and, as a result of that outreach, SMUD concluded that its existing easements for use of both private roads are not a general grant of a right-of-way, as would be required to allow the public to use the roadways for boating access. [20] The Commission concluded that SMUD had demonstrated that opposition by landowners near the powerhouse makes the area infeasible as a site for the take-out facilities. [21]

12.    On rehearing, American Whitewater claims that the Commission should have independently inquired whether SMUD had validly determined that its existing access rights on property at the downstream White Rock Powerhouse are insufficient to establish recreational boating access for the public. [22] According to American Whitewater, the Commission also failed to consider competing evidence that American Whitewater submitted to show that SMUD's easements are sufficient to provide take-out access at White Rock Powerhouse on the days when SMUD is providing recreational streamflow releases pursuant to the

p. 61,788
p. 61,789

license. [23] American Whitewater also criticizes the Commission for failing to cite substantial evidence that landowner opposition in the vicinity of the White Rock Powerhouse, as alleged by SMUD, is sufficient to render the site completely infeasible. [24]

13.    The Commission appropriately relied on SMUD's explanation that its existing easements at White Rock Powerhouse do not allow the public to use the roadways for boating access. [25] With the submitted Plan, SMUD reproduced its responses to similar arguments from American Whitewater in its comments on the draft Plan. [26] SMUD responded that under California statute and caselaw, the scope of a granted property right is tied to the explicit terms of the grant. [27] SMUD stated that the grants for use of Meadow Lane and Holland Drive at White Rock Powerhouse are specifically "for ingress to and egress from [SMUD's] electrical facilities." [28] Thus, SMUD concluded that the grant does not provide for an easement for the public to use the roadways for recreational boating near SMUD's electrical facilities. [29] SMUD explained that there is no indication in the grant that SMUD or the landowners intended the broader use of the roadways, that the obligation under SMUD's license to provide the take-out facility could not expand the scope of the existing easements, and that a past history of boaters' unauthorized use of the roadways did not give rise to a public right-of-way for boaters. [30]

14.    On rehearing, American Whitewater disagrees with SMUD's view of the language of the easements, factual history, and case law. For example, American Whitewater notes that some but not all easements include the limiting language about ingress and egress to electrical facilities. [31] Even when the limiting language is present, American Whitewater argues that it does not restrict the *purpose* for accessing the electrical facilities,

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

such as accessing the river at the same site. [32] American Whitewater also argues that SMUD has a history of authorizing third parties to use the easements for license-mandated activities, such as allowing parties to conduct environmental analysis or boaters to participate in SMUD's 2003 whitewater boating flow study. [33] American Whitewater states that SMUD has not provided a cogent explanation for prohibiting license-mandated take- out access for boaters during recreational streamflows. [34]

15.    Legal disputes regarding property rights—such as those that might arise when a licensee seeks to obtain an easement from a private landowner—are not within the Commission's jurisdiction. [35] Rather, property rights are a matter of state law for an appropriate court to resolve, as the Commission does not adjudicate property rights. American Whitewater has not shown SMUD's position to be unreasonable or in error. We are not persuaded by American Whitewater's comparison between, on the one hand, SMUD permitting its agents to use the easements to access the site for information-gathering, including the three-day period in which SMUD shuttled boaters from the site as part of SMUD's 2003 whitewater boating flow study, and, on the other hand, SMUD allowing unknown people to use the easements to access the site for recreation year-after-year.

16.    We find that the Commission appropriately concluded that "SMUD has demonstrated that opposition by landowners near the powerhouse makes that area infeasible as a site." [36] SMUD described in detail its efforts to negotiate with landowners for parking and access to the White Rock Powerhouse. [37] Specifically, SMUD hosted a community meeting in December 2012 with Meadow Lane and Holland Drive private property owners regarding the use of easements for parking and access at White Rock Powerhouse. [38] SMUD stated that none of the attending landowners at the meeting spoke in favor of signing an agreement to allow recreational use on the roads. [39] SMUD also stated that in September and October 2016, SMUD approached all 33 landowners again by letter detailing SMUD's interest in acquiring additional access rights and compensating landowners for those rights. [40] SMUD reported that of the thirty landowners for whom SMUD received return receipts, eighteen were opposed

p. 61,789
p. 61,790

to amending the easement, three were in favor, and nine did not respond. [41] SMUD made a second effort to contact non-responsive landowners, resulting in one additional opponent. [42] Because additional access requires consent from all landowners to make the take-out facility viable, SMUD stated that it discontinued its outreach effort. [43]

17.    Given this history of outreach and the responses from the relevant landowners, we continue to find that SMUD satisfied Condition 50.1's requirement to make "a good faith effort to purchase at fair market value suitable real property as such property becomes available, or to obtain a long-term lease or easement for use of such property, if necessary for [access and parking] facilities" as contemplated by Condition 50.1. [44]

18.    American Whitewater states that in the September 2021 Order, the Commission did not discuss the use of a licensee-provided shuttle service to facilitate boater access at the White Rock Powerhouse without the need for boaters themselves to drive on easement roads. [45] American Whitewater suggested a shuttle service in its motion to intervene as a means to reduce vehicle traffic and place it under SMUD's control. [46] On rehearing, American Whitewater cites three examples where the Commission required licensees to provide take-out shuttle services at the North Georgia Hydroelectric Project No. 2354, at the Santa Felicia Project No. 2153, and at the Prospect 2 Project No. 2630. [47]

19.    The 2014 License Order and 2016 Amendment Order do not require that SMUD consider a shuttle service for boaters at White Rock Powerhouse. A shuttle is not compatible with SMUD's interpretation that its existing easements are limited to providing ingress and egress to the project's electrical facilities. The fact that SMUD operated a shuttle for boaters for three days in 2003 for the purpose of completing whitewater boating flow study does not show that SMUD can or must continue to provide such service for the whitewater recreation

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



season year-after-year. Further, we find that the examples of shuttles cited by American Whitewater are not instructive. [48] Although it is true that the Commission staff ordered licensee Georgia Power Company to provide a free take-out shuttle at its North Georgia Hydroelectric Project No. 2354, the Commission did so as a time-limited measure because the licensee's modernization plan for a dam and powerhouse would restrict parking at an existing, authorized take-out site used by boaters during recreation flows. [49] The shuttle at the Santa Felicia Project No. 2153 was similarly a time-limited interim measure. The Commission required that the licensee provide the shuttle until the licensee could provide a permanent access facility. [50] The shuttle at Prospect 2 Project No. 2630 was not required by the Commission. Instead the licensee PacifiCorp proposed to provide the shuttle on its own lands during a three-year recreation flow study, with an offer to provide a shuttle on private lands "contingent on the paddling community securing an agreement with downstream property owners for egress on their lands." [51] No agreement was reached during the study period. PacifiCorp later voluntarily committed to continue providing the shuttle service on its own lands and again offered to provide a shuttle over the private lands if the boaters could obtain the necessary property rights. [52] Here, by contrast, Condition 50.1 contemplates that if SMUD cannot obtain easements for access and parking at White Rock Powerhouse for recreational boating, then SMUD and the other parties will select an alternate location. The Commission will not place a requirement on SMUD to consider a shuttle service at the White Rock Powerhouse.

20.    On rehearing, American Whitewater claims that in the September 2021 Order, the Commission failed to conduct an independent inquiry or provide substantial evidence for a conclusion that a take-out facility at a 0.2-acre area at White Rock Powerhouse, which is within the project boundary of the downstream Chili Bar Project, would be unsafe. [53] American Whitewater offers no citation to the flawed discussion in the September 2021 Order and we cannot identify it. American Whitewater is obligated to "set forth specifically the ground or grounds upon which" its request for rehearing is based. [54] The Commission did not discuss or rely on safety concerns in its

p. 61,790

p. 61,791

decision to accept SMUD's plan to use an alternate location rather than siting the take-out in the immediate vicinity of the White Rock Powerhouse. [55] We dismiss American Whitewater's argument.

### 2. Accepting Rock Creek Powerhouse

#### a. Suitability

21.    In the September 2021 Order, the Commission noted several reasons provided by SMUD for the selection of the Rock Creek Powerhouse as the most suitable alternate location for a take-out facility:

> [T]he site is: (1) located on public land administered by BLM; (2) there is existing infrastructure, such as road access and space for parking, as well as developable land; (3) there are limited environmental impacts associated with the site; and (4) the site could be developed in a short period of time. [56]

On rehearing, American Whitewater contends that the Commission did not support these findings with substantial evidence and did not consider important aspects of the site's feasibility. [57]

22.    Because the alternate location at Rock Creek Powerhouse might result in the take-out facilities being placed within the project boundary of a different licensed project, the September 2021 Order requires that:

> If needed, to preclude overlapping project boundaries, [SMUD] must coordinate with [Hydroland Omega, LLC (Hydroland)], the owner of the Rock Creek Project No. 3189, to file concurring

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Sep 13, 2024 from VitalLaw®

Exhibit 13E
Page 5 of 16

Wolters Kluwer

applications to amend their respective project boundaries to include the proposed improvements associated with the whitewater boating take-out facility only in the Upper American River Hydroelectric Project No. 2101 project boundary. [58]

American Whitewater claims that the Commission provided no evidence that Hydroland is willing to amend its project boundary, and the Commission failed to consider that the take-out at Rock Creek Powerhouse will be infeasible without Hydroland's consent. [59] In a related argument, American Whitewater states that the Commission did not consider whether the requirements and conditions in the separate license for the Rock Creek Project No. 3189, such as its requirement that Hydroland provide picnic tables and parking at the powerhouse area, might complicate or preclude Hydroland's ability to amend its project boundary. [60] Another possible complication raised by American Whitewater is that the location at the immediate outlet of the Rock Creek Powerhouse may void Hydroland's exemption from the Commission's requirement to prepare an Emergency Action Plan, the burden and cost of which would disincentivize Hydroland from adjusting its project boundary. [61]

23.    SMUD will continue to work with BLM, the Water Control Board, California Outdoors, and American Whitewater on the final project design and location. [62] SMUD is required to coordinate the amendment of both project boundaries only if needed. We also note that the problem of potentially overlapping project boundaries would be an administrative issue in this case, not a jurisdictional or functional issue. The project boundary is intended, as a matter of administrative convenience, to define those lands, waters, and facilities that comprise a project, but it does not set the limit of the Commission's authority to require a licensee to fulfill its obligations under a license. [63] The Commission will retain complete jurisdiction to ensure that both SMUD and Hydroland fulfill their obligations under their respective licenses. Even if the project boundaries were to partially overlap, there is nothing in the record to indicate that SMUD's whitewater take-out facility will encroach upon or affect the operation or facilities of the Rock Creek Hydroelectric Project, including any effect on Hydroland's exemption from the Commission's requirement to prepare an Emergency Action Plan. American Whitewater's concerns are premature.

24.    American Whitewater states that the Commission found that existing infrastructure at the Rock Creek Powerhouse aids in site suitability, yet argues that the Commission failed to consider American Whitewater's competing evidence of issues such as safety and functionality that affect the site's suitability, cost to develop, and feasibility. [64] American Whitewater asserts that the Commission improperly deferred reasoned decision-making by accepting SMUD's commitment to address site-specific considerations in the post-approval project design phase. [65]

p. 61,791
p. 61,792

25.    In the September 2021 Order, the Commission summarized American Whitewater's position that:

the proposed Rock Creek Powerhouse site presents significant challenges to boaters, and it recommends an alternative site approximately 100 feet upstream from the proposed take-out location near Rock Creek Powerhouse, which it states would provide smoother egress. [66]

American Whitewater has not claimed on rehearing that the Commission misrepresented its position. The Commission also noted SMUD's response that:

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Sep 13, 2024 from VitalLaw®

Exhibit 13E
Page 6 of 16

> site-specific considerations like this would be addressed in the project design phase, and that the Parking and Access Plan was revised to emphasize that final project design would include an access trail and streambank improvements to address concerns regarding suitability of the site. [67]

American Whitewater does not argue that its concerns cannot be addressed through revisions during the project design phase, in which SMUD has committed to work with American Whitewater. As noted in the September 2021 Order, SMUD's selected Rock Creek Powerhouse site was used successfully as an interim take-out during the 2016, 2018, and 2019 recreation streamflow releases. [68]

26.    American Whitewater also takes issue with the Commission's unsupported findings that there would be limited environmental impacts associated with the site and that the site could be developed in a short period of time. [69] On the matter of timing, American Whitewater states that the Commission erred by failing to consider how future environmental review or a future coordinated amendment of the project boundaries could affect timing. [70]

27.    The Commission must ensure that SMUD has complied and will comply with the procedures and substantive outcomes required by the 2014 License Order and the 2016 Amendment Order. In the September 2021 Order, the Commission noted SMUD's reasoning for selecting the Rock Creek Powerhouse site, specifically due to its: location on public land administered by BLM, existing infrastructure and developable land, limited environmental impacts, and ability to be developed in a short period of time. [71] Although the Commission noted SMUD's reasoning for the site selection, these were not findings by the Commission. There is no requirement under the 2014 License Order or the 2016 Amendment Order that the alternate location provide some environmental or timing advantage.

28.    In fact, Condition 50.1 does not prescribe any traits of the alternate location. BLM's Specific Resource Condition 1 in the Amendment Order requires that an alternate location on BLM land must provide vehicular access, parking, an onsite water gage sign, and a kiosk sign that is acceptable and approved by BLM. In a letter dated January 8, 2020, BLM stated that it reviewed the Plan and determined that the design of the facility improvements would adequately address Condition 1. [72] Because it is not possible for a site "in the immediate vicinity of White Rock Powerhouse" to "provide easement for access and parking … for the recreational streamflows" that Condition 50.1 requires in the Slab Creek reach, the alternate location must satisfy this purpose. Accordingly, in September 2021 Order, the Commission concluded that the Rock Creek Powerhouse site would satisfy the requirements in the license:

> As noted above, the Rock Creek Powerhouse site was used successfully as an interim take-out during the 2016, 2018, and 2019 recreation streamflow releases. We conclude that the Parking and Access Plan details a facility that would ensure reliable egress for boaters during license-required recreation streamflow releases. [73]

We continue to find that SMUD provided sufficient evidence that it had fulfilled the procedural requirements for the selection of the alternate location and that the selected Rock Creek Powerhouse site will facilitate the license-required recreation. [74]

### b. *Access to recreational streamflows*

29.    On rehearing, American Whitewater claims that the Commission provided no substantial evidence or reasoned explanation for the Commission's conclusion that "[g]iven the whitewater boating runs that would be provided by the proposed Plan and that there are intermediate whitewater runs in the immediate vicinity, we

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

conclude that the Plan provides sufficient recreational opportunities." [75] American Whitewater refutes SMUD's statement, recounted in the September 2021 Order, that SMUD provides several miles of paddling at the same difficulty level in the Chili Bar reach five miles below the downstream Chili Bar dam. [76] American Whitewater contends that these are not comparable substitutes; paddlers

p. 61,792

p. 61,793

prefer the experience on the lower Slab Creek reach because it is less crowded and is highly rated for scenery, ease of use, accessibility, and enjoyability. [77] American Whitewater argues that access to both the Chili Bar reach and the lower Slab Creek reach is needed to meet demand. [78]

30.    Related to access, the Commission stated in the September 2021 Order that SMUD would need to provide a formal put-in site at the Rock Creek Powerhouse to support paddlers seeking to only access the intermediate rapids in the lower Slab Creek reach, without first traversing the expert-level rapids upstream, but there is no requirement on SMUD to do so. [79] On rehearing, American Whitewater responds that construction of a river access facility at Rock Creek Powerhouse is not necessary because Hydroland already allows boaters to walk 0.7 mile along a road carrying their kayaks to an informal put-in at the river. [80] American Whitewater directly contradicts its own prior criticism of the Plan for failing to address "the need for the Rock Creek Powerhouse to serve as the put-in for the only portion of the Slab Creek reach that is accessible for intermediate skill level boaters." [81] Regardless, this point is not relevant to the inquiry whether the Rock Creek Powerhouse site is an acceptable alternate location to satisfy the requirement in Condition 50.1 for a take-out facility.

31.    American Whitewater also states that its request for a take-out facility at the White Rock Powerhouse is not based on a flawed notion that "the licensee must provide for all whitewater resources possible in the area," as the September 2021 Order suggests, [82] but is based on the need to provide access for the full Slab Creek reach that SMUD studied in its 2004 Whitewater Boating Study, which the Forest Service referenced extensively in its rationale for the Condition-50-required whitewater releases and access. [83]

32.    We continue to find that the Plan provides sufficient recreational opportunities. Condition 50.1 contemplates an alternate location to the White Rock Powerhouse to provide access and parking for the recreational streamflows that Condition 50.1 requires in the Slab Creek reach, but the Forest Service provided no criteria to evaluate the alternate location. Any alternate location upstream of the White Rock Powerhouse would forfeit access to some segment of the lower Slab Creek reach. The presence of other whitewater resources in the immediate area, even if the substitution is imperfect, is an appropriate mitigating factor for the Commission to consider. In the September 2021 Order, the Commission noted that the whitewater run below the Slab Creek reservoir extending to the Rock Creek Powerhouse site is a six-mile technical Class IV/V run, which the recreation streamflows were intended to provide. [84] The Commission cited information from the 2008 Final Environmental Impact Statement, which was informed by SMUD's 2004 Whitewater Boating Flow Study, that the reach of Class IV rapids already draws visitation at the expert level and that Commission staff expected more use in the reach by outfitters and others. [85] The Rationale Report from the Forest Service is consistent with this focus on the advanced whitewater opportunities in the upper Slab Creek reach. The rationale from the Forest Service, cited by American Whitewater, for Condition 50.1 refers only to the "advanced to expert" class IV and class V rapids in the Slab Creek reach, with no mention of intermediate class II or class III rapids in the lower Slab Creek reach. [86] For these reasons we continue to conclude that the Plan satisfies the content and purpose of Condition 50.1.

**B. *Process***

33.    As noted above, the Forest Service reproduced text from the Relicensing Settlement Agreement verbatim in Condition 50.1. In its June 11, 2008 proposal the Forest Service explained that it had combined its mandatory section 4(e) conditions and section 10(a) recommendations:

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

Sep 13, 2024 from VitalLaw®

Exhibit 13E
Page 8 of 16

> … the following Section 4(e) conditions are in nearly the exact wording as in the settlement agreement. Wording that has been italicized in these conditions indicates that the Forest Service determined that this portion of the condition was not within its jurisdiction; however, the Forest Service fully supports the italicized wording and recommends it be included in the license under Section 10(a) of the Federal Power Act. [87]

In the License Order, Commission staff noted that the italicized measures "pertain generally to references to consultation with other agencies and specifically to locations that are not within or adjacent to the Eldorado National Forest or to issues that are under the purview of other agencies." [88]

--------------------------------------------------------------------------------
p. 61,793
p. 61,794

34.    Specifically, Condition 50.1, regarding the Parking and Access Plan, combines both mandatory section 4(e) conditions and section 10(a) recommendations related to cooperation, consultation, and approval:

> The licensee shall, in cooperation with [Forest Service], [ *Water Control Board*] *, BLM, and the Consultation Group*, prepare, implement, and update as necessary, a plan that will provide easement for access and parking in the immediate vicinity of White Rock Powerhouse for recreational streamflows described above. … If easements cannot be obtained, licensee shall consult with [Forest Service], [ *Water Control Board*] *, BLM, and the Consultation Group* to determine an alternate location for access. The plan shall be approved by [Forest Service], [ *Water Control Board*] *, BLM, and the Consultation Group* and implemented no later than year 2 after license issuance. [89]

On rehearing, American Whitewater objects that the Commission ignored or improperly applied the requirements to cooperate in preparing the Plan, to obtain approval of the Plan, and to cooperate in implementing the Plan, as discussed below.

35.    The Forest Service determined that the requirements of cooperation, consultation, and approval were not part of its mandatory 4(e) conditions, except with regard to the Forest Service's own involvement. Rather, the italicized references to the Water Control Board, BLM, and the Consultation Group were recommendations under section 10(a) of the FPA. The statute directs the Commission to consider such recommendations but does not obligate the Commission to accept them. [90] The License Order did not discuss Condition 50.1's procedural requirements under 10(a). However, settlement-based consultation requirements like those in the Forest Service condition pose a jurisdictional problem. As the Commission has previously explained, we have no authority over any signatory other than the licensee and, therefore, cannot enforce those signatories' compliance with such provisions. [91] Generally, the Commission will require the licensee to: consult with specified entities, allow the entities to comment and to make recommendations, and include documentation of the consultation and copies of the entities' comments with the draft filing. [92] We find that these requirements are consistent with the scope of our authority in these circumstances, and that SMUD has satisfied these requirements.

36.    On rehearing, American Whitewater states that although SMUD fulfilled a process "generally consistent with the Commission's established expectation of licensee and applicant consultation with stakeholders," the standard of "cooperation" is substantially different. [93] To support its position, American Whitewater quotes an entry from the Oxford Dictionary [94] defining cooperation to mean "the action or process of working together to the same end." [95] American Whitewater states that cooperation would have involved "a participatory role [for the Consultation Group] in the conception, research, and writing of the plan" with open discussion of challenges on an ongoing basis, as well as a flow of ideas and solutions between the participants as they

© 2024 CCH Incorporated and its affiliates and licensors.
All rights reserved.

worked together to produce a plan. [96] The process of cooperation, American Whitewater predicts, would have required compromise by all cooperating parties and would have yielded an outcome that participants "take ownership in and find more favorable." [97] American Whitewater states that in the September 2021 Order, the Commission failed to consider the argument from its motion to intervene that SMUD did not cooperate with American Whitewater, as shown by the fact that the Plan does not substantively incorporate Consultation Group input. [98]

37.    We disagree with American Whitewater's premise that SMUD's effort over several years to request and respond to input from the resource agencies and the Consultation Group does not satisfy a definition of cooperation as "the action or process of working together to the same end." [99] More importantly, American Whitewater offers no evidence that the Forest Service intended this meaning in its direction to SMUD to "cooperate with" the participants or further intended American Whitewater's derived requirements of ongoing collaboration between all the participants and mandatory compromise by all cooperating parties.

38.    In the September 2021 Order, the Commission noted that SMUD submitted a draft Plan to the Consultation Group and other interested parties for a 30-day review and comment period. [100] The Water Control Board, Forest Service, American Whitewater, BLM, Pacific Gas and Electric, and Hilde Schweitzer returned comments. SMUD then provided a revised draft Plan to the Forest Service, BLM, the Water Control Board, California Outdoors, and American Whitewater for a 60-day

p. 61,794

p. 61,795

review and approval period. [101] The Commission concluded that "the process in which SMUD: (1) held public meetings to seek public input; (2) provided a review and comment period on the draft Plan; and (3) drafted written responses to submitted comments on the draft Plan, complies with SMUD's license obligations." [102] The Commission's analysis was appropriate and consistent with precedent.

39.    Condition 50.1 also requires that "the plan shall be approved by [Forest Service], [Water Control Board] , *BLM, and the Consultation Group* …." [103] American Whitewater claims that the September 2021 Order does not cite any evidence that BLM approved the Plan under Condition 50.1, as contrasted with BLM's approval under the Amendment Order, and the September 2021 Order does not cite any evidence that the 13 members of the Consultation Group approved the Plan. [104]

40.    The September 2021 Order noted that Forest Service, Water Control Board, and BLM responded during the 60-day review and approval period for the revised draft Plan. Forest Service and the Board stated that they lacked authority to approve the Plan. [105] Forest Service specifically deferred to the BLM and the Commission for approval. [106] BLM approved the Plan based on a determination that it would adequately address BLM's additional requirements in the 2016 Amendment Order for take-out facilities to be sited on BLM land. [107] American Whitewater does not provide support for its position that BLM's approval of the Plan based on the more specific requirements that BLM added to the 2016 Amendment Order— *e.g.*, that SMUD will conduct the environmental review for the site and install specific facilities [108] —is not a sufficient approval of the Plan under the more general requirements of Condition 50.1 in the 2014 License Order. We conclude that BLM's approval of the Plan satisfies both provisions.

41.    American Whitewater (as a sole entity) and California Outdoors did not provide a response within the 60-day review and approval period for the revised draft Plan. [109] The Commission explained in the September 2021 Order that because the parties reached an impasse over the alternate location at Rock Creek Powerhouse, SMUD filed the Parking and Access Plan with the Commission to "resolve the dispute" and "exercise its discretion about how to proceed by order." [110] Like Condition 50.1's recommended cooperation, the recommended approvals are similarly unenforceable. At most, the Commission can require the licensee to make a diligent, good faith effort to obtain approvals from other signatories to the settlement agreement.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



SMUD made this good faith effort. The settlement parties agreed that an additional take-out facility is necessary to facilitate whitewater recreation in the Slab Creek reach. The Forest Service endorsed this conclusion by filing Condition 50.1 with the Commission. But we find no indication that the Forest Service intended that the approval structure from the settlement, included only as a recommendation beyond Forest Service's jurisdiction, should allow a consulted party to prevent the development of the needed take-out facility even if the licensee had satisfied the other requirements in Condition 50.1. We are not persuaded by American Whitewater's interpretation.

42.    American Whitewater objects to the Commission's conclusion that, after the Commission's approval of the Plan, SMUD need only work with BLM, the Water Control Board, California Outdoors, and American Whitewater on the final project design, with no obligation to consult the entire Consultation Group. [111] In addition, American Whitewater claims that the Commission did not explain in the September 2021 Order how the design and construction phase of the Plan is different than "implementation" of the Plan as used in Condition 50.1's requirement that SMUD must "cooperate with" the relevant agencies and the entire Consultation Group to "prepare, implement, and update" the Plan. [112]

43.    We agree with American Whitewater that under Condition 50.1, SMUD must consult with the Consultation Group as SMUD prepares the final design plan for submission to BLM and the Water Control Board. [113] SMUD must provide a

p. 61,795<br>p. 61,796

draft final design plan to the Consultation Group for a minimum of 30 days to allow the Consultation Group to comment and to make recommendations. When SMUD files the final design plan with BLM and the Water Control Board, SMUD must include documentation of consultation with the Consultation Group. SMUD must include copies of their comments and recommendations. If SMUD does not accept a comment or recommendation, SMUD must include an explanation why. When SMUD later files a construction completion report with the Commission, pursuant to ordering paragraph (B) of the September 2021 Order, [114] SMUD must include the same documentation.

***The Commission orders***:

(A) In response to American Whitewater's October 25, 2021 request for rehearing, the September 2021 Order is hereby modified and set aside, in part, as discussed in the body of this order.

(B) SMUD must consult with the Consultation Group as SMUD prepares the final design plan for submission to BLM and the Water Control Board. SMUD must provide a draft final design plan to the Consultation Group for a minimum of 30 days to allow the Consultation Group to comment and to make recommendations. When SMUD files the final design plan with BLM and the Water Control Board, SMUD must include documentation of consultation with the Consultation Group. SMUD must include copies of their comments and recommendations. If SMUD does not accept a comment or recommendation, SMUD must include an explanation why. When SMUD later files a construction completion report with the Commission, pursuant to ordering paragraph (B) of the September 2021 Order, SMUD must include the same documentation.

---

**Footnotes**

1    *Sacramento Mun. Util. Dist*., 176 FERC ¶61,184 (2021) (September 2021 Order).

2    September 2021 Order, 176 FERC ¶61,184 at PP 32 - 42.

3    October 25, 2021 Request for Rehearing (American Whitewater Rehearing Request).

4    964 F.3d 1 (D.C. Cir. 2020) (en banc).

5    16 U.S.C. §825 *l*(a) ( "Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b), the Commission may at any time, upon reasonable notice and in such manner as it shall deem

© 2024 CCH Incorporated and its affiliates and licensors.    11    Sep 13, 2024 from VitalLaw®
All rights reserved.



proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter." ).

6    *Allegheny Def. Project*, 964 F.3d at 16-17. The Commission is not changing the outcome of the September 2021 Order. *See Smith Lake Improvement & Stakeholders Ass'n v. FERC* , 809 F.3d 55, 56-57 (D.C. Cir. 2015).

7    *Sacramento Mun. Util. Dist.*, 148 FERC ¶62,070 (2014) (License Order).

8    SMUD February 1, 2007 Filing, Relicensing Settlement Agreement at section 4.12.1 (Project No. 2101-084) (Relicensing Settlement Agreement). The agreement was signed by American Whitewater (as a sole entity), American River Recreation Association, BLM, California Parks and Recreation, California Fish and Wildlife, California Outdoors, California Sportfishing Protection Alliance, Camp Lotus, Foothill Conservancy, Forest Service, Friends of the River, U.S. Fish and Wildlife Service, U.S. Department of the Interior, National Park Service, Pacific Gas & Electric, Rich Platt, Hilde Schweitzer, Theresa Simsiman, and SMUD.

9    *E.g.*, Forest Service January 30, 2007 Preliminary Terms and Conditions at 3 (noting that Forest Service's preliminary terms and conditions are consistent with the settlement agreement); Forest Service June 11, 2008 Final Section 4(e) Terms and Conditions at 1 (same).

10   Forest Service June 11, 2008 Final Section 4(e) Terms and Conditions at 1-2. Section 4(e) requires that if project works are within a federal reservation, the Commission must include in the license all conditions that "the Secretary of the department under whose supervision such reservation falls shall deem necessary for the adequate protection and utilization of such reservation[.]" 16 U.S.C. §797(e). Section 10(a)(2)(B) requires that the Commission consider recommendations of federal and state agencies exercising administration over recreation and other relevant resources. 16 U.S.C. §803(a)(2)(B).

11   Forest Service June 11, 2008 Final Section 4(e) Terms and Conditions at 1-2.

12   *Id.*, app. B, Condition 50; *see* Relicensing Settlement Agreement at 1-72, (Article 1-24 Recreation Streamflows).

13   The Consultation Group consists of all parties to the Relicensing Settlement Agreement. *See supra* note 8. Per section 4.12.1 of the agreement, all parties to the agreement must be invited to participate in the Consultation Group; however, unless specifically provided otherwise under the project license, "the information and advice provided by the members of the Consultation Group are advisory only." Relicensing Settlement Agreement at section 4.12.1

14   License Order, 148 FERC ¶62,070, at app. B, Condition 50.1 (italics in original).

15   *Id.* at ordering para. (H), art. 401(a).

16   *Sacramento Mun. Util. Dist.*, 157 FERC ¶62,106, app. C, BLM Final 4(e) Terms and Conditions, Pt. II Specific Resource Condition No. 1 (2016) (Amendment Order) (emphasis added). In the Amendment Order, Commission staff approved an amendment to SMUD's license to, among other things, incorporate Specific Resource Condition 1.

17   September 2021 Order, 176 FERC ¶61,184 at P 45.

18   *Id.*

19   License Order, 148 FERC ¶62,070 at app. B, Condition 50.1 (emphasis in original).

20   September 2021 Order, 176 FERC ¶61,184 at P 8 (citing SMUD February 26, 2019 Filing, SMUD Response to Consultation Group Comments at 1); *id.* at P 28 (citing SMUD March 26, 2020 Filing at 8).

21   September 2021 Order, 176 FERC ¶61,184 at P 34.

22   American Whitewater Rehearing Request at 22

23   *Id.* at 23.

24   *Id.* at 25-26.

25   September 2021 Order, 176 FERC ¶61,184 at P 8 (citing SMUD February 26, 2019 Filing, attach., SMUD Response to Consultation Group Comments at 1); *id.* at P 28 (citing SMUD March 26, 2020 Filing at 8).

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

Sep 13, 2024 from VitalLaw®

26  SMUD February 26, 2019 Filing, attach., SMUD Response to Consultation Group Comments.

27  *Id*. at 1-3.

28  *Id*. at 2.

29  *Id*. at 2.

30  *Id*. at 2-3.

31  American Whitewater Rehearing Request at 23 (citing American Whitewater January 6, 2020 Motion to Intervene at 19-24).

32  *Id*.; American Whitewater January 6, 2020 Motion to Intervene at 20-21.

33  American Whitewater Rehearing Request at 23; American Whitewater January 6, 2020 Motion to Intervene at 21.

34  American Whitewater Rehearing Request at 23; American Whitewater January 6, 2020 Motion to Intervene at 21.

35  *See, e.g.*, *Halecrest Co.*, 60 FERC ¶61,121, at 61,413 (1992) (finding that the Federal Power Act does not confer the Commission with any jurisdiction or authority to resolve disputes between the licensee and third parties that concern interests in real property).

36  September 2021 Order, 176 FERC ¶61,184 at P 34.

37  SMUD February 26, 2019 Filing, attach. C at 3-5 (reproducing SMUD's responses to comments on the draft Plan); SMUD March 26, 2020 Filing, attach. C at 1-3 (timeline of activities associated with SMUD's development of the Plan).

38  September 2021 Order, 176 FERC ¶61,184 at P 8.

39  SMUD February 26, 2019 Filing, attach. C at 4; SMUD March 26, 2020 Filing at 3; *id*., attach. C at 1.

40  SMUD February 26, 2019 Filing, attach. C at 4; SMUD March 26, 2020 Filing at 3; *id*., attach. C at 2.

41  SMUD February 26, 2019 Filing, attach. C at 4-5; SMUD March 26, 2020 Filing at 3; *id*., attach. C at 2.

42  SMUD February 26, 2019 Filing, attach. C at 5; SMUD March 26, 2020 Filing at 3; *id*., attach. C at 2.

43  SMUD March 26, 2020 Filing, attach. C at 2.

44  September 2021 Order, 176 FERC ¶61,184 at P 39; License Order, 148 FERC ¶62,070 at app. B, Condition 50.1.

45  American Whitewater Rehearing Request at 23-24.

46  *Id*. at 24 (citing American Whitewater *et al*. Motion to Intervene at 23-24).

47  American Whitewater Rehearing Request at 24 (citing *Ga. Power Co.*, 176 FERC ¶62,152 (2021)).

48  American Whitewater also previously noted in its motion to intervene that the privately run Coloma Shuttle provides shuttle service for the nearby whitewater run at the Chili Bar Hydroelectric Project No. 2155 (Chili Bar Project). American Whitewater Motion to Intervene at 24. According to the website cited by American Whitewater, the Coloma Shuttle is funded by a county air quality management district and is operated by a non-profit organization, not by the licensee for the project. Coloma Shuttle, About, https://colomashuttle.com/about/ (last visited Nov. 29, 2021).

49  *Ga. Power Co.*, 176 FERC ¶62,152.

50  *United Water Conservation Dist.*, 124 FERC ¶62,193 at ordering para. (G), arts. 409, 410.

51  PacifiCorp, Whitewater Flow Release and Access Monitoring Plans, Project No. 2630-024, at 2-7 (filed Dec. 21, 2008).

52  PacifiCorp, Whitewater Feasibility Study - Final Summary Report and Recommendations, Project No. 2630-024, at 5-2 (filed June 6, 2012).

53  American Whitewater Rehearing Request at 33-34.

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

54   16 U.S.C. §825 *l*(a).

55   *Compare* September 2021 Order, 176 FERC ¶61,184 at PP 34, 39 (accepting SMUD's documentation of its good faith, unsuccessful effort to obtain property rights in the vicinity of White Rock Powerhouse) *with id*. P 36 (noting that PG&E and SMUD both expressed concerns about public safety at an alternative site downstream of the White Rock Powerhouse within the Chili Bar reservoir) (citing SMUD February 26, 2019 Filing at 7-8).

56   September 2021 Order, 176 FERC ¶61,184 at P 37 (citing SMUD March 26, 2020 Filing at 2).

57   American Whitewater Rehearing Request at 26-30.

58   September 2021 Order, 176 FERC ¶61,184 at ordering para. (C).

59   American Whitewater Rehearing Request at 26-27.

60   *Id*. at 28.

61   *Id*. (citing 18 C.F.R. §12.21(a)).

62   September 2021 Order, 176 FERC ¶61,184 at P 43.

63   *See, e.g*., *Pub. Util. Dist. No. 1 of Lewis Cty., Wash*., 168 FERC ¶61,164 at P 14 (2019) (explaining that the Commission had authority to ensure that a licensee maintained adequate public access to a take-out-site, regardless that two roads to the site were outside the project boundary).

64   American Whitewater Rehearing Request at 29.

65   *Id*.

66   September 2021 Order, 176 FERC ¶61,184 at P 35 (citing American Whitewater January 6, 2020 Motion to Intervene at 28-30). The September 2021 Order cited the same portions of American Whitewater's motion to intervene that American Whitewater now cites on rehearing.

67   *Id*.

68   *Id*. PP 12, 37.

69   American Whitewater Rehearing Request at 29-30.

70   *Id*. at 30.

71   September 2021 Order, 176 FERC ¶61,184 at P 37.

72   SMUD March 26, 2020 Filing at 5 and attach. E.

73   September 2021 Order, 176 FERC ¶61,184 at P 37.

74   *Id*. at P 45.

75   American Whitewater Rehearing Request at 31-33; September 2021 Order, 176 FERC ¶61,184 at P 33.

76   September 2021 Order, 176 FERC ¶61,184 at P 33 (citing SMUD March 26, 2020 Filing at 6).

77   American Whitewater Rehearing Request at 31-32.

78   *Id*. at 32.

79   September 2021 Order, 176 FERC ¶61,184 at P 33.

80   American Whitewater Rehearing Request at 32.

81   American Whitewater January 6, 2020 Motion to Intervene at 26.

82   American Whitewater Rehearing Request at 32 (quoting September 2021 Order, 176 FERC ¶61,184 at P 33).

83   *Id*. at 32-33 (citing Forest Service October 18, 2006 Filing, Enclosure 2, Rationale Report for Comprehensive Resource Agency/NGO Alternative at 248-254 (Forest Service 2006 Rationale Report)).

84   September 2021 Order, 176 FERC ¶61,184 at P 33 (citing Commission Staff March 14, 2008 Final Environmental Impact Statement at 5-35).

85   *Id*. (citing Commission Staff March 14, 2008 Final Environmental Impact Statement at 5-35).

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.

 Wolters Kluwer

86  Forest Service 2006 Rationale Report at 248, 249, 250; *cf*. Forest Service January 30, 2007 Filing, Enclosure 2, Rationale Report for Relicensing Settlement Agreement at 244-245 (same).

87  Forest Service June 11, 2008 Final Section 4(e) Terms and Conditions at 1-2.

88  License Order, 148 FERC ¶62,070 at P 77.

89  *Id*., app. B, Condition 50.1 (italics in original).

90  16 U.S.C. §803(a)(2)(B).

91  *E.g., Avista Corp.*, 93 FERC ¶61,116, at 61,328 - 29 (2000) (explaining that although the Commission strongly encourages settlements in hydropower licensing proceedings, "the Commission can enforce only those matters that fall within its jurisdiction. For licensed projects, the Commission's authority extends only over the licensee."); *id*. at 61,329 ( "The enforceability issue has primarily arisen with respect to settlement provisions calling for various types of consultation and first- round dispute resolution among the signatory parties.").

92  *Id*. at 61,239.

93  American Whitewater Rehearing Request at 34-35.

94  American Whitewater does not provide a citation.

95  American Whitewater Rehearing Request at 35.

96  *Id*.

97  *Id*.

98  American Whitewater Rehearing Request at 37 (citing American Whitewater Motion to Intervene at 26-27).

99  *Id*. at 35.

100  September 2021 Order, 176 FERC ¶61,184 at P 20.

101  *Id*.

102  *Id*. at P 41.

103  License Order, 148 FERC ¶62,070 at app. B, Condition 50.1.

104  American Whitewater Rehearing Request at 37.

105  September 2021 Order, 176 FERC ¶61,184 at PP 21 - 22.

106  *Id*. at P 21; SMUD March 26, 2020 Filing, attach. E (reproducing an email dated November 16, 2018, from Forest Service employee Katy Parr to SMUD employee Darold Perry) ( "As this site falls well outside of the Forest Service jurisdiction, the Forest Service will defer to the BLM and Commission for 4(e) Condition approval.").

107  September 2021 Order, 176 FERC ¶61,184 at PP 23, 41.

108  In relevant part, BLM's 4(e) Specific Resource Condition 1 in the Amendment Order requires that "the Licensee shall fund and conduct the NEPA analysis, and construct and maintain the boating takeout(s) within three years. The take- out needs to include vehicular access, parking, onsite water gage sign, and a Kiosk sign that is acceptable and approved by BLM. Funding provided from SMUD will be required to pay for BLM involvement in managing this activity if the takeout occurs on BLM land." Amendment Order, 157 FERC ¶62,106, app. C, BLM Final 4(e) Terms and Conditions, Pt. II Specific Resource Condition No. 1.

109  September 2021 Order, 176 FERC ¶61,184 at P 24.

110  *Id*. at P 41.

111  American Whitewater Rehearing Request at 38 (citing September 2021 Order, 176 FERC ¶61,184 at P 43).

112  *Id*.

113  SMUD is not required to consult with the Forest Service because it has already disclaimed jurisdiction over the site at Rock Creek Powerhouse. SMUD has already committed in the Plan to work with BLM, the Water Control Board, California Outdoors, and American Whitewater on the final Project design. SMUD February 26,

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.



2019 Filing, Plan at 5. Both BLM and the Water Control Board will review and approve or deny SMUD's final project design prior to implementation. *Id*.

114    September 2021 Order, 176 FERC ¶61,184 at ordering para. (B).

© 2024 CCH Incorporated and its affiliates and licensors. All rights reserved.